**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE iANTHUS CAPITAL HOLDINGS, INC. SECURITIES LITIGATION | No.: 1:20-cv-03135-LAK<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| THIS DOCUMENT RELATES TO: SECURITIES CLASS ACTION (CASE Nos: 1:20-cv-03135 AND 1:20-cv-03513) | |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION AND VENUE .........................................................................6

III.  PARTIES .............................................................................................................7

IV.   SUBSTANTIVE ALLEGATIONS .....................................................................8

    A.    iAnthus's History .....................................................................................8

    B.    iAnthus's Financing During The Class Period .........................................9

    C.    iAnthus Took on Debt Under False Pretenses .......................................14

    D.    iAnthus Conducted Its Financing for Ford's Personal Benefit .............19

    E.    iAnthus's Conflicted Financing Led to Its Defaulting on its Loan Obligations and Restructuring the Company in Favor of Its Lenders ...............................................23

    F.    iAnthus Failed to Fund the Escrow Account That it Agreed to With GGP ...........31

    G.    Defendants' Additional Acts of Self-Dealing ........................................32

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ....................................................................37

    A.    Statements in Connection With the May 14, 2018 GGP Financing ...................37

    B.    Statements in iAnthus's Release of Its Results for the First Quarter of 2018 .......41

    C.    Statements in iAnthus's Release of Its Results for the Second Quarter of 2018...42

    D.    Statements in iAnthus's Release of Its Results for the Third Quarter of 2018......44

    E.    Ford's February 7, 2019 Interview .........................................................45

    F.    Statements in Connection With the Company's March 2019 Debentures ...........46

    G.    Statements in iAnthus's 2018 Annual Filings .......................................47

    H.    Statements in iAnthus's Release of Its Results for the First Quarter of 2019 .......49

    I.    Statements in iAnthus's Release of Its Results for the Second Quarter of 2019...50

    J.    Statements in Connection With the September 2019 GGP Financing ................51

    K.    Statements in iAnthus's Release of Its Results for the Third Quarter of 2019......55

    L.    Statements in Connection With the December 2019 GGP Financing ................58

    M.    Corporate Governance Statements .........................................................59

    N.    Statements in GGP's Required Disclosures ...........................................60

VI.   THE TRUTH BEGINS TO EMERGE ............................................................62

VII.  ADDITIONAL SCIENTER ALLEGATIONS ................................................70

VIII. NO SAFE HARBOR ........................................................................................75

IX.   CLASS ACTION ALLEGATIONS .................................................................75

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS ..................................................77

XI.     COUNT I ........................................................................................................................78

XII.    COUNT II .......................................................................................................................81

XIII.   PRAYER FOR RELIEF ................................................................................................83

XIV.    DEMAND FOR TRIAL BY JURY ...............................................................................83

Lead Plaintiff Jose Antonio Silva ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, filings with Canadian securities regulators, wire and press releases published by and regarding iAnthus Capital Holdings, Inc. ("iAnthus" or the "Company"), analysts' reports and advisories about the Company, interviews of confidential witnesses, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I.      <u>INTRODUCTION</u>

1.      This federal securities class action arises out of Defendants' false and misleading statements concerning iAnthus's financing arrangements from May 2018 through the planned restructuring that it announced in July 2020. Plaintiff brings this action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired iAnthus securities between May 14, 2018 and July 10, 2020, both dates inclusive (the "Class Period").

2.      iAnthus describes itself as providing "Shareholders with diversified exposure to best-in-class licensed cannabis cultivators, processors and dispensaries throughout the United States." At the start of the Class Period, iAnthus had operations in just four states and was entirely dependent on raising new capital through debt and equity issuances to fund its expansion through the acquisition of other companies and building out its operations. iAnthus's entire

---

[1] Emphases in this Consolidated Amended Class Action Complaint are added unless otherwise noted. Dollar values are provided in U.S. dollars unless otherwise noted.

business model was therefore dependent on its raising capital without taking on onerous debt or diluting its shareholders more than necessary.

3.  iAnthus raised approximately $166 million during the Class Period from several lenders, including $106 million from a cannabis investor called Gotham Green Partners ("GGP").Investors depended on iAnthus obtaining this financing in way that supported the Company's stated business plan. Instead, iAnthus engaged in these financing activities for the personal financial benefit of iAnthus's co-founder and CEO, Hadley Ford. When this scheme came to a head because iAnthus defaulted on its sizable debt obligations in March 2020, it was finally revealed that Ford received hundreds of thousands of dollars in personal payments from both GGP and the broker that arranged for iAnthus's other $60 million in debt financing during the Class Period. A Special Committee that iAnthus appointed confirmed that Ford received $100,000 from Defendant Jason Adler, GGP's Managing Member, and an additional $60,000 from the broker that arranged iAnthus's loans from other lenders during the Class Period. All of the $166 million that iAnthus raised during the Class Period was therefore tainted by Ford's self-dealing. Ford was fired immediately after the Special Committee revealed his misconduct.

4.  Defendants made several false and misleading statements about iAnthus's financing arrangements during the Class Period. *First*, iAnthus purported to disclose "Related Party Transactions" or other conflicts of interest. The Company even specifically described certain related-party transactions that Ford was involved in, but omitted the large personal payments that he received in connection with iAnthus's loans.

5.  *Second*, iAnthus described GGP as a long-term investor whose interests were aligned with those of iAnthus's shareholders. These statements were false because GGP was actually positioning itself to take over the Company at a moment of weakness. Defendants even

2

falsely portrayed GGP's initial round of funding in May 2018 as containing a $10 million equity investment. But GGP did not undertake the risk of that investment because iAnthus secretly agreed to pay GGP a corresponding $10 million "exit fee" if the Company did not repay GGP's $40 million loan in full. iAnthus did not disclose this exit fee until after the Class Period, when the Company belatedly disclosed its results for the fourth quarter of 2019 on July 31, 2020. Defendants also falsely promoted iAnthus's $166 million in financing from GGP and other lenders as supporting the Company's business plan and being in shareholders' best interests, when those transactions were corrupted by Ford's self-dealing.

6. **Third**, iAnthus told investors that it had adequate financing available to meet its financial obligations. This was false because iAnthus defaulted on $4.4 million in interest payments due on March 31, 2020 when it was unable to raise funds that iAnthus had told shareholders it was "certain" that GGP would provide and that the Company could also obtain from other sources.

7. **Fourth**, iAnthus misrepresented that it had committed to putting $5.3 million in an escrow account to guarantee its interest payments to GGP. These funds were not available when iAnthus's interest payments came due.

8. Ford's self-interested behavior runs even deeper than the incidents that the Board was able to confirm. For example, the person that initially revealed his conflicts of interest also disclosed that Ford's $100,000 "loan" from Adler in December 2019 was only the most recent in a string of personal payments that Adler made to Ford. Similarly, Ford owed David Rozinov—the broker for iAnthus's non-GGP loans—not just $60,000, but $300,000.

9. Ford also acted for his own financial gain, to the detriment of iAnthus's shareholders, in several other ways. In March 2020, when iAnthus was considering whether to

default on its burdensome debt obligations that it took on as a result of Ford's conflicts of interest, he proposed to lead a buyout that would pay shareholders just $0.50 per share—a fraction of the Company's stock price of $3.69 per share at the beginning of the Class Period. Ford thus sought to profit from his having decimated iAnthus's value. Ford also received $1.48 million in net proceeds from sales of iAnthus stock during the Class Period at prices ranging from $5 to $1.25 per share, far-higher prices than the Company's diminished share price at the end of the Class Period.

10.   Ford's egregious conflicts of interest were shocking in and of themselves. iAnthus's stock fell 62% just on April 6, 2020, the day that the Company announced the Special Committee's investigation into allegations of Ford's conflicts of interest. But Ford's financial improprieties also harmed the Company even further because they tainted all of the $166 million in financing that iAnthus obtained from GGP and other lenders during the Class Period.

11.   On July 13, 2020, iAnthus announced that it reached a restructuring agreement with GGP and 91% of its unsecured lenders that will result in these lenders taking over the Company from iAnthus's shareholders while reducing the $97.5 million in principal that GGP lent to iAnthus during the Class Period by just $7.5 million.[2] GGP was able to obtain such a favorable restructuring deal because of the aspects of its relationship with iAnthus that Defendants misrepresented, including its undisclosed $10 million "exit fee." iAnthus gave GGP such favorable terms in their financing deals because Ford is so beholden to Adler that he (Ford) acted in GGP's interests at the direct expense of iAnthus's shareholders. Former iAnthus employees bolster this conclusion with their observations that iAnthus's loans from GGP did not

---

[2] $1.358 million was added to the $96.15 million that GGP lent iAnthus between May 2018 and December 2019, when GGP waived an interest payment it was owed in September 2019 in exchange for that amount being added to iAnthus's principal balance.

make financial sense and that Ford and Adler were good friends who met regularly for dinner outside the office.

12.     iAnthus's financing arrangements that Ford entered into while accepting secret payments for his own personal gain led to iAnthus's default on its debt obligations and planned restructuring in several ways. First, if not for Ford's conflicts of interest, iAnthus would not have entered into its $166 million in financing from GGP and other lenders that put iAnthus in such a precarious financial position. At the very least, iAnthus would have obtained more favorable terms for that financing if Ford was not receiving personal payments when making those deals.

13.     Second, when iAnthus entered into a $100 million financing plan with GGP on September 30, 2019, Ford assured investors that "I don't lose any sleep about the availability of money from Gotham. . . . I do know them personally, they never say something unless they can deliver it and I have full confidence that, if we do need to capital, that it will be there." However, following this assurance, GGP failed to provide the last $30 million from its portion of that financing plan. iAnthus's inability to obtain those funds caused the Company to default on its debt and allowed GGP to enforce its secured interest in iAnthus's assets. Giving GGP that priority interest under the burdensome constraints of GGP's senior secured notes made the Company extremely vulnerable to GGP's predation. By misstating the true nature of iAnthus's relationship with GGP, Defendants misrepresented the risk that GGP would take advantage of its position and take over the Company for far below its value.

14.     Third, iAnthus could have sold assets in order to avoid defaulting on its debt to GGP. iAnthus told investors previously that it could take such steps and Ford even proposed in his buyout offer raising $61 million—far more than the $4.4 million in interest that iAnthus owed—by selling certain assets. Ford declared when announcing iAnthus's default that its

"business has never been stronger." He decided to default on iAnthus's debt obligations "to maintain the inherent value of our business operations," even though doing so allowed GGP to take over the Company and wipe out iAnthus's shareholders. Ford acted in GGP's interests rather than the Company's shareholders. *EquityGuru*, which analyzes the cannabis industry, observed in an April 6, 2020 article that iAnthus "wouldn't have defaulted on that interest payment without Gotham giving them a quiet go ahead and, . . . it's my thinking that GGP and IAN are happy little friends on the quiet." This article concluded that "iAnthus and Gotham Green are so close" because of the personal payments that Adler gave to Ford.

15.     Defendants' fraud has obliterated shareholder value. In addition to falling 62% just on April 6, 2020—the day that iAnthus announced the Special Committee investigation into Ford's conflicts of interest—iAnthus's stock has fallen from a market capitalization of approximately $780 million on March 18, 2019, when iAnthus's stock traded at a price of $5.70 per share, to just $17 million (at the meager price of $0.10 per share) on July 13, 2020, when iAnthus announced its restructuring plan that stands to wipe out the Company's shareholders.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The Company's principal executive offices are located in this Judicial District. In addition, both the Company and GGP conduct substantial business in this Judicial District and many of the acts and transactions alleged herein

occurred in this Judicial District.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate phone communications, and the facilities of a national securities exchange.

### III.    PARTIES

20.     Plaintiff Jose Antonio Silva, as set forth in his Certification filed with the Court, acquired iAnthus securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures and the materialization of undisclosed risks regarding iAnthus's business, as alleged herein. (Plaintiff's Certification at ECF No. 34-3).

21.     Defendant iAnthus is incorporated in Canada, with its registered office located at Suite 1500, 1055 West Georgia Street, Vancouver, British Columbia, Canada, V6E 4N7, and its principal executive offices at 505 Fifth Avenue, 23rd Floor, New York, NY 10017. The Company's common shares are listed on the Canadian Securities Exchange ("CSE") under the trading symbol "IAN," and trade in the United States over-the-counter market on the OTCQX, part of the OTC Markets Group, under the trading symbol "ITHUF." iAnthus told investors that its stock was listed on both the CSE and OTCQX (or OTCQB earlier in the Class Period).

22.     Defendant Hadley C. Ford ("Ford") is the co-founder of the Company and served as its Chief Executive Officer and as a Director until he was forced to resign from those positions on April 27, 2020, because of his self-dealing, as described further below.

23.     Defendant Julius John Kalcevich ("Kalcevich") has served at all relevant times as the Chief Financial Officer of iAnthus. He also served as a Director of the Company until December 5, 2019.

24.     Defendant GGP is a private equity firm that focuses on deploying capital into cannabis and cannabis-related enterprises. GGP maintains its primary offices at 1437 4th Street,

Suite 200, Santa Monica, CA 90401.

25.     Defendant Jason Adler ("Adler") has served at all relevant times as the Managing Member of GGP.

26.     Defendants Ford, Kalcevich and Adler are sometimes referred to herein collectively as the "Individual Defendants."

27.     Defendants iAnthus, Ford, and Kalcevich are sometimes referred to herein collectively as the "iAnthus Defendants."

28.     Defendants GGP and Adler are sometimes referred to herein collectively as the "GGP Defendants."

29.     The Individual Defendants, iAnthus, and GGP are sometimes referred to herein collectively as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     iAnthus's History

30.     iAnthus represents that "[t]hrough its wholly-owned subsidiaries, the Company's principal business activity is to provide Shareholders with diversified exposure to best-in-class licensed cannabis cultivators, processors and dispensaries throughout the United States" by "acquir[ing] and operat[ing] a diversified portfolio of cannabis licenses and investments."

31.     Defendant Ford founded iAnthus with Randy Maslow in November 2013. On September 7, 2016, the Company went public following a reverse merger with iAnthus Capital Management, LLC. Ford and Maslow founded iAnthus "to capitalize on the rapidly growing U.S. regulated cannabis (marijuana) market and the unique opportunity that exists for providing capital investment and expert management services ('value-added capital') to licensed cultivators, product manufacturers and dispensaries."

32.     iAnthus's business model involves acquiring licensed cannabis cultivation and

dispensary facilities across the United States, where such operations are licensed at the state level. As of March 31, 2018, the end of the first quarter of 2018 and just before the start of the Class Period, iAnthus had operations in New York, Massachusetts, Vermont, and Florida.

33.     At that time, iAnthus had approximately $21 million in current assets and $34 million in current liabilities, and was losing money on its current operations. It was therefore entirely dependent on raising capital through debt and equity issuances to fund its strategy of expansion through the acquisition of other cannabis companies throughout the country.

**B.     iAnthus's Financing During The Class Period**

34.     iAnthus's main source of financing during the Class Period came from secured debt that it borrowed from GGP at the very high interest rate of 13%. iAnthus told investors that GGP was not only providing secured debt, but was also an equity investor that was aligned with the interests of ordinary shareholders. iAnthus borrowed $96 million from GGP during the Class Period, which accounted for over 60% of iAnthus's total debt during that time. Borrowing so much from GGP on a secured basis put the Company in a very precarious position because it gave GGP a priority claim on all of iAnthus's assets. The Company's shareholders trusted Defendants' assurances that iAnthus entered into these transactions without any conflicts of interest and with the best interests of the Company's shareholders in mind. iAnthus's shareholders were therefore shocked to learn at the end of the Class Period that Ford engaged in egregious self-dealing with GGP.

35.     The only other debt that iAnthus incurred during the Class Period was also tainted by Ford's self-dealing. iAnthus raised $60 million in unsecured financing in March and May 2019. As with the GGP financing, Ford received secret personal payments in connection with this financing. This self-dealing made iAnthus even further indebted to its lenders and set the Company up for failure because iAnthus took on these substantial debt obligations for Ford's

personal financial benefit instead of the Company's financial needs.

       1.    *The GGP Financing*

36.    On May 14, 2018, iAnthus raised $50 million in financing from GGP, including 1 - $40 million from high yield senior secured notes with 13% interest that matured three years from issuance and 2 - $10 million from the issuance of approximately 3.89 million shares (at a price of $2.57 per share). While the financing was for $50 million, iAnthus received only $46 million from the transaction, after deducting fees and structuring costs. The Company stated that the net proceeds from the transaction would "be allocated to continued cultivation and dispensary build-outs in the Company's key markets of New York and Florida, repayment of $20.0 million of unsecured debentures issued in January 2018, with the remainder to be utilized for potential expansion activities consistent with the Company's strategic objectives."

37.    iAnthus's press release announcing this deal described GGP as "a New York-based private equity firm focused on deploying capital into cannabis and cannabis-related enterprises on a global scale. The firm manages a diversified portfolio of investments and is actively investing across the cannabis value chain."

38.    When announcing this deal, Ford stated that "Gotham Green Partners is well recognized as a long-term investor and leader within the cannabis investment community, and we are excited to partner with GGP to create value for our shareholders." GGP similarly described iAnthus as providing "a compelling growth and investment opportunity." In addition, Kalcevich announced that "Jason [Adler] and the GGP team have demonstrated the ability to help portfolio companies accelerate geographic expansion and operational efficiencies to create meaningful value for investors."

39.    Defendants thus portrayed GGP as making an investment in the Company with a long-term interest that was aligned with the Company's shareholders. This message was bolstered by GGP purchasing $10 million of iAnthus stock in addition to its lending $40 million

in secured debt. Defendants, however, did not disclose that this transaction included an "exit fee" whereby iAnthus would pay GGP $10 million, plus 13% interest, if the Company did not repay the entire $40 million in secured debt plus interest no later than five days prior to its maturity in May 2021. Upon payment of the "exit fee," GGP is required to return the approximately 3.9 million shares that it was issued under the $10 million "equity financing that closed concurrently with the secured notes issued in May 2018." This provision shows that the "exit fee" is intended to protect GGP's $10 million equity investment. iAnthus did not reveal this "exit fee" until it belatedly disclosed its financial results for the fourth quarter of 2019 on July 31, 2020. Then, when iAnthus disclosed its results for the first quarter of 2020, on August 14, 2020, it revealed that as of March 31, 2020, iAnthus actually owed $12.5 million for the "exit fee," because the fee started to accrue its 13% interest as far back as September 30, 2019.[3]

40.     This "exit fee" enabled Defendants to portray GGP as taking a significant equity stake in iAnthus while secretly having that stake not only protected entirely in the event of default on its secured debt, but also being a source of further profit because of the 13% interest that the fee accrues.

41.     By the end of 2018, iAnthus's $40 million high yield secured loan from GGP was the Company's only outstanding debt. On September 30, 2019, iAnthus announced that it borrowed an additional $20 million from GGP on the same terms as the prior financing (including 13% interest on secured notes that matured on May 14, 2021). iAnthus explained that this new round of funding was "part of a broader $100.0 million financing plan to support the buildout of all existing markets in which the Company currently operates."

---

[3] Interest began to accrue on the "exit fee" as of September 30, 2019, because GGP waived $1.358 million in interest that was due at that time, in exchange for adding that interest payment to the principal balance of its debt.

42.     The note purchase agreement for this new round of funding with GGP in September 2019 also gave GGP the right to purchase additional notes of up to $66.5 million on the same terms as the notes that were issued in the prior rounds of financing. iAnthus also announced that it "may obtain an additional $13.5 million from potential financing sources, including GGP or others, to fulfill its $100.0 million plan, with any such additional financing subject to the negotiation of pricing, terms and conditions in the context of the market."

43.     On December 20, 2019, iAnthus announced an additional $36.15 million in financing from GGP under the same terms as the prior rounds, as part of the $100 million financing plan. iAnthus stated that at this point, including GGP's original $50 million in financing from May 20, 2018 and $20 million from September 30, 2019, "GGP has led investments totaling over $106 million into iAnthus."[4]

2.      *iAnthus's Additional Financing During the Class Period*

44.     In 2019, iAnthus also obtained an additional $60 million in financing from lenders other than GGP. On March 18, 2019, iAnthus announced that it issued $35 million of 8% unsecured convertible debentures that would mature on March 15, 2023, to several parties. iAnthus "agreed to pay a finder fee to one party, of US$1.2 million, of which 50% is payable in cash and 50% is payable through the issuance of 116,600 Common Shares."

45.     On May 2, 2019, iAnthus announced that it issued an additional $25.0 million of

---

[4] While iAnthus referred to this $36.15 million as coming from GGP and "additional co-investors," iAnthus did not disclose who those other investors are or any relationship they might have to GGP. At the very least, GGP directly provided approximately $78.5 of the $106 million total that iAnthus announced (including the entirety of the first $66 million in secured debt and $10 million in equity from May 2018 and September 2019) and led the entire financing plan. GGP disclosed in its Required Disclosure By An Eligible Institutional Investor, which it filed with the CSE on July 20, 2020, that the funds that it controls owned approximately $78.5 of the $97.5 million outstanding principal balance of the secured notes. GGP also had an even larger interest in the secured notes because it disclosed in this filing that it "will receive from one of the Secured Lenders"—which GGP did not name—"a portion of the gross profit received by such Secured Lender as a result of its investment."

unsecured convertible notes "as an add-on to the private placement offering of US$35 million convertible note units announced on March 18." iAnthus "agreed to pay finders and structuring fees of US$0.4M in connection with the transaction, a portion of which the Company [stated it] will satisfy through the issuance of 15,548 Common Shares."

46.     An entity called Hi-Med LLC purchased $5 million of the $35 million in unsecured notes that iAnthus issued in March 2019. Hi-Med, which has filed a separate action in this Court against iAnthus, revealed that an entity called Oasis Investments II Master Fund Ltd. ("Oasis") purchased the remaining $55 million of unsecured debt that iAnthus issued in March and May 2019.[5]

47.     In total, iAnthus obtained approximately $156 million in debt financing during the Class Period, including the $96 million in secured debt that it borrowed from GGP and the $60 million in unsecured debt that it borrowed in March and May 2019 from Oasis and Hi-Med.

48.     iAnthus also raised capital during the Class Period by issuing stock that diluted its current shareholders. On October 10, 2018, iAnthus closed an offering of approximately 5.19 million common shares for total proceeds of $26.6 million.

   *3.     iAnthus Used Its Funding to Expand its Operations*

49.     On October 18, 2018, iAnthus announced an agreement to purchase MPX Bioceutical Corporation ("MPX"), another cannabis company, in an all-stock transaction valued at $835 million.

50.     iAnthus funded this transaction primarily by issuing new stock, further diluting its

---

[5] Hi-Med's action was filed as *HI-MED LLC v. iAnthus Capital Holds., Inc.*, No. 1:20-cv-3898-LAK (S.D.N.Y.), and is being pursued in coordination with this action. In addition, iAnthus disclosed when it filed its Material Change Report for the March 2019 offering, that "until April 26, 2019, one of the noteholders shall have the right to purchase up to an additional US$25 million aggregate principal amount of Notes and corresponding Warrants." This shows that the same investor participated in both of iAnthus's issuances of unsecured notes in 2019.

current shareholders. iAnthus announced that the new combined company would "encompass operations and cannabis licenses in 10 states that will permit iAnthus to operate 56 retail locations and 14 cultivation/processing facilities. As a result of the transaction, iAnthus will add retail and/or production capabilities in Arizona, Maryland, Nevada, California and Massachusetts. These additional licenses complement iAnthus' existing assets in New York, Florida, Massachusetts, Vermont, Colorado, and New Mexico, forming super-regional footprints in both the eastern and western United States." When the MPX deal closed on February 5, 2019, iAnthus announced that this acquisition nearly doubled the size of its footprint in the United States and that its "Multistate Operations Expands [From 6] to 11 States Forming Super-Regional Footprints."

51.     iAnthus then made another significant acquisition after the MPX transaction when it acquired a company called CBD for Life on June 28, 2019, for $10.4 million. The Company again financed this acquisition primarily by further diluting current shareholders through the issuance of approximately 2.45 million common shares.

52.     While iAnthus funded its acquisitions of MPX and CBD For Life primarily with new stock issuances, it used the debt that it raised during the Class Period to continue to expand the operations that it owned across the country. During 2019, iAnthus spent approximately $49 million on its "continued build out of [its other] existing and acquired operations. During the year, 19 dispensaries came online and an additional 300,000 sq. ft. of cultivation and processing was built out."

C.     **iAnthus Took on Debt Under False Pretenses**

53.     iAnthus explained that it expanded rapidly during the Class Period through "the Company's fourth quarter 2017 acquisitions of Mayflower and Pilgrim, first quarter 2018 acquisitions of Citiva and GrowHealthy, and the . . . acquisitions of MPX and CBD For Life in the first and second quarters of 2019, respectively." But iAnthus funded this expansion with debt

14

that it raised under false pretenses. iAnthus's raising $156 million in debt during the Class Period made the Company heavily indebted to GGP and its unsecured lenders. iAnthus also heavily diluted the stakes of its ordinary shareholders by issuing hundreds of millions of dollars' worth of stock that it used to fund its acquisitions—including its $835 million purchase of MPX. These steps gave iAnthus many assets that GGP and the Company's other lenders could seize if the Company were to default on $156 million in debt that the Company owed them.

54.    As of April 29, 2018—just before iAnthus announced its first funding round with GGP at the start of the Class Period in May 2018—iAnthus had approximately 59 million common shares issued and outstanding and 79 million shares on a fully diluted basis (after accounting for shares that could be issued pursuant to various warrants, options, and convertible notes). By July 31, 2020, the Company had approximately 172 million common shares issued and outstanding, and 294 million shares on a fully diluted basis. iAnthus thus decreased its shareholders' stake in the Company by three times what it was at the start of the Class Period, all in pursuit of the Company's purported growth strategy.

55.    iAnthus misrepresented the nature of its financing that formed the foundation for its expansion strategy. The fact that GGP received secured debt—giving it a priority claim on the Company's valuable assets—at the exorbitant rate of 13% (or 16% in the event of default), while also receiving an undisclosed $10 million "exit fee," highlights how unfavorable this financing was for iAnthus. In comparison, Oasis and Hi-Med received unsecured debt—putting them in lower priority as compared to GGP—at a lower interest rate than GGP received.

56.    iAnthus's shareholders also did not know the true nature of iAnthus's and Ford's relationship with GGP and Ford's other acts of self-dealing. Investors thus incorrectly trusted Defendants' representations that iAnthus engaged in these transactions because GGP was a

reputable investor whose interests were aligned with those of shareholders.

57.     Analysts bought into Defendants' positive portrayal of the GGP financing. (*See supra* ¶¶ 36-39). In a May 14, 2018 note, Canaccord Genuity described GGP's funding as a $50 million "investment from Gotham Green Partners, a New York private equity firm focused on building out a portfolio of cannabis related assets." Canaccord concluded that "iAnthus shores up its balance sheet with US$50M investment to fund growth initiatives."

58.     Similarly, in a May 15, 2018 note, Cormark Securities Inc. stated that "iAnthus announced a $50 MM investment from New York-based, cannabis private equity investor Gotham Green Partners." Cormark determined that "[w]e continue to like iAnthus for its US focused strategy, high-quality leadership, and growth outlook. We also highlight that with Gotham Green, iAnthus gains a strategic partner deeply rooted in the US cannabis sector, which we believe may offer additional benefits for the company. We reiterate our Buy (S) rating."

59.     Defendants then continued to portray GGP as making a substantial equity investment in the Company. When GGP bought an additional $20 million in secured notes on September 30, 2019, as part of a broader $100 million financing plan, iAnthus held a special conference call during which Ford described GGP as "the preeminent investor in the cannabis sector. They have been investors in all parts of the value chain." He said that the $100 million financing plan "will allow us to build out everything we have on the plate today and achieve operating cash flow generation in 2020."

60.     Analysts again trusted iAnthus that GGP was acting with the same interests as shareholders. *EquityGuru*, which specializes in covering the cannabis industry, noted on October 2, 2019, that Ford's statements on the Company's September 30 conference call conveyed that "Gotham Green Partners' $100M investment guarantees the build-out" that iAnthus planned.

61.     Beacon Securities Limited wrote in a September 30, 2019 note titled "Gotham Green Steps Up" that iAnthus stated that the planned $100 million in financing "would be enough to finance its current growth projects." Beacon also observed that "GGP is already a major investor in IAN, including a $50M investment in high yield notes and units [*i.e.*, stock] made in May 2018. We therefore expect IAN to close on the remaining $66.5M within approximately 45 days, given both sides know each other well." Beacon "**view[ed] the follow on investment by an existing major shareholder as very favourable**." (Emphasis in original).

62.     iAnthus continued to explain its funding from GGP in similar terms on the Company's earnings call of the third quarter of 2019, held on November 21, 2019. Ford stated that "[f]ortunately, in this tough financing market we are fully financed. We are being prudent with our capital, we are generating cash in our operations, and we need the majority of our Gotham money, not for operations, but for additional major growth in our key markets."

63.     Kalcevich then explained on this call that "[o]n September 30, we announced the $100 million financing plan with Gotham Green Partners. To date, we've received $20 million and we anticipate closing tranche two in December and the final tranche shortly thereafter."

64.     An analyst on the call asked about investor concerns with iAnthus "actually obtaining" the full $100 million in financing that it announced as part of its financing plan with GGP. This analyst noted that "people are wondering, if GGP and other capital suppliers are going to have to -- if they're going to actually follow through on making all these funds available." Ford responded by reassuring investors:

> I don't lose any sleep about the availability of money from Gotham. It's the reason we picked them as our partner a year and a half ago, been tremendously supportive, and have always followed through on everything they've always said they're going to do. I can't speak to their structure and internal dynamic, but I do know them personally, they never say something unless they can deliver it and I have full confidence that, if we do need [the] capital, that it will be there.

65.     Kalcevich also explained on this November 21, 2019, call that in addition to its funding from GGP, iAnthus could conduct a sale leaseback to raise further capital because "I think anything's available. One of the things we love [about] working [] with Gotham is, we're a big equity play for them, it's structured as a senior secured piece of debt, but they're not in for the lending returns. So anything that can effectively lower cost of capital or allow us access to capital, build something out there and enhance shareholder returns, they are in favor of. So there is nothing off the table from a corporate finance perspective. . . . It's something that we have -- some of the arrows we have in the quiver, and we look at that, just like we look at any type of fundraising to continue to drive shareholder value."[6]

66.     In addition, Ford reassured investors by stating on this call that iAnthus was "cash generative in our operations. We're covering expenses, we're covering maintenance CapEx. The vast bulk of that money from Gotham is for growth initiatives. So the viability of our company is fine, it's really the growth aspects of it and we'd like to be in that position."

67.     Analysts determined that the new financing plan with GGP meant that iAnthus was sufficiently capitalized. Canaccord wrote in a November 21, 2019 note that because iAnthus ended the third quarter of 2019 with approximately $28 million of cash on hand and access to an additional $67 million from Gotham, Canaccord had "comfort that iAnthus is now funded for its current expansion initiatives as the company inches closer towards profitability."

68.     Beacon Securities Limited was also reassured, in its November 22, 2019 note, that

_____

[6] Similarly, Kalcevich stated on iAnthus's earnings call for the second quarter of 2019 (held on August 27, 2019), that the Company's "total assets amounted to $110 million," including "[o]ur fixed asset and real estate space [that] also is at approximately $106 million, which we believe is beneficial as we continue to seek out and explore non-dilutive financing sources to fund our expansion plans and preserve shareholder value."

"**Management Expressed Confidence that $100M Financing Package will be Fulfilled.**" Beacon explained that "[o]ur model already assumes that the company closes on the remaining $80M of the financing package in Q4/19. Management indicated it is open to a number of additional financing alternatives," including sale/leaseback transactions.

69.     Defendants, however, misled investors by misrepresenting the true nature of iAnthus's—and Ford's—relationship with GGP and its other lenders.

D.     **iAnthus Conducted Its Financing for Ford's Personal Benefit**

70.     On April 6, 2020, iAnthus announced that it had "not been able to secure a further round of financing since December 20, 2019, whether as part of the larger financing plan previously announced on September 30, 2019 or from other sources." It therefore did not pay the $4.4 million in interest that it owed to GGP and its unsecured lenders on March 31, 2020. This constituted an event of default under the secured notes with GGP, which, in turn was a cross-default under the unsecured notes.

71.     iAnthus also disclosed in this April 6, 2020 announcement that its Board formed a Special Committee to "investigate any potential conflicts of interest and/or required disclosures with respect to the Company's CEO and certain related parties[.]" The Company explained that it initiated this investigation because of an online report that was made on March 31, 2020, alleging that Ford "is or has been acting in a conflict of interest and has misused iAnthus' resources to his own benefit."

72.     On April 27, 2020, iAnthus announced that its Special Committee found, and the Board accepted, that "Ford entered into two undisclosed loans (one loan for US$100,000.00 with a related-party and the other for US$60,000.00 with a non-arm's length party) and those loans created a potential or apparent conflict and should have been disclosed to the Board in a timely way."

73.     The Board determined that on December 21, 2019, the day after iAnthus closed

19

its loan with GGP, Adler, GGP's Managing Member, "entered into a loan for the principal sum of US$100,000, documented by an email. The loan bore no interest and was to be repayable on March 31, 2020. The loan has not been repaid." When iAnthus disclosed its financial results for the first quarter of 2020, on August 14, 2020, it revealed that this loan still had "not been repaid and remains outstanding." While Defendants characterized this payment from Adler to Ford as a non-interest loan, it thus appears to have been simply a $100,000 payment.

74.     The Special Committee also concluded, and the Board accepted, that Ford's "failure to disclose such personal loans to the Board was a breach of the Company's conflict policies and other obligations as an officer and director of the Company." As a result of these findings, Ford was fired from his position as CEO and as a Director of the Company.

75.     Then, on May 8, 2020, shortly after the Special Committee completed its three-week investigation—and less than two weeks after iAnthus announced the Special Committee's findings—Mark Dowley resigned from the Company's Board. Dowley had just joined the Board in December 2019, as one of the five new Directors that iAnthus promoted as part of its effort to transition to a Board that would have a majority of "independent" directors. Dowley's term as a Director was scheduled to run at least through 2020. Even so, iAnthus did not provide any explanation for his sudden resignation so soon into his first term as a Director. The only plausible explanation for Dowley's early resignation immediately after the Special Committee's brief investigation, is that he was not comfortable being a part of iAnthus's Board because of Ford's misconduct.

76.     iAnthus's Board "accepted" the Special Committee's findings even though the Board included Ford, Maslow (who co-founded the Company with Ford and served as iAnthus's President during the Class Period), and Beth Stavola, iAnthus's Chief Strategy Officer who

joined the Company in the course of its acquisition of MPX.

77.     When iAnthus—led by Ford and Maslow—announced the Special Committee's findings, it stated that two of the allegations in the March 31, 2020 report that triggered the investigation were "substantiated," including by an email documenting Ford's December 21, 2019, $100,000 "loan" from Adler, and were the basis for further action—namely Ford's firing. But iAnthus's announcement of these findings did not provide the full extent of Ford's self-dealing. For example, while the Special Committee found that Ford entered into a $60,000 loan "with a non-arm's length party," it did not state who that was.

78.     Hi-Med revealed in its complaint against iAnthus that this $60,000 loan was from an individual named David Rozinov of Star Capital Management, LLC, who brokered iAnthus's $60 million in unsecured debt that it issued in March and May 2019. Hi-Med purchased $5 million of the March 2019 debentures, and therefore knows firsthand of Rozinov's role as the broker for this loan. Hi-Med was also iAnthus's largest shareholder as a result of equity that it obtained through iAnthus's acquisition of MPX.

79.     iAnthus has disclosed other transactions with Rozinov, but not Ford's personal payments. The Company's Second Debenture Purchase Agreement with GGP, made in connection with GGP's $40 million loan on May 14, 2018, disclosed in Schedule 4.11(C) that one of iAnthus's outstanding material agreements was a "Convertible Promissory Note Agreement with David Rozinov" for $475,000.

80.     The March 31, 2020 report that spurred the Special Committee's investigation confirms that Ford secretly took personal payments from Adler and Rozinov, and adds more instances of Ford's self-dealing. The report, on the website Stockhouse.com, revealed that Ford:

- "agreed [to] all the terms of $95MM of iAnthus' Gotham Green[] loans notes. However he didn't disclose that he personally owes money to Jason

Adler who heads up Gotham Green. He hasn't even disclosed the last
personal loan from Jason Adler to Hadley Ford for $100k that isn't even
formalised. An informal loan is often considered a bribe";

- "nominated Randy Maslow be a director of Ianthus with a salary of $400k
  a year, but he didn't disclose that he owed money to Randy";

- "engaged with a broker David Rozinov to raise funding, however Ford
  didn't disclose that he personally owes David $300,000"; and

- "arranged for iAnthus to pay $150,000 a year to his sister who doesn't
  really work for the company."

81. The fact that the Special Committee and Hi-Med corroborated key portions of
these allegations based on the evidence that they had firsthand access to, bolsters the rest of the
allegations in this March 31, 2020 report. That report makes clear that, among other acts of
self-dealing, Ford received multiple payments from Adler and Rozinov, not just the $100,000
"loan" from Adler or the $60,000 from Rozinov that the Special Committee confirmed in its
brief investigation.

82. Former employees of the Company add to the evidence of Ford's improper
relationship with GGP. An employee who worked directly with Ford as an assistant at iAnthus's
headquarters in New York City from early 2018, before the start of the Class Period, until early
2020 ("CW 1") observed that Ford and Adler were "good friends" who met regularly outside of
the office, often for dinner, both in New York City and elsewhere when their travel schedules
aligned.

83. Another former employee, who worked at iAnthus from July 2015 until June
2019 ("CW 2"), most recently as a Director of Business Strategy who reported to the Vice
President of Infrastructure, was "not surprised" that Ford received personal payments. CW 2 has
a good understanding of how iAnthus operated because CW 2 started at the Company less than
two years after its founding and worked in a financing role, reporting to the Chief Operating

Officer, before moving to an operational role as Director of Business Strategy in January 2018.

84.     The revelation of Ford's self-dealing was shocking to shareholders in and of itself. iAnthus's stock price dropped 62% on April 6, 2020, when iAnthus announced the Special Committee investigation into potential conflicts of interest between Ford and related parties. In addition, Ford's self-dealing in connection with all of the debt that iAnthus took on during the Class Period resulted in iAnthus's default and restructuring that stands to wipe out the Company's shareholders.

### E.     iAnthus's Conflicted Financing Led to Its Defaulting on its Loan Obligations and Restructuring the Company in Favor of Its Lenders

85.     iAnthus's entire business model was dependent on its ability to raise sufficient capital to fund its expansion. Defendants represented to investors during the Class Period that the Company had adequate funding to fulfill these plans. When GGP did not come through with its remaining portion of the $100 million financing plan that Defendants announced in September 2019, iAnthus did not have enough funding and defaulted on its interest obligations. If Ford was not so deeply conflicted by having taken personal payments in connection with the Company's $166 million in financing during the Class Period, iAnthus either would not have taken this financing or, at the very least, would have received better terms. In either case, the Company would not have had such onerous debt obligations. Or, if iAnthus had disclosed Ford's self-dealing and the true nature of the Company's relationship with GGP, then investors would have known the risk that GGP would not complete the $100 million financing plan that it agreed to and would instead seek to use its secured position to force a restructuring that stands to take over the Company from its shareholders.

86.     When iAnthus announced on April 6, 2020 that it defaulted on its $4.4 million interest payment, it stated that "[d]espite its best efforts as of this date, the Company has not been able to secure a further round of financing since December 20, 2019, whether as part of the

larger financing plan previously announced on September 30, 2019 or from other sources." In other words, iAnthus defaulted on its obligations because GGP did not fulfill its end of the $100 million financing plan that iAnthus previously told investors it was "certain" would be available.

87.     Then, contrary to Defendants' prior representation that GGP was aligned with the Company's shareholders and would provide iAnthus with adequate funding, GGP initiated steps to take over the Company. On June 23, 2020, iAnthus announced that because it was in default of its loan obligations, GGP made a demand for repayment of the entire amount of principal, interest, and any other charges associated with its Amended and Restated Secured Debenture Purchase Agreement with GGP, dated October 10, 2019. GGP also gave iAnthus a Notice of Intention to Enforce Security under section 244 of the *Bankruptcy and Insolvency Act* (Canada). This meant that GGP could force iAnthus to sell its assets in order to repay GGP if the parties could not come to a restructuring agreement.

88.     On July 13, 2020, iAnthus announced that it entered into a Restructuring Support Agreement with GGP and 91% of its unsecured debentureholders (*i.e.*, Oasis).[7] Under this plan, GGP will receive half of the equity in iAnthus and the unsecured debentureholders will receive the other half, with existing shareholders being wiped out entirely. iAnthus has tried to incentivize existing shareholders to approve of this plan by giving them a miniscule 2.75% of the Company if they approve, in which case GGP and the unsecured debentureholders would each receive 48.625% of the Company's equity. This alternative is a transparent attempt to coerce the current shareholders to receive far less than their fair value because otherwise they will receive nothing.[8]

89.     In addition to taking over at least 48.625% of the Company, GGP will retain $85 million

---

[7] Hi-Med held the remaining 8% of iAnthus's unsecured debentures and does not appear to have agreed to this plan because it would wipe out Hi-Med's large equity stake in the Company.

[8] A Special Meeting is scheduled for September 14, 2020, for iAnthus's lenders and shareholders to vote on the restructuring plan.

in 8% five-year senior secured debt, will receive $5 million in "preferred equity" (which functions the same as unsecured debt), and will provide $14 million in new senior secured debt for an additional $700,000 fee (in addition to the 8% interest that it will accrue) as interim financing.

90.     Moreover, in addition to receiving at least 48.625% of the Company, the unsecured debentureholders (namely, Oasis) will receive $15 million in new 8% unsecured notes.

91.     The restructuring plan also calls for "[a] to-be-determined amount of equity [that] will be made available for management, employee, and director incentives, as determined by the New Board (as defined below) following consummation of the" restructuring.

92.     This restructuring reduces the principal amount of iAnthus's outstanding debt from $159.1 million to $121.4 million.[9] This $121.4 million of remaining debt includes $85 million in new secured debt for GGP, $14.7 million in interim financing provided by GGP, $20 million of "preferred equity" that is functionally equivalent to unsecured debt ($5 million of which is for GGP and $15 million of which is for the unsecured lenders), and $1.7 million of unnamed other debt.[10] iAnthus thus agreed to give nearly all of the Company away to its lenders in exchange for the reduction of just $52.4 million in the principal balance of its debt, while also incurring an additional $14.7 million in interim financing. This plan is even more favorable to GGP, which will receive half the Company in exchange for reducing the $97.5 million principal balance on its secured debt by just $7.5 million and reducing the interest rate of this debt by just 5%.

93.     GGP was able to obtain such a favorable restructuring deal because of the aspects of its

---

[9] This $159.1 million in total principal includes $97.5 million in senior secured debt owed to GGP, $60.0 million in unsecured debt owed primarily to Oasis, and $1.6 million of "other debt."

[10] This $20 million of "preferred equity" functions like unsecured debt because it has "an 8% paid-in-kind cumulative dividend; a maturity date of five years; is non-callable for three years; and is subordinate to the Restructured Senior Debt but senior to the Common Shares." iAnthus even disclosed that this preferred equity "may instead be subordinated unsecured debt" for tax planning purposes.

relationship with iAnthus that Defendants misrepresented, including the undisclosed "exit fee" that added $12.5 million (plus additional interest) to the amount that the Company owed GGP. Similarly, while GGP agreed to provide an additional $14 million in secured financing at 8% interest as interim financing (plus a $700,000 fee for that loan), iAnthus had stated in connection with its prior $100 million financing plan that it was "certain" that GGP would provide the full amount of financing provided under that plan. Instead of providing the $30 million in financing that remained from GGP's portion of the plan in the ordinary course of business, GGP is now providing only $14 million as part of its plot to take over the Company. Moreover, GGP was in a position to refuse to provide the remainder of the $100 million financing plan and instead force iAnthus into restructuring by enforcing its security interest in the Company's assets, only because of the extremely onerous $96 million in senior secured debt that Ford agreed to borrow from GGP as a result of his self-dealing.

94.     The unduly favorable treatment that iAnthus gave to GGP in their financing deals is also confirmed by iAnthus's deal with its unsecured lenders. iAnthus agreed as part of its restructuring plan to resolve pending litigation in which Oasis claims that iAnthus breached its debt agreement with Oasis by engaging in its $100 million financing plan with GGP. iAnthus agreed as part of its restructuring to stop the litigation that it brought against Oasis (claiming that Oasis was interfering with iAnthus's business by taking the position that iAnthus breached their debt agreement), with prejudice, regardless of whether the restructuring is finalized. Oasis, on the other hand, agreed to halt its claims against iAnthus only if the restructuring is completed. iAnthus's favorable treatment of Oasis's claim that iAnthus favored GGP, shows that there was merit to Oasis's claims. Otherwise, iAnthus would not have dismissed its claims against Oasis with prejudice while allowing Oasis to continue to pursue its claims against iAnthus if the restructuring does not occur.

95.     Ford also favored GGP by deciding to default on iAnthus's debt obligations. This

allowed GGP to force iAnthus into the restructuring that will give GGP half of the Company while maintaining a sizable debt position. iAnthus ran into financial difficulties because GGP declined to fulfill their financing plan. But iAnthus still could have saved more value for shareholders by selling some of the Company's assets in order to meet its debt obligations.

96.     *EquityGuru*, which analyzes cannabis companies and other companies listed in Canada, has provided detailed analysis of iAnthus since 2017. iAnthus was even a marketing client of *EquityGuru* in 2018. *EquityGuru* observed in an April 6 2020 article titled "iAnthus defaults on debenture payments – but is that a weakness or a tactic?," that iAnthus "wouldn't have defaulted on that interest payment [owed to GGP] without Gotham giving them a quiet go ahead and, based on IAN's other statements today, that the company will 'continue to expand' while they're in this mess, it's my thinking that GGP and IAN are happy little friends on the quiet." This article concluded that "iAnthus and Gotham Green are so close" because of the secret personal payments that Ford took from Adler. It therefore made sense that GGP would be agreeable to iAnthus defaulting on its interest payments in order to make iAnthus even more "dependent on [GGP] going forward."

97.     iAnthus's default on its debt is even more suspicious because, as this *EquityGuru* article observed, iAnthus could have paid its interest payments if it wanted to. "[C]ertainly, IAN could, at any time, sell a dispensary and pay their interest and keep themselves afloat for a while if needed." This is confirmed by iAnthus's prior statements that it had many types of financing (including asset sales) available, the fact that iAnthus had acquired so many operations over the prior three years, and Ford's buyout offer that proposed raising $55 million from these types of activities. (*See supra and infra* ¶¶ 65, 68, 114).

98.     Indeed, through the third quarter of 2019—the last time period for which iAnthus

released financial statements before it announced its restructuring plan in July 2020—iAnthus disclosed that it had approximately $832 million in total assets and just $212 million in total liabilities.  Even in its results for the full year 2019, which iAnthus did not disclose until July 31, 2020, after it announced its restructuring plan, iAnthus stated that it had $604 million in assets and only $238 million in liabilities.

99.     This included substantial amounts of tangible assets. Through the first quarter of 2020, iAnthus owned or operated 35 dispensaries and 13 cultivation/processing facilities throughout the United States. Beyond these facilities, iAnthus distributed cannabis products to over 200 dispensaries and more than 2,300 retail stores throughout the United States. The Company also had the ability to operate even more broadly because its "existing licenses, interests, and contractual arrangements provide the Company with the capacity to own and/or operate up to 72 dispensaries and up to 15 cultivation/processing facilities, and manufacture and/or distribute its cannabis products in 11 states within the United States." When iAnthus acquired MPX in February 2019, it valued MPX alone as being worth $835 million. The Company described its acquisition of MPX as doubling iAnthus's size by creating a "transformational $1.6 billion business combination."

100.     As late as April 28, 2020, even after iAnthus defaulted on its interest payment to GGP and the Company revealed the Special Committee's findings, Beacon Securities Limited stated that "[w]e continue to believe the asset base has considerable value." Beacon expected iAnthus to have $270 million in revenue in 2020 and $30 million in positive operating cash flow.

101.     When iAnthus announced its default on April 6, 2020, Ford stated that its "business has never been stronger" and that "[i]t was a difficult decision to not make the interest payment when it was due, but management and the board decided it was in the best interest of the Company and our stakeholders to spend our cash to maintain the inherent value of our business operations." Even if iAnthus's operating cash flow was insufficient to meet its debt obligations, it could

have made those payments by selling some of its assets. But, as Ford admitted in this statement, iAnthus chose instead to maintain the value of its business operations even though doing so allowed GGP to take those operations over and wipe out iAnthus's ordinary shareholders. The only plausible explanation of this strategy is that iAnthus decided to default on its interest payments because it was secretly beholden to GGP instead of its shareholders.

102.    After iAnthus announced the Special Committee's finding of Ford's self-dealing and the Company's restructuring plan, *EquityGuru* explained in a July 14, 2020 article titled "iAnthus shareholders all but wiped out by Gotham Green Partners in recapitalization deal," that its analyst was duped by iAnthus's and Ford's past attempts to portray Ford as a responsible leader. Instead, Ford showed himself to be "a slick villain in a superhero costume, conning folks looking for a good guy" in the cannabis industry. *EquityGuru* observed that Ford engaged in self-dealing "in ways that the pocket stuffers at MedMen [a cannabis company that 'revealed itself as a self-dealing executive wealth generator from day one'] might have taken notes on, so history will judge him poorly. The demise of iAnthus will hang around Ford's neck forever more. He'll never be called 'respectable management' again."

103.    Furthermore, putting aside the issue of whether iAnthus chose to default rather than sell assets in order to favor GGP, it was iAnthus's prior fraudulent dealings with GGP that put GGP in a position to take advantage of the situation. *EquityGuru* explained that iAnthus's downfall resulted from the Company using GGP's funding to purchase "yet-to-be-profitable dispensaries across the US at inflated prices. . . . Either [iAnthus] will repay their debt with high interest (a win), or they won't, which would lead to [GGP] sucking up most of the company in an extended period of refinancing, restructuring, and pillaging (a bigger win)." When iAnthus went on its buying spree of cannabis businesses around the country without sufficient funding to

support that plan, it paved the way for GGP to take over these assets from the Company's shareholders. Defendants' misrepresentation of iAnthus's relationship with GGP hid the true nature of GGP's position from investors.

104.    Company insiders confirm that iAnthus's pending restructuring is the result of its ill-conceived financing with GGP, rather than external forces. For example, a senior executive at the Company from July 2017 until February 2019 ("CW 3"), who interacted with Ford and Maslow in the course of running the Company, explained that "[t]his deal is not a function of Covid. This happened because Hadley [Ford] wouldn't listen to anyone inside the Company and he and Julius [Kalcevich] chased after creative financing." This witness also described Ford as keeping information about the relationship with GGP "close to the vest."

105.    Similarly, CW 2 (a Director of Business Strategy) questioned iAnthus's funding from GGP, remarking that "with a finance team this seasoned in place, it makes you scratch your head." CW 2 observed that iAnthus's restructuring resulted from "bad decisions [that] unraveled years of hard work" and its assets "are lucrative and are getting heavily penalized due to mistakes at the top."

106.    Witnesses also observed that iAnthus's business plan depended on its overstating its financial projections. According to CW 3, because iAnthus's "capital structure had issues," there was "pressure to produce ever-increasing forecasts." Because CW 3's "math was different enough," CW 3 stopped being invited to certain meetings with the Company's other executives.

107.    Another witness, who worked as a Finance Controller from March 2018 to May 2019 and reported to the now-CFO of iAnthus's Citiva subsidiary ("CW 4"), explained that iAnthus relied too much on theoretical revenues that were hard to quantify due to the complex nature of marijuana cultivation and sale. This witness also explained that "financial reporting on

cannabis is a little different. There are a lot of things that get left out and you can plead ignorance."

108.    These observations show that iAnthus's financing activities were not able to support its business plan. They therefore bolster the significance of iAnthus's financing deals with GGP that Ford conducted for his own personal interests. Those unsustainable arrangements led directly to iAnthus's default on its debt.

### F.    iAnthus Failed to Fund the Escrow Account That it Agreed to With GGP

109.    As a further example of the fraudulent nature of iAnthus's relationship with GGP, iAnthus promised in each of its first two lending agreements with GGP—from May 2018 and September 2019—that iAnthus would put approximately $5.27 million in an escrow account so that those funds would be assured to be available to pay iAnthus's interest obligations. (iAnthus did not disclose its agreement with GGP from their third loan, made in December 2019, during the Class Period.) The debenture agreements for iAnthus's May 2018 and September 2019 loans from GGP stated:

> the Escrow Agent will hold back US$5,272,222.22 (the "**Escrowed Interest Payments**") from the Proceeds in an escrow account held by the Escrow Agent (the "**Interest Payment Escrow**") to ensure the timely payment of one (1) year's accrued interest on the Debentures in the event that the Issuer does not have sufficient funds to satisfy such interest obligations in accordance with the Debentures. If the Issuer does not have sufficient funds to satisfy such interest obligations under the Debentures, whether during the first year of the term of the Debentures or thereafter, then the Issuer and the Lenders shall direct the Escrow Agent in writing in accordance with the Escrow Agreement to release funds from the Interest Payment Escrow to satisfy such interest obligations. The Interest Payment Escrow, or the portion then held in trust, shall be fully released by the Escrow Agent, after payment of all fees and other obligations under the Escrow Agreement, in accordance with the Escrow Agreement (a) to the Lenders promptly upon notice to the Escrow Agent of the occurrence of an Event of Default, (b) to the Issuer as directed by the Issuer and the Lenders if the Issuer has not used the Interest Payment Escrow to satisfy interest on the Debentures for two consecutive financial quarters during the second year of the term of the Debentures, provided that the Issuer has satisfied all interest obligations under the terms of the Debentures and is not in default thereunder, or (c) to the Issuer as directed by the Issuer and the Lenders on the Maturity Date of the Debentures (as

defined therein), provided that the Issuer has satisfied all Obligations under the terms of the Debentures and is not in default. Notwithstanding the preceding sentence and the terms of the Escrow Agreement, the Lenders, the Company and the Issuer may by joint, irrevocable direction direct that the Escrow Agent release the Interest Payment Escrow to the Company in accordance with the terms of the Escrow Agreement.

110.    While iAnthus disclosed that its escrow funds from its May 2018 loan were "fully released to the Company during the first quarter of 2019," the Company did not have any basis for releasing those funds at that time under the three conditions that that agreement provided. This breach of the lending agreement was therefore the result of collusion with GGP, which continued to lend to iAnthus after this event.

111.    Moreover, iAnthus never disclosed that the escrow funds that it promised in its September 30, 2019 loan were released (or that they were never funded at all). But those funds were also not available when iAnthus defaulted on its interest payment in March 2020.

## G.    Defendants' Additional Acts of Self-Dealing

112.    Ford's improper motive when agreeing to the financing that led to iAnthus's downfall is further highlighted by his and the other Defendants' other blatant acts of self-dealing.

### 1.    *Ford Attempted to Buy iAnthus on the Cheap*

113.    In March 2020, Ford and Maslow proposed a management buyout in which they would purchase iAnthus themselves. Ford and Maslow revealed this plan internally at the beginning of the Company's Board meeting in the first week of April 2020, at which the Board appointed the Special Committee, and therefore recused themselves from the meeting.

114.    *The Deep Dive*, which specializes in analyzing the cannabis market, obtained the following slides from Ford and Maslow's offer that proposed giving 10% of the Company to themselves and issuing an additional 10% of shares in an employee stock option pool:



### Illustrative Transaction – Capitalization Considerations

- For illustrative purposes, we have made the following capital structure assumptions in an iAnthus go-private transaction:
  - 70% of equity holders would be bought out at a premium to iAnthus' current share price;
  - Gotham Green secured convertible debtholders[1] and unsecured convertible debtholders would roll forward[2];
  - Gotham Green high yield holders[3] and other debtholders[4] would be repaid;
  - Management will hold 10% pro forma basic equity ownership; and
  - 10% of fully diluted shares will be issued through an employee option pool exercisable at a 10% premium to offer price

#### Current iAnthus Debt Overview and Treatment (US$ MM)

| | | | |
|---|---|---|---|
| Gotham Green High Yield Notes | $41 MM | • 13.0% PIK interest<br>• Convertible at US$3.08<br>• Due May 2021 | *Treatment: Buy out at 103% of principal balance* |
| Gotham Green Secured Convertible Debenture | $56 MM<br>($20 MM and $36 MM tranches) | • 13.0% PIK interest rate<br>• Convertible at US$1.61 to US$1.89<br>• Due May 2021 | *Treatment: Roll forward; adjust conversion price to US$1.00* |
| Unsecured Convertible Debentures | $60 MM<br>($35 MM and $25 MM tranches) | • 8.0% interest rate<br>• Convertible at US$5.92<br>• Due March 2023 | *Treatment: Roll forward; adjust conversion price to US$1.50* |
| Other | $6 MM | • 4.0% to 10.0% interest rates<br>• Due August 2020 to September 2022 | *Treatment: Buy out $2 MM at 100% of principal balance; $4 MM contingent consideration expires August 2020* |
| Total | $164 MM | | |

5  Sources: Company filings, Bloomberg, S&P Capital IQ as of April 6, 2020.
(1) Conversion price repriced to $1.00 for illustrative purposes
(2) Conversion price repriced to $1.50 for illustrative purposes
(3) Bought out at 103% of principal balance; for illustrative purposes
(4) Bought out at 100% of balance outstanding for illustrative purposes



### Illustrative Transaction – Sources and Uses

- We have assumed the following in an iAnthus go-private transaction:
  - 70% of common equity holders would be bought out at US$0.50 per share, a 178% premium to iAnthus' current share price, where the other 30% of equity holders would roll forward and hold shares of the pro forma entity
    - In-the-money option and warrant holders exercise before the transaction occurs[1]
    - Out-of-the-money option and warrant holders receive no consideration
  - The Company has US$95 million of pro forma cash requirements for capital expenditures, working capital and other matters

#### Transaction Sources and Uses (US$ MM)

| Sources | | Uses | |
|---|---|---|---|
| Cash | | Debt Repayment | |
| On Hand (End of Q4 2019) | $6 | Gotham Green High Yield Notes | $43 |
| Proceeds from Sale-Leaseback Transaction | $50 | Other | $2 |
| Proceeds from Asset Sale | $5 | Total Debt Repayment | $44 |
| Total Cash | $61 | | |
| | | Equity Buyback | |
| Equity | | Basic Shares (30% Roll Forward) | $60 |
| Equity Investment | $139 | ITM Options and Warrants | $0 |
| Total Cash from Equity Issuance | $139 | Total Equity Buyback | $60 |
| Total Sources | $200 | Illustrative Transaction Expenses | $15 |
| | | New Jersey Acquisition | $30 |
| | | | $35 |
| | | Working Capital / Other | $15 |

115.    At this point, in April 2020, iAnthus's share price had declined substantially as a result of the vast amount of debt that the Company took on and the dilutive financing that tripled

the number of shares outstanding since the beginning of the Class Period.[11] Ford and Maslow proposed paying just $0.50 per share even though the Company's stock price was $3.69 per share at the beginning of the Class Period. This attempt to buy iAnthus after its share price had declined so substantially as a result of Ford's dilutive and self-interested financing activities shows his motive to profit from all of these steps that caused the Company's decline.

## 2. *Defendants' Additional Acts of Self-Dealing*

116.   Ford and iAnthus also engaged in other conspicuous acts of self-dealing that highlight the iAnthus Defendants' improper motives in running the Company during the Class Period.

117.   iAnthus disclosed that in 2017, it extended a CAD$500,000 loan to Ford with a very favorable interest rate of just 2.5% due upon maturity of the loan in June 2020. iAnthus stated in its 2018 Annual Report that "[t]he loan is repayable on demand and is expected to be repaid within the next 12 months." This repayment did not occur. As of the end of March 31, 2020, the full balance was still outstanding, plus $25,000 in interest.

118.   When iAnthus belatedly disclosed its financial results for the fourth quarter of 2019, on July 31, 2020, it revealed that Ford's termination agreement—after he was fired because of his self-dealing—extended the loan's maturity date to June 30, 2021, and provided that "the balance of the loan due is to be partially offset by compensation owed to Ford."

119.   As another example of the iAnthus Defendants' self-dealing, on April 23, 2019, iAnthus granted approximately 7.2 million stock options to its executives and employees, with an exercise price of $7.08 (CAD). The Company's stock price proceeded to drop precipitously

---

[11] This offer was also very favorable to GGP, which would have had its original $40 million loan repaid in full, plus 3%, and had the remainder of its loan fully rolled forward with a better conversion price.

over the course of the next several months, making it difficult for the Company's insiders to profit from these options in the near term. Even though these options did not expire for 10 years, on June 6, 2019, iAnthus cancelled these options and granted approximately 9.65 million new options—even more than it had granted in April—with a substantially lower exercise price of just $5.35(CAD) per share. This included approximately 1.72 million options granted to Ford, 1.67 million options granted to Maslow, 1 million options granted to Kalcevich, and 700,000 options granted to each of Stavola and Robert Galvin (another iAnthus Director).

120.    Shareholders were outraged that as their share value was plummeting, iAnthus repriced its executives' options so that they could reap short-term profits. iAnthus attempted to defuse the situation by explaining on June 13, 2019, that the options "impact[ed] over 160 team members and strategic consultants to the Company" and were meant "to ensure our team stays focused on growing the company and aligned with our shareholders through a long-term incentive program." Ford apologized for failing to handle iAnthus's explanation of these options from a public relations perspective, stating that "we clearly did not handle the public release of this information in the proactive manner which our shareholders have come to expect from us, and for this I apologize."

121.    Ford's attempt to salvage his profits from the options repricing did not make sense, because approximately 6 million of the 9.6 million options that were granted were given to iAnthus's top seven executives, with only 2.9 million being dispersed among 158 employees and consultant. Moreover, because the options did not expire for 10 years, Defendants' need to reprice them after a short-term fall in the Company's stock price displayed their motive to attain short-term profits.[12]

122.    Furthermore, according to information reported on Canada's System for Electronic

---

[12] While iAnthus ended up repricing many of these options yet again, this time with a strike price of $7.50 (CAD) per share, it did so only after shareholders continued to be outraged after Ford tried to justify management's self-dealing.

Disclosure by Insiders ("SEDI"), Ford received approximately $1.48 million in net proceeds from his sale of iAnthus stock, after accounting for his cost of exercising options. Ford made his initial sales privately, rather than in the public market, including the sale of 150,000 shares on July 17, 2018 for $750,000; the sale of 150,000 shares on October 25, 2018 for $187,500; and the sale of 241,000 shares on November 30, 2018 for $402,470. Then, from December 7, 2018 until September 3, 2019, Ford sold 125,000 shares in the public market for total proceeds of $735,500 (CAD). Ford sold his shares at prices between $5 per share and $1.25 per share. All of these sales were at prices that were multiple times higher than the price of iAnthus stock at the end of the Class Period (which was under $0.10 per share), after iAnthus announced the Special Committee investigation, its default on its loan obligations, and its restructuring plan that stands to wipe out the Company's shareholders.

123.    In addition, on January 10, 2020, iAnthus repaid the full outstanding balance that it owed to Stavola—the Company's Chief Strategy Office and a Director since iAnthus acquired MPX—of $10.8 million in principal and $24,000 in interest, on a note that was owed to her and matured on January 19, 2020. The Company did not reveal this payment until July 31, 2020, when it finally disclosed its financial results for the full year 2019, nearly four months after the Company was originally scheduled to do so. iAnthus's decision to pay Stavola approximately $11 million shortly before the Company would default on a $4.4 million interest payment owed to its lenders and enter into a restructuring agreement that will wipe out the Company's shareholders, highlights the extent to which iAnthus prioritized the financial interests of its executives over the interests of ordinary shareholders.

124.    On August 4, 2020, iAnthus announced Stavola's resignation from the Company without giving any explanation for her departure.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

125.    During the Class Period, Defendants made statements that were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to iAnthus's business and operations, which were known to Defendants or recklessly disregarded by them: (i) Ford engaged in significant acts of self-dealing, including  his taking personal payments in connection with iAnthus's $106 million in financing from GGP and its $60 million in unsecured debt, as well as the other significant acts of self-dealing described above; (ii) GGP's interests did not align with those of iAnthus's shareholders, because GGP's purported $10 million equity investment in iAnthus on May 14, 2018 was protected by GGP's secret "exit fee" and GGP sought to use its debt to take over the Company; (iii) iAnthus did not have adequate access to financing to meet its financial obligations or fund its business plan; and (iv) iAnthus did not comply with its obligation under its agreement with GGP to keep $5,272,222.22 in an escrow account to guarantee its interest payments.

### A.     Statements in Connection With the May 14, 2018 GGP Financing

126.    On May 14, 2018, iAnthus issued a press release, available on the Company's website and filed with the CSE, titled "Gotham Green Partners Invests $50 Million in iAnthus to Accelerate Growth Initiatives." This press release listed Defendant Kalcevich as the Company's contact person.[13]

127.    This press release quoted Defendant Ford as stating that "Gotham Green Partners is well recognized as a long-term investor and leader within the cannabis investment community, and we are excited to partner with GGP to create value for our shareholders." Ford also stated in

---

[13] Documents that iAnthus filed with the CSE are available through Canada's System for Electronic Document Analysis and Retrieval ("SEDAR") and/or the CSE website.

this press release that "[a]s the U.S. cannabis industry continues to grow, we will be well-capitalized and well-positioned to continue the buildout of our existing assets and pursue opportunistic acquisitions to expand our footprint."

128.    In addition, Defendant Kalcevich praised GGP in this press release by stating that "Jason and the GGP team have demonstrated the ability to help portfolio companies accelerate geographic expansion and operational efficiencies to create meaningful value for investors."

129.    This press release also described in detail GGP's supposed $10 million equity investment in iAnthus, stating that "[t]he Company has concurrently issued US$10 million aggregate amount of Units, with each Unit comprised of one Class A share of the Company at US$2.57 per share and a warrant to purchase one share of the Company at a price of US$3.86 per share, which amount was reserved by price reservation with the Canadian Securities Exchange."

130.    The statements referenced in ¶¶ 126-29 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders (including because GGP did not actually make a $50 million investment, or a "$10 million equity investment in iAnthus," after accounting for its $10 million "exit fee"), and iAnthus was not "well-capitalized and well-positioned to continue" its expansion plan.

131.    This press release also quoted Defendant Adler as stating that "iAnthus' recent acquisitions in New York and Florida, combined with its operations in Massachusetts, provide a compelling growth and investment opportunity. With this infusion of capital, we look forward to working with the management team to source additional strategic opportunities and accelerate the Company's growth profile."

132.    The statements referenced in ¶ 131 above were materially false and/or misleading

for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing and GGP's interests did not align with iAnthus's shareholders.

133.    On May 14, 2018, iAnthus filed a Notice of Proposed Issuance of Listed Securities on Form 9 with the CSE disclosing the securities that were being issued in connection with the $50 million financing from GGP. Defendant Kalcevich singed iAnthus's Certificate of Compliance for this filing.

134.    This filing described iAnthus's relationship to GGP as "Arm's length."

135.    In addition, the Certificate of Compliance certified that "there is not material information concerning the Issuer which has not been publicly disclosed."

136.    The statements referenced in ¶¶ 133-35 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing and  iAnthus's relationship with GGP was not "Arm's length."

137.    iAnthus filed its Secured Debenture Purchase Agreement, in connection with its sale of $40 million in secured debt to GGP, with the CSE on May 24, 2018. Ford signed this agreement on behalf of iAnthus Capital Management, LLC, Kalcevich signed on behalf of iAnthus Capital Holdings, Inc., and Adler signed on behalf of Gotham Green Fund 1, L.P. and Gotham Green Credit Partners SPV 1, L.P.[14]

138.    iAnthus provided the following covenant in Section 4.9(e) of this agreement, under a section titled Compliance With Laws:

---

[14] Gotham Green Fund 1, L.P. and Gotham Green Credit Partners SPV 1, L.P. are funds controlled by GGP. GGP disclosed in its Required Disclosure by an Eligible Institutional Investor that it made in connection with this transaction (*see infra* ¶¶ 251-52), that it "exercised direction and control" over the iAnthus securities that these funds held.

The Company is in compliance in all material respects with its continuous and timely disclosure obligations under applicable Canadian Securities Laws and the rules and regulations of the CSE and has filed all documents required to be filed by it with the Canadian Securities Commissions under applicable Canadian Securities Laws . . . . None of the documents filed in accordance with applicable Canadian Securities Laws contained, as at the date of filing thereof, a misrepresentation.

139. iAnthus also represented, in Section 4.15, titled Material Facts Disclosed:

None of the foregoing representations, warranties and statements of fact and no other statement furnished by or on behalf of any Credit Party to the Lender in connection with the Transaction Agreements contain any untrue statement of a material fact or omit to state any material fact necessary to make such statement or representation not misleading to a prospective lender or purchaser of securities of the Company seeking full information as to the Company and the properties, financial condition, prospects, businesses and affairs thereof.

140. The statements referenced in ¶¶ 138-39 above were materially false and/or misleading because iAnthus did not comply with the covenants described in those paragraphs in light of the true nature of iAnthus's and Ford's relationship with GGP.

141. In addition, on May 24, 2018, iAnthus filed a Material Change Report on Form 51-102F3 ("Material Change Report") in connection with the Company's purported $50 million financing from GGP. This report listed Defendant Kalcevich as the "senior officer of the Company [that] is knowledgeable about the material change and this Material Change Report."

142. This Material Change Report described iAnthus's "US$50,000,000 financing through the issuance of: (i) US$40,000,000 aggregate principal amount of high yield secured notes issued by the Company's wholly-owned subsidiary and (ii) US$10,000,000 equity units."

143. iAnthus gave a "Full Description of Material Change" in this report and confirmed that "[n]o information has been omitted," but the report did not disclose Ford's self-dealing with Adler or GGP's $10 million "exit fee."

144. The statements referenced in ¶¶ 142-43 above were materially false and/or

misleading for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing and GGP's interests did not align with those of iAnthus's shareholders (including because of GGP's $10 million "exit fee").

**B.     Statements in iAnthus's Release of Its Results for the First Quarter of 2018**

145.    On May 30, 2018, iAnthus released its financial results for the first quarter of 2018, including its Condensed Interim Consolidated Financial Statements and Management's Discussion & Analysis ("MD&A") for the three months ended March 31, 2018 and 2017.

146.    iAnthus filed a CEO Certification, signed by Ford, and a CFO Certification, signed by Kalcevich, with the CSE in connection with this quarterly report. They certified that the filings "do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings," and that the "report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented."

147.    iAnthus's MD&A for the first quarter of 2018 stated that "[o]n May 14, 2018, the Company received a $50.0 million investment from GGP, of which $40.0 million was in the form of high yield senior secured notes. The Company concurrently issued $10.0 million in the form of Class A shares."

148.    This filing described the Company's May 2018 "$50,000,000 investment from GGP, in the form of high yield senior secured notes and Class A Shares," as an example of how iAnthus "has historically had, and continues to have, access to equity and debt financing from the public and prospectus-exempt (private placement) markets in Canada."

149.    iAnthus's financial statements for the first quarter of 2018 similarly described the

41

Company's $50 million financing from GGP.

150.    The statements referenced in ¶¶ 146-49 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders (including because GGP did not actually make a "$50 million investment," or a $10 million equity investment in iAnthus, after accounting for its $10 million "exit fee"), and iAnthus did not have adequate access to financing.

151.    iAnthus's MD&A and its financial statements for the first quarter of 2018 described the Company's "Transactions with Related Parties" (in the MD&A) and "Related Party Transactions" (in the financial statements). These disclosures described several transactions that iAnthus had engaged in with related parties, including the Company's CAD$500,000 loan to Ford, but did not disclose Ford's related-party transactions with Adler or his other related party transactions described above.

152.    The statements referenced in ¶ 151 above were materially false and/or misleading because of Ford's self-dealing set forth in ¶ 125(i).

**C.    Statements in iAnthus's Release of Its Results for the Second Quarter of 2018**

153.    On August 28, 2018, iAnthus released its financial results for the second quarter of 2018, including its Condensed Interim Consolidated Financial Statements and MD&A for the three months ended June 30, 2018 and 2017.

154.    iAnthus filed a CEO Certification, signed by Defendant Ford, and a CFO Certification, signed by Defendant Kalcevich, with the CSE in connection with this quarterly report that made the same certifications that Ford and Kalcevich made the prior quarter.

155.    iAnthus's MD&A for the second quarter of 2018 touted as the first "Corporate Highlight" for the quarter that "iAnthus Receives $50M Investment from Gotham Green

Partners." The MD&A stated that "[c]oncurrently with the issuance of the [$40 million in] HY Notes, the Company issued $10,000,000 of 3,891,051 Units," with each Unit including one share of iAnthus stock priced at $2.57 per share. The MD&A also described the cash generated from this activity as "$46.0 million from the GGP financing through the issuance of $40.0 million of debt and $10.0 million of equity net issuance costs of $4.0 million."

156.    iAnthus's MD&A for the second quarter of 2018 also repeated the Company's statements from the prior quarter concerning the "$50,000,000 investment from GGP" as an example of how the Company "has historically had, and continues to have, access to equity and debt financing from the public and prospectus-exempt (private placement) markets in Canada."

157.    The statements referenced in ¶¶ 154-56 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders (including because of GGP's $10 million "exit fee"), and iAnthus did not have adequate access to financing.

158.    iAnthus's filings for the second quarter of 2018 also continued to describe "Transactions With Related Parties" and "Related Party Transactions," as iAnthus did the prior quarter, but did not disclose Ford's related-party transactions with Adler or his other related party transactions described above.

159.    The statements referenced in ¶ 158 above were materially false and/or misleading because of Ford's self-dealing set forth in ¶ 125(i).

160.    iAnthus's MD&A for the second quarter of 2018 also confirmed, when discussing the Company's financing activities, that it "has complied with all covenants during the period."

161.    Similarly, iAnthus's financial statements for the second quarter of 2018 stated that

the terms of the GGP financing "contain several financial and non-financial covenants. For the six months ended June 30, 2018, the Company is in compliance with all covenants."

162.    The statements referenced in ¶¶ 160-61 above were materially false and/or misleading because iAnthus did not comply with the covenants referenced in ¶¶ 138-39 in light of the true nature of iAnthus's and Ford's relationship with GGP.

D.    **Statements in iAnthus's Release of Its Results for the Third Quarter of 2018**

163.    On November 27, 2018, iAnthus released its financial results for the third quarter of 2018, including its Condensed Interim Consolidated Financial Statements and MD&A for the three months ended September 30, 2018 and 2017.

164.    iAnthus filed a CEO Certification, signed by Defendant Ford, and a CFO Certification, signed by Defendant Kalcevich, with the CSE in connection with this quarterly report that made the same certifications that Ford and Kalcevich made the prior quarter.

165.    iAnthus's MD&A for the third quarter of 2018 repeated the Company's statements from the prior quarter concerning the "$50,000,000 investment from GGP, in the form of high-yield senior secured notes and Class A Shares," as an example of how the Company "has historically had, and continues to have, access to equity and debt financing from the public and prospectus-exempt (private placement) markets."

166.    iAnthus's MD&A for the third quarter of 2018 also repeated the Company's statements from the prior quarter describing its cash generated from the GGP financing as "$46.0 million from the GGP financing through the issuance of $40.0 million of debt and $10.0 million of equity net issuance costs of $4.0 million."

167.    iAnthus's filings for the third quarter of 2018 also continued to describe "Transactions With Related Parties" and "Related Party Transactions," as iAnthus did the prior quarter, but did not disclose Ford's related-party transactions with Adler or his other related

44

party transactions described above.

168.    iAnthus's filings for the third quarter of 2018 also repeated the statements from the prior quarter confirming its compliance with all covenants in its agreements with GGP.

169.    The statements referenced in ¶¶ 164-68 above were materially false and/or misleading for the same reasons that these statements were materially false and misleading when made in connection with the Company's statements from the second quarter of 2018. (*See supra* Section V.C).

### E.    Ford's February 7, 2019 Interview

170.    On February 7, 2019, Ford gave an interview to the industry publication *Midas Letter*, focusing on the MPX acquisition.[15] Ford stated that having a "reasonable cost of capital" is one of three keys to the cannabis industry. He then explained that iAnthus takes a disciplined approach to using its stock for acquisitions because the public nature of the Company is paramount. Ford assured that "every aspect of it has been about being public," including avoiding conflicts from multi-voting shares. He explained that "you have to be disciplined every day because when you're public, it's not your money, we're just stewards of the capital, we're very thankful for people like yourself [i.e., shareholders] who have been supportive of us[.] We get up every day and we work for you, and we pay close attention to that cost of capital."

171.    The statements referenced in ¶ 170 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus did not pay a "reasonable cost" for its capital, avoid conflicts of interest, or act in shareholders' best interests, because iAnthus's relationship with GGP was tainted by Ford's self-dealing and GGP's interests did not align with those of iAnthus's shareholders.

---

[15] *Available at* https://www.youtube.com/watch?v=R5xEXY3MAwk.

### F.   Statements in Connection With the Company's March 2019 Debentures

172.    On March 18, 2019, iAnthus issued a press release that it filed on CSE, titled "iAnthus Announces Closing of US$35 Million Private Placement of Unsecured Convertible Note Units." Ford stated that "[t]his financing allows the Company to simultaneously strengthen our balance sheet, deepen our investor base, and fund our growth capital."

173.    The statements referenced in ¶ 172 above were materially false and/or misleading for the reasons set forth in ¶ 125(i), including because this financing was tainted by Ford's self-dealing with Rozinov.

174.    In addition, on March 25, 2019, iAnthus filed a Material Change Report in connection with the Company's purported $35 million debt issuance. This report listed Defendant Kalcevich as the "senior officer of the Company [that] is knowledgeable about the material change and this material change report."

175.    This Material Change Report described the terms of the $35 million of unsecured debt that iAnthus issued in March 2019. iAnthus gave a "Full Description of Material Change" in this report and stated "Not applicable" under the entry for "Omitted Information," but the report did not disclose Ford's self-dealing with Rozinov in connection with this debt issuance.

176.    Similarly, on May 3, 2019, iAnthus filed a Material Change Report that described the terms of the Company's $25 million issuance of unsecured debt that it completed on May 1, 2019, but did not disclose Ford's self-dealing with Rozinov in connection with this debt issuance. This report also listed Defendant Kalcevich as the "senior officer of the Company [that] is knowledgeable about the material change and this material change report" and stated "Not applicable" under the entry for "Omitted Information."

177.    The statements referenced in the Material Change Reports described in ¶¶ 174-76 above were materially false and/or misleading for the reasons set forth in ¶ 125(i), including

because the financings at issue were tainted by Ford's self-dealing with Rozinov.

      **G.**     **Statements in iAnthus's 2018 Annual Filings**

      178.     On April 2, 2019, iAnthus released its financial results for the fourth quarter and full year 2018 in the Company's 2018 Annual Report. Ford and Kalcevich signed the 2018 Annual Report on behalf of iAnthus.

      179.     On April 12, 2019, iAnthus filed its 2018 Annual Report and its 2018 Annual Information Form with CSE.

      180.     Also on April 12, 2019, iAnthus filed Certifications of Annual Filings (including its Annual Report and Annual Information Form) by Ford and Kalcevich. These Certifications made substantially the same certifications that Ford and Kalcevich made in connection with iAnthus's quarterly filings from the prior quarter.

      181.     iAnthus's 2018 Annual Report touted its financing from GGP, claiming that "[a]s part of the GGP transaction, in addition to the note payable, the Company issued $10.0 million aggregate number of units."

      182.     In addition, the 2018 Annual Report described iAnthus's March 2019 financing with Oasis and Hi-Med as follows: "On March 18, 2019, the Company completed a private placement of $35,000,000 of unsecured convertible debentures . . . and corresponding warrants of 2,177,291 to purchase common shares of the Company. Prior to April 26, 2019, an additional $25,000,000 of debentures and 1,555,209 corresponding warrants can be issued."

      183.     The 2018 Annual Report stated that the Company's May 2018 "investment from GGP" and its March 2019 Debentures were examples of how the Company "has historically had, and continues to have, access to equity and debt financing from the public and prospectus-exempt (private placement) markets, specifically."

      184.     The statements referenced in ¶¶ 180-83 above from iAnthus's 2018 Annual

Report were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationship with GGP and the Company's unsecured lenders was tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders (including because of GGP's $10 million "exit fee"), and iAnthus did not have adequate access to financing.

185. iAnthus's 2018 Annual Report also continued to disclose "Related Party Transactions," as iAnthus did the prior quarter, but did not disclose Ford's related-party transactions with Adler or his other related party transactions described above.

186. The statements referenced in ¶ 185 above were materially false and/or misleading because of Ford's self-dealing set forth in ¶ 125(i).

187. iAnthus's 2018 Annual Information Form also contained a section titled "Interests of Management and Others in Material Transactions." This section affirmed that "[o]ther than as disclosed herein in this AIF and in the [Company's consolidated financial statements for 2018], to the best of the Company's knowledge, other than disclosed herein, none of the directors or executive officers of the Company . . . had any material interests, direct or indirect, in any transaction within the three most recently completed financial years or during the current year that has materially affected or is reasonably expected to materially affect the Company."

188. The 2018 Annual Report and the 2018 Annual Information Form both further assured investors in a section addressing potential conflicts of interest that the "Company's executive officers and directors may devote time to their outside business interests, so long as such activities do not materially or adversely interfere with their duties to the Company."

189. The statements referenced in ¶¶ 187-88 above concerning potential conflicts of interest were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(ii), including

48

because iAnthus's relationships with GGP and the Company's unsecured lenders were tainted by Ford's self-dealing and GGP's interests did not align with those of iAnthus's shareholders.

### H.   Statements in iAnthus's Release of Its Results for the First Quarter of 2019

190.   On May 30, 2019, iAnthus released its financial results for the first quarter of 2019, including its Condensed Interim Consolidated Financial Statements and MD&A for the three months ended March 31, 2019 and 2018.

191.   Ford stated in the Company's press release for these earnings results that "[m]anaging growth is our number one focus, and we remain committed to investing prudently in our business to take advantage of this once ever opportunity.  We will continue to be opportunistic in our approach to M&A and will maintain a strong focus on reducing our overall cost of capital.  We are very excited about 2019 and look forward to continuing to deliver for our shareholders."

192.   The statements referenced in ¶ 191 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus did not "maintain a strong focus on reducing our overall cost of capital," its relationships with GGP and the unsecured lenders were tainted by Ford's self-dealing, and GGP's interests did not align with those of iAnthus's shareholders.

193.   iAnthus filed a CEO Certification, signed by Defendant Ford, and a CFO Certification, signed by Defendant Kalcevich, with the CSE in connection with this quarterly report that made the same certifications that they made in the third quarter of 2018.

194.   The MD&A for the first quarter of 2019 stated that the Company's May 2018 "investment from GGP," its March 2019 Debentures, and its May 2019 Debentures were examples of how the Company "has historically had, and continues to have, access to equity and debt financing from the public and prospectus-exempt (private placement) markets."

195.   iAnthus's filings for the first quarter of 2019 also continued to disclose

"Transactions With Related Parties" and "Related Party Transactions," as iAnthus did the prior quarter, but did not disclose Ford's related-party transactions with Adler or his other related party transactions described above.

196.    The statements referenced in ¶¶ 193-95 above from iAnthus's 2018 Annual Report were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationship with GGP and the unsecured lenders was tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders, and iAnthus did not have adequate access to financing.

197.    This MD&A for the first quarter of 2019 also confirmed when discussing iAnthus's financing arrangements that it "complied with all covenants as at March 31, 2019."

198.    Similarly, iAnthus's financial statements for the first quarter of 2019 stated that the terms of the GGP financing "contain several financial and non-financial covenants. For the three months ended March 31, 2019, the Company is in compliance with all covenants."

199.    The statements referenced in ¶¶ 197-98 above were materially false and/or misleading because iAnthus did not comply with the covenants referenced in ¶¶ 138-39 in light of the true nature of iAnthus's and Ford's relationship with GGP.

**I.        Statements in iAnthus's Release of Its Results for the Second Quarter of 2019**

200.    On August 26, 2019, iAnthus released its financial results for the second quarter of 2019, including its Condensed Interim Consolidated Financial Statements and MD&A for the three months ended June 30, 2019 and 2018.

201.    When summarizing the Company's quarter in its press release for these earnings results, Ford emphasized that "[a]s always, reducing our cost of capital remains a focus" so that the Company can "maximize returns for our shareholders."

202.    The statements referenced in ¶ 201 above were materially false and/or misleading

for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus did not focus on "reducing our cost of capital" in order to "maximize return for our shareholders," because iAnthus's relationships with GGP and the Company's unsecured lenders were tainted by Ford's self-dealing and GGP's interests did not align with those of iAnthus's shareholders.

203.    In addition, iAnthus filed a CEO Certification, signed by Defendant Ford, and a CFO Certification, signed by Defendant Kalcevich, with CSE in connection with this quarterly report that made the same certifications that Ford and Kalcevich made the prior quarter.

204.    iAnthus's MD&A and financial statements for the second quarter of 2019 contained substantially the same false and misleading statements described in ¶¶ 193-99 above from the first quarter of 2019 concerning the Company's financing activities and related party transactions.

### J.    Statements in Connection With the September 2019 GGP Financing

205.    On September 30, 2019, iAnthus issued a press release announcing that GGP purchased an additional $20 million in senior secured convertible notes as "part of a broader $100.0 million financing plan to support the buildout of all existing markets in which the Company currently operates." This plan involved GGP purchasing an additional $66.5 million in notes.

206.    Ford described GGP as "a leading financial investor in the U.S. cannabis sector" and stated that "[w]e believe this level of support from GGP will fully fund the development of our existing assets and provide the necessary capital for iAnthus to achieve positive and sustainable EBITDA and operational free cash flow in 2020."

207.    In addition, this press release quoted Defendant Adler as stating on behalf of GGP that "[w]e have viewed iAnthus as a key partner since our initial investment in May 2018 and have closely watched the Company's evolution as it has continued to execute on its operational strategy across multiple markets. The Company has made significant strides in broadening and operationalizing its

footprint, which we do not believe is reflected in the Company's current trading price[.] . . . We look forward to working alongside iAnthus and continuing to support the growth of the Company."

208.    The statements referenced in ¶¶ 205-07 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders, and iAnthus did not have adequate access to financing.

209.    iAnthus held a conference call on September 30, 2019 with Ford to discuss this new financing from GGP. Ford sought to reassure investors that iAnthus was doing well despite the recent poor performance of the Company's stock price. He described several factors that, he stated, "[w]e firmly believe [are] supporting our stock today," including "***the capital certainty of this financing [with GGP]***; our leadership team, especially our new COO and CMO; and laser focus on the building blocks of planning, variance analysis and ***accountability***."

210.    Ford emphasized on this call that "[w]ith this announced financing, our ability to build our markets is certain. Gotham Green is the preeminent investor in the cannabis sector. They have been investors in all parts of the value chain, including brands, operators and technologies in both Canada and the United States, and they have a deep knowledge of what are the key drivers of long-term value and competitive positioning in the industry. They've been a meaningful partner in our operating success to date, including a $50 million investment a year ago May, and they have absolute visibility into our team, our operations and our forecast."

211.    In addition, Ford assured investors that "we all wake up every day with one focus, to work for our public shareholders. We have the best team in the industry. And with this financing, we now have the capital. Now we need all of you to take advantage of a stock on sale. Our stock is at an all-time low, yet we have more people, licenses, assets and revenues than we

have ever had. We have no financing concerns and pro forma for our pending acquisition." He concluded the call by telling investors that "we thank you for your trust and support."

212.   The statements referenced in ¶¶ 209-11 above that Defendants made on September 30, 2019 in connection with GGP's new financing were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders (including because of GGP's $10 million "exit fee"), and iAnthus did not have adequate access to financing.

213.   On October 10, 2019, iAnthus filed its Amended and Restated Secured Debenture Purchase Agreement, which contained the terms of the September 30, 2019 debenture, with CSE. This agreement was signed by Ford on behalf of iAnthus and Adler on behalf of GGP.[16]

214.   This Amended and Restated Secured Debenture Purchase Agreement contained the same false and misleading statements that are described in ¶¶ 138-40 above in connection with iAnthus's and GGP's May 14, 2018 debenture agreement.

215.   This Amended and Restated Secured Debenture Purchase Agreement also contained the following provision concerning the Company's placement of funds in an escrow account to ensure their availability to pay the Company's interest obligations:

> Interest Escrow. On the Closing Date, the Lenders, the Company and the Issuer shall enter into an escrow agreement (the "Escrow Agreement") with SkyLaw Professional Corporation (the "Escrow Agent") pursuant to which the Escrow Agent will hold back US$5,272,222.22 (the "Escrowed Interest Payments") from

---

[16] Adler signed on behalf of Gotham Green Fund 1, L.P., Gotham Green Credit Partners SPV 1, L.P., Gotham Green Fund 1 (Q), L.P., Gotham Green Fund II, L.P., and Gotham Green Fund II (Q), L.P., all as lenders to iAnthus, and as Gotham Green Admin 1, LLC, as collateral agent. These are all entities that GGP controlled. GGP disclosed in its Required Disclosure by an Eligible Institutional Investor that it made in connection with this transaction (*see infra* ¶¶ 251-52) that it "has control and direction over" the iAnthus securities that these funds held.

the Proceeds in an escrow account held by the Escrow Agent (the "Interest Payment Escrow") to ensure the timely payment of one (1) year's accrued interest on the Debentures in the event that the Issuer does not have sufficient funds to satisfy such interest obligations in accordance with the Debentures. If the Issuer does not have sufficient funds to satisfy such interest obligations under the Debentures, whether during the first year of the term of the Debentures or thereafter, then the Issuer and the Lenders shall direct the Escrow Agent in writing in accordance with the Escrow Agreement to release funds from the Interest Payment Escrow to satisfy such interest obligations. The Interest Payment Escrow, or the portion then held in trust, shall be fully released by the Escrow Agent, after payment of all fees and other obligations under the Escrow Agreement, in accordance with the Escrow Agreement (a) to the Lenders promptly upon notice to the Escrow Agent of the occurrence of an Event of Default, (b) to the Issuer as directed by the Issuer and the Lenders if the Issuer has not used the Interest Payment Escrow to satisfy interest on the Debentures for two consecutive financial quarters during the second year of the term of the Debentures, provided that the Issuer has satisfied all interest obligations under the terms of the Debentures and is not in default thereunder, or (c) to the Issuer as directed by the Issuer and the Lenders on the Maturity Date of the Debentures (as defined therein), provided that the Issuer has satisfied all Obligations under the terms of the Debentures and is not in default. Notwithstanding the preceding sentence and the terms of the Escrow Agreement, the Lenders, the Company and the Issuer may by joint, irrevocable direction direct that the Escrow Agent release the Interest Payment Escrow to the Company in accordance with the terms of the Escrow Agreement.

216.   The statements referenced in ¶ 215 above were materially false and/or misleading for the reasons set forth in ¶ 125(iv), because iAnthus did not fund or maintain this escrow obligation from its agreement with GGP.

217.   In addition, on October 10, 2019, iAnthus filed a Material Change Report in connection with the Company's September 30, 2019 agreement with GGP. This report listed Defendant Kalcevich as the "senior officer of the Company [that] is knowledgeable about the material change and this Material Change Report."

218.   This Material Change Report described the terms of iAnthus's September 30, 2019 agreement with GGP, including that "[p]rior to completion of the Private Placement, GGP held, in aggregate, US$40,000,000 principal amount of Notes."

219.    iAnthus gave a "Full Description of Material Change" in this report and confirmed that "[n]o information has been omitted," but the report did not disclose Ford's self-dealing with Adler or GGP's $10 million "exit fee."

220.    The statements referenced in ¶¶ 217-19 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing and GGP's interests did not align with iAnthus's shareholders.

221.    This Material Change Report also described how GGP "waived its right to receive the quarterly cash interest payment due on September 30, 2019 and instead determined to receive such interest payment (in the amount of US$1,357,777.78) as a payment 'in kind' on September 30, 2019 (the 'PIK Payment'), which shall accrue and be added to the principal amount of such 2018 Notes."

222.    The statements referenced in ¶ 221 above were materially false and/or misleading because they did not disclose that iAnthus and GGP agreed to an "exit fee" that began to accrue interest at this point.

### K.    Statements in iAnthus's Release of Its Results for the Third Quarter of 2019

223.    On November 20, 2019, iAnthus released its financial results for the third quarter of 2019, including its Condensed Interim Consolidated Financial Statements and MD&A for the three months ended September 30, 2019 and 2018. These were the last financial results that iAnthus disclosed during the Class Period, because iAnthus inordinately delayed the release of its financial results for the fourth quarter and full year of 2019 until July 31, 2020, and its financial results for the first quarter of 2020 until August 14, 2020.

224.    iAnthus filed a CEO Certification, signed by Defendant Ford, and a CFO Certification, signed by Defendant Kalcevich, with CSE in connection with its quarterly report

55

for the third quarter of 2019, that made the same certifications that Ford and Kalcevich made the prior quarter.

225.    These filings for the third quarter of 2019 highlighted that "[o]n September 30, 2019, the Company announced that Gotham Green Partners ('GGP') has invested an additional $20.0 million through the purchase of secured convertible notes from iAnthus. GGP's investment is part of a broader $100.0 million financing plan to support the buildout of existing markets in which the Company currently operates."

226.    iAnthus's financial reports for the third quarter of 2019 also contained substantially the same false and misleading statements described in ¶¶ 193-99 and 203-04 above in connection with the first and second quarters of 2019 concerning the Company's financing activities and related-party transactions.

227.    In addition, iAnthus's statement in its MD&A for the third quarter of 2019 that it "complied with all covenants as at September 30, 2019" in its agreements with GGP, and its representation in its financial statement for the third quarter of 2019 that "[a]s at September 30, 2019, the Company was in compliance with all covenants" in its secured notes that it issued to GGP on September 30, 2019, were materially false and/or misleading for the reasons set forth in ¶ 125(iv), because iAnthus did not fund or maintain its interest escrow obligation from its September 30, 2019 agreement with GGP.

228.    iAnthus's financial statements for the third quarter of 2019 also represented that GGP "waived the right to receive the [$1.358 million] cash interest payment due on September 30, 2019, electing instead to add the balance to the principal amount payable for Tranche One Secured Notes. The new higher principal amount is subject to the same terms as the original principal balance of Tranche One Secured Notes at issuance."

229.    The statements referenced in ¶ 228 above were materially false and/or misleading because they did not disclose that iAnthus and GGP agreed to an "exit fee" that began to accrue interest at this point.

230.    The iAnthus Defendants also made several false and misleading statements on the Company's November 21, 2019, earnings call for the third quarter of 2019.

231.    Defendant Ford stated on this call that "[w]e are being prudent with our capital, we are generating cash in our operations, and we need the majority of our Gotham money, not for operations, but for additional major growth in our key markets."

232.    When an analyst asked Ford about his level of confidence that GGP was "going to actually follow through on making" the full $100 million in new financing, Ford responded:

> *I don't lose any sleep about the availability of money from Gotham.* It's the reason we picked them as our partner a year and a half ago, *[they've] been tremendously supportive, and have always followed through on everything they've always said they're going to do.* I can't speak to their structure and internal dynamic, but *I do know them personally, they never say something unless they can deliver it and I have full confidence that, if we do need to capital, that it will be there.* And I would like to make an observation that, we are cash generative in our operations. We're covering expenses, we're covering maintenance CapEx. *The vast bulk of that money from Gotham is for growth initiatives.*
>
> *So the viability of our company is fine,* it's really the growth aspects of it and we'd like to be in that position. We think that can help differentiate ourselves against a lot of our peers in the marketplace in 2020.

233.    Later on this call, in response to an analyst's question about whether iAnthus would be able to pledge assets or conduct a sale/leaseback to raise additional capital, Kalcevich responded that "*I think anything's available. One of the things we love [about] working [] with Gotham is, we're a big equity play for them, it's structured as a senior secured piece of debt, but they're not in for the lending returns.* So anything that can effectively lower cost of capital or allow us access to capital, build something out there and enhance shareholder returns, they are

in favor of. *So there is nothing off the table from a corporate finance perspective.*"

234.    Kalcevich then continued, in response to a follow-up question seeking to confirm whether this type of financing was an option, that "*everything is an option.* It's just a matter of what the cost is. A lot of these sale leasebacks are very costly. . . . If your choice is equity or sale leaseback, I'd probably guess the sale leaseback is going to compare favorably to the cost of equity, given where stock prices are today. I can't fault people for making that decision. *It's something that we have -- some of the arrows we have in the quiver, and we look at that, just like we look at any type of fundraising to continue to drive shareholder value.*"

235.    This analyst was reassured by Kalcevich's answer, commenting that "it[']s good to hear you have that flexibility, and congratulations on continued growth."

236.    The statements referenced in ¶¶ 231-34 above from iAnthus's earnings call for the third quarter of 2019 were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationships with GGP and its unsecured lenders were tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders, and iAnthus did not have adequate access to financing.

**L.    Statements in Connection With the December 2019 GGP Financing**

237.    On December 20, 2019, the Company issued a press released titled "iAnthus Closes on $36 Million Senior Secured Convertible Notes in a Third Tranche of Funding Led by Gotham Green Partners."

238.    This press release stated that iAnthus "is pleased to announce the closing of an additional $36.15 million of senior secured convertible notes from Gotham Green Partners ('GGP') and additional co-investors" as part of the Company's broader $100 million financing plan that was announced on September 30, 2019.  This release stated in the "aggregate, including its original investment made in May 2018, GGP has led investments totaling over $106 million."

239.   This press release quoted Kalcevich as stating that "[w]e are on the road to EBITDA positive and operational free cash flow positive in 2020, and the support from GGP will allow us to focus entirely on continued operational execution."

240.   The statements referenced in ¶¶ 237-39 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(iii), including because iAnthus's relationships with GGP and its unsecured lenders were tainted by Ford's self-dealing, GGP's interests did not align with those of iAnthus's shareholders, and iAnthus did not have a "fully-financed capital plan" to meet its ongoing financial obligations.

241.   On December 30, 2019, iAnthus filed a Material Change Report in connection with the Company's December 20, 2019 issuance of $36.15 million of senior secured notes to GGP. This report listed Defendant Kalcevich as the "senior officer of the Company [that] is knowledgeable about the material change and this Material Change Report."

242.   This Material Change Report described the terms of iAnthus's December 20, 2019 agreement with GGP, including that "[p]rior to the completion of the Subsequent Tranche, GGP held, in aggregate, US$61,357,778 principal amount of Notes."

243.   iAnthus gave a "Full Description of Material Change" in this report and confirmed that "[n]o information has been omitted," but the report did not disclose Ford's self-dealing with Adler or GGP's $10 million "exit fee."

244.   The statements referenced in ¶¶ 242-43 above were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing and GGP's interests did not align with iAnthus's shareholders.

**M.**   **Corporate Governance Statements**

245.   On October 17, 2019, iAnthus announced that it was nominating "five new

independent Directors" to its Board as part of its "Emphasis on Corporate Governance and Oversight." Ford stated in the press release making this announcement, "[t]his completes one of our main 2019 objectives; transforming our Board into a best-in-class Board in Cannabis, truly independent and highly experienced."

246.    On iAnthus's earnings call for the third quarter of 2019, Ford stated that "we've established leadership in the governance of your company. We have moved the company to a single class of stock. We recently announced plans to move our Board of Directors to a majority of independent directors, who are wholly unaffiliated with any existing investor or manager. . . . No one told us to do this. It was not required by anyone. But it's the right way to comport yourself, when you've been entrusted with capital from public investors."

247.    The statements referenced in ¶¶ 245-46 above concerning iAnthus's Board of Directors were materially false and/or misleading for the reasons set forth in ¶ 125(i), because Ford engaged in significant acts of self-dealing.

## N.    Statements in GGP's Required Disclosures

248.    Following each of its three financings during the Class Period, GGP filed a Required Disclosure by an Eligible Institutional Investor Under Part 4, on Form 62-103F3 ("Required Disclosure"), with CSE, including on June 7, 2018, October 10, 2019, and January 10, 2020. Defendant Adler signed each of these forms on behalf of GGP, certifying "that the statements made in this report are true and complete in every respect."

249.    These reports described the iAnthus securities that GGP acquired from its financings on May 14, 2018, September 30, 2019, and December 20, 2019.

250.    In each of these reports, GGP responded "N/A" to the question: "If the eligible institutional investor or any of its joint actors is a party to an agreement, arrangement or understanding that has the effect of altering, directly or indirectly, the eligible institutional

investor's economic exposure to the security of the class of securities to which this report relates, describe the material terms of the agreement, arrangement or understanding."

251.    GGP also stated in each of these reports, in response to an instruction to "[s]tate the purpose or purposes of the eligible institutional investor and any joint actors for the acquisition or disposition of securities of the reporting issuer," that the iAnthus securities were acquired "in the ordinary course of business, for investment purposes only and not for the purpose of exercising control or direction over [iAnthus]."

252.    In addition, GGP answered "N/A" to the questions of whether it had "any plans or future intentions which the eligible institutional investor and any joint actors may have which relate to or would result in . . . a material change in the present capitalization or dividend policy of the reporting issuer;" "a material change in the reporting issuer's business or corporate structure;" or "a class of securities of the reporting issuer being delisted from, or ceasing to be authorized to be quoted on, a marketplace."

253.    This Required Disclosure also instructed GGP to "[d]escribe the material terms of any agreements, arrangements, commitments or understandings between the eligible institutional investor and a joint actor and among those persons and any person with respect to securities of the class of securities to which this report relates, including but not limited to . . . finder's fees . . . [or] loan or option arrangements." GGP did not disclose Adler's personal payments to Ford or GGP's $10 million "exit fee" in response to this section of the form.

254.    The statements referenced in ¶¶ 248-53 above in GGP's Required Disclosures were materially false and/or misleading for the reasons set forth in ¶ 125(i)-(ii), including because iAnthus's relationship with GGP was tainted by Ford's self-dealing; GGP's investments were not made "for investment purposes only and not for the purpose of exercising control or

direction over [iAnthus]" (because GGP sought to take control of the Company); and GGP did not actually make a $10 million equity investment in light of GGP's $10 million "exit fee."

255.    In addition, GGP's October 10, 2019 and January 10, 2020 Required Disclosures stated that "on September 30, 2019, the Funds holding the Original Notes waived their right to receive the quarterly cash interest payment in the amount of US$1,357,777.78 which had accrued on the Original Notes and was due on September 30, 2019. Such Funds instead determined to receive such interest payment as a payment 'in kind' (the 'PIK Payment') on the Original Notes, which PIK Payment shall accrue and be added to the outstanding principal amount of such Original Notes, and shall be payable on the date that all remaining principal amount is due and payable pursuant to the terms of the Original Notes."

256.    The statements referenced in ¶ 255 above were materially false and/or misleading because they did not disclose that iAnthus and GGP agreed to an "exit fee" that began to accrue interest on September 30, 2019.

## VI.    THE TRUTH BEGINS TO EMERGE

257.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

258.    Throughout the Class Period, the price of iAnthus securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

259.    The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class

members have suffered significant losses and damages.

260.    On May 14, 2018, the first day of the Class Period, iAnthus's stock price closed at $3.69 per share. On March 18, 2019—the day that iAnthus announced its $35 million financing with Oasis and Hi-Med—the Company's stock price closed at $5.70 per share.

261.    iAnthus's stock price declined dramatically after March 18, 2019. By September 30, 2019, the day that iAnthus announced its $100 million financing plan with GGP, the Company's stock price closed at just $1.41 per share, a 75% decline since March 18.

262.    iAnthus's stock price then continued its decline since that time, through the Company's taking on onerous terms in its financing with GGP, defaulting on its loan obligations, the revelation of Ford's self-dealing, and, ultimately, the Company's restructuring that will wipe out iAnthus's shareholders in favor of GGP and Oasis.

### A.    The Entire Decline in iAnthus's Stock Price During the Class Period Resulted From Ford's Conflicted Financing Activities

263.    On July 13, 2020, the day that iAnthus announced its restructuring plan, the Company's stock price closed at just ten cents ($0.10) per share, a 98% decline from the Company's stock price on March 18, 2019. This wiped out approximately $763 million in shareholder value, from a market capitalization of approximately $780 million on March 18, 2019 to just $17 million on July 13, 2020.

264.    This enormous decline in value was the result of Defendants' fraud. Echelon Wealth Partners and Canaccord Genuity explained in notes that they published following the September 30, 2019 announcement of iAnthus's $100 million financing plan with GGP (*see infra* ¶¶ 275-77), that investors' concerns with iAnthus obtaining the financing that it needed had caused the Company's prior stock-price decline leading up to its September 30, 2019 announcement of the $100 million financing plan. Canaccord noted "the severe pressure on the

company's stock price as of late" and that investors were concerned about "the risk of IAN being able to secure the capital required to achieve its objectives."

265.    Echelon similarly noted that "uncertainty or concerns regarding the timing and nature of the required financing" that iAnthus needed prior to its September 30 announcement caused the Company's prior drop in share price.

266.    Concerns over the terms of iAnthus's financing with GGP continued after iAnthus announced its $36.15 million round of financing on December 20, 2019. Cantor Fitzgerald initiated coverage of iAnthus on February 13, 2020, in a note titled "Fast Expanding MSO, but We See Dilution Risk." The note explained that "[s]o far, Gotham Green Partners (GGP) has been a source of funds ($106Mn since May 2018), but at the cost of hefty dilution and interest." Cantor Fitzgerald also noted that "Last September, [iAnthus] agreed on a $100Mn facility with Green Gotham Partners; $20Mn were drawn in late Sep., and another $36.15Mn in mid Dec. – the terms are costly. . . . In other words, for the company to raise $36Mn it will need to pay interest expense equivalent to 5.6% of current annualized sales (it is already paying ~20% of sales in interest), and shareholders will see ~18% dilution ([22.5mn+10.8mm]/189mn)."

267.    Investors' concerns through September 2019 with the Company being able to meet its financing needs to support the businesses that it acquired during the Class Period, as well as the poor terms that iAnthus obtained in those financing arrangements, were materializations of the undisclosed risk of iAnthus taking on vast amounts of debt, and heavily diluting shareholders through equity issuances, to support its expansion strategy that Ford pursued under false pretenses. iAnthus's business plan that required this financing was dependent on the Company's relationship with its lenders that were tainted by Ford's self-dealing. If not for that self-dealing, iAnthus either would not have embarked on its financing

and expansion plan or would have obtained better terms for its financing.

268.   Defendants, however, continued to conceal their fraud when announcing iAnthus's financing with GGP because investors still did not know the true nature of iAnthus's relationship with GGP or Ford's self-dealing. iAnthus also falsely reassured investors that its $100 million financing plan with GGP, which Defendants announced on September 30, 2019, was part of GGP's long-term investment in the Company and that iAnthus was "certain" that GGP would fulfill its part of the plan. (*See supra* Sections V.J-K). Even if the terms of this financing were unduly onerous, investors were reassured by Defendants' statements that GGP would provide the amount of financing that iAnthus needed to maintain the viability of its business.

**B.   Specific Disclosures Revealed, or Were the Materialization of the Risks Concealed by, Defendants' Fraud**

269.   The market also reacted negatively to specific disclosures that revealed the falsity of Defendants' statements or were the materialization of the risks that those misstatements concealed.

270.   On September 30, 2019, after iAnthus disclosed its $100 million financing plan with GGP before the market opened, the Company's stock price dropped approximately 7%, or $0.21 per share, to close at $1.41 per share on twice the 20-day average trading volume.

271.   The Company's stock price continued to fall another 7% the following day, to close at $1.31 per share on October 1, 2019, also on nearly twice the 20-day average volume.

272.   The market reacted so negatively because of the highly unfavorable terms of this financing for iAnthus. Those terms were a result of Ford's receiving personal payments from Adler of GGP. Echelon Wealth Partners explained in an October 1, 2019 note titled "iAnthus Announces $100M Financing Deal via Senior Secured Convertible Debentures to Support

Growth Plans," that "we had assumed the Company would be able to access our forecasted $60M in required financing using non-dilutive secured debt, as such terms had become available for MSOs in the preceding months based on precedent transactions by several competitors."

273.    Echelon also commented in this note that "[w]hile it is positive that the Company has secured the necessary capital, and is now fully funded for existing growth plans, the terms are less favourable than those assumed under the secured debt (9%, no conversion feature). As such, we are adjusting our cost of capital from 15% to 18% in our DCF model." Echelon therefore lowered its price target for iAnthus from CAD$10 per share to CAD$7 per share, noting that "[o]ur dilution to the capital structure and adjustment to the cost of capital in light of this financing have the largest impact on our target price."

274.    Similarly, Canaccord Genuity commented in a note on September 30, 2019, discussing the financing plan with GGP, that "given the magnitude of the warrants that could be issued as part of this deal, this announcement is nonetheless dilutive to our target price."

275.    The Cantor Fitzgerald note discussed above also explains how poor the terms of this financing were for iAnthus. (*See supra* ¶ 269).

276.    The negative effects of iAnthus's relationship with GGP were felt further when iAnthus announced before the market opened on February 27, 2020, that it was taking the extraordinary step of suing Oasis, one of its main creditors, for allegedly interfering in the Company's business. iAnthus was responding to Oasis's complaints that iAnthus's financing from GGP violated the terms of Oasis's loan agreements with iAnthus.

277.    iAnthus's stock price fell approximately 16% (or $0.16) on February 27, 2020, to close at $0.84 per share, on trading volume that was over four times the 20-day moving average.

278.    Then, after iAnthus announced before the market opened on March 16, 2020, that

it received a counterclaim from Oasis seeking "a declaration that iAnthus is in breach of its obligations under the Unsecured Debenture (and related purchase agreement), a declaration that iAnthus has acted in a manner that is oppressive to Oasis, and an order for payment of funds sufficient to repay the Unsecured Debenture, plus any applicable interest, expenses and fees, in full," iAnthus's stock price fell approximately 18% (or $0.08 per share) to close at a price of $0.36 per share on March 16, 2020.

279.    At this point, while the risk of Defendants' fraudulent conduct had started to materialize, the core of their fraud was still hidden because the public did not know the true nature of Ford's improper relationship with GGP, that iAnthus agreed to give GGP a secret "exit fee" in connection with the $40 million loan that GGP made in May 2018, Ford's other acts of self-dealing, or the effect that this would have on iAnthus's business. iAnthus had even reassured investors in its earnings call for the third quarter of 2019 that it was "certain" that GGP would fulfill its part of the $100 million financing plan.

280.    For example, on March 18, 2020, Echelon Wealth Partners published a note titled "We see Potential for Upside if iAnthus." The analyst—not knowing about Ford's self-dealing— had a positive view of the Company's potential, but noted that it was essential for iAnthus to "secur[e] the capital necessary to achieve its current expansion objectives." The note emphasized that this "point is perhaps the biggest factor of uncertainty weighing on the stock, and is the biggest question mark in our model/valuation. The current uncertainty has undoubtably impacted the Street's outlook: for example, 2020 sales estimates range from $142-276M, by no means a small variance." iAnthus's performance was thus entirely dependent on the "Company achiev[ing] financing on reasonable terms."

281.    On March 31, 2020, the report alleging Ford's improper dealings (*see supra* ¶ 80) was published on the Stockhouse website at 3:58 pm.

282.    The Company's stock price fell approximately 6% (or $0.03 per share) that day and fell approximately 16% (or $0.08 per share) the following day, on April 1, 2020, to close at $0.45 per share on April 1 (from a closing price of $0.56 per share on March 30, 2020).

283.    The market, however, still did not know the extent of Ford's self-dealing, because the allegations at this point came from an anonymous report. On April 6, 2020, before the market opened, iAnthus announced that it was appointing the Special Committee to "investigate any potential conflicts of interest and/or required disclosures with respect to the Company's CEO and certain related parties," that the Company had defaulted on its $4.4 million interest payment owed to GGP, and that it was exploring "strategic alternatives" in light of its financing difficulties. This gave credibility to the Stockhouse allegations.

284.    On this news, iAnthus's stock price fell $0.29 per share, or nearly 62%, to close at approximately $0.18 per share on April 6, 2020 (from a closing price of approximately $0.47 per share on April 3, 2020, the prior trading day), on trading volume that was over 8 times the 20-day moving average.

285.    iAnthus's stock price subsequently declined even more as the effects of Defendants' fraud continued to materialize.

286.    On May 29, 2020, in a press release dated May 28, iAnthus announced that even though it had previously stated it would belatedly file its annual filings for 2019 by May 29, 2020, and its quarterly filing for the first quarter of 2020 by June 30, 2020, in order to be able to incorporate "subsequent events," it was now further postponing these filings. These further delays told investors that iAnthus was facing serious problems as a result of its improper relationship with GGP and attendant financial problems.

287.    iAnthus's stock price fell approximately 20% over the course of three consecutive

trading days, from approximately $0.40 per share at the close of trading on May 27, 2020, to $0.28 per share at the close of trading on June 1, 2020, including a drop of approximately 16% on May 28, 8% on May 29, 9% on June 1.

288.    After the market closed on June 11, 2020, iAnthus announced that it "does not expect to be in a position to make interest payments on the Secured Debentures or Unsecured Debentures due on June 30, 2020." This announcement also stated that iAnthus's "Strategic Alternatives Review Process is ongoing and there can be no assurance as to what, if any, alternative might be pursued by the Company or whether any such alternative would provide any value to the Company's shareholders."

289.    In response to this news making it much more likely that iAnthus would be forced into bankruptcy or restructuring, the Company's stock price fell approximately 31% on June 12, 2020 (or $0.10 per share) to close at a price of $0.22 per share on trading volume that was over three times the 20-day moving average.

290.    Before the market opened on June 23, 2020, iAnthus announced that GGP had provided a demand for repayment "of the entire principal amount, together with interest, fees, costs and other allowable charges that have accrued or may accrue" under iAnthus's Amended and Restated Secured Debenture Purchase Agreement, dated October 10, 2019, with GGP.

291.    In response to this news bringing iAnthus even closer to bankruptcy or restructuring, iAnthus's stock price fell approximately 18% (or $0.04 per share) on June 23, 2020, to close at approximately $0.19 per share (from a closing price of approximately $0.23 per share on June 22, 2020) on trading volume that was over twice the 20-day moving average.

292.    Before the market opened on July 13, 2020, iAnthus announced its restructuring agreement that stands to wipe out the Company's shareholders. iAnthus's stock price fell

approximately 46% (or $0.09 per share) that day to close at $0.10 per share (from a closing price of approximately $0.19 per share on July 10, 2020, the prior trading day) on trading volume that was over 8 times the 20-day moving average.

293.    iAnthus's stock continued to fall the following two days, including 16% on July 14, 2020, and approximately 13% on July 15, 2020, to close at approximately $0.07 per share on July 15, on nearly twice the 20-day average trading volume on both days.[17]

294.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

295.    Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described in ¶ 125 above for the reasons described in the Substantive Allegations section of this complaint.

296.    Defendants Ford and Kalcevich's actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certifications in connection with iAnthus's filing of its periodic financial reports. These certifications certified, among other things, that the "filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made," and that the reports "fairly present in all material respects the financial condition, financial performance and cash flows of the issuer."

297.    Similarly, Defendant Adler's actual knowledge of the falsity of the alleged

---

[17].iAnthus also announced on the morning of July 15, 2020, that the Company missed the July 14, 2020 deadline for the Company to file its financial statements for the first quarter of 2020. This delay was also the result of Defendants' improper dealings and ensuing restructuring.

misstatements and omissions is established by his certifying in GGP's Required Disclosures "that the statements made in this report are true and complete in every respect."

298.   Before vouching for the accuracy of the statements made in iAnthus's and GGP's CSE filings, the certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations of iAnthus and GGP described therein.

299.   Ford's scienter is also established because the key fraudulent statements and conduct at issue focuses on his personal self-dealing. This includes:

- Ford's receipt of multiple personal payments from Adler, including the $100,000 payment that the Special Committee concluded that he received on December 21, 2019;

- Ford's receipt of $300,000 in personal loans from David Rozinov (who brokered iAnthus's $60 million in unsecured debt that it issued in March and May 2019), including the $60,000 payment that the Special Committee concluded that Ford received from "a non-arm's length party";

- Ford's personal loans from Randy Maslow, his co-founder of the Company who served as the Company's President during the Class Period; and

- Ford's arranging for iAnthus to pay his sister $150,000 a year even though she did not earn those funds based on work for the Company.

300.   In addition, Ford's scienter is established by CW 3's description of Ford's keeping information about the relationship with GGP "close to the vest."

301.   Defendants' scienter is further established by CW 2's and CW 3's descriptions of iAnthus's funding from GGP. CW 2 commented that "with a finance team this seasoned in place, it makes you scratch your head." Moreover, CW 3 observed that because iAnthus's "capital structure had issues," there was "pressure to produce ever-increasing forecasts." This witness even stopped being invited to certain meetings with the Company's other executives because his or her "math was different enough."

302.   Ford's scienter is also established by his sale of iAnthus stock during the Class

Period for net proceeds of $1.48 million at prices ranging from $5 per share to $1.25 per share—all of which were far higher than the price of iAnthus stock after Defendants' fraud was revealed.

303.    Ford's and Kalcevich's scienter is also established by iAnthus's June 6, 2019, cancellation of its prior stock options grant from April 23, 2019 and its re-grant of approximately 9.65 million options—even more than it had granted in April—with a substantially lower exercise price of just $5.35(CAD) per share. This included approximately 1.72 million options granted to Ford, 1.67 million options granted to Maslow, 1 million options granted to Kalcevich, and 700,000 options granted to each of Stavola and Robert Galvin (another iAnthus Director). Even after shareholders were outraged at this windfall for Company insiders, the iAnthus Defendants at first tried to keep these lucrative options by portraying their actions as a public relations issue and trying to justify their receipt of these stock options.

304.    The iAnthus Defendants' scienter is further established by the Company's repayment of the full outstanding balance that it owed to Stavola of $10.8 million in principal and $24,000 in interest, on the note that was owed to her and matured on January 19, 2020. The Company did not reveal this payment until July 31, 2020, when it finally disclosed its financial results for the full year 2019, nearly four months after the Company was originally scheduled to do so. This payment to iAnthus's Chief Strategy Office and a Director shortly before the Company would default on the interest owed to its lenders and enter into a restructuring agreement that will wipe out the Company's shareholders, highlights the extent to which iAnthus prioritized the financial interests of its executives over the interests of ordinary shareholders.

305.    Ford's scienter is further established by his and Maslow's offer in March 2020 to buy iAnthus for $0.50 per share. This offer to buy iAnthus after its value had declined so substantially as a result of the Defendants' fraudulent financing activities shows Ford's financial

motive when engaging in all of those activities that caused the iAnthus's decline.

306. Ford and Adler's scienter is further established by CW 1's description of their close personal friendship, including their frequent social meetings outside the office.

307. Adler's scienter is further established by his personally making the payments to Ford described above.

308. Adler's scienter is also established by his financial motive to take over iAnthus for a price that is far below the Company's value.

309. Defendants' scienter is further established by iAnthus's dealings with GGP. The decision to default on iAnthus's debt obligations even though iAnthus could have raised capital through other means to meet its obligations to GGP, shows that Defendants were favoring GGP at the expense of ordinary shareholders.

310. The resignation of Mark Dowley from iAnthus's Board of Directors on May 8, 2020, without any explanation given for his resignation, further highlights Defendants' scienter. Dowley was one of iAnthus's new independent directors that started in December 2019 as part of what the Company promoted as substantial corporate governance reforms. His resignation so soon into his term as a Director, and less than two weeks after iAnthus announced the Special Committee's findings of Ford's improper dealings, shows that Dowley was not comfortable being a part of iAnthus's Board because of Ford's misconduct.

311. The resignation of Stavola—iAnthus's Chief Strategy Officer and a Director—on August 4, 2020, soon after the Special Committee's investigation and the Company's planned restructuring, also shows Defendants' scienter.

312. Ford and Kalcevich's scienter is also established because the alleged misstatements and omissions at issue concerned iAnthus's core operations. iAnthus was entirely

dependent on its financing form GGP and its unsecured lenders, which totaled approximately $166 million during the Class Period, to fund its business. This comprised the entirety of iAnthus's debt during the Class Period and was essential to iAnthus's business plan. Ford was iAnthus's CEO, co-founder, and a Director until he was forced to resign on April 27, 2020. Kalcevich was iAnthus's Chief Financial Officer at all relevant times and a Director until December 5, 2019. Ford and Kalcevich, by virtue of their roles in senior management and on the Company's Board, including their involvement in the Company's core operations, would have had knowledge of the true nature of the iAnthus's core businesses during the Class Period, including the nature of the Company's relationship with GGP and the unsecured lenders. In addition, Ford and Kalcevich had access to reports and communications describing these operations.

313.    Adler's scienter is also established because the alleged misstatements and omissions at issue here concerned GGP's core operations. GGP focuses its investments on the cannabis industry. The $106 million that Defendants stated that GGP invested in iAnthus during the Class Period was a substantial investment for GGP at the core of its business. GGP's funding that it provided to iAnthus was one of its largest investments. Adler was GGP's Managing Member and senior-most executive who controlled the closely held investment company. Adler, by virtue of his role in GGP's senior management and involvement in its core operations, would have had knowledge of the true nature of GGP's relationship with iAnthus during the Class Period.  In addition, Adler had access to reports and communications describing these dealings.

314.    iAnthus and GGP each had scienter as to the false and misleading nature of the statements described above based on the knowledge of Ford and Kalcevich (for iAnthus) and Adler (for GGP), who were each company's most senior executives and on their management

74

teams. In addition, because the false and misleading statements at issue relate to iAnthus's and GGP's basic business models, each company's scienter can be inferred because these statements would have been approved by corporate officials that knew they were false or misleading.

## VIII.   NO SAFE HARBOR

315.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## IX.    CLASS ACTION ALLEGATIONS

316.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired iAnthus securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures and the materialization of the undisclosed risks. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

317.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, iAnthus securities were actively traded on the CSE and OTCQX (or OTCQB earlier in the Class Period).  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by iAnthus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

318.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

319.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

320.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of iAnthus;

- whether the Individual Defendants caused iAnthus or GGP to issue false and

misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of iAnthus securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

321.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for them to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

322.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- iAnthus securities are traded in an efficient market;

- the Company's stock was liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the CSE and OTCQX (or OTCQB earlier in the Class Period), and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold iAnthus securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of

77

the omitted or misrepresented facts

323.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

324.    Alternatively, Plaintiff and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United State*s, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.    <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

325.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

326.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

327.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members; (ii) artificially inflate and maintain the market price of iAnthus securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire iAnthus

securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

328.     The iAnthus Defendants also had a duty to disclose the material facts discussed above because under Canadian securities law, there is a duty of reporting issuers to publicly disclose any material changes to the issuer's affairs, both through a news release disclosing the substance of the change and by filing a material change report with the CSE. Moreover, under International Accounting Standards (IAS 24), Canadian public companies are required to disclose related party transactions. iAnthus therefore had an independent duty to disclose the material facts discussed above.

329.     In addition, the GGP Defendants had a duty under Canadian securities law to make the Required Disclosures by an Eligible Institutional Investors.

330.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, CSE filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for iAnthus securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about iAnthus's finances and business condition.

331.     By virtue of their positions at iAnthus and GGP, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of

the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

332.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of iAnthus or GGP, the Individual Defendants had knowledge of the details of iAnthus's or GGP's internal affairs.

333.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of iAnthus and GGP. As officers and/or directors of a publicly-held company, or of an institutional investor making an investment in a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to iAnthus's or GGP's businesses, operations, future financial condition and future prospects.

334.    As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of iAnthus securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning iAnthus's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired iAnthus securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

335.    During the Class Period, iAnthus securities were traded on an active and efficient

market. Plaintiff and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of iAnthus securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of iAnthus securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of iAnthus securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

336.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

337.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of iAnthus securities during the Class Period, upon the disclosure that the Company and GGP had been disseminating misrepresented information to the investing public.

## XII.   COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

338.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

339.    During the Class Period, Ford and Kalcevich participated in the operation and management of iAnthus, and Adler participated in the operation and management of GGP. Because of their senior positions, they knew the adverse non-public information about iAnthus's

and GGP's false and misleading misstatements.

340.    As officers and/or directors of a publicly owned company or of an institutional investor making an investment in a public company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to iAnthus's (for Ford and Kalcevich) and GGP's (for Adler) financial condition and results of operations, and to correct promptly any public statements issued by iAnthus or GGP which had become materially false or misleading.

341.    Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which iAnthus and GGP disseminated in the marketplace during the Class Period concerning  their operations.

342.    In addition, the Individual Defendants authorized the publication of the documents and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within iAnthus and GGP and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were false and misleading.

343.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause iAnthus (for Ford and Kalcevich) and GGP (for Adler) to engage in the wrongful acts complained of herein. Each of the Individual Defendants exercised control over the general operations of iAnthus or GGP and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. The Individual Defendants were therefore "controlling persons" of iAnthus

(for Ford and Kalcevich) and GGP (for Adler) within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of iAnthus's securities.

344.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by iAnthus (for Ford and Kalcevich) and GGP (for Adler).

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XIV.   DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 4, 2020                           Respectfully submitted,

                                                   **POMERANTZ LLP**

                                                   */s/ Michael Grunfeld_____*
                                                   Jeremy A. Lieberman
                                                   Michael Grunfeld
                                                   600 Third Avenue, 20th Floor

New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mgrunfeld@pomlaw.com

*Lead Counsel for Lead Plaintiff*

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-8209
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2020, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by other means to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF System.

*/s/Michael Grunfeld*
Michael Grunfeld
