**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE iANTHUS CAPITAL HOLDINGS, INC. SECURITIES LITIGATION | No.: 1:20-cv-03135-LAK <br><br> **LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| THIS DOCUMENT RELATES TO: SECURITIES CLASS ACTION (CASE Nos: 1:20-cv-03135 AND 1:20-cv-03513) | |

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND ...................................................................................... 5

    A.   iAnthus's Business ............................................................................................. 5

    B.   Ford's Conflicts of Interest ............................................................................... 6

    C.   Defendants Misrepresented GGP as Making an Equity Investment .................... 10

    D.   iAnthus Did Not Fund the Escrow Account That it Agreed to With GGP ........... 11

    E.   Defendants' False and Misleading Statements ..................................................... 12

        1.   Statements About Conflicts .................................................................... 12

        2.   Descriptions of iAnthus's Debt ............................................................. 13

        3.   Statements About the Availability of Financing ...................................... 14

        4.   Escrow Statements ................................................................................. 15

        5.   Statements of Full Disclosure ................................................................ 16

        6.   Statements by GGP ............................................................................... 16

    F.   Defendants Profited From Their Fraud ............................................................... 18

    G.   Defendants' Fraud Caused Substantial Losses to iAnthus's Shareholders ........... 19

    H.   Defendants Improperly Rely on Information Outside the Record ........................ 19

        1.   Defendants' Improper Assertions Related to the Exit Fee ....................... 19

        2.   Defendants' Improper Assertions Related to the Canadian Proceedings . 20

        3.   Defendants' Improper Assertions Related to iAnthus's Collapse ............ 21

        4.   The Court Should Reject Defendants' Extraneous Factual Assertions .... 22

III. ARGUMENT ............................................................................................................. 23

    A.   The Complaint Satisfies *Morrison* ................................................................... 24

        1.   The OTCX and OTCQB Markets are Domestic Exchanges .................... 24

        2.   Plaintiff Transacted in iAnthus Securities in the United States ................ 26

        3.   Plaintiff's Claims Are Not Predominantly Foreign ................................. 28

    B.   The Complaint Should Not be Dismissed Under the Doctrine of *Forum Non Conveniens* ....................................................................................................... 29

    C.   The Complaint Adequately Pleads False and Misleading Statements .................. 32

        1.   The iAnthus Defendants' Materially False and Misleading Statements About Conflicts of Interest ..................................................................... 32

        2.   Materially False and Misleading Descriptions of iAnthus's Debt ............ 38

            a)   Descriptions of iAnthus's Debt Were Materially False and Misleading Because of Ford's Self-Dealing .............................. 39

           b)      Descriptions of iAnthus's GGP Loans Were Materially False and Misleading Because of the Exit Fee................................................. 41

           c)      The GGP Defendants' Statements About GGP's Loans Were Materially False and Misleading...................................................... 45

      3.      The iAnthus Defendants' Materially False and Misleading Statements About the Availability of Financing ......................................................... 45

      4.      Defendants' Escrow Statements Were Materially False and Misleading. 50

      5.      Defendants' Statements of Full Disclosure Were Materially False and Misleading............................................................................................. 51

           a)      iAnthus's Statements of Full Disclosure...................................... 51

           b)      The GGP Defendants' Statements of Full Disclosure .................. 52

  D.      The Complaint Pleads a Strong Inference of Scienter......................................... 54

      1.      The Complaint Adequately Pleads Defendants' Motive and Opportunity 55

      2.      The Complaint Pleads a Strong Inference of Conscious Misbehavior and Recklessness ...................................................................................... 58

      3.      The Core Operations Doctrine Supports a Strong Inference of Scienter.. 61

      4.      The Inference of Scienter is at Least as Compelling as Defendants' Competing Inference................................................................................ 62

  E.      The GGP Defendants Made Their Statements "In Connection With" the Purchase or Sale of a Security.............................................................................................. 63

  F.      The Presumption of Reliance Applies ................................................................. 64

  G.      The Complaint Adequately Pleads Economic Loss and Loss Causation ............. 66

  H.      The Complaint Adequately Pleads Scheme Liability .......................................... 69

  I.      The Complaint Adequately Pleads Control Person Liability................................ 69

IV.   CONCLUSION.......................................................................................................... 70

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABF Capital Mgmt. v. Askin Cap. Mgmt., L.P.*,
No. 96 CIV. 2978 (RWS), 1997 WL 317365 (S.D.N.Y. June 12, 1997) ..........................42, 43

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)...................................................................................................26

*Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009)...............................................................................55, 58

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
No. 11 CIV. 2279 CM, 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)....................................67

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972).............................................................................................................66

*Alki Partners, L.P. v. Vatas Holding GmbH*,
769 F. Supp. 2d 478 (S.D.N.Y. 2011)...............................................................................65, 66

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) ..........................................................................................65

*Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014).....................................................................................47

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................23

*Atlantica Holds. v. BTA Bank JSC*,
No. 13-CV-5790 JMF, 2015 WL 144165 (S.D.N.Y. Jan. 12, 2015)................................26, 28

*Atlantica Holds. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
2 F. Supp. 3d 550 (S.D.N.Y 2014), *aff'd in part,* 813 F.3d 98 (2d Cir. 2016) ......................26

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................................................61

*In re Avon Sec. Litig.*,
No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ..............................49

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)....................................................................................31

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................43, 64, 65

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................23

*Billhofer v. Flamel Techs., SA.*,
  663 F. Supp. 2d 288 (S.D.N.Y. 2009)....................................................................23

*Black v. Finantra Capital*,
  418 F.3d 203 (2d Cir. 2005)...................................................................................65

*Blank v. TriPoint Glob. Equities, LLC*,
  338 F. Supp. 3d 194 (S.D.N.Y. 2018)..............................................................55, 57

*In re BofI Holding, Inc. Sec. Litig.*,
  No. 315CV02324GPCKSC, 2017 WL 2557980 (S.D. Cal. May 23, 2017)............46

*Bohn v. Bartels*,
  620 F. Supp. 2d 418 (S.D.N.Y. 2007)....................................................................31

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008)...............................................................21, 67

*Burke v. China Aviation Oil Corp.*,
  421 F. Supp. 2d 649 (S.D.N.Y. 2005).....................................................................65

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).....................................................................................38

*Caiola v. Citibank, N.A., New York*,
  295 F.3d 312 (2d Cir. 2002)..............................................................................52, 53

*In re Carter-Wallace*,
  150 F.3d 153 (2d Cir. 1998)....................................................................................63

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017)...............................................................................60

*In re CINAR Corp. Sec. Litig.*,
  186 F. Supp. 2d 279 (E.D.N.Y. 2002) ....................................................................31

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. Nov. 9, 2010)........................................................41

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................22

*City of Brockton Ret. Sys. v. Avon Prod., Inc.*,
  No. 11 CIV. 4665 PGG, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)................................47

*City of Providence, R.I. v. Bats Glob. Mrkts, Inc.*,
  878 F.3d 36 (2d Cir. 2017)..................................................................................................69

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
  No. 20-cv-2031-JSR, 2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020)......................................42

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015)....................................................................................67

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*,
  413 F. Supp. 3d 187 (S.D.N.Y. 2019)..................................................................................42

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018).......................................................................14, 39, 47

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................................66, 67, 68

*E.ON AG v. Acciona, S.A.*,
  468 F. Supp. 2d 559 (S.D.N.Y. 2007)..................................................................................30

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)..................................................................................38

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017).......................................................................34, 48, 69

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
  343 F.3d 189 (2d Cir. 2003)..................................................................................................68

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019)................................................................................37

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
  No. 14 Civ. 0950(LAK)(AJP), 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015)...........................66

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  783 F.3d 395 (2d Cir. 2015)..................................................................................................67

*In re ForceField Energy Inc. Sec. Litig.*,
  2015 WL 4476345 (S.D.N.Y. July 22, 2015) .......................................................................65

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................................................46

*GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*,
   838 F.3d 214 (2d Cir. 2016)...............................................................................31

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000)..............................................................4, 36, 43, 55

*Gauquie v. Albany Molecular Rsch.*,
   No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016)........................61

*In re GE Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012), *recon. denied*...............................................62

*Gentry v. Kaltner*,
   2020 WL 467358 (S.D.N.Y. Mar. 25, 2020) ........................................................22

*In re GeoPharma, Inc. Sec. Litig.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006)............................................................56, 57

*In re Glob. Brokerage, Inc.*,
   No. 1:17-cv-00916-RA, 2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019)......................39, 42, 48

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019)............................................................48, 50

*Hayden v. Paterson*,
   594 F.3d 150 (2d Cir. 2010).............................................................................23

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12 Civ. 8557(CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)....................................61

*Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*,
   688 F. Supp. 2d 229 (W.D.N.Y. 2010) .................................................................55

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................................65

*In re ITT Educ. Servs.*,
   34 F. Supp. 3d 298 (S.D.N.Y. 2014).....................................................................38

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306 (S.D.N.Y. 2012).....................................................................58

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)............................................................................... *passim*

*Johnson v. Sequans Commc'ns S.A.*,
   2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ..........................................................50

*Joyner v. Cont'l Cas Co.*,
   2012 WL 92290 (S.D.N.Y. Jan. 9, 2012) ...............................................................................31

*In re JPMorgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. Mar. 28, 2005).....................................................................38

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...................................................................................50

*Khoja v. Orexigen Therapeutics*,
   899 F.3d 988 (9th Cir. 2018) ...........................................................................................22, 23

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*,
   No. 01 CIV. 2946 (AGS), 2002 WL 432390 (S.D.N.Y. Mar. 20, 2002)................................29

*Kitaru Innovations Inc. v. Chandaria*,
   698 F. Supp. 2d 386 (S.D.N.Y. 2010)....................................................................................31

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)....................................................................................48

*Last Atlantis Cap. v. AGS Spec. Parts.*,
   749 F. Supp. 2d 828 (N.D. Ill. Nov. 4, 2010) ........................................................................63

*In re LendingClub Sec. Litig.*,
   254 F. Supp. 3d 1107 (N.D. Cal. 2017) .....................................................................36, 37, 40

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)............................................................................................68, 69

*Lewy v. SkyPeople Fruit Juice, Inc.*,
   No. 11 CIV. 2700 PKC, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ..........................37, 61

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015).....................................................................................44

*Livingston v. Shore Slurry Seal*,
   98 F. Supp. 2d 594 (D.N.J. 2000) ..........................................................................................35

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)............................................................................................54, 70

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019)...........................................................................................................69

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................................................................................40

*In re MCI Worldcom, Inc. Sec. Litig.*,
    93 F. Supp. 2d 276 (E.D.N.Y. 2000) ...............................................................58, 59

*McIntire v. China Mediaexpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)...............................................................37, 59

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)........................................................................... *passim*

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    78 F. Supp. 3d 1215 (N.D. Cal. 2015) ..................................................................37

*Morrison. Giunta v. Dingman*,
    893 F.3d 73 (2d Cir. 2018)............................................................................24, 27

*Morrison v Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010).......................................................................................... *passim*

*Muller-Paisner v. TIAA*,
    289 F. App'x 461 (2d Cir. 2008) ..........................................................................32

*Muzinich & Co. v. Raytheon*,
    No. CV-01-284-S-BLW, 2002 U.S. Dist. LEXIS 26962 (D. Idaho Apr. 30,
    2002) .......................................................................................................................63

*In re Mylan N.V. Sec. Litig.*,
    No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018).................46

*Myun–Uk Choi v. Tower Rsch. Cap. LLC*,
    890 F.3d 60 (2d Cir. 2018)....................................................................................27

*In re Nevsun Res. Ltd.*,
    No. 12 Civ. 1845(PGG), 2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ...............60

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)...................................................................63

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................................54, 60

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019)..................................................................................22

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    No. 18-cv-9848-PGG, 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)...................43

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990).........................................................................46

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014)......................................................................24, 27, 28, 29

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005)......................................................................65

*In re Parmalat Sec. Litig.*,
  No. 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)..........................64, 65

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
  No. 14 CIV. 9443 (ER), 2016 WL 2859622 (S.D.N.Y. May 16, 2016)..................................44

*In re Perrigo Co. PLC Sec. Litig.*,
  435 F. Supp. 3d 571 (S.D.N.Y. 2020)......................................................................43

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................................34, 47

*In re Petrobras Sec. Litig.*,
  150 F. Supp. 3d 337 (S.D.N.Y. 2015)......................................................................26

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
  *Arbitron Inc.*,
  741 F. Supp. 2d 474 (S.D.N.Y. 2010)......................................................................59

*In re Poseidon Concepts Sec. Litig.*,
  No. 13CV1213 (DLC), 2016 WL 3017395 (S.D.N.Y. May 24, 2016) ................27, 28, 29, 30

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
  937 F.3d 94 (2d Cir. 2019)..............................................................................28, 29

*In re Refco Inc. Sec. Litig.*,
  No. 07-md-1902-JSR, 2010 WL 11500542 (S.D.N.Y. Oct. 22, 2010)..................................42

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................60

*Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................59

*Ret. Sys. of Gov't of V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)................................................................................54

*Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)......................................................................54

*Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)......................................................................64

*Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................................54

*Richman v. Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................................33

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)........................................................................................38

*In re Royal Grp. Techs. Sec. Litig.*,
  No. 04 CIV.9809 HB, 2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005) ....................31

*Rubenstein v. Cosmos Holdings, Inc.*,
  19-cv-6976 (KPF), 2020 WL 3893347 (S.D.N.Y. July 10, 2020).............24, 25, 26

*S.E.C. v. Goldman Sachs & Co.*,
  790 F. Supp. 2d 147 (S.D.N.Y. 2011)........................................................................41

*Salvani v. ADVFN PLC*,
  50 F. Supp. 3d 459 (S.D.N.Y. 2014), *aff'd sub nom. Salvani v.*
  *InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015)........................................65

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris*
  *Companies*,
  75 F.3d 801 (2d Cir. 1996)........................................................................................56

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)........................................................................................32

*SEC v. Kueng*,
  No. 09 Civ. 8763 (BSJ) (AJP), 2010 WL 3026618 (S.D.N.Y. July 30, 2010).......23

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)......................................................................................56

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)...........................................................59

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012)..................................................................63, 69

*Speakes v. Taro Pharm. Indus., Ltd.*,
  No. 16-CV-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)...............66

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008)......................................................................................22

x

*Strategic Value Master Fund, Ltd. v. Cargill Fin. Serv. Corp.*,
    421 F. Supp. 2d 741 (S.D.N.Y. 2006)......................................................................31

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015).............................................................................52, 53

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................54, 62

*In re Thornburg Mortg., Inc. Sec. Litig.*,
    683 F. Supp. 2d 1236 (D.N.M. 2010) ....................................................................44

*Tobia v. United Grp. of Companies, Inc.*,
    No. 115CV1208BKSDEP, 2016 WL 5417824 (N.D.N.Y. Sept. 22, 2016) ......................33, 63

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)..................................................................................49

*In re Tronox, Inc. Sec. Litig.*,
    2010 WL 2835545 (S.D.N.Y. June 28, 2010) ............................................................65

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
    No. 18-CV-02104-DME-NYW, 2019 WL 2521834 (D. Colo. June 18, 2019) ......................33

*In re UBS Auction Rate Sec. Litig.*,
    2010 WL 2541166 (S.D.N.Y. June 10, 2010) ............................................................65

*United States v. Isaacson*,
    752 F.3d 1291 (11th Cir. 2014) ............................................................................26

*In re Vale S.A. Sec. Litig.*,
    No. 19CV526RJDSJB, 2020 WL 2610979 (E.D.N.Y. May 20, 2020) ................................33

*Valentini v. Citigroup, Inc.*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011)......................................................................68

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)......................................................................39

*In re VEON Ltd. Sec. Litig.*,
    2017 WL 4162342 (ALC) (S.D.N.Y. Sept. 19, 2017)....................................................54

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    No. 15 Civ. 2106 (ER), 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017)................................34

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    195 F. Supp. 3d 528 (S.D.N.Y. 2016).......................................................................64

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)..................................................................................32, 48, 68

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*,
   No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ............................................30

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   No. CIV.A. 13-6731, 2015 WL 3755218 (E.D. Pa. June 16, 2015) ......................................49

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)....................................................................................................66

*Weiss v. Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ....................................................................................60

*Zhi Zhong Qiu v. Diamond*,
   No. 19 Civ 2050 (ER), 2020 WL 978352 (S.D.N.Y. Feb. 27, 2020) ......................................22

**Rules**

Fed. R. Civ. P. 8 ..................................................................................................................66

Fed. R. Civ. P. 9 ..............................................................................................................32, 66

Fed. R. Civ. P. 12 ................................................................................................................23

Fed. R. Civ. P. 15 ................................................................................................................70

Fed. R. Civ. P. 44 ................................................................................................................31

**Other Authorities**

17 C.F.R. § 240.10b–5 ..................................................................................................31, 68, 69

Lead Plaintiff Jose Antonio Silva ("Plaintiff") respectfully submits this Omnibus Memorandum of Law in Opposition to the Motions to Dismiss of Defendants iAnthus Capital Holdings, Inc. ("iAnthus" or the "Company") and Julius John Kalcevich ("Kalcevich") (Dkt. Nos. 67-69), Hadley C. Ford ("Ford") (Dkt. Nos. 64-65), and Gotham Green Partners, LLC ("GGP") and Jason Adler ("Adler") (Dkt. Nos. 61-63); (*see* Dkt. No. 54 ¶¶ 5-6).[1]

## I.    INTRODUCTION

This action arises out of Defendants' fraudulent misrepresentations concerning iAnthus's $156 million in debt that it raised during the Class Period. iAnthus is a cannabis company that purports to own "best-in-class" licensed cannabis businesses throughout the United States. ¶ 30. The Company's business model depends on its raising capital through debt financing so that it can continue expanding throughout the country. During the Class Period, starting on May 14, 2018, iAnthus raised $156 million in debt, including $96 million in senior secured debt from GGP and $60 million from several unsecured lenders. iAnthus's shareholders trusted Defendants' assurances that iAnthus entered into its substantial debt transactions without any conflicts of interest. Investors were therefore shocked to learn toward the end of the Class Period that Ford engaged in egregious self-dealing by taking hundreds of thousands of dollars in personal payments in connection with the Company's loans. Defendants also misrepresented a key term of iAnthus's transactions with GGP—a secret $10 million exit fee (the "Exit Fee") that fundamentally altered the nature of their relationship by protecting the entire downside risk of a $10 million equity investment that GGP purportedly made in iAnthus.

---

[1] "¶ _" references are to the Consolidated Amended Class Action Complaint ("Complaint," Dkt. No. 48). Capitalized terms not defined herein have the same meaning as in the Complaint. iAnthus and Kalcevich's memorandum of law in support of their motion to dismiss (Dkt. No. 68) is referred to herein as the "iAnthus MTD"; and the GGP Defendants' memorandum of law in support of their motion dismiss (Dkt. No. 62) is referred to herein as "GGP MTD." iAnthus, Kalcevich, and Ford are referred to collectively as the "iAnthus Defendants." GGP and Adler are referred to collectively as the "GGP Defendants."

An online report on March 31, 2020 revealed that Ford received hundreds of thousands of dollars in personal payments from Defendant Adler (GGP's Managing Member) and David Rozinov, who was the broker for iAnthus's $60 million in unsecured debt. A subsequent investigation by a Special Committee of iAnthus's Board of Directors confirmed key portions of this report, including that Ford received a $100,000 payment from Adler on December 21, 2019 and that he received a $60,000 payment from a "non-arm's length party" that can only be Rozinov. This blatant self-dealing tainted iAnthus's $156 million in debt that it raised during the Class Period. After iAnthus defaulted on its debt on April 6, 2020, it agreed to a restructuring agreement in which GGP and the Company's other lenders stand to take over at least 97.25% of the Company. This deal is even more favorable to GGP, which will receive 48.625% of iAnthus in exchange for reducing iAnthus's $97.5 million in debt by just $7.5 million.

Defendants made several categories of misrepresentations during the Class Period concerning iAnthus's relationship with its lenders. *First*, the iAnthus Defendants misrepresented that they disclosed all conflicts of interest, including "related party transactions." These statements were plainly false in light of Ford's self-dealing in connection with iAnthus's loans.

*Second*, Defendants misrepresented the nature of iAnthus's loans with GGP. They described GGP as making a $10 million "equity" investment in the Company in addition to its $40 million loan that it made on May 14, 2018. That was not true because GGP's supposed $10 million equity investment was protected by GGP's secret $10 million Exit Fee. Having the downside risk of GGP's equity investment protected negated the equity nature of that investment and made GGP's interests diverge from those of iAnthus's shareholders.

*Third*, by failing to disclose Ford's self-dealing and GGP's Exit Fee, Defendants misrepresented the nature of iAnthus's $156 million in debt from GGP and the Company's

unsecured lenders. iAnthus pointed to those historical transactions as a basis for its ability to obtain additional financing, while omitting that those prior loans were tainted by Ford's self-dealing and GGP's secret Exit Fee. For example, in each of its quarterly and annual filings, iAnthus assured investors based on its prior loans that the Company "has historically had, and continues to have, access to equity and debt financing." Then, after GGP and the Company reached a $100 million financing plan in September 2019, the iAnthus Defendants told investors that they were "certain" and had "full confidence" in GGP's providing that full amount of funding. ¶¶ 209-11, 232. But GGP did not provide the final $43.85 million of this $100 million, which enabled GGP to demand repayment of its debt and allowed iAnthus's lenders take over the Company from its shareholders.

*Fourth*, Defendants falsely represented that they disclosed all material terms of their transactions. These statements were false in light of Ford's self-dealing and GGP's secret Exit Fee.

*Fifth*, Defendants misrepresented that iAnthus complied with a provision in its September 30, 2019 agreement with GGP that required the Company to post $5.27 million in an escrow account so that those funds would be available to repay GGP.

If investors would have known the true nature of iAnthus's relationship with its lenders— including Ford's self-dealing and GGP's Exit Fee—then they would have known the actual risk that iAnthus faced that its lenders would take over the Company if iAnthus were to default on its large debt obligations. In their motions to dismiss, Defendants concede the key factual allegations in the Complaint. They acknowledge (as they must) the Special Committee's finding that Ford took the $160,000 in personal payments from Adler and a "non-arm's length party." Defendants also concede that they did not disclose the Exit Fee until after the Class Period. But Defendants make other assertions that improperly ask the Court to resolve factual disputes in their favor.

Defendants argue that they did not make any misstatements concerning Ford's self-dealing

3

because he did not accept any payments until the $100,000 that Adler gave him on December 21, 2019. This timing argument ignores the multiple sources that plausibly allege that Ford also received payments from Rozinov in connection with iAnthus's $60 million in unsecured debt that it raised in March and May 2019, as well as prior payments from Adler. Defendants also ignore the fact that they misrepresented iAnthus's December 20, 2019 loan from GGP after Adler gave Ford $100,000 in connection with that loan. ¶¶ 237-44, 248.

In addition, Defendants argue that GGP's Exit Fee was not material because it depended on iAnthus defaulting on its debt. But while iAnthus's default was a contingent event, the existence of the Exit Fee was plainly a historical fact that Defendants misrepresented when describing GGP's loans. Issues of materiality are particularly unsuitable to be decided on a motion to dismiss. S*ee Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). That is unquestionably the case here, where GGP's Exit Fee fundamentally altered the nature of its investment in iAnthus. Moreover, Defendants' description of GGP as making an "equity" investment in iAnthus was outright false because the Exit Free removed the risk that is inherent to an equity investment.

iAnthus also tries to pin the blame on Ford, who has retained separate counsel from the Company. iAnthus argues that it was "permitted a reasonable amount of time to evaluate" the allegations of Ford's self-dealing. (iAnthus MTD at 21). This argument ignores that Ford's knowledge is imputed to the Company because he was iAnthus's CEO who regularly spoke on behalf of the Company. iAnthus cannot dissociate itself from Ford's self-dealing.

In addition, Defendants try to introduce a plethora of extraneous documents that are not referenced in the Complaint. They append 53 exhibits, spanning over 600 pages, to support their assertions concerning 1 - iAnthus's restructuring proceedings in Canada, 2 - the materiality of the Exit Fee, and 3 - the reasons for iAnthus's collapse. The Court may not consider these extrinsic

4

materials. But even if it could, they merely create additional factual issues that cannot be resolved at this stage, where the Court must draw all reasonable inferences in Plaintiff's favor.

Ultimately, Ford received hundreds of thousands of dollars in personal payments in connection with iAnthus's $156 million in financing from GGP and the Company's unsecured lenders. Adler and GGP received the secret $10 million Exit Fee that strengthened GGP's position as to the Company's debt. In addition to supporting the falsity of Defendants' statements, these allegations present a paradigmatic situation where Defendants acted with both motive and opportunity to commit fraud and conscious misbehavior and recklessness.

Defendants also attempt to portray this action as extraterritorial under *Morrison v Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010), because iAnthus is listed on the Canadian Stock Exchange. This argument ignores that iAnthus also listed its stock on the U.S. over-the-counter markets. Moreover, iAnthus is based in New York and operates exclusively in the U.S., and Plaintiff is a U.S. resident who conducted all of his transactions through his U.S. brokerage account. That is exactly the type of situation that the U.S. securities laws are intended to cover.

For all of these reasons, and those described below, the Court should deny Defendants' motions to dismiss in their entirety.

## II.    FACTUAL BACKGROUND

### A.    iAnthus's Business

iAnthus advertises that it provides its "Shareholders with diversified exposure to best-in-class licensed cannabis cultivators, processors and dispensaries throughout the United States." ¶ 30. Defendant Ford founded iAnthus in 2013. ¶ 31. He served as the Company's CEO and as a Director until he was fired on April 27, 2020, because of his self-dealing. ¶ 22. Kalcevich served at all relevant times as iAnthus's CFO and as a Director until December 5, 2019. ¶ 23.

iAnthus's business model is dependent on its acquiring licensed cannabis facilities to add

5

to its portfolio. ¶ 32. During the Class Period, the Company needed to raise additional capital through debt and equity issuances to fund its expansion strategy. ¶ 33. iAnthus misrepresented the nature of the $156 million in debt that it raised to support this strategy that was central to its business model. ¶¶ 47, 53-61. Investors depended on iAnthus obtaining this financing in a way that supported the Company's stated business plan. Instead, iAnthus engaged in these financing transactions for Ford's personal financial benefit.

B.      **Ford's Conflicts of Interest**

GGP was iAnthus's main lender, providing $96 million in senior secured debt through three rounds of financing at an extremely high 13% interest rate. This includes 1 - $40 million that iAnthus borrowed from GGP on May 14, 2018, ¶ 36; 2 - $20 million that iAnthus borrowed on September 30, 2019, ¶ 41; and 3 - $36.15 million that iAnthus borrowed on December 20, 2019, ¶ 43. Defendants described GGP's last two financings (in September and December 2019) as the beginning of a $100 million financing plan with GGP. ¶¶ 43, 59. But GGP never provided the final $43.85 million of this plan. ¶¶ 85-86, 93. iAnthus's remaining $60 million in debt that it raised during the Class Period came from $35 million in unsecured debt that it raised on March 18, 2019 and $25 million that it raised on May 2, 2019 from other parties, including Oasis Investments II Master Fund Ltd. ("Oasis") and Hi-Med LLC ("Hi-Med"). ¶¶ 44-46.

All of this $156 million in debt was tainted by Ford's self-dealing. On March 31, 2020, a tipster on the website *Stockhouse.com* revealed that Ford had engaged in multiple undisclosed personal transactions through his role as iAnthus's CEO, including that he:

- "agreed [to] all the terms of $95MM of iAnthus' Gotham Green[] loans notes. However he didn't disclose that he personally owes money to Jason Adler who heads up Gotham Green. He hasn't even disclosed the last personal loan from Jason Adler to Hadley Ford for $100k that isn't even formalised. An informal loan is often considered a bribe";

- "nominated Randy Maslow be a director of Ianthus with a salary of $400k a year, but

6

he didn't disclose that he owed money to Randy";

- "engaged with a broker David Rozinov to raise funding, however Ford didn't disclose that he personally owes David $300,000"; and

- "arranged for iAnthus to pay $150,000 a year to his sister who doesn't really work for the company."

¶ 80. On April 6, 2020, the Company announced, along with its default on its debt, that its Board formed a Special Committee to "investigate any potential conflicts of interest and/or required disclosures with respect to [Ford] and certain related parties[.]" ¶ 71. The Company initiated this investigation because of the March 31, 2020 *Stockhouse* report alleging that Ford "is or has been acting in a conflict of interest and has misused iAnthus' resources to his own benefit." ¶ 71.

On April 27, 2020, just three weeks after iAnthus formed the Special Committee, the Company announced that the Committee found, and the Board accepted, that "Ford entered into two undisclosed loans (one loan for US$100,000.00 with a related-party and the other for US$60,000.00 with a non-arm's length party) and those loans created a potential or apparent conflict and should have been disclosed to the Board in a timely way." ¶ 72. The Board also determined that on December 21, 2019, the day after iAnthus closed its third loan with GGP, Adler (GGP's Managing Member, ¶ 25), "entered into a loan for the principal sum of US$100,000, documented by an email. The loan bore no interest and was to be repayable on March 31, 2020." While Defendants characterized this payment from Adler to Ford as a non-interest loan, it bears far more resemblance to a simple $100,000 personal payment. On August 14, 2020, when iAnthus belatedly disclosed its financial results for the first quarter of 2020, it revealed that this loan still had "not been repaid and remains outstanding." ¶ 73. When iAnthus announced the Special Committee's findings, the Board fired Ford from his position as iAnthus's CEO and Director because his "failure to disclose such personal loans to the Board was a breach of the Company's

conflict policies and other obligations." ¶ 74.

Defendants argue that the Special Committee's findings show that Ford's personal payments were limited to his December 21, 2019 $100,00 payment from Adler. (iAnthus MTD at 21-22). But the evidence here goes far beyond that single payment. The Special Committee also revealed that Ford entered into an additional "undisclosed loan" for "$60,000.00 with a non-arm's length party." ¶ 72. Multiple sources corroborate that this payment came from David Rozinov, the broker for iAnthus's $60 million debt from lenders other than GGP. *First*, the Special Committee stated that it was able to substantiate "[t]wo allegations" from the *Stockhouse* report. ¶ 77. The only allegation from the *Stockhouse* report that could qualify as a loan with a "non-arm's length party" who was not a "related party" is Ford's payments from Rozinov. ¶ 80. *Second*, Hi-Med revealed in its parallel complaint against iAnthus that the $60,000 loan that the Special Committee identified was from Rozinov of Star Capital Management, LLC, who brokered iAnthus's $60 million in unsecured debt that it issued in March and May 2019. ¶ 78. Hi-Med purchased $5 million of that debt and therefore knows firsthand of Rozinov's role as the broker for this loan. *Id. Third*, iAnthus has disclosed a promissory note with Rozinov for $475,000 that was outstanding as of May 14, 2018. ¶ 79. *Fourth*, iAnthus paid $1.6 million in "finder fees" to an undisclosed party in connection with its $60 million in unsecured financing. ¶¶ 44-45. All of these facts leave no doubt—and easily support the plausible inference—that the $60,000 personal payment that the Special Committee identified was from Rozinov and was made as a kickback in connection with iAnthus's $60 million in debt that it raised in 2019. Defendants therefore wrongly limit the Special Committee's findings to Ford's personal payment from Adler on December 21, 2019.

Furthermore, the full set of allegations disclosed in the March 31, 2020 *Stockhouse* report should be credited. ¶ 80. This includes Ford's receipt of multiple "loans" from Adler of GGP, not

just the $100,000 payment that this report described as the most recent one that Ford received. *Id.* Similarly, *Stockhouse* revealed that Ford owed Rozinov $300,000, not just the $60,000 that the Special Committee found. *Id.* The *Stockhouse* report is particularly credible because the Special Committee and Hi-Med confirmed several of its specific allegations—namely Ford's latest $100,000 payment from Adler and Ford's $60,000 loan from Rozinov—based on the evidence that they were able to access firsthand. ¶ 81. In addition, the Special Committee did not conduct a comprehensive investigation of all of Ford's dealings. Rather, the Committee's findings were based only on what it was able to "substantiate" based on email documentation after a brief three-week investigation during which the Committee was also busy with exploring "strategic alternatives" for iAnthus. ¶¶ 77, 283. The Company and the Committee also chose not to disclose the details of Ford's $60,000 loan from "a non-arm's length party" that they did not identify. *Id.*[2]

The completeness of the Special Committee's investigation is called into question even further because on May 8, 2020—less than two weeks after the Committee's investigation—Mark Dowley, a Committee member, resigned from iAnthus's Board. ¶¶ 75, 310. Dowley's term as a Director was scheduled to run at least through 2020. *Id.* Even so, iAnthus did not provide any explanation for his sudden resignation. The most plausible explanation for Dowley's abrupt departure is that he was not comfortable with the Committee's cursory investigation into Ford's misconduct. Ford's personal payments from Adler are also consistent with the observations of former iAnthus employees. ¶¶ 82-83. An employee who worked directly with Ford as an assistant at iAnthus's headquarters in New York from early 2018 until early 2020 ("CW 1") observed that

---

[2] Defendants point to the Special Committee's vaguely worded statement that it "did not find a basis to conclude that Ford's conduct in the face of the potential or apparent conflict impacted the terms, timing, or negotiations the Company had with the related-party or the non-arm's length party." (iAnthus MTD at 7). But this statement is also limited by what the Committee had a "basis" to conclude definitively based on the narrow scope of its investigation. The Committee even equivocated on the nature of Ford's blatant conflict of interest.

Ford and Adler were "good friends" who met regularly outside of the office for dinner. ¶ 82.

In sum, the Complaint pleads ample support for its allegations that Ford received improper personal payments in connection with all of iAnthus's $156 million in debt from GGP and its unsecured lenders during the Class Period.

### C.    Defendants Misrepresented GGP as Making an Equity Investment

iAnthus described GGP as providing not just loans to the Company, but as making a significant equity investment that made GGP's interests aligned with those of iAnthus's shareholders. When iAnthus announced its initial loan from GGP in May 2018, it described GGP as "a New York-based private equity firm" that "is well recognized as a long-term investor and leader within the cannabis investment community, and we are excited to partner with GGP to create value for our shareholders." ¶¶ 37-38.

Defendants further gave the impression that GGP was making a substantial equity investment in GGP by including a purported $10 million equity investment alongside GGP's $40 million in debt that it lent iAnthus on May 14, 2018. Analysts bought into this portrayal of the GGP's financing. For example, after Defendants announced GGP's $100 million financing plan that started with its $20 million loan in September 2019, Beacon Securities Limited noted that "GGP is already a major investor in" iAnthus and "**view[ed] the follow on investment by an existing major shareholder as very favourable**." ¶ 61 (emphasis in original); ¶¶ 57-58, 60, 64-65 (Kalcevich assuring investors on November 21, 2019 that "*we're a big equity play for them*").

Defendants, however, misrepresented the true nature of GGP's investment in iAnthus. They did not disclose that the loan documents between iAnthus and GGP provided for the secret Exit Fee whereby iAnthus would pay GGP $10 million, plus 13% interest, if the Company did not repay the entire $40 million in secured debt that GGP lent on May 14, 2018. ¶ 39. The Exit Fee

10

corresponded exactly to GGP's supposed $10 million equity investment that it made in iAnthus alongside its $40 million loan. In addition to being the same amount as that equity investment, upon payment of the Exit Fee, GGP was required to return the 3.9 million shares that it was issued under its $10 million "equity financing that closed concurrently with the secured notes issued in May 2018." ¶ 39. GGP thus did not face the downside risk from its purported $10 million equity investment because that amount was protected entirely by the Exit Fee.

Defendants *admit* that they did not disclose GGP's Exit Fee until after iAnthus defaulted on its debt. The May 14, 2018 loan agreement that iAnthus includes as an exhibit to its motion references only a "Fee Letter . . . regarding certain fees entered into" between iAnthus and GGP, but does not reveal the substance of these fees. (*See* iAnthus MTD at 6, citing Ex. I at 5, 9, 14).[3] Then, when iAnthus disclosed its results for the first quarter of 2020 on August 14, 2020, it revealed that as of March 31, 2020, iAnthus owed not just $10 million for the Exit Fee, but $12.5 million, after accounting for the fee's 13% interest. ¶ 39. iAnthus's investors were therefore misled into believing that GGP put $10 million at risk by investing in iAnthus's stock when, in reality, the Exit Fee not only protected that entire $10 million investment, but also allowed GGP to profit even further by accruing 13% interest if iAnthus defaulted on its debt.

### D.    iAnthus Did Not Fund the Escrow Account That it Agreed to With GGP

As a further example of the fraudulent nature of iAnthus's relationship with GGP, iAnthus promised in each of its first two lending agreements with GGP—from May 2018 and September 2019—that iAnthus would put approximately $5.27 million in an escrow account so that those funds would be available to pay iAnthus's interest obligations. ¶ 109. While iAnthus disclosed that

---

[3] iAnthus first revealed the Exit Fee when it belatedly reported its financial results for 2019 on July 31, 2020. (*See* iAnthus MTD at 6 and Ex. I); ¶¶ 39, 98, 123. Defendants note that iAnthus's May 2018 loan agreement with GGP referenced a "separate 'Fee Letter' setting forth this arrangement," but concede that "iAnthus did not file the fee letter itself." (iAnthus MTD at 6).

its escrow funds from its May 2018 loan were "fully released" on March 5, 2019 (*see* iAnthus MTD at 28), iAnthus never disclosed that the escrow funds that it promised in its September 30, 2019 loan were released or never funded at all. ¶¶ 110-11. But those funds were not available when iAnthus defaulted on its interest payment in March 2020. ¶ 111. If iAnthus had kept these funds in escrow as promised, it would not have defaulted on its loan obligations to GGP on April 6, 2020.

### E.    Defendants' False and Misleading Statements

Defendants made several categories of false and misleading statements based on Ford's self-dealing and GGP's secret $10 million Exit Fee.

#### 1.    Statements About Conflicts

Throughout the Class Period, iAnthus purported to disclose in the Company's quarterly and annual financial reports all "Transactions with Related Parties" and "Related Party Transactions." ¶¶ 151-52, 158-59, 167, 169, 185-86, 195-96, 204, 226. These disclosures described several transactions that iAnthus had engaged in with related parties, including a CAD$500,000 loan to Ford, but did not disclose Ford's related-party transactions with Adler (in connection with GGP's loans) or with Rozinov (in connection with iAnthus's remaining $60 million in debt). *Id.*

Similarly, iAnthus's 2018 Annual Information Form affirmed that "to the best of the Company's knowledge, other than disclosed herein, none of the directors or executive officers of the Company . . . had any material interests, direct or indirect, in any transaction within the three most recently completed financial years or during the current year that has materially affected or is reasonably expected to materially affect the Company." ¶ 187. iAnthus's 2018 Annual Report and Annual Information Form also both assured investors, in a section on conflicts of interest, that the "Company's executive officers and directors may devote time to their outside business interests, so long as such activities do not materially or adversely interfere with their duties to the

12

Company." ¶¶ 188-89. iAnthus also falsely described its relationship with GGP as "Arm's length" in regulatory filings. ¶ 134. None of these materials disclosed Ford's self-dealing.

iAnthus also made misrepresentations touting its corporate governance practices. On October 17, 2019, the Company announced that it was nominating "five new independent Directors" as part of its "Emphasis on Corporate Governance and Oversight." Ford stated in the press release announcing the Company's "best-in-class Board in Cannabis," that "[n]o one told us to do this. It was not required by anyone. But it's the right way to comport yourself, when you've been entrusted with capital from public investors." ¶¶ 245-46.

All of these statements were false and misleading in light of Ford's undisclosed self-dealing with Adler and (for the representations made after March 2019) Rozinov.

2.      Descriptions of iAnthus's Debt

Defendants described in detail iAnthus's $156 million in debt that it raised during the Class Period, including its $96 million in debt from GGP and its $60 million in debt from other lenders. All of these statements were misleading because they did not disclose the personal payments that Ford received in connection with these loans or the Exit Fee that fundamentally altered the nature of iAnthus's transactions with GGP. ¶¶ 125(i)-(ii). When Defendants described the GGP debt, they falsely described GGP's purported $10 million equity investment, even though the Exit Fee that removed all risk from that investment. ¶¶ 129, 142-43, 147, 155, 166, 181, 210, 238-39. Similarly, iAnthus and Ford falsely described GGP's investment in iAnthus as being "a big equity play for them, it's structured as a senior secured piece of debt, but they're not in [it] for the lending returns." ¶ 233. In addition, Defendants emphasized the importance of GGP's and the unsecured lenders' financing to iAnthus's operations. ¶¶ 127-28, 172, 205-06, 210, 238-39; *see also* ¶¶ 172-76, 182 (describing $35 million in unsecured debt raised in March 2019 and $25 million raised in May

13

2019). iAnthus also filed Material Change Reports with the Canadian securities regulators on May 24, 2018, March 25, 2019, May 3, 2019, October 10, 2019, and December 30, 2019—for each transaction with GGP and the unsecured lenders—that misleadingly described these transactions while failing to disclose Ford's conflicts or GGP's Exit Fee. ¶¶ 141-43, 174-76, 217-21, 241-43.

In addition, iAnthus told investors on October 10, 2019, that GGP "waived its right to receive the quarterly cash interest payment due on September 30, 2019 and instead determined to receive such interest" as a "payment in kind." ¶ 221. Defendants did not disclose that this event triggered the accrual of 13% interest on GGP's Exit Fee. ¶¶ 222, 228.

3.      Statements About the Availability of Financing

iAnthus also falsely reassured investors that it had adequate access to financing based on its historic financings from GGP and its unsecured lenders. For example, on September 30, 2019, iAnthus held a special investor conference call to announce its $100 million financing plan with GGP. Ford told investors that GGP's financing gave iAnthus "capital *certainty*" ¶ 209, "our ability to build our markets is *certain*" ¶ 210, and "[w]e have no financing concerns" ¶ 211. Then, on iAnthus's conference call for the third quarter of 2019 on November 21, 2019, an analyst asked whether  GGP would "actually follow through on making all these funds available." Ford responded by adamantly reassuring investors:

> ***I don't lose any sleep about the availability of money from Gotham.*** It's the reason we picked them as our partner a year and a half ago, [they have] been tremendously supportive, and have always followed through on everything they've always said they're going to do. I can't speak to their structure and internal dynamic, but ***I do know them personally, they never say something unless they can deliver it and I have full confidence that, if we do need [the] capital, that it will be there.***

¶¶ 64, 232. Kalcevich also told investors that iAnthus had other financing options and that "there is nothing off the table" because "***we're a big equity play for [GGP]***"and "everything is an option." ¶¶ 233-35; *see also* ¶¶ 205-12, 230-40 (discussing GGP's $100 million financing plan).

14

In addition, iAnthus promoted, in each of its quarterly and annual reports, GGP's financing and, after March 2019, the Company's unsecured debt, as demonstrating that iAnthus "has historically had, and continues to have, access to equity and debt financing." ¶¶ 148, 156, 165-66, 183, 194, 226. Ford also promoted his "disciplined" approach to raising capital because "when you're public, it's not your money, we're just stewards of the capital" for shareholders. ¶ 170; *see also* ¶¶ 191, 201-202 (discussing focus on "reducing our cost of capital").

All of these statements were false and misleading because if investors had known about Ford's self-dealing or GGP's secret Exit Fee they would have known not to be "certain" about GGP's $100 million financing plan or that iAnthus's historical financing from GGP and its unsecured lenders showed how the Company had adequate access to financing. Moreover, investors would have known that additional financing would put them at greater risk because of GGP's extra $10 million Exit Fee. Former employees confirm the tenuous nature of iAnthus's financing. For example, a senior executive at the Company from July 2017 until February 2019 ("CW 3"), who interacted with Ford and Maslow in the course of running the Company, explained that Ford and Kalcevich "chased after creative financing" and Ford kept information about the relationship with GGP "close to the vest." ¶¶104. Similarly, a Director of Business Strategy (CW 2) questioned iAnthus's funding from GGP, remarking that "with a finance team this seasoned in place, it makes you scratch your head." ¶¶105. Defendants' misstatements about iAnthus's historical financing and the availability of additional financing were particularly important to investors. Investment analysts took comfort in GGP's involvement with iAnthus and in the Company's confidence in the availability of financing. ¶¶ 57-61, 67-68.

4.     Escrow Statements

iAnthus publicly filed its Amended and Restated Secured Debenture Purchase Agreement,

which contained the terms of its September 30, 2019 loan from GGP. This agreement contained the provision described above that required iAnthus to place $5.27 million into an escrow account to ensure the funds would be available to pay the Company's interest obligations. ¶¶ 215-16. iAnthus also falsely represented in its financial report for the third quarter of 2019 that it "complied with all covenants as September 30, 2019" and that it "was in compliance with all covenants" in its notes that it issued to GGP on September 30, 2019. ¶ 227.

### 5.    Statements of Full Disclosure

In each Material Change Report that iAnthus filed for each of its three loans from GGP and its two unsecured loans, it confirmed that these reports gave a "Full Description of Material Change" and that "[n]o information has been omitted" (or stated "Not applicable" under the entry for "Omitted Information"). ¶¶ 141-43, 174-76, 217-19, 241-43. These assurances of full disclosure were false because iAnthus did not disclose Ford's self-dealing or GGP's Exit Fee.

iAnthus also falsely represented in its May 14, 2018 loan agreement with GGP that none of the representations or other statements in the agreement "contain any untrue statement of a material fact or omit to state any material fact necessary to make such statement or representation not misleading to a prospective lender or purchaser of securities of the Company seeking full information as to the Company's" business. ¶ 139. The Company also represented in this agreement that it "is in compliance in all material respects with its continuous and timely disclosure obligations under applicable Canadian Securities Laws and the rules and regulations of the CSE." ¶ 138. iAnthus then represented throughout the Class Period that it was "in compliance with all covenants" in its agreements with GGP. ¶¶ 160-61, 197-98, 227.[4]

### 6.    Statements by GGP

---

[4] iAnthus repeated these representations in its September 30, 2019 loan agreement with GGP. ¶¶ 213-14.

16

GGP argues that it is not the "maker" of statements by iAnthus. (GGP MTD at 27-28). But the Complaint does not allege otherwise. The Complaint specifies for each statement alleged to be false and misleading, who the speaker was and when and where they made the statement. All of the statements described above were made by iAnthus and either Ford or Kalcevich on behalf of the Company. In addition to these statements, the Complaint alleges specific false and misleading statements made by GGP and Adler on its behalf.

The press release announcing GGP's May 14, 2018 financing quoted Adler as stating that iAnthus's business "provide[s] a compelling growth and investment opportunity. With this infusion of capital, we look forward to working with the management team to source additional strategic opportunities." ¶ 131. Similarly, the press release for GGP's September 30, 2019 financing quoted Adler as stating that "[w]e have viewed iAnthus as a key partner since our initial investment in May 2018." Adler even noted that "[w]e do not believe" that iAnthus's recent progress "is reflected in the Company's current trading price." ¶ 207. Adler also signed GGP's May 14, 2018 and September 30, 2019 loan agreements with iAnthus. ¶¶ 137, 213.

In addition, on June 7, 2018, October 10, 2019, and January 10, 2020, following each of GGP's three financing transactions, GGP filed a Required Disclosure by an Eligible Institutional Investor ("Required Disclosure"). Adler signed each of these forms on behalf of GGP. ¶ 248. These reports provided false and misleading descriptions of GGP's financings. ¶ 249. In addition, these forms specifically required GGP to disclose the material terms of any "agreement, arrangement or understanding" that altered its "economic exposure" to the iAnthus securities at issue. ¶ 250. Similarly, the forms instructed GGP to "[d]escribe the material terms of any agreements, arrangements, commitments or understandings . . . , including but not limited to . . . finder's fees . . . [or] loan or option arrangements." ¶ 253.  GGP did not disclose Adler's personal payments to

17

Ford or GGP's Exit Fee in response to either of these questions, even though those side agreements fundamentally altered the nature of GGP's transactions with iAnthus.

Lastly, GGP misleadingly stated in its Required Disclosure forms that it waived its right to receive the quarterly cash interest payment that was due on September 30, 2019, but did not disclose that this event triggered the accrual of interest under the undisclosed Exit Fee. ¶¶ 255-56.

### F.        Defendants Profited From Their Fraud

Ford profited from his fraud in several ways. First, he received hundreds of thousands of dollars in personal payments through his self-dealing. Second, Ford sold iAnthus stock during the Class Period for net proceeds of $1.48 million at prices that were far higher than the price of iAnthus stock after Defendants' fraud was revealed. ¶¶ 122, 302.

Third, Ford and Kalcevich stood to profit substantially by lowering the strike price of 9.65 million stock options for Company insiders (including 1.72 million for Ford and 1 million for Kalcevich) in April 2019. ¶¶ 119, 121. Their plan failed only because shareholders were outraged by this effort to make a short-term profit while the Company's stock price was falling. ¶¶ 120-21.

Fourth, in March 2020, just before iAnthus defaulted on its debt, Ford proposed a management buyout that would give him and Maslow 10% of the Company and an additional 10% to employee stock options. ¶ 114. Ford proposed paying just $0.50 per share even though the Company's stock price was $3.69 per share at the beginning of the Class Period. ¶ 115.

GGP and Adler also profited substantially from their fraud, including by removing the risk from their $10 million equity investment through GGP's secret Exit Fee, receiving very favorable financing terms by bribing Ford, and taking control of iAnthus in an extremely favorable restructuring deal. ¶¶ 89-94, 266.

18

### G.    Defendants' Fraud Caused Substantial Losses to iAnthus's Shareholders

iAnthus's stock price declined dramatically as a result of Defendants' fraud. The market reacted negatively to the disclosure of Ford's self-dealing. ¶¶ 281-84. iAnthus's stock price also dropped in response to other specific disclosures of iAnthus's financial difficulties that led to its restructuring that stands to wipe out shareholders' investments. These events, as well as iAnthus's overall loss of $763 million in shareholder value, were the materialization of the risk that Ford took through his improper dealings with GGP and iAnthus's other lenders. iAnthus's financing arrangements, which were tainted by Ford's self-dealing and GGP's secret Exit Fee, gave GGP extremely favorable terms and substantially increased the risk that GGP and the Company's other lenders would take over iAnthus if the Company defaulted on its debt. *See* ¶¶ 34, 85, 93, 102-03 and Complaint Section VI. Indeed, iAnthus agreed to give GGP 48.625% of the Company in exchange for reducing iAnthus's $97.5 million in debt by just $7.5 million and reducing its interest rate by just 5%. ¶¶ 92-93.

### H.    Defendants Improperly Rely on Information Outside the Record

Defendants append 53 exhibits, spanning over 600 pages, to support their motions. These documents are improper factual materials outside the Complaint that the Court cannot consider at this stage. But even if the Court were to consider these documents, they raise additional factual issue that the Court may not resolve in Defendants' favor.

#### 1.    Defendants' Improper Assertions Related to the Exit Fee

Defendants argue that "the exit fee was never triggered, as Gotham, as a secured lender, forgave the relevant defaults as part of the Restructuring Transaction." (iAnthus MTD at 24; GGP MTD at 20). But the July 13, 2020 press release that Defendants cite makes no mention of the Exit Fee. Rather, it notes that GGP and iAnthus's other lenders "will forbear from" further pursuing

19

"any events of default" in exchange for iAnthus's agreeing to the restructuring agreement. (iAnthus Ex. L at 2). Defendants cannot seriously contend that GGP simply "forgave" the Exit Fee as a charitable act. Rather, the $12.5 million that iAnthus owed under the Exit Fee contributed to GGP obtaining such a favorable deal in the restructuring. ¶¶ 92-93.

Defendants also make the equally untenable factual argument that the $10 million Exit Fee (plus 13% interest) is irrelevant because it was not due until iAnthus defaulted on GGP's loans in March 2020. (iAnthus MTD at 23-25; GGP MTD at 19).[5] GGP proves too much by asserting that all events that are contingent on a future default are inherently irrelevant to investors. For example, investors would undoubtedly care about an onerous secret provision providing that shareholders would be automatically wiped out in the event of a future default, regardless of the value of the Company's assets. GGP must then be arguing that the particular terms of this Exit Fee are insignificant. That is plainly wrong in light of the Exit Fee's substantial size, the fact that it started to accrue 13% interest when GGP waived iAnthus's interest payment in September 2019 (¶ 39 n.11), and the fact that it nullified GGP's purported $10 million equity investment.

### 2. Defendants' Improper Assertions Related to the Canadian Proceedings

Defendants also raise improper factual assertions related to ongoing proceedings in Canada arising out of iAnthus's collapse, which took place after the Complaint was filed. iAnthus notes that on October 5, 2020, the Canadian court approved iAnthus's restructuring, but that "the matter is ongoing," pending appeal. (iAnthus MTD at 8; GGP MTD at 4-5 n.2, 20 n.13).

---

[5] iAnthus similarly argues that Defendants believed the Exit Fee would not be paid because it was "more likely than not that GGP would exercise the conversion option" (iAnthus MTD at 6). This is belied by the very documents that iAnthus attaches to its motion. GGP was extremely unlikely to exercise the conversion option because iAnthus's stock price was just $1.41 per share when iAnthus and GGP made their second loan agreement on September 30, 2019, and continued to decline after that time. ¶¶ 260-62. Yet the "conversion option" required GGP to pay a "conversion rate of $3.08 per share," which was multiple times the stock's actual value. (iAnthus Ex. H at 21). iAnthus's assertion about the likelihood that GGP would exercise the conversion option is completely implausible. Moreover, what matters to investors is not Defendants' belief about the Exit Fee—which Defendants never disclosed—but rather the objective significance of the fee to a reasonable investor, which cannot be resolved at this stage.

In addition to being extrinsic to the Complaint, these Canadian proceedings raise facts that support *Plaintiff's* allegations. For example, the court initially rejected the restructuring because the dealt sought to extinguish claims of former shareholders. The agreement that was ultimately approved allows shareholders to seek "liabilities or claims attributable to such Released Party's gross negligence, fraud or willful misconduct." (iAnthus Ex. O ¶¶ 21, 38). Moreover, the Canadian court noted that one of the objectors to the restructuring attested to "an alleged $10 million side deal between iAnthus and Gotham Green." (GGP Ex. 26 ¶ 46).[6] The Canadian court also noted that only 59% of iAnthus's shareholders unrelated to the Company voted for the restructuring. (GGP Ex. 26 ¶ 51). This is an extraordinarily low figure considering that the 41% of unrelated shareholders that voted against the plan stood to receive *nothing* if it is not approved. (*Id.* ¶ 6). In addition, the Canadian court was focused on iAnthus's restructuring agreement (*see* GGP Ex. 26 ¶ 49), not the earlier activities that put iAnthus's lenders in such a strong position in these proceedings. The Complaint alleges that "iAnthus's *prior* fraudulent dealings . . . put GGP in a position to take advantage of the situation." ¶ 103 (emphasis added); *see also* ¶¶ 12, 34.

### 3. Defendants' Improper Assertions Related to iAnthus's Collapse

Defendants also repeatedly try to attribute iAnthus's decline to the COVID-19 pandemic rather than Defendants' fraud. (*See* iAnthus MTD at 1, 6-7, 9, 25-26, 30, 33-34; GGP MTD at 30). This alternative causal theory for iAnthus's collapse does not change the plainly false and misleading nature of Defendants' statements concerning iAnthus's relationship with its lenders or the resulting drop in iAnthus's stock price. In fact, CW 3, a senior executive at iAnthus from July 2017 until February 2019 who interacted directly with Ford, saw through Defendants' excuse. CW

---

[6] While the Canadian court described the evidence as hearsay, that is not the standard here, where the court must "draws all reasonable inferences in plaintiff's favor." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 172 n.9 (S.D.N.Y. 2008) (rejecting defendant's argument that allegations contained "inadmissible hearsay").

3 explained specifically that iAnthus's restructuring was a result of Ford's and Kalcevich's "chas[ing] after creative financing" and "is not a function of Covid." ¶ 104.

    4.    <u>The Court Should Reject Defendants' Extraneous Factual Assertions</u>

Defendants argue that the Court should "take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information," even if those facts are not referenced in the Complaint or in documents that the Complaint incorporates by reference. (iAnthus MTD at 3 n.2 (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). But the Second Circuit limited this holding to situations where the defendant did not offer the documents for "the truth of their contents." *Staehr*, 547 F.3d at 425; *see also Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998-99 (9th Cir. 2018) (noting "concerning pattern in securities cases" of "overuse and improper application" of incorporation-by-reference and judicial notice doctrines); *Gentry v. Kaltner*, 2020 WL 467358, at *6 (S.D.N.Y. Mar. 25, 2020) (judicial notice of news article "must be limited to the fact that press coverage . . . contained certain information, without regard to the truth of [its] contents").

Defendants here, in contrast, offer extraneous facts for their truth, including that iAnthus's restructuring is "[substantively] fair and reasonable" to shareholders (iAnthus MTD at 2, 8, 15); that GGP "forgave" the Exit Fee and that "it was more likely than not that GGP would exercise the conversion option on the Secured Notes" (iAnthus MTD at 6, 23-24); and that COVID, rather than Defendants' fraud, caused iAnthus's downfall (iAnthus MTD at 1, 6-7, 9, 25-26, 30, 33-34; GGP MTD at 30).

The Court should not consider these extrinsic materials because the law is clear that the Court may not "rel[y] on matters outside the pleadings to decide the motion to dismiss." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019); *Zhi Zhong Qiu v. Diamond*, No. 19 Civ 2050

(ER), 2020 WL 978352, at *9 (S.D.N.Y. Feb. 27, 2020) (holding there was no "basis for finding that the [agreement] was integrated into the complaint through reference or reliance"); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 289 (S.D.N.Y. 2013) (striking defendants' use of exhibits as evidence that they did not act with scienter); *SEC v. Kueng*, No. 09 Civ. 8763 (BSJ) (AJP), 2010 WL 3026618, at *2 (S.D.N.Y. July 30, 2010) (excluding "factual assertions that fall outside the scope of the complaint").

Moreover, even if Defendants' alternative factual assertions could be considered (which they cannot), these contentions raise issues that are contradicted by the specific allegations in the Complaint and that cannot be decided in Defendants' favor. (*See supra* at 19-22). These types of factual issues are precisely why defendants cannot introduce new facts outside the Complaint at this stage. "[T]he point of discovery [is] to see whether plaintiff's well-pleaded factual allegations are true." *Billhofer v. Flamel Techs., SA.*, 663 F. Supp. 2d 288, 304 (S.D.N.Y. 2009); *see also Orexigen Theraps.*, 899 F.3d at 1003 (holding "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute . . . well-pleaded" facts).

## III.   ARGUMENT

On a Rule 12(b)(6) motion to dismiss, the court must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014). To survive the motion, a complaint must allege "enough facts to state a claim … that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must assume the truth of all "'well-pleaded factual allegations.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft*, 556 U.S. at 679). Moreover, the court "does not impose a probability requirement at the pleading stage," however; "it simply calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## A.      The Complaint Satisfies *Morrison*

The U.S. securities laws apply to "domestic" transactions, including 1 - "transactions in securities listed on domestic exchanges [] and [2 -] domestic transactions in other securities." *Morrison v Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010). Meeting either of these tests with allegations that are "plausible on [their] face" satisfies *Morrison. Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018). Plaintiff's claims satisfy each of these independent prongs of the *Morrison* analysis. The Second Circuit also requires that claims not be "predominantly foreign." *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014). The Complaint easily surpasses this hurdle because iAnthus is based in New York, focuses on the U.S. cannabis industry, and listed its shares on the U.S. OTC markets. ¶¶ 21, 30-32.

### 1.      The OTCX and OTCQB Markets are Domestic Exchanges

iAnthus advertised to investors that its stock traded in the United States on the OTCQX over-the-counter market, which are part of the OTC Markets Group. ¶ 21; (*see* iAnthus Ex. B (2018 Annual Report) at 15). Plaintiff purchased his iAnthus securities on this market. Defendants are wrong that "the Complaint does not allege where Plaintiff purchased iAnthus securities." (iAnthus MTD at 11). Plaintiff's certification in connection with his motion to be appointed Lead Plaintiff (which the Complaint references) makes clear that his transactions were for iAnthus securities traded under the symbol "ITHUF," which is iAnthus's ticker symbol on the OTCQX market. ¶¶ 20-21; *see* Dkt. Nos. 34-3 (containing Plaintiff's List of Purchases and Sales for "ITHUF" securities); 34-1 (chart showing Plaintiff's financial interest in "ITHUF" securities). In contrast, iAnthus's stock traded under the symbol "IAN" on the Canadian Securities Exchange. ¶ 21.

As a court in this District recently held, a company's stock being listed on the OTCQB

24

market "constitute[s] an allegation that [the company] is traded on a domestic exchange, thus satisfying the second prong of *Morrison*'s transactional test," which the court defined as a transaction that "involves a security listed on a domestic exchange." *Rubenstein v. Cosmos Holdings, Inc.*, 19-cv-6976 (KPF), 2020 WL 3893347, at *10-11 (S.D.N.Y. July 10, 2020). iAnthus's stock also traded on the OTCQB market, earlier in the Class Period, before iAnthus upgraded to the OTCQX market. ¶ 21. In addition, *Cosmos Holdings* applies with even more force to the OTCQX market, which is the OTC Markets Group's market for more established companies and has stricter eligibility requirements than its OTCQB market.

Companies must meet the OTC Markets Group's disclosure requirements to upgrade to the OTCQX and OTCQB markets, which the OTC Markets Group describes as its "premium markets." (Declaration of Michael Grunfeld in Support of Lead Plaintiff's Opposition ("Grunfeld Decl."), Ex. 1). The requirements for the OTCQX market are particularly strict. The OTC Markets Group explains that "[t]o qualify for the OTCQX market, companies must meet high financial standards, follow best practice corporate governance, demonstrate compliance with U.S. securities laws and have a professional third-party sponsor introduction." (*Id.*, Ex. 2).[7] iAnthus took many steps to have its securities listed on the OTCQB market and took even more rigorous action to have its securities upgraded to the OTCQX market. These include meeting reporting standards, obtaining a sponsor, signing an agreement with OTC Markets Group, authorizing a background check, and paying an application and annual fees. (*Id.*, Ex. 4). In addition, by upgrading to the OTCQX market, iAnthus agreed to the "[t]imely disclosure of material news and other information required to be made publicly available pursuant to the Exchange Act Rule 12g3-2(b)[.]" (*Id.*).

Moreover, the OTC Markets Group is headquartered in New York. (Grunfeld Decl. Ex. 5).

---

[7] iAnthus repeated this explanation in a press release on January 24, 2019. (Grunfeld Decl. Ex. 3).

25

Securities that trade on the OTC Markets Group's markets trade through OTC Link® ATS, which is the OTC Markets Group's SEC-registered Alternative Trading System and is governed by FINRA and SEC regulations. (Grunfeld Decl. Ex. 6). The OTCQX and OTCQB markets, with their heightened listing requirements, New York headquarters, and SEC-registered trading system are therefore "domestic exchanges" under *Morrison*. *See Cosmos Holdings*, 2020 WL 3893347, at *10; *United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2014) (discussing an expert report detailing how over-the-counter "exchanges [were] 'similar to' the NYSE and the NASDAQ").[8] The Second Circuit has expressly declined to decide the issue of whether the over-the-counter markets constitute "domestic exchanges" under *Morrison*. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012). The OTCQX and OTCQB markets qualify as "domestic exchanges" for the reasons explained above.

2.      Plaintiff Transacted in iAnthus Securities in the United States

Defendants argue that Plaintiff did not engage in a "domestic transaction" under *Morrison*. (iAnthus MTD at 12-13; GGP MTD at 15-16). A transaction is "domestic" if the parties become "irrevocably bound", or if title is transferred, in the U.S. *Absolute Activist,* 677 F.3d at 68. Irrevocable liability may be pled by alleging "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, *or* the exchange of money." *Id.* at 70 (emphasis added). This test is satisfied if *either* the purchaser *or* the seller incur irrevocable liability in the U.S. *Id.* at 68. Whether a transaction is domestic involves a fact-intensive inquiry that is not well-suited for a motion to dismiss. *See Atlantica Holds. v. BTA Bank JSC*, No. 13-CV-5790 JMF, 2015 WL 144165, at *9 (S.D.N.Y. Jan. 12, 2015). The question at this stage "is whether Plaintiffs

---

[8] The court in *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337 (S.D.N.Y. 2015), which Defendants cite, dealt with notes that traded in the over-the-counter *bond* market, not the OTCQX or OTCQB markets. *Id.* at 340. (*See* iAnthus MTD at 12; GGP MTD at 15-16).

26

have alleged facts suggesting that irrevocable liability was incurred" in the U.S. *Atlantica Holds. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 560 (S.D.N.Y 2014), *aff'd in part,* 813 F.3d 98 (2d Cir. 2016).

In addition to having transacted on a "domestic exchange," Plaintiff satisfies *Morrison* for the independent reason that his transactions in iAnthus securities qualify as "domestic transactions." Plaintiff is a U.S. resident who resided in Louisiana during the entire Class Period. (Grunfeld Decl., Ex. 7 ¶¶ 4-5). He acquired all of his iAnthus securities through his online TD Ameritrade account from Louisiana. (*Id.* ¶¶ 6, 8). Plaintiff directed these trades himself and did not have the discretion to revoke or cancel those transactions after he made them. (*Id.* ¶¶ 7, 9). Moreover, TD Ameritrade is a U.S. broker (as its name suggests) with offices throughout the U.S., but none internationally. (Grunfeld Decl., Ex. 8). These allegations are more than sufficient to allege a domestic transaction under *Morrison. See Giunta v. Dingman*, 893 F.3d 73, 80 (2d Cir. 2018) ("irrevocable liability was incurred when the parties entered into" agreement, even though there were conditions subsequent); *Myun–Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018) (trades were matched with U.S. counterparties but not cleared until next day in Korea).

This is the same situation as in *In re Poseidon Concepts Sec. Litig.*, No. 13CV1213 (DLC), 2016 WL 3017395, at *14 (S.D.N.Y. May 24, 2016). The plaintiff there was a Florida resident who bought stock in a Canadian corporation that traded in the U.S. on an OTC market through the office of his local broker. *Id.* The court determined that the plaintiff sufficiently alleged a "domestic transaction in other securities" because he could not revoke acceptance after he placed his order. *Id.* at *35-36. Plaintiff here, just as in *Poseidon Concepts*, engaged in "domestic transactions" because he was irrevocably bound to purchase his iAnthus securities in the U.S.

27

3.       Plaintiff's Claims Are Not Predominantly Foreign

Defendants disingenuously assert that "the claims here are so predominantly Canadian as to fall outside of Section 10(b)." (iAnthus MTD at 13-15; GGP MTD at 15-16). The claims here are based entirely on U.S.-focused activities. In *Parkcentral*, which Defendants cite, certain U.S. hedge funds entered into swap agreements referencing shares of a German company trading only on foreign exchanges. 763 F.3d at 201. The Second Circuit found the transactions "predominantly foreign," but cautioned against broadly applying its holding to other cases due to the unique nature of the relevant transactions and claims in that case. *Id.* at 215-16.

This case is very different. *First*, the defendants in *Parkcentral* had "no alleged involvement in plaintiffs' transactions," because the swap agreements were between two private parties. *Id.* at 201. Here, Plaintiff bought shares issued by iAnthus, not a derivative security. *See Poseidon Concepts*, 2016 WL 3017395, at *13; *Atlantica Holds.*, 2015 WL 144165, at *8 (refusing to extend *Parkcentral*'s holding to subordinated notes issued to debt holders).

*Second*, iAnthus is based in New York, does all of its business in the U.S. cannabis industry, and actively marketed its securities to U.S. investors through the OTC markets. ¶¶ 21, 30-32. GGP—the main counterparty to iAnthus's transactions at issue here—is also based in the U.S. ¶ 24. Moreover, Plaintiff is a U.S. resident who purchased his securities in the U.S. The mere fact that iAnthus chose to list its securities on the Canadian Securities Exchange (and therefore took related corporate actions in Canada) alongside the U.S. OTC markets does not make this action "predominantly foreign." *Parkcentral*, in contrast, involved an alleged fraud in Germany and does "not suggest that the presence of some foreign element in a transaction necessarily means that Congress did not intend to include it in the coverage of § 10(b)." *Poseidon Concepts*, 2016 WL 3017395, at *13 (quoting *Parkcentral*, 763 F.3d at 216).

Defendants even acknowledge that "iAnthus, as a business, engages in domestic activities,"

28

and they do not dispute the "Complaint's allegation that iAnthus's 'principal executive offices' are in New York." (iAnthus MTD at 14).[9] The U.S. securities laws should therefore protect Plaintiff and the Class from Defendants' fraud.

**B.    The Complaint Should Not be Dismissed Under the Doctrine of *Forum Non Conveniens***

Defendants raise the same facts that they use to support their *Morrison* argument to argue that this action should be dismissed under the doctrine of *forum non conveniens*. (iAnthus MTD at 16-17). The *forum non conveniens* analysis involves three steps: "At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Lastly, a court balances 'public interest factors' and 'private interest factors.'" *Poseidon Concepts*, 2016 WL 3017395, at *8 (internal quotations marks and citations omitted).

The court in *Poseidon Concepts* explained that a lead plaintiff's choice of this District as opposed to a foreign country "is entitled to significant deference" for "claims [that] arise under U.S. securities laws," because "[s]ecurities litigation is regularly litigated in New York, which is the nation's financial center. As a result, its bar and courts are well-versed in suits of this nature. As a transportation hub, travel to New York is relatively convenient for both the Floridian Lead Plaintiff and the Canadian defendants." *Id.* at *9. These same factors support conducting this litigation here even more because iAnthus is based in New York and it does business exclusively in the U.S. ¶¶ 21, 30-32. Poseidon, in contrast, "was a Canadian corporation with head

---

[9] In *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019), the only other case that the iAnthus defendants cite (iAnthus MTD at 14), the Second Circuit addressed whether *Parkcentral* applies to claims under the Commodities Exchange Act. 937 F.3d at 105. The Court in *Prime International Trading* even highlighted that in *Parkcentral*, "[a]ll of defendants' misconduct occurred in Germany, and Volkswagen stock only traded on European stock exchanges." *Id.* It then explained that its facts were "remarkably similar to those in *Parkcentral,*" because the case involved transactions in derivatives that were "pegged to the value of another asset" that was traded internationally, the underlying misconduct was "entirely foreign," and the pricing of the futures contracts at issue was four steps removed from the underlying misconduct. *Id.* at 106-07.

administrative offices in Calgary, Alberta," that engaged in business "across North America" and conducted its U.S. operations through a subsidiary that was based in Colorado. *Id.*, at *1-2.[10]

Defendants' *forum non conveniens* argument also fails because they have not met their burden to "show that the balance of the private and public convenience factors tilts strongly in favor of the foreign forum." *Id.*, at *9 (internal quotation marks omitted). The facts here are even more in Plaintiff's favor than they were in *Poseidon Concepts*, because the key evidence and witnesses are located in New York, where iAnthus is based, and in the U.S. more generally, where GGP is based. ¶¶ 21, 24, 31-32, 82. Furthermore, as in *Poseidon Concepts*, "more importantly, there is a strong interest in having American courts interpret and apply U.S. securities law." *Poseidon Concepts*, 2016 WL 3017395, at *10; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281, at *10 (N.D. Cal. Jan. 4, 2017) (rejecting *forum non conveniens* argument where "the United States undoubtedly has an interest in protecting domestic investors from fraud[]" (citing *Kingdom 5-KR-41, Ltd.*, 2002 WL 432390, at *7)); *E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 559, 588 (S.D.N.Y. 2007) (noting "strong interest in having an American court interpret and apply U.S. securities law claims")).

The factors that Defendants cite do not provide the type of evidence that is required to show that they are "strongly in favor of the foreign forum." *Poseidon Concepts*, 2016 WL 3017395, at *9. For example, the fact that iAnthus's restructuring proceeding and other investor actions are pending in Canada does not support dismissal because "[t]he existence of such litigation . . . does not obviate United States interests in enforcing securities laws in American courts on behalf of United States investors." *Id.* at *10.  Defendants also cite to a single paragraph of the Complaint

---

[10] The question of whether Canada is an "adequate alternative forum" is merely a "threshold issue" that does not provide a basis for dismissal where the other factors weigh in plaintiff's favor. *See Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 01 CIV. 2946 (AGS), 2002 WL 432390, at *6-7 (S.D.N.Y. Mar. 20, 2002) (holding that "even if Norway were an adequate forum, neither the private nor public interest factors weigh sufficiently towards dismissal").

30

"concerning iAnthus's obligations under Canadian securities laws and Canadian accounting principles." (iAnthus MTD at 17, 21 n.10; GGP MTD at 16-17). But, as explained below, the Court does not need to address the substance of Canadian law at all. (*See infra* Section III.C.5). Moreover, even if it did, the rest of the Complaint, other than the single paragraph that Defendants cite, is focused on allegations showing that Defendants made false and misleading statements that adequately plead claims for securities fraud under the U.S. securities laws. Courts regularly address issues of foreign law in this type of limited circumstance. *See In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 301 (E.D.N.Y. 2002) (rejecting *forum non conveniens* argument because "for the most part, United States securities law [applies], not Canadian tax law as the defendants claim. To the extent [the] Court will be asked to interpret Canadian law, . . . it does not create an issue of great concern.").[11]

Furthermore, an action that satisfies *Morrison* should not dismissed to a foreign country on *forum non conveniens* grounds because that would prevent plaintiffs from availing themselves of the U.S. securities laws for claims that are domestic under *Morrison*.[12] Defendants, tellingly, do not cite any cases that satisfied *Morrison* but were dismissed for *forum non conveniens*.

---

[11] *See also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 636 (S.D.N.Y. 2017) (holding that "in determining an issue of foreign law, courts 'may consider any relevant material or source'" (quoting Fed. R. Civ. P. 44.1)). Indeed, this briefing makes clear that Plaintiff's claims are centered on U.S. securities law.

[12] Defendants cite only one case addressing *forum non conveniens* in the context of securities claims, and that was decided prior to *Morrison* and dealt with facts that were far-more removed from the U.S. than those at issue here. (*See* iAnthus MTD at 16-17 (citing *In re Royal Grp. Techs. Sec. Litig.*, No. 04 CIV.9809 HB, 2005 WL 3105341, at *2-3 (S.D.N.Y. Nov. 21, 2005) (addressing claims brought by foreign plaintiffs who did not dispute that "the vast majority of documents and witnesses" were in Canada, where the defendant company's headquarters were located)). None of the other cases that Defendants cite dealt with claims for securities fraud. (*See* iAnthus MTD at 16-17 (citing *Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 388-89, 393 (S.D.N.Y. 2010) (addressing patent infringement claims); *Joyner v. Cont'l Cas Co.*, 2012 WL 92290, at *1 (S.D.N.Y. Jan. 9, 2012) (addressing motion to transfer to Western District of Virginia—not a foreign country—in claim for denial of insurance benefits); *Bohn v. Bartels*, 620 F. Supp. 2d 418, 423-24 (S.D.N.Y. 2007) (claim for negligence arising out of car accident); and *Strategic Value Master Fund, Ltd. v. Cargill Fin. Serv. Corp.*, 421 F. Supp. 2d 741, 746 (S.D.N.Y. 2006) (breach of contract)).)

C.    **The Complaint Adequately Pleads False and Misleading Statements**

The elements of a claim brought under Section 10(b) and Rule 10b-5 include 1 – a material misrepresentation or omission by the defendant, 2 – in connection with the purchase or sale of a security, 3 – scienter, 4 – reliance, and 5 – economic loss and loss causation. *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016). In addition to prohibiting statements that are outright false, Section 10(b) prohibits "half-truths, or statements that are misleading by omission." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016). Once defendants choose to speak about a topic, they therefore have "a duty to tell the whole truth," including "to be both accurate and complete." *JinkoSolar*, 761 F.3d at 250.

Even under the heightened pleading standard of Rule 9(b) and the PSLRA, "we do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Instead, a plaintiff must specify the fraudulent statements or omissions, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 463 (2d Cir. 2008). The Complaint alleges that Defendants made false and misleading statements concerning 1 – conflicts of interest; 2 – their descriptions of iAnthus's debt; 3 – the availability of financing; 4 – the obligation to put funds in an escrow account; and 5 – affirmations of full disclosure. Defendants' arguments to the contrary misinterpret the applicable law and ask the Court to ignore the plausible inferences that follow from the specific allegations in the Complaint.

1.    The iAnthus Defendants' Materially False and Misleading Statements About Conflicts of Interest

Throughout the Class Period, iAnthus told investors that it disclosed all related party transactions and that its executive officers and directors did not have "any material interests" in any transaction "that has materially affected or is reasonably expected to materially affect the

32

Company." ¶¶ 151-52, 158-59, 167, 169, 185-86, 195-96, 204, 226 (Transactions with Related Parties" and "Related Party Transactions"); ¶¶ 187-89 (statements about material interests). iAnthus also falsely described its relationship with GGP as "Arm's length." ¶ 134. (*See supra* Section II.E.1) These disclosures even described specific related-party transactions Ford engaged in, but did not disclose his related-party transactions with Adler (in connection with GGP's loans) or with Rozinov (in connection with iAnthus's remaining $60 million in debt).

These are outright false statements because Ford's receipt of hundreds of thousands of dollars in connection with iAnthus's financing was exactly the type of "related party transaction" or "material interest" that iAnthus told investors did not exist. (*See supra* Section II.B). Ford's payments also meant that iAnthus did not have an "Arm's length" relationship with GGP.

The law is clear that defendants may not make statements about conflicts of interest that contradict or fail to disclose conflicts that existed at the time. *See In re Vale S.A. Sec. Litig.*, No. 19CV526RJDSJB, 2020 WL 2610979, at *7, 18 (E.D.N.Y. May 20, 2020) (holding complaint adequately alleged that defendants "materially misrepresented or omitted facts related to . . . Vale's third-party dam safety auditor having a conflict of interest as early as 2018"); *Tobia v. United Grp. of Companies, Inc.*, No. 115CV1208BKSDEP, 2016 WL 5417824, at *11 (N.D.N.Y. Sept. 22, 2016) (holding that "while the 2011 Form ADV disclosed that the PageOne Defendants might have conflicts of interest because they received certain compensation and fees for recommending investments, Plaintiffs plausibly allege that it did not reveal the true nature and extent of their conflict"); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 280 (S.D.N.Y. 2012) (holding statements about conflicts of interest were actionable); *see also Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, No. 18-CV-02104-DME-NYW, 2019 WL 2521834, at *3 (D. Colo. June 18, 2019) (holding plaintiffs adequately alleged "defendants gave misleading information

33

regarding the loans" by failing to disclose that the recipients "were related parties").

iAnthus also made misstatements touting the Company's corporate governance practices. On October 17, 2019, when the Company discussed its "Emphasis on Corporate Governance and Oversight," Ford emphasized iAnthus's "best-in-class Board in Cannabis," highlighting that "[n]o one told us to do this. . . . But it's the right way to comport yourself, when you've been entrusted with capital from public investors." ¶¶ 245-46. These statements were misleading because investors would understand from iAnthus's portrayal of exemplary corporate governance practices, that Ford was not taking secret personal payments in connection with the $156 million in debt that the Company borrowed during the Class Period. *See Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) (holding complaint adequately pled Defendant did not believe its statements "that its disclosure controls were effective in ensuring that 'financial and non-financial information [was] properly recorded . . . and reported'"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 464 (S.D.N.Y. 2017) (holding statements "with respect to Eletrobras's repeated references to its ethics and integrity" were actionable); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 375, 380-81 (S.D.N.Y. 2015) (holding statements about "integrity" of management and adequacy of internal controls were actionable where "management was well aware of the extensive corruption").[13]

Defendants' main response is to focus on the timing of Ford's improper payments. They argue incorrectly that Ford's loans "took place *after* all of the alleged misrepresentations in the

---

[13] Defendants do not argue that these statements concerning related party transactions, conflicts of interest, and corporate governance were puffery, but rather, argue, without referencing specific statements, that "no duty to update could exist" because their statements were "vague statements of optimism or expressions of opinion," or "statements that are not forward looking," and therefore could not relate to a payment that would be made in the future. (iAnthus MTD at 20-21 (internal quotation marks omitted)). This argument is based on Defendants' flawed timing argument discussed above. Moreover, Defendants' statements concerning related party transactions, conflicts of interest, and corporate governance are not puffery because they referenced specific transactions by iAnthus's executives and were "made to reassure investors" about the Company's integrity. *See Eletrobras*, 245 F. Supp. 3d at 463-64.

34

Complaint." (iAnthus MTD at 20 (emphasis in original)). Defendants base this contention on the Special Committee's finding that Adler's loan "was entered into on December 21, 2019, after all rounds of financing from Gotham." (iAnthus MTD at 19). But the Special Committee also determined that Ford took a separate $60,000 loan from an individual that the Company chose not to name. Defendants assert that "Plaintiff does not specify the timing or terms of" this loan. (iAnthus MTD at 22). In fact, the Complaint pleads specifically, based on multiple sources— including a straightforward comparison of the Special Committee's findings to the *Stockhouse* report, Hi-Med's firsthand knowledge of Rozinov's role in brokering iAnthus's unsecured debt, Rozinov's $1.6 million in finder fees, and his prior relationship with iAnthus—that this additional payment was from Rozinov in connection with iAnthus's $60 million in unsecured debt that he brokered. (*See supra* at 8). Moreover, iAnthus reported the Special Committee's findings regarding this $60,000 loan and chose not to disclose further details about it. ¶¶ 72, 77. Defendants should not benefit from iAnthus's inadequate disclosure of these details. *See Livingston v. Shore Slurry Seal*, 98 F. Supp. 2d 594, 597-98 (D.N.J. 2000) (holding courts "should not require plaintiffs to plead issues that may have been concealed by the defendants").

This evidence related to Rozinov eviscerates Defendants' timing argument as to all of their statements about conflicts that they made after iAnthus entered into its first agreement that Rozinov brokered in March 2019. Moreover, Defendants made their last statements about related party transactions on November 20, 2019, in connection with iAnthus's financial results for the third quarter of 2019. ¶ 226; *see also* ¶ 151. And on October 17, 2019, Defendants promoted iAnthus's corporate governance practices. ¶¶ 245-46. The Complaint plausibly alleges that Ford's $60,000 payment from Rozinov took place before these statements were made just several months prior to the March 31, 2020 *Stockhouse* report and subsequent Special Committee investigation.

Defendants other passing arguments, including that Rozinov was not a related party and that his payments to Ford are not material (iAnthus MTD at 22), cannot be taken seriously because Rozinov was the broker for iAnthus's $60 million of unsecured debt and engaged in other transactions with the Company. (*See supra* Section II.B). Moreover, even if Rozinov was not a related party, Ford was the epitome of a related party to iAnthus. His personal payments in connection with iAnthus's unsecured debt therefore should have been disclosed in the Company's description of related party transactions. It is well-established that "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). The Complaint plausibly pleads that investors would consider Defendants' statements about related party transactions, conflicts of interest, and corporate governance practices materially false and misleading in light of Rozinov's secret payments to Ford. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (holding complaint adequately alleged "LendingClub's failure to disclose its relationship with Cirrix . . . was material" and that "setting aside the relatedness . . . , investors would also have been interested to know that millions of dollars of loans . . . were inflated artificially through self-dealing").

Moreover, Defendants improperly dismiss the other allegations in the *Stockhouse* report, including that the $100,000 payment that the Special Committee found was just the most recent in a series of payments that Adler made to Ford, and that Rozinov gave Ford not just $60,000, but $300,000. ¶ 80. Defendants tar this as "conclusory" based on "an anonymous website report." (iAnthus MTD at 21-22). But these allegations are far more substantial because the Special Committee corroborated key parts of the *Stockhouse* report based only on what the Committee was

36

able to "substantiate" through documentary evidence that it was able to obtain in its brief three-week investigation. (*See supra* at 8-10). And Mark Dowley's abrupt resignation from the Company's Board further calls the completeness of the Committee's investigation into question. (*Id.*). Ford's self-dealing is also consistent with CW 1's observation that Ford and Adler were "good friends" who met regularly for dinner. ¶¶ 82-83. All of this corroboration bolsters the credibility of the *Stockhouse* report. *See Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (holding other sources "tend to corroborate the findings of Absaroka's unnamed 'investigators'" and a "motion to dismiss is not the proper vehicle to test the credibility of witnesses or the manner in which the plaintiffs will attempt to prove their allegations"); *see also In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1235-36 (N.D. Ga. 2019) (holding "[n]ews articles, which frequently rely upon unnamed sources, constitute reliable bases for allegations").

All of these allegations strongly support the inference that Ford took personal payments from Adler and Rozinov throughout the Class Period, and certainly before the iAnthus Defendants made their last statements about related party transactions, conflicts of interest, and corporate governance practices in October and November 2019. These allegations meet Plaintiff's burden to plead specific information supporting a plausible inference that Ford received payments in connection with iAnthus's $156 million in debt during the Class Period. Defendants' contrary interpretation strains credulity and "conflate[s] pleading and proof." *McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 125 (S.D.N.Y. 2013); *see also JinkoSolar*, 761 F.3d at 249 (describing requirement to draw all reasonable inferences in plaintiff's favor); *In re LendingClub*, 254 F. Supp. 3d at 1118 (holding allegation "that at least one news report indicate[d] that" CEO had relationship with Cirrix that "'predated the IPO,' (without identifying the source of

37

that report)," along with CEO's "willingness to engage in self-dealing," supported inference that parties could "'significantly influence' each other at the time of the IPO"); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1225 (N.D. Cal. 2015) (holding plaintiffs allege sufficient "facts giving rise to the plausibility of a continued close relationship" to qualify as a "related party"). Moreover, the law is clear that plaintiffs in securities fraud class actions are not required to plead "the exact date and time" of the fraud. *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000); *see also In re ITT Educ. Servs.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014) (holding the court need not "identify the precise moment at which the culpable inference overtook the innocent one"); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. Mar. 28, 2005) (holding it is sufficient that plaintiffs "supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged"); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002) (requiring only that "the complaint *as a whole* is sufficiently particular to pass muster under the PSLRA").

Lastly, iAnthus argues that it timely disclosed Ford's self-dealing because the Special Committee announced its findings within four months of Ford's December 21, 2019 loan from Adler. (iAnthus MTD at 21). This argument fails because iAnthus cannot extricate itself from Ford's misconduct.[14] As iAnthus's CEO who made many of the statements at issue, Ford's culpability the moment that he engaged in self-dealing is attributable to the Company.

2.     Materially False and Misleading Descriptions of iAnthus's Debt

The iAnthus Defendants described in detail iAnthus's $156 million in debt that it raised during the Class Period, including its $40 million from GGP on May 14, 2018 (along with the

---

[14] The court in *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008), which Defendants cite (iAnthus MTD at 21), held that a pharmaceutical company was permitted a reasonable amount of time to investigate whether a drug trial should be suspended because of a rare side effect. Ford, in contrast, knew of his own misconduct.

additional $10 million that GGP supposedly invested in the Company's equity), $20 million from GGP on September 30, 2019, and $36.15 million from GGP on December 20, 2019, and iAnthus's $60 million from other lenders that it raised on March 18, 2019 and May 2, 2019. (*See supra* Section II.E.2). The iAnthus Defendants made these statements in Material Change Reports for each round of financing, ¶¶ 141-43, 174-76, 217-22, 241-43; press releases, ¶¶ 129, 172, 238-39; and quarterly and annual financial reports and conference calls, ¶¶ 147, 155, 166, 181-82, 210, 228, 233. iAnthus also described GGP's role in this financing as crucial to the Company's success. ¶ 127 ("[GGP] is well recognized as a long-term [private equity] investor and leader within the cannabis investment community"); ¶ 128 ("Jason and the GGP team have demonstrated the ability to help portfolio companies accelerate geographic expansion and operational efficiencies to create meaningful value for investors"); ¶¶ 205-06 (describing GGP as "a leading financial investor in the U.S. cannabis sector" and making iAnthus "fully fund[ed]"); ¶ 210 ("[GGP] is the preeminent investor in the cannabis sector. They have been investors in all parts of the value chain . . . . They've been a meaningful partner in our operating success to date"); ¶ 238-39 (describing crucial "support from GGP"). And iAnthus described its unsecured debt as "allow[ing] the Company to simultaneously strengthen our balance sheet, deepen our investor base, and fund our growth capital." ¶ 172.

### a)   *Descriptions of iAnthus's Debt Were Materially False and Misleading Because of Ford's Self-Dealing*

Once defendants choose to speak about a topic, they have "a duty to tell the whole truth," including "to be both accurate and complete." *JinkoSolar*, 761 F.3d at 250. For this reason, when a company puts the "cause of its financial success at issue," its failure to disclose misconduct related to that performance is actionable. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005). This is especially true when the underlying misconduct

involves self-dealing or similarly corrupt behavior. *See In re Glob. Brokerage, Inc.*, No. 1:17-cv-00916-RA, 2019 WL 1428395, at *9 (S.D.N.Y. Mar. 28, 2019) (holding plaintiffs adequately alleged "FXCM did not simply act as a mere 'credit intermediary, or riskless principal,' but rather, "through the Company's arrangements with Effex, it profited from positions taken by this market maker directly against those of FXCM's customers"); *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442-44 (S.D.N.Y. 2018) (holding descriptions of company's success were adequately alleged to be misleading "because they suggested that CNO's successes were the result of legitimate factors" rather than bribery ); *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 476 (S.D.N.Y. 2006) (statements were actionable based on "MMC's failure to disclose that it directed clients to insurers to maximize" revenues through kickback scheme "rather than to serve the clients' best interests"); *LendingClub*, 254 F. Supp. 3d at 1118.

That is precisely what iAnthus did here. The iAnthus Defendants' descriptions of its debt omitted Ford's self-dealing in connection with those transactions. This self-dealing includes Ford's payments from Adler in connection with the GGP funding—including Ford's most recent $100,000 payment on December 21, 2019—and Ford's receipt of $300,000 from Rozinov in connection with iAnthus's $60 million in unsecured debt. (*See supra* Section II.B). Defendants went beyond just describing the terms of the financing, which itself was misleading. They further put the nature of iAnthus's relationship with its lenders at issue by describing the crucial role that GGP played by providing this debt and the importance of the unsecured debt to iAnthus's operations. (*See supra* Section II.E.2 and 38-39). Ford's secret payments that he received in connection with these transactions makes Defendants' descriptions of them misleading because reasonable investors would assume that iAnthus's CEO was not receiving undisclosed personal payments in connection with the Company's crucial financing. ¶¶ 33, 53-61.

40

The iAnthus Defendants make the same arguments about Ford's self-dealing in connection with these statements that they do about statements concerning related party transactions and conflicts of interest. (iAnthus MTD at 19-22). Those arguments fail for the reasons described in the prior section. Moreover, the iAnthus Defendants' timing arguments are even more misplaced for these statements because iAnthus described its last round of financing with GGP on December 20, 2019 and filed its Material Change Report for that transaction on December 30, 2019. ¶¶ 237-44. Even according to the iAnthus Defendants, these statements were made contemporaneously with and after Ford's December 21, 2019 $100,000 payment from Adler.[15]

### b)   Descriptions of iAnthus's GGP Loans Were Materially False and Misleading Because of the Exit Fee

The iAnthus Defendants' description of the GGP debt was also false and misleading for the additional reason that these statements falsely characterized GGP as making a $10 million equity investment in iAnthus even though GGP's secret Exit Fee fundamentally altered the nature of GGP's funding. (*See supra* Section II.C). iAnthus and Ford falsely described GGP's investment as being "a big equity play for them, it's structured as a senior secured piece of debt, but they're not in [it] for the lending returns." ¶ 233. They also explicitly described GGP's May 14, 2018 financing as including "$10 million of equity" and described GGP's "$50 million investment a year ago." ¶¶ 155-56, 210; *see also* ¶ 142. And Defendants further misled investors by stating that GGP waived its right to a quarterly interest payment on September 30, 2019 without disclosing that this triggered the accrual of 13% interest under the Exit Fee. ¶¶ 221-22, 228-29.

The law is clear that it is misleading to omit a key term that fundamentally alters the nature of the transaction being described. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 240

---

[15] While iAnthus's announced this loan on December 20 and the Special Committee found that Adler paid Ford on December 21, the most plausible inference is that Ford and Adler agreed to this $100,000 payment in connection with GGP's financing, rather than that they did not agree to it until the day immediately after the financing was announced.

(S.D.N.Y. Nov. 9, 2010) (disclosure of $43 billion CDO liability was misleading because it failed to disclose additional $10.5 billion in indirect exposure). This rule applies in particular where defendants falsely describe another party as taking an equity stake in a transaction. *See S.E.C. v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 161-62 (S.D.N.Y. 2011) (holding that after affirmatively representing Paulson as "a long equity investor"—"in order to be both accurate and complete, Goldman and Tourre had a duty to disclose Paulson had a different investment interest— that it was short"); *In re Glob. Brokerage*, 2019 WL 1428395, at *9 (explaining that "FXCM allegedly provided benefits to Effex that were not reported to the Company's investors and customers"). Defendants description of GGP's $50 million investment in May 2018 was false and misleading because the $10 million portion of this investment that they described as an "equity" investment was actually protected entirely by the undisclosed $10 million Exit Fee.

Defendants' descriptions of GGP making an "equity" investment were particularly inaccurate because "[t]he distinction between investor and creditor is significant . . . . Permitting an equity investor to assume the position of a creditor, who relies on the existence of a corporation's assets in bankruptcy proceedings, would permit the investor to avoid the risks that come with investment, such as the risk of loss of assets." *ABF Capital Mgmt. v. Askin Cap. Mgmt., L.P.*, No. 96 CIV. 2978 (RWS), 1997 WL 317365, at *3 (S.D.N.Y. June 12, 1997).

Defendants respond by arguing that the Exit Fee was not material because it was contingent on future events, that "iAnthus believed that it was more likely than not that GGP would exercise the conversion option on the Secured Notes," and that iAnthus vaguely referenced a "Fee Letter" without describing its contents until after the Class Period. (*See* iAnthus MTD at 23-25; GGP MTD at 25-26). These arguments raise extraneous facts not referenced in the Complaint that cannot be

42

considered, or decided in Defendants' favor, at this stage. (*See supra* Section II.H).[16]

Moreover, none of Defendants' factual arguments make their misstatements about the Exit Fee "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162. The Exit Fee "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). *First*, the fee was not an obscure contractual provision, but rather, equaled 25% of GGP's $40 million loan. *Second*, the Exit Fee was not just part of GGP's $40 million loan, but also corresponded to, and fundamentally altered the nature of, GGP's supposed $10 million equity investment. Investors would certainly want to know that GGP's interests were not aligned with theirs in the way that Defendants represented. That is why "[t]he distinction between investor and creditor is significant" as a matter of law. *ABF Capital Mgmt.*, 1997 WL 317365, at *3. Indeed, analysts viewed GGP's equity investment as significant to their evaluation of iAnthus's financial health because it protected shareholders from GGP's enforcing its security interest in the Company's assets. ¶ 61; *see also* ¶¶ 57-58, 60. Even Defendants were sensitive to that risk when they told investors that iAnthus was "a big equity play for [GGP], it's structured as a senior secured piece of debt, but they're not in [it] for the lending returns." ¶ 233. *Third*, Defendants do not address the fact that Exit Fee started to accrue 13% interest in September 2019. ¶¶ 39 n.3, 221-22, 228-29, 255-26.

The fact that the Exit Fee was contingent on future events does not make it immaterial because courts regularly hold that statements misrepresenting the risk of future events are

---

[16] How investors would understand Defendants' "equity" label for this part of GGP's financing in light of GGP's Exit Fee is also, at the very least, a factual issue that cannot be decided at this stage. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, No. 20-cv-2031-JSR, 2020 WL 4547217, at *4 (S.D.N.Y. Aug. 6, 2020) (holding definition of contract "renewal" is a factual issue); *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 210 (S.D.N.Y. 2019) (holding term "political risk" is a factual issue); *In re Refco Inc. Sec. Litig.*, No. 07-md-1902-JSR, 2010 WL 11500542, at *8 (S.D.N.Y. Oct. 22, 2010) (same as to "prime broker").

actionable. *See JinkoSolar*, 761 F.3d at 251 (holding risk disclosure does not suffice when omitted information would "substantially affect a reasonable investor's calculations of probability" and "cause a reasonable investor to make an overly optimistic assessment of the risk"); *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 587 (S.D.N.Y. 2020) (holding "loss contingencies by definition are uncertain as to their ultimate outcome; what Perrigo was required to disclose was a reasonable estimate of the possible loss"); *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18-cv-9848-PGG, 2020 WL 5757628, at *11-13 (S.D.N.Y. Sept. 27, 2020) (holding defendants omitted "presently-existing risk" of regulation based on non-compliance).[17]

Defendants also misunderstand why the Exit Fee made their statements false and misleading. When courts hold that an outcome is too speculative to require disclosure, they are referring to an event that that has not yet occurred. Here, in contrast, there is nothing contingent about the existence of the Exit Fee. The fee itself existed since iAnthus and GGP agreed to their May 14, 2018 loan *on the first day of the Class Period*. Plaintiffs do not argue that Defendants should have disclosed the probability that iAnthus would trigger the Exit Fee, but rather that they misrepresented the nature of their agreements by concealing the Exit Fee itself and that it started to accrue interest in September 2019. If Defendants had told investors about that historical information, investors could have assessed the impact of a potential default for themselves.[18]

---

[17] The cases that Defendants cite merely stand for the uncontroversial proposition that defendants are not required to disclose information that does not render any affirmative statements misleading. (*See* iAnthus MTD at 24 (citing *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, No. 14 CIV. 9443 (ER), 2016 WL 2859622, at *9-10 (S.D.N.Y. May 16, 2016) (holding "Plaintiff nowhere explains in his pleading how these alleged omissions rendered any of Defendants' prior statements false or misleading") and *In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1258 (D.N.M. 2010) (holding plaintiffs failed to allege there was anything "unique" about the provision at issue and "the inclusion of such provisions is commonplace and well known in the investment marketplace")).

[18] The court's reasoning in *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144 (S.D.N.Y. 2015), which Defendants cite, is therefore irrelevant. (iAnthus MTD at 24; GGP MTD at 19). The defendants in *Lipow* were not required to disclose the risk that their contract might be invalidated in the future. 131 F. Supp. 3d at 170. But the defendants did not hide any of the contract's key provisions. Here, in contrast, Defendants concealed the *existence* of the Exit Fee.

44

### c) The GGP Defendants' Statements About GGP's Loans Were Materially False and Misleading

The iAnthus Defendants made all of the statements described above in this Section. GGP and Adler made similarly false and misleading statements describing GGP's financings. These representations include Adler's statements in the press releases announcing GGP's May 14, 2018 and September 30, 2019 financings, promoting GGP's investments in iAnthus. ¶ 131 (stating that iAnthus provides "a compelling growth and investment opportunity"), ¶ 207 (stating "[w]e have viewed iAnthus as a key partner since our initial investment in May 2018" and "do not believe" iAnthus's recent progress "is reflected in the Company's current trading price").

These statements are false and misleading for the same reasons as the other statements described above in this section, and are described separately here for ease of reference to each set of Defendants. As explained above, a reasonable investor would interpret GGP's statements touting its investments in, and partnership with, iAnthus to mean that Adler was not making undisclosed payments to Ford and that iAnthus did not give GGP a secret $10 million Exit Fee that protected its equity investment. GGP responds by repeating the same flawed arguments discussed above concerning the timing and materiality of Defendants' misconduct. (GGP MTD at 19-21, 24-25). These arguments fail for the reasons described above. (*Supra* at 36-44).

### 3. The iAnthus Defendants' Materially False and Misleading Statements About the Availability of Financing

The iAnthus Defendants misrepresented the Company's access to financing in several ways. (*See supra* Section II.E.3). First, they falsely reassured investors that the Company had adequate access to financing based on a $100 million financing plan that the Company entered into with GGP in September 2019. Ford told investors when announcing this $100 million financing plan that the plan was "certain" and "[w]e have no financing concerns." ¶¶ 209-11. Then, on

November 21, 2019, Ford assured investors that he had "full confidence" in GGP's providing the full $100 million, and he did not "lose any sleep about the availability of money from Gotham," based on his "personal" relationship with GGP. ¶ 232. Kalcevich also assured that GGP would allow iAnthus to access other types of financing because "we're a big equity play for them."

iAnthus also highlighted, in each of its quarterly and annual reports during the Class Period, its prior financing from GGP and its unsecured lenders as examples of how iAnthus "has historically had, and continues to have, access to equity and debt financing." ¶¶ 148, 156, 165-66, 183, 194, 226. Lastly, Ford told investors that iAnthus was focused on "reducing our cost of capital" and that the Company was "disciplined" in raising capital because they were acting as "stewards of the capital" for public shareholders. ¶¶ 170, 191, 201, 234.

These statements were misleading because they put the source of iAnthus's ability to obtain financing "at issue," but failed to disclose that the historical sources that supported these statements—iAnthus's prior loans from GGP and its other lenders—were tainted by Ford's self-dealing and the GGP's secret Exit Fee. *See In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) (holding "statements *explaining* income **put the sources of Mylan's revenue at issue** and therefore "may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices" (emphasis in original)); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677–78 (S.D.N.Y. 1990) (holding statements "extolling Par's ability to obtain FDA approvals" and "projecting continued success in obtaining rapid approvals" were misleading because the company obtained those prior approvals through bribery). Defendants are therefore wrong that their statements about prior financing were "simply true statements." (iAnthus MTD at 26-27). Investors would assume from these statements promoting GGP's $100 million financing

46

plan, iAnthus's ability to obtain financing based on its prior financing, Ford's "personal" relationship with GGP, and the Company's "disciplined" approach to serving as "stewards" of shareholders' capital, that Ford was not taking substantial personal payments in connection with iAnthus's $156 million in financing and that GGP did not receive a secret $10 million Exit Fee. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 185 (S.D.N.Y. 2010) (holding statements about defendant's "disciplined" approach to lending were actionable); *In re BofI Holding, Inc. Sec. Litig.*, No. 315CV02324GPCKSC, 2017 WL 2557980, at \*3 (S.D. Cal. May 23, 2017) (holding statements describing defendant "as a 'careful, prudent institution' [that] emphasized their 'conservative loan-underwriting standards'" were actionable based on allegation that the bank "had a troubled identity that" relied on "unlawful conduct"). Moreover, iAnthus referred to its "historical" and "continue[d]" access to "*equity*" financing as support for its ability to obtain future financing. That falsely described GGP's prior financing because its secret $ Exit Fee changed the nature of GGP's supposed equity investment.

Defendants also argue that their statements about iAnthus's availability of financing are inactionable "fraud by hindsight," puffery, forward-looking statements, and statements of opinion. (iAnthus MTD at 25-27; GGP MTD at 19-21, 24-25). These arguments miss the mark because "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381; *see also Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) (holding statements were not puffery because they provided "a completely misleading description of what, according to the complaint, was actually going on"). Defendants' statements are actionable because they stated that they had "full confidence" and "certain[ty]" about GGP fulfilling its $100 million financing plan, and based other statements about the availability of financing on the historical facts of the financing that iAnthus

47

had already raised. *See City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11 CIV. 4665 PGG, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) (holding reasonable investor might rely upon defendant's "statements as a guarantee that" internal controls were implemented); *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 443 (S.D.N.Y. 2018) (statements are not puffery when "they are worded as guarantees or are supported by specific statements of fact").

Moreover, even if Defendants couched certain of these statements as supporting the ability to obtain future financing, it is well-established that statements can have both a forward-looking and an historical component. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (holding "safe-harbor provision does not protect . . . present representations . . . embedded within statements that Vivendi deems forward-looking"). Defendants' statements about iAnthus's historical financing transactions and Ford's "personal" relationship with GGP were false and misleading because they did not tell investors about Ford's self-dealing in connection with those transactions or GGP's Exit Fee. Moreover, Defendants' statements about iAnthus's ability to obtain financing gave investors the false impression that such financing was guaranteed based on Defendants' expressions of certainty.

In addition, a company's "specific statements" about matters that are "central to its financial condition" are actionable. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d at 463 (internal quotation marks omitted); *In re Glob. Brokerage*, 2019 WL 1428395, at *9 (statements in which "FXCM portrayed its agency-trading model as 'fundamental to [its] core business philosophy'" were actionable); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (holding statements about integrity not puffery because integrity "was at the heart" of defendant's business). iAnthus's statements about its ability to obtain financing are not puffery because this was crucial to iAnthus's business. ¶¶ 33, 53-61, 57-61, 67-68.

Defendants also argue that iAnthus's statement about the availability of financing that the Company repeated in each of its periodic financial reports was not misleading because iAnthus cautioned that financiers "have approached the cannabis industry cautiously to date" and "there is neither a broader nor deep pool of institutional capital" available. (iAnthus MTD at 27). But this does not change the false impression that iAnthus gave about the availability of financing because it did not warn investors of the *specific risk* that iAnthus's prior financing was tainted by Ford's self-dealing or GGP's secret Exit Fee. *See Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 847 (S.D.N.Y. 2019) (holding defendants did not warn "about the specific risks associated with Carmike's underinvestment in its theaters").[19]

Similarly, even if Defendants characterized certain statements about iAnthus's ability to obtain financing as opinions, they are actionable under *Omnicare* for the independent reasons that they 1 - contained embedded false statements fact concerning the Company's prior financing and 2 – would mislead a reasonable investor based on the omission of Ford's self-dealing and GGP's Exit Fee. *See In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019) (holding that "[f]or a statement of belief or opinion to be actionable," a plaintiff must allege "(1) the speaker did not hold the belief she professed, (2) the supporting fact[s] she supplied were untrue, or (3) the stated opinion, though sincerely held and otherwise true as a matter of fact, omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor" (quoting *Omnicare* and *Tongue v. Sanofi,* 816 F.3d 199 (2d Cir. 2016)); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CIV.A. 13-6731, 2015 WL 3755218,

---

[19] Defendants similarly argue that the Exit Fee was not material because the Company warned about "the difficulty of obtaining financing in the cannabis market." (iAnthus MTD at 25 (citing FY 2017 MDA)). The Court should not consider this assertion because it is yet another claim based on extrinsic evidence. (*See supra* Section II.H). But even if the Court were to consider this statement, it did not disclose the true nature of iAnthus's past financing and only highlights the importance to investors of the terms and availability of financing in the cannabis market.

at *13 (E.D. Pa. June 16, 2015) (holding that even if statements were opinions, they "remain actionable" because representations of "conservative" lending practices and "adequate" collateralization "clearly implicate" the securities laws if defendants "intentionally or recklessly omits certain facts contradicting these representations" (internal quotation marks omitted)).

### 4. Defendants' Escrow Statements Were Materially False and Misleading

iAnthus's September 30, 2019 loan agreement with GGP contained a provision requiring iAnthus to place $5.27 million in an escrow account to ensure that the funds would be available to pay the Company's interest obligations to GGP. ¶¶ 213-16. iAnthus not only disclosed this contractual provision; it also affirmatively represented that the Company was in compliance with it. ¶ 227. These statements were false and misleading because the escrow funds were not available when iAnthus defaulted on its debt to GGP on April 6, 2020. (*See supra* Section II.E.4).

Defendants only response to these clear misstatements is to argue that "iAnthus expressly disclosed both the funding and release of the relevant" funds. (iAnthus MTD at 28-29). But Defendants obscure the issue by focusing on the release of funds from iAnthus's *prior* agreement with GGP, which the Complaint acknowledges was disclosed. ¶¶ 110-11. iAnthus's financial results for the third quarter of 2019 state only that the "restricted cash in escrow as part of the Tranche **One** Secured Notes . . . was fully released to the Company during the first quarter of 2019." (iAnthus Ex. G at 16). The same page of this document defines the "Tranche One Secured Notes" as the notes from iAnthus's May 14, 2018 agreement with GGP. The next page of the document makes clear that the notes from iAnthus's September 30, 2019 loan from GGP are the Tranche **Two** Secured Notes. (*Id.* at 17).[20] The Complaint specifies that Defendants' misstatements

---

[20] iAnthus also cites its prior disclosure, made before the September 30, 2019, that the escrow existed; and its full-year 2019 results, which the Company filed after the Class Period, which also do not disclose that the escrow funds from iAnthus's *second* agreement with GGP were released. (*See* iAnthus MTD at 28 (citing Exhibits B and E-H)).

concerning the escrow funds relate to the Tranche **Two** Secured Notes. ¶¶ 215-16, 227.[21]

    5.    <u>Defendants' Statements of Full Disclosure Were Materially False and Misleading</u>

    *a)*    ***iAnthus's Statements of Full Disclosure***

Ford and Kalcevich signed certifications in connection with the Company's periodic reporting during the Class Period, including that they "do not contain any untrue statement of a material fact or omit to state a material fact required . . . to make a statement not misleading" and that they "***fairly present in all material respects the financial condition, financial performance and cash flows of the issuer***." ¶¶ 146, 154, 164, 180, 193, 203, 224. iAnthus also confirmed that it gave a "Full Description of Material Change" in its Material Change Reports describing its loan agreements with GGP and the unsecured lenders and that "***no information has been omitted***" (or "Not Applicable" in the entry for "Omitted Information"). ¶¶ 141-43, 174-76, 217-19, 241-43. (*See supra* Section II.E.5).

In addition, iAnthus represented in its May 14, 2018 loan agreement with GGP that iAnthus was in compliance with its "continuous and timely disclosure obligations" under the Canadian securities laws, and that none of the representations or other statements contained in the agreement "contain any untrue statement of a material fact or omit to state any material fact necessary to make such statement or representation not misleading" to investors "seeking ***full information*** as to the Company." ¶¶ 137-39 (emphasis added). iAnthus repeated these compliance representations in its September 30, 2019 loan agreement with GGP. ¶¶ 213-14. iAnthus then represented throughout the Class Period that it was "in compliance with all covenants" in its agreements with

---

[21] Defendants' cases are irrelevant because the information at issue in them was actually disclosed. (iAnthus MTD at 28-29 (citing *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 379 (E.D.N.Y. 2003) and *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *13 (S.D.N.Y. Jan. 17, 2013)). Here, in contrast, the release or nonfunding of the escrow account from the September 30, 2019 agreement with GGP was decidedly not disclosed. *See AMC Entm't Holdings*, 422 F. Supp. 3d at 837 (rejecting argument that allegedly omitted information was disclosed).

GGP. ¶¶ 160-61, 197-98, 227. In addition, Kalcevich signed a certification in connection with the Notice of Proposed Issuance for the May 14, 2018 loan affirming that "there is not material information concerning the Issuer which has not been publicly disclosed." ¶ 135.

Defendants argue that a foreign disclosure obligation cannot give rise to Section 10(b) liability. (iAnthus MTD at 21 n.10; GGP MTD at 16-17). But the Court does not need to reach the substance of Canadian law because iAnthus affirmatively represented in these statements that it disclosed all material information concerning its agreements with GGP and its unsecured lenders. These affirmative assurances of full disclosure were outright false and misleading because iAnthus failed to disclose Ford's self-dealing and GGP's Exit Fee.[22] *See Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) (holding once a defendant chooses to speak, it must "be both accurate and complete").

### b)      The GGP Defendants' Statements of Full Disclosure

The GGP Defendants made similar statements confirming that they disclosed all material information as those made by the iAnthus Defendants. *First*, on June 7, 2018, October 10, 2019, and January 10, 2020, following each of its three financings, GGP filed a Required Disclosure by an Eligible Institutional Investor, describing the iAnthus securities that GGP acquired from its financings on May 14, 2018, September 30, 2019, and December 20, 2019. ¶¶ 248-49. Adler signed each of these forms on behalf of GGP. *Id. Second,* Adler signed the May 14, 2018 and September 30, 2010 loan agreements on behalf of GGP and therefore made the same statements in them that iAnthus made. ¶¶ 137-39, 213-14.

---

[22] Moreover, while the Court does not need to reach the issue in light of Defendants' representations that they disclosed all material information, their suggestion that disclosure obligations under foreign law cannot give raise to a duty to disclose goes against the plain meaning of the Second Circuit's holding that it has "long recognized that a duty to disclose under Section 10(b) can derive from statutes or regulations that obligate a party to speak." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015).

In each of GGP's Required Disclosures, it responded "N/A" to the question of whether GGP or "any of its joint actors is a party to an agreement, arrangement or understanding that has the effect of altering, directly or indirectly" GGP's economic exposure to the securities at issue. ¶ 250. Similarly, these forms instructed GGP to "[d]escribe the material terms of any agreements, arrangements, commitments or understandings . . . , including but not limited to . . . finder's fees . . . [or] loan or option arrangements." ¶ 253. These disclosures falsely stated that GGP did not have any side agreements, and that it disclosed all material terms, in connection with its transactions with iAnthus. These statements were false in light of Adler's undisclosed payments to Ford and GGP's secret $10 million Exit Fee.

Lastly, GGP stated in its Required Disclosure forms that it waived its right to receive the quarterly cash interest payment that was due on September 30, 2019, and instead determined to receive such interest as a payment "in kind." ¶ 255. This was misleading because it did not disclose that this event triggered the accrual of interest under the undisclosed Exit Fee. ¶ 256.

GGP's primary response is to repeat the iAnthus's Defendants' timing argument claiming that Adler's only payment to Ford occurred on December 21, 2019. (*See* GGP MTD at 18-19, 26). As explained above, however, the Complaint adequately pleads that Adler's December 21, 2019 payment to Ford was just the last of a string of personal payments. (*See supra* Section II.B). Moreover, GGP ignores the fact that *after* Adler made his December 21, 2019 payment to Ford in connection with GGP's December 20, 2019 loan to iAnthus, GGP misrepresented that loan in its January 10, 2020 Required Disclosure. ¶¶ 248-56.

The GGP Defendants' also disparage their Required Disclosures as merely containing "answers to specific pre-populated questions." (GGP MTD at 23). That is no defense to GGP's incorrectly completing these forms. GGP also contends that Adler's personal payments to Ford

53

and "GGP's contractual rights to an exit fee" could not have "made statements about the economic terms of" of GGP's loans to iAnthus false or misleading. (*Id.*). This argument is patently absurd because the Exit Fee was a key economic term of GGP's loans to iAnthus, and Adler paid Ford in connection with GGP's loans.[23]

### D.    The Complaint Pleads a Strong Inference of Scienter

Scienter may be pled either by alleging facts (a) showing that "defendants had both motive and opportunity to commit fraud" or (b) "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Recklessness occurs when individuals "knew facts or had access to information suggesting that their public statements were not accurate." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). The test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation" suffices. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). These allegations need not be "irrefutable" or "of the 'smoking-gun' genre, or even the 'most plausible of'" all inferences. *Id.* at 324. Rather, they must only be "cogent and at least as compelling as any opposing inference." *Id.* In other words, a tie goes to the plaintiff. *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

A corporation's scienter is adequately alleged based on facts pleading that high-level

---

[23] GGP also offers a strained interpretation of the Required Disclosure form, in a futile effort to argue that the form did not require disclosure of these facts. (*See* GGP MTD at 23 n.5). GGP clearly stated in response to Item 3.7 of the form that it was not "a party to an agreement, arrangement or understanding" that would alter the nature of its "economic exposure" to the iAnthus securities that the report covers. (*See* GGP Exs. 4, 12, and 16). Moreover, Item 5 calls for the disclosure of all "material terms of any agreements, arrangements, commitments or understandings" that GGP had related to the securities at issue. (*Id.*). The Exit Fee is not a "standard default provision" that Item 5 of the form excludes because it provided not just that GGP could enforce its agreement in the event of default, but that GGP would be entitled to an extraordinary $10 million fee that accrues 13% interest, and that negated entirely GGP's supposed $10 million equity investment. Moreover, Section 3 of the form did not contain any exception for "standard default provisions," and Adler's payments to Ford are additional transactions that GGP falsely omitted from the form.

executives acted with scienter. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015). The person "whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement or omission at issue." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012). Courts hold "that the scienter of 'management level' employees can be attributed to the corporation." *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, 15-cv-08672 (ALC) at *10 n.3 (S.D.N.Y. Sept. 19, 2017). Ford's and Kalcevich's scienter is therefore imputed to iAnthus and Adler's to GGP. ¶ 314.

1.    The Complaint Adequately Pleads Defendants' Motive and Opportunity

A motive to commit fraud exists where a defendant has a financial incentive to make misrepresentations to investors. *See Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214-15 (S.D.N.Y. 2018) (holding incentive to obtain commissions constitutes motive); *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 179 (S.D.N.Y. 2009) (motive of obtaining credit-rating business and selling highly rated notes suffices). Moreover, the law is clear that "motive and opportunity" is an independently sufficient basis for a defendant's scienter regardless of the defendant's conscious misbehavior or recklessness. *Ganino*, 228 F.3d at 170 (holding "the Complaint need only plead scienter by alleging either motive and opportunity, *or* conscious or reckless misbehavior" (emphasis added)); *TriPoint Glob. Equities*, 338 F. Supp. 3d at 215 (addressing conscious misbehavior or recklessness only in case motive was insufficient).

Ford had the opportunity to commit fraud because he was iAnthus's CEO and therefore had control over its relationship with its lenders and its public statements, including through his frequent statements on behalf of the Company. *E.g.*, ¶¶ 22, 137, 146. Ford's financial motive is particularly pronounced. Most obviously, Ford received hundreds of thousands of dollars in personal payments in connection with iAnthus's loans that are the subject of this action. (*See supra*

Section II.B); ¶ 299. These illicit payments are enough on their own to establish Ford's scienter. *See Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*, 688 F. Supp. 2d 229, 246 (W.D.N.Y. 2010) (holding "unwarranted compensation package that [defendant] received as a bribe for her participation in the scheme" sufficed to plead motive).

Defendants' only response is to rehash their arguments about the timing of Ford's payments, which ignore the timing of iAnthus's misstatements, as well as allegations of Ford's earlier payments from Adler and Ford's receipt of payments in connection with iAnthus's unsecured debt. (iAnthus MTD at 31; *see supra* at 34-38, 41, 53).[24]

Ford also received $1.48 million in net proceeds from the sale of stock during the Class Period at prices ranging from $5 per share to $1.25 per share—all of which were far higher than the Company's stock price of less than $.10 per share at the end of the Class Period or the $0.50 per share at which Ford tried to buy the Company in March 2020. ¶¶ 115, 122, 302. Defendants try to downplay Ford's stock sales because he last sold shares on September 3, 2019. (iAnthus MTD at 30). But this was less than four weeks before iAnthus and GGP announced their $100 million financing plan on September 30, 2019 that Ford would misrepresent as providing iAnthus with financial certainty. (*See supra* Section II.E.3). Moreover, by this point, Ford already knew about his improper payments and GGP's secret Exit Fee. This sequence of events shows that Ford was cashing out on his stake in the Company while laying the groundwork for its demise.[25]

---

[24] The only case that Defendants cite concerning Ford's receipt of improper payments addresses a completely different situation, where the defendants "intend[ed] to inflate the stock price so that they could protect their executive positions and the compensation and prestige they enjoy thereby." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994) (cited by iAnthus MTD at 31).

[25] Defendants assert that Kalcevich increased his stock ownership by less than five percent on July 11, 2019. (iAnthus MTD at 30). This does not diminish the strong evidence of Ford's motive based on his sales. In *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801 (2d Cir. 1996), which Defendants cite, the defendant's sales were not sufficient "[i]n the context of [that] case," where the defendant did not "ha[ve] the opportunity" to commit fraud and the plaintiffs' claims failed for other, independent reasons. *Id.* at 814 & n.14.

In addition, Ford sought to profit even further by trying to buy the Company in March 2020 for a mere $0.50 per share, after its stock price was decimated by his misconduct. ¶¶ 113-15, 305. Defendants argue that Ford's proposed management buyout does not demonstrate his improper motive because iAnthus's stock price proceeded to decline even further after his proposal failed. (iAnthus MTD at 29-30). But a defendant's scheme can still support their motive even if it did not ultimately succeed, as long as "plaintiffs allege a scheme that has any chance of achieving its putative ends." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 443 (S.D.N.Y. 2006). Defendants' hindsight argument also does not make sense. If Ford succeeded, his buyout would have propped up the Company's stock price, including by injecting more cash into the Company and restructuring its debt. ¶¶ 119-21. Moreover, it was in Ford's interest to purchase the Company for $0.50 per share—which was just a fraction of its earlier price when Ford sold shares for a net profit of $1.48—because he knew that he would not have the opportunity to do so later if his self-dealing was revealed, as it was shortly after Ford made his offer.

Furthermore, Ford and Kalcevich (iAnthus's CFO) both sought to profit from iAnthus's repricing of 9.65 million stock options (including 1.72 million for Ford and 1 million for Kalcevich) after a sharp fall in the Company's stock price. ¶¶ 119-21, 303. While the existence of stock options themselves are not evidence of motive, Defendants tried—over strenuous shareholder objections—to lower the strike price of 10-year options so that they could make a short-term profit. *Id.* This effort failed only because shareholders continued to object after Ford tried to salvage the plan by characterizing it as a public relations problem and misrepresenting the options as impacting over 160 individuals even though over 60 percent of them were given to iAnthus's top seven executives. ¶¶ 120-21. These actions highlight Ford's and Kalcevich's placement of their own short-term profits over the interests of iAnthus's shareholders.

The Complaint also specifically alleges Adler's and GGP's motive. First, GGP's Exit Fee is a quintessential example of defrauding investors for financial gain. The Exit Fee is a straightforward instance of Adler hiding a $10 million payment (plus 13% interest) that GGP would receive in the event of default. *See TriPoint Glob.*, 338 F. Supp. 3d at 214 (requiring "that Defendants benefitted in some concrete and personal way from the purported fraud"). Second, the Complaint specifically alleges the GGP Defendants' motive to take over iAnthus for far less than its true value. ¶ 308. Market observers noted that Ford's secret personal payments from Adler caused him to act in GGP's interests at the expense of iAnthus's shareholders. ¶¶ 96-102. GGP raises a red herring by arguing against a takeover plan "that was years in the making." (GGP MTD at 30). GGP continued its efforts through the end of 2019, when Adler paid Ford $100,000 on December 21, 2019. Moreover, regardless of whether Adler planned all along to take over iAnthus, he acted in his and GGP's financial interest by obtaining the Exit Fee and bribing Ford to give GGP such favorable terms on its debt so that GGP would be in a position to take over iAnthus on very beneficial terms. ¶¶ 12, 34, 85, 103. That is precisely the type of motive that courts recognize as supporting a strong inference of scienter. *See Abu Dhabi Commer. Bank*, 651 F. Supp. 2d at 179; *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 284 (E.D.N.Y. 2000) ("being able to acquire a company for a significantly reduced price is a sufficient economic benefit").

2.     <u>The Complaint Pleads a Strong Inference of Conscious Misbehavior and Recklessness</u>

The Complaint also pleads specific allegations supporting a strong inference of Defendants' conscious misbehavior and recklessness. This is an independent basis for finding a strong inference of scienter. (*See supra* at 55).

Ford and Adler, by definition, had scienter concerning Adler's payments to Ford because they engaged in these payments. Ford was also aware of the payments that he received from

58

Rozinov. ¶¶ 299, 307; (*see supra* Section II.B). These payments are enough by themselves to plead a strong inference of Ford's and Adler's scienter concerning their false and misleading statements describing iAnthus's relationship with GGP and (as to Ford) its unsecured lenders.[26]

Defendants' scienter is further established by Ford's being fired for his misconduct and Dowley's abrupt resignation less than two weeks after iAnthus announced the Special Committee's findings of Ford's improper dealings. ¶¶ 74, 310. Dowley's resignation right after he was involved in the Special Committee's investigation, and so soon into his term that was meant to add credibility to iAnthus's Board, adds to the inference that Ford's wrongdoing went far beyond the Special Committee's findings. *Id.* And the resignation of Beth Stavola—iAnthus's Chief Strategy Officer and its only Director other than Ford and Maslow to "accept" the Special Committee's findings—on August 4, 2020, raises even more suspicions about Defendants' activities and the Board's findings. ¶¶ 76, 124, 311; *see McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 127 (S.D.N.Y. 2013) (holding resignation of CFO, two board members, and independent auditor contribute to a strong inference of scienter).

Ford's, Kalcevich's, and Adler's scienter are also shown by their certifications that their many statements that they made on behalf of iAnthus and GGP, respectively, were true and did not omit any material information. ¶¶ 296-98; *see also* ¶¶ 133-35, 146, 154, 164, 180, 193, 203, 224, 248.  Their decisions to speak so forcefully and guarantee the accuracy of their statements in these certifications, as well as in response to analysts' questions about GGP's financing (¶¶ 232-34; *see also* ¶¶ 209, 170), carry with them an obligation to investigate the truth of their statements and precludes them rom pleading ignorance. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL

---

[26] The cases that iAnthus cites dealt with different situations because Ford and Adler displayed both the "participation in the fraud" and knowledge of these facts by virtue of their direct involvement in these payments. (*See* iAnthus MTD at 31-32 (quoting *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *11 (S.D.N.Y. 2012)).

6167889, at \*16 (S.D.N.Y. Nov. 26, 2018) (defendants' attempts to placate concerns raised by analysts supported scienter); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552-53 (S.D.N.Y. 2017) (holding "reaction to the inquires by the media" supports a "cogent inference" that defendants "knew or consciously disregarded" falsity of their statements).[27]

The Confidential Witnesses that the Complaint describes further support a strong inference of scienter because these witnesses—who include high-level employees that interacted directly with Ford—establish that Ford and Adler had a close personal friendship, Ford kept his relationship with GGP "close to the vest," and iAnthus's financing arrangements did not make sense. ¶¶ 83, 300-01, 306.

All of these red flags corroborate the other substantial allegations in the Complaint that raise a strong inference of scienter. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 648, 658-59 (S.D.N.Y. 2007) (holding timing of transactions "would certainly have been suspicious to anyone who became aware of them").[28]

Ford, Adler, and Kalcevich also knew about, and had access to, GGP's $10 million Exit Fee because it was a key feature of GGP's initial $40 million loan to iAnthus. (*See supra* Section II.C). Confidential witnesses, including a senior executive who specifically named Ford and Kalcevich as "chas[ing] after creative financing," explained that iAnthus's financing arrangements with GGP did not make financial sense and that "it makes you scratch your head." ¶¶ 104-05, 301.

The Complaint's allegations against Kalcevich are therefore based on more than just his role as CFO, as Defendants incorrectly argue. (iAnthus MTD at 33). Moreover, given Kalcevich's

---

[27] *See also Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010) (hold CEO "speaking so positively" supported recklessness).

[28] GGP argues that "[c]ommon social activities" do not support a strong inference of scienter. (GGP MTD at 29). But the only case that GGP cites dealt with individuals that were married to each other. *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 952 (D. Ariz. 2007). That is very different than the secret dealings between Ford and Adler.

60

central role as CFO in arranging iAnthus's financing, and Ford's control over iAnthus's relationship with GGP—which he kept "close to the vest" ¶¶ 104, 300—"it is virtually inconceivable" that they would not have known about GGP's Exit Fee. *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017). Ford and Kalcevich also had access to this information and were reckless if they ignored it. *See Novak*, 216 F.3d at 308 (holding an "egregious refusal to see the obvious, or to investigate the doubtful" suffices to plead scienter); *In re Nevsun Res. Ltd.*, No. 12 Civ. 1845(PGG), 2013 WL 6017402, at *14 (S.D.N.Y. Sept. 27, 2013) (scienter adequately pled where contrary information was "alleged to have been known by defendants [when] misrepresentations were made"); *Lewy*, 2012 WL 3957916, at *16 (defendant "overlooked or ignored" information that "she was or should have been aware" of).

3. The Core Operations Doctrine Supports a Strong Inference of Scienter

A plaintiff may also support scienter allegations based "on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557(CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013); *see also Gauquie v. Albany Molecular Rsch.*, No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (core operations doctrine supported scienter as to issues at key laboratory); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) (imputing knowledge based on core operations).

Scienter may therefore be imputed to Ford and Kalcevich by virtue of their roles as iAnthus's CEO and CFO, and Directors, and to Adler as GGP's Managing Member of the closely held investment company. ¶¶ 312-13. iAnthus's business depended on its $156 million in debt and its ability to obtain further financing. ¶¶ 33, 53-61. And GGP's $106 million investment in iAnthus

61

was a substantial investment at the core of GGP's business that focuses on the cannabis industry, which iAnthus describes as having limited financing options. ¶ 313; (iAnthus MTD at 25, 27). The importance of iAnthus's relationship with GGP and its other lenders supports a finding that Defendants had knowledge of the key details of these relationships.

4. The Inference of Scienter is at Least as Compelling as Defendants' Competing Inference

The inference of scienter need only be "at least as compelling" as Defendants' non-culpable inference. *Tellabs*, 551 U.S. at 324. This assessment must be made on a "holistic" basis "[w]hen the allegations are accepted as true and taken collectively." *Id.* at 326. Defendants' competing inference is that iAnthus "ultimately faced challenges managing its debt due to . . . COVID-19." (iAnthus MTD at 32-33; GGP MTD at 30).[29] But that alternative speculative explanation for iAnthus's demise—which CW 3 expressly rejected (¶ 104)—does not change Defendants' culpability *concerning the falsity of their statements*. Defendants acted out of self-interested motives, and with conscious misbehavior and recklessness, when they put iAnthus in such a precarious financial position while blatantly misrepresented key aspects of iAnthus's relationship its lenders. That is not only at least as plausible as Defendants' opposing inference—which is all that Plaintiff is required to plead—it is the only sensible explanation of Defendants' misrepresentations concerning Ford's self-dealing and GGP's Exit Fee. *See In re GE Sec. Litig.*, 857 F. Supp. 2d 367, 394-98 (S.D.N.Y. 2012) (holding culpable explanations were at least as compelling as non-fraudulent ones), *recon. denied*, 856. F. Supp 2d 645. Moreover, Defendants

---

[29] GGP similarly cites iAnthus's litigation with Oasis as a reason for iAnthus's defaults. (GGP MTD at 30). But iAnthus dismissed with prejudice its claims against Oasis for interfering in iAnthus's business, while agreeing that if their restructuring plan did not succeed, Oasis could revive its claim that iAnthus's relationship with GGP breached the Company's agreement with Oasis. ¶ 94. iAnthus's litigation with Oasis further supports the inference of scienter because it highlights the improper nature of iAnthus's relationship with GGP that put GGP's interests ahead of those of iAnthus's shareholders.

cannot evade their knowledge of events that they were personally involved in.

E.    **The GGP Defendants Made Their Statements "In Connection With" the Purchase or Sale of a Security**

The GGP Defendants argue that they did not make their statements "in connection with" the purchase or sale of iAnthus securities, as required by Section 10(b), because "GGP's required disclosures provide information pertaining to the private financing arrangements that GGP made with iAnthus." (GGP MTD at 31 (addressing statements alleged in ¶¶ 248-56)). This argument is limited to GGP's Required Disclosures. GGP concedes that Adler's statements in press releases (¶¶ 131, 207) and loan agreements (¶¶ 137, 213) satisfy the "in connection with" requirement.

GGP's argument as to its Required Disclosures fail because the "in connection with" requirement is "broadly construed." *Tobia v. United Grp. of Cos., Inc.*, No. 115CV1208BKSDEP, 2016 WL 5417824, at *13 (N.D.N.Y. Sept. 22, 2016). Courts regularly hold that publicly disclosed statements are made "regarding" securities transactions because "market professionals generally consider most publicly announced material statements." *In re Carter-Wallace*, 150 F.3d 153, 156 (2d Cir. 1998); *see also Last Atlantis Cap. v. AGS Spec. Parts.*, 749 F. Supp. 2d 828, 834 (N.D. Ill. Nov. 4, 2010) (holding that statements on company websites are actionable); *Muzinich & Co. v. Raytheon*, No. CV-01-284-S-BLW, 2002 U.S. Dist. LEXIS 26962, *10-11 (D. Idaho Apr. 30, 2002) (broadly interpreting the "in connection with" requirement).[30] GGP acknowledges that the purpose of the Required Disclosure form is to inform "the market" about the institutional investor's interest in the issuer's securities. (GGP MTD at 8). That purpose easily satisfies Section 10(b)'s

---

[30] The court in *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003), which GGP cites (GGP MTD at 31), held only that JDSU shareholders could not bring a claim against Nortel "upon the facts presented," based on Nortel's "statements about *its own* business performance and prospects." *Id.* at 622-24 (emphasis added).The court recognized, however, that in other circumstances, "misrepresentations by and about one company (Cendant) could be found to have been made 'in connection with' the purchase of shares in a different company." *Id.* at 624. GGP's statements here are even more relevant because they were about GGP's interest in iAnthus's securities.

63

broad "in connection with" requirement.

GGP and Adler are also responsible for all of these statements under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), because they include statements that GGP and Adler disseminated (such as in GGP's Required Disclosures, which Adler signed ¶¶ 248-56) and other statements that they made themselves (such as in GGP's agreements with iAnthus that Adler also signed (¶¶ 137, 213) and quotations that iAnthus attributed Adler in iAnthus's press releases (¶¶ 131, 207)). *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) (holding "signatories of misleading documents 'made' the statements in those documents"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 541 (S.D.N.Y. 2016); *City of Roseville Empls.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417-18 & n.9 (S.D.N.Y. 2011) (holding *Janus* "recognized that attribution could be 'implicit from surrounding circumstances,'" including where defendant "had control over the content of the message").

## F.     The Presumption of Reliance Applies

This is a straightforward securities fraud class action where Plaintiff and the Class are entitled to the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (holding that "the market price of shares traded on well-developed markets reflects *all publicly available information*, and, hence, any material misrepresentations"). GGP argues that the fraud-on-the-market presumption does not apply because "Plaintiff cannot allege an efficient market." (GGP MTD at 32-33). That is plainly wrong. The Complaint alleges multiple factors supporting an efficient market, which supports the presumption that Plaintiff and the Class relied on the integrity of the market price for iAnthus's stock. ¶¶ 322-23. This includes that iAnthus's "stock was liquid and traded with moderate to heavy volume," it traded on the OTCQX, OTCQB, and CSE markets, it was covered by multiple analysts, Defendants' misrepresentations would tend

64

to induce a reasonable investor to misjudge the value of the Company's stock, and iAnthus's stock reacted to news about the Company. ¶¶ 269, 322-23.

Courts regularly hold that the presumption-of-reliance applies to transactions on different types of markets, not just the NYSE and NASDAQ, when the plaintiff relied on the integrity of the market price. For example, the court in *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008), found "plaintiffs' evidence and conclusions regarding market efficiency sufficiently persuasive" as to the OTC market *at the class certification stage. Id.* at \*10; *see also In re ForceField Energy Inc. Sec. Litig.*, 2015 WL 4476345, at \*4 (S.D.N.Y. July 22, 2015) (plaintiff "plausibly relied on the market" price when conducting an off-market exchange); *Black v. Finantra Capital*, 418 F.3d 203, 205-06, 209-10 (2d Cir. 2005) (holding *Basic* presumption applied to privately negotiated transaction). Moreover, the law is clear that the question "on a motion to dismiss is not whether plaintiff has proved an efficient market, but whether he has pleaded one." *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at \*5, 12 (S.D.N.Y. June 28, 2010); *see also Basic*, 485 U.S. at 249 n. 29 ("Proof of that sort is a matter for trial"); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 473 (S.D.N.Y. 2014), *aff'd sub nom. Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015) (holding "the question of whether a market is efficient" is "a question of fact and therefore not meant to be answered on a motion to dismiss"); *In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166, at \*25 (S.D.N.Y. June 10, 2010) (same); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 508-09 (S.D.N.Y. 2005) (same); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003) (same).[31]

Defendants, tellingly, do not cite any cases holding on a motion to dismiss that an OTC

---

[31] GGP cites a case where the complaint did not allege that defendants "made a public misstatement." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 175 (S.D.N.Y. 2010) (*cited by* GGP MTD at 32). That has nothing to do with the facts here, where Defendants' made the many misstatements described above.

market was not efficient. (*See* GGP MTD at 33 (citing *Burke v. China Aviation Oil Corp.*, 421 F. Supp. 2d 649, 653 (S.D.N.Y. 2005) (denying motion for service of process by Letters Rogatory)). Defendants also blatantly mischaracterize the court's holding in *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478 (S.D.N.Y. 2011), which held, in an individual action for market manipulation, that even if "the OTCBB was an efficient, free market," the plaintiffs, " by their own admissions, did not rely on that market" because they purchased stock "for the sole purpose" of reselling it "on a cost-plus basis." *Id.* at 493.[32]

### G.    The Complaint Adequately Pleads Economic Loss and Loss Causation

"Allegations of loss causation are evaluated under [Rule 8(a)'s] notice pleading standard." *In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14 Civ. 0950(LAK)(AJP), 2015 WL 249508, at *16 (S.D.N.Y. Jan. 20, 2015). But regardless of whether Rule 9(b) or Rule 8(a) applies, "the securities fraud plaintiff's burden is not a heavy one." *Speakes v. Taro Pharm. Indus., Ltd.*, No. 16-CV-08318 (ALC), 2018 WL 4572987, at *10 (S.D.N.Y. Sept. 24, 2018). A plaintiff "must only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

The GGP Defendants cite to a single paragraph of the Complaint to argue vaguely that it does not sufficiently allege that Defendants' misstatements "inflated the price of iAnthus stock, that Plaintiff subsequently sold his shares at a loss, or that . . . the price for iAnthus stock decreased for reasons unrelated to normal market factors." (GGP MTD at 33-34). But the Complaint alleges in detail how "the price of iAnthus securities was artificially inflated and/or maintained at an

---

[32] In addition, the presumption of reliance under *Affiliated Ute* applies as an independent basis for reliance because Defendants had an independent duty under Canadian securities law, separate from their affirmative misstatements, to disclose all material information related to iAnthus's transactions with its lenders. *Affiliated Ute Citizens of Utah v. United State*s, 406 U.S. 128 (1972); ¶¶ 328-29; *see Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (explaining *Affiliated Ute* presumption may apply to omissions that are not "directly related to the earlier statements").

artificially high level as a result of" Defendants' misstatements and how the price of the Company's securities declined significantly when the information that Defendants misrepresented was revealed and the risks that they concealed materialized. (*See* Complaint Section VI).

The Complaint alleges multiple specific corrective disclosures where the Company's stock price fell significantly in reaction to negative news that revealed Defendants' fraud. For example, iAnthus's stock price fell 16% the day after the *Stockhouse* report started to reveal Ford's self-dealing. ¶¶ 281-82; *see In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11 CIV. 2279 CM, 2012 WL 3758085, at *6, 12-13 (S.D.N.Y. Aug. 29, 2012) (holding allegations based on report by "an anonymous blogger/analyst" supported loss causation). The Company's stock price then fell 62% after its April 6, 2020 announcement that it was investigating Ford's "potential conflicts of interest"—which bolstered the *Stockhouse* allegations—and that it was exploring "strategic alternatives" because it defaulted on its debt to GGP. ¶¶ 283-84.

Then, on June 23, 2020, iAnthus announced that GGP provided a demand for repayment of its debt. ¶ 290. iAnthus's stock price fell approximately 18% in response to this news bringing the Company closer to bankruptcy. ¶ 291. This action by GGP was a foreseeable result of the true nature of its investment in iAnthus, which was tainted by Ford's self-dealing and which Defendants misrepresented as being an "equity" investment. These allegations, as well as the Complaint's other specific allegations of loss causation (¶¶ 264, 267-68, 270-71, 276-78, 286-89, 292-93), satisfy Plaintiff's burden at this stage to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.[33]

The GGP Defendants try to attribute the decline in iAnthus's stock price to "iAnthus'

---

[33] *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 85 (S.D.N.Y. 2015), the only case that the GGP Defendants cite in support of their loss causation argument (GGP MTD at 34), dealt with the very different situation where the complaint failed to account for "S & P's decision to downgrade the credit rating of the United States for the first time in history," which occurred in connection with a very small drop in the company's stock price.

decision to amass more and more debt and initiate litigation against another lender." (GGP MTD at 34). This argument fails for two reasons. First, the law is clear that at this stage, the plaintiff is not required to identify "the exclusive cause of its losses; rather, it need only allege sufficient facts to raise a reasonable inference that [defendant's actions] caused an ascertainable portion of its loss." *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015); *see also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 166 (S.D.N.Y. 2008) (holding it is not necessary "to ascribe the actual amount of loss to one cause or another"). The Complaint's multiple specific allegations of information that revealed Defendants' fraud or was a materialization of the risk that they concealed provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347; *see also Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (holding whether loss was caused by an intervening event "not to be decided on" a motion to dismiss); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 321 (S.D.N.Y. 2011) (holding "[d]ifficult causal distinctions," including "[t]he fact that the harms occurred during a period of financial crisis," cannot be "resolved on a motion to dismiss").

Second, the Complaint pleads that iAnthus's default and subsequent restructuring that stands to nearly wipe out the Company's shareholders were the materialization of the precise risk that Defendants identify. iAnthus's collapse resulted from the Company misrepresenting the true terms of its onerous debt—including Ford's self-dealing and GGP's secret Exit Fee—and its access to financing. ¶¶ 267-68, 279; *see Vivendi*, 838 F.3d at 261-63 (holding materialization of the risk occurs where "events revealing the truth about the company's *risk* of bankruptcy caused investors to lose money"); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). GGP's alternative causal explanation of iAnthus's decline—in addition to being inadequate to rebut

68

Plaintiff's allegations at this stage—is actually part of fraud that Defendants concealed.

### H.     The Complaint Adequately Pleads Scheme Liability

In addition to being liable for making false and misleading statements under Rule 10b-5(b), Defendants engaged in a fraudulent scheme in violation of Rules 10b-5(a) and (c) by making secret side deals in iAnthus's agreements with GGP and its other lenders. These activities include Ford's personal payments from Adler and Rozinov and GGP's $10 million Exit Fee. This conduct is actionable as a fraudulent scheme because Rule 10b–5(c) (making it unlawful to engage in any "act, practice, or course of business" that "operates . . . as a fraud or deceit," 17 C.F.R. § 240.10b–5) is "expansive" and "capture[s] a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019); *see also Eletrobras*, 245 F. Supp. 3d at 471-72 (applying scheme liability where officer allegedly participated in bribery scheme that caused misleading financial statements); *City of Providence, R.I. v. Bats Glob. Mrkts, Inc.*, 878 F.3d 36, 52 (2d Cir. 2017) (holding undisclosed conduct resulting in artificial prices stated a claim under Rules 10b-5(a)-(c)).

Unlike in the cases that Defendants cite, their misstatements are not "the sole basis for" Plaintiff's claims. (iAnthus MTD at 34 (quoting *Lentell*, 396 F.3d at 177; GGP MTD at 20 n.12)). The court in *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152 (S.D.N.Y. 2012), which Defendants cite, held the plaintiffs adequately pled scheme liability by alleging that the defendants created an entity "in order to conceal a scheme designed to" divert cost savings. *Id.* at 161. Defendants here also "engaged in deceptive conduct separate from any alleged misstatements or omissions," *id.*, because they arranged loans containing side deals that favored Ford and iAnthus's lenders, at the expense of the Company's shareholders. *See* ¶¶ 39-40, 72-83, 93-94, 102-03.

### I.      The Complaint Adequately Pleads Control Person Liability

The Complaint alleges that Ford and Kalcevich are liable under Section 20(a) as control

persons of iAnthus and that Adler is liable as a control person of GGP. ¶¶ 339-44. Each of these Defendants participated in the operation and management of their respective companies. *Id.* Defendants' arguments to the contrary are entirely derivative of their other arguments discussed above and fail for the same reasons. (*See* iAnthus MTD at 35; GGP MTD at 34-35).[34]

## IV.    CONCLUSION

For all of these reasons, the Court should deny Defendants' motions in their entirety. In the alternative, if any part of the Complaint is dismissed, Plaintiff respectfully requests leave to amend. *See Loreley*, 797 F.3d at 190 (describing "permissive standard" for leave to amend under Fed. R. Civ. P. 15(a)(2)).

Dated: January 8, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael Grunfeld_____*
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mgrunfeld@pomlaw.com

*Lead Counsel for Lead Plaintiff*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-8209
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff*

---

[34] The Complaint is clear that it alleges Adler's § 20(a) liability only as to his control of GGP. ¶¶ 313, 339-40, 343.

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2020, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by other means to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF System.

/s/Michael Grunfeld_____
Michael Grunfeld

71