UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re

iANTHUS CAPITAL HOLDINGS, INC.
SECURITIES LITIGATION

20-cv-3135 (LAK)

This document relates to: 20-cv-03135, 20-cv-03898
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/30/2021

## MEMORANDUM OPINION

Appearances:

>   Jeremy A. Lieberman
>   Michael Grunfeld
>   POMERANTZ LLP
>
>   Peretz Bronstein
>   BRONSTEIN, GEWIRTZ &
>   GROSSMAN, LLC
>
>   *Attorneys for Lead Plaintiff Jose Antonio Silva*
>
>   Michael Paul O'Mullan
>   RIKER DANZIG SCHERER HYLAND
>   PERRETTI LLP
>
>   Richard Joseph lamar Lomuscio
>   TARTER KRINSKY & DROGIN LLP
>
>   *Attorneys for Plaintiff Hi-Med LLC*
>
>   Seth L. Levine
>   Chad Albert
>   LEVINE LEE LLP
>   *Attorneys for Defendants iAnthus,*
>   *Julius John Kalcevich, Randy Maslow & Robert Galvin*

Carla M Wirtschafter
Ian Marcus Turetsky
James Sanders
Jason Mayer
REED SMITH LLP
*Attorneys for Defendants*
*Gotham Green Partners & Jason Adler*

Adam Ross Mandelsberg
Adam Hugh Schuman
PERKINS COIE LLP
*Attorneys for Defendant Hadley C. Ford*

Charles J Falletta
Mark Steven Olinsky
SILLS CUMMIS & GROSS, P.C.
*Attorneys for Defendant Elizabeth Stavola*

LEWIS A. KAPLAN, *District Judge.*

These are purported class actions against iAnthus Capital Holdings Inc. ("iAnthus"), a Canadian corporation engaged in the cannabis business in the United States. They have been brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and regulations thereunder. Defendants move to dismiss on the ground that the Exchange Act does not apply because its use here would be extraterritorial and therefore improper.

## *Facts*

iAnthus, as noted, is organized and exists under and by virtue of Canadian law. Its registered office is in Canada and its shares are listed on the Canadian Stock Exchange (the

"CSE").[1] But it operates cannabis cultivation and dispensary facilities in the United States,[2] and its shares trade also over-the-counter in the United States on the OTCQX,[3] which is operated by OTC Markets Group, Inc.[4]

These cases arise from iAnthus' April 6, 2020 announcement that it had defaulted on its debt, including interest due to its senior secured lender and largest source of financing, Gotham Green Partners ("GGP").[5] Shortly thereafter, iAnthus announced that its chief executive officer had accepted an interest free loan from GGP's managing member one day after the final round of financing between their companies had closed.[6]

Following these announcements, iAnthus and GGP negotiated a restructuring support agreement (the "Restructuring Transaction") which, if effective, would give GGP almost half of the equity in iAnthus in exchange for reducing iAnthus' debt and providing additional interim financing, and would leave pre-existing equity holders – at most – with only fractions of their investments.[7] In October 2020, the Restructuring Transaction was approved by the Supreme Court

---

[1] Consolidated Amended Complaint [20-cv-3135, Dkt. 48] ("Cons. Am. Compl.") at ¶ 21; Amended Complaint [20-cv-3989, Dkt. 39] ("Hi–Med Am. Compl.") at ¶ 11.

[2] *Id.*; Cons. Am. Compl. at ¶ 32.

[3] *Id.* at ¶ 21; Hi-Med Am. Compl. at ¶ 11.

[4] OTC MARKETS, https://www.otcmarkets.com/corporate-services (last visited Aug. 9, 2021).

[5] Cons. Am. Compl at ¶¶ 3, 70.

[6] *Id.* at ¶¶ 72-73.

[7] *Id.* at ¶¶ 88-89.

4

of British Columbia in Vancouver.[8] An appeal from that order was dismissed by the British Columbia Court of Appeal.[9] Other litigation has been instituted against iAnthus in Ontario and British Columbia courts, at least one of them by iAnthus largest shareholder, HI-MED LLC ("Hi-Med").[10]

The actions now before this Court are consolidated class actions led by plaintiff Jose Antonio Silva and an individual action by Hi-Med. On a broad level, plaintiffs here allege that iAnthus, GGP, and executives at both companies violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by failing to disclose information regarding iAnthus' relationship with GGP and certain terms governing financing provided by GGP. They claim that these undisclosed facts caused iAnthus to default on its loans to GGP and positioned GGP to take over the company following that default. In addition, Hi-Med asserts common law claims based on the same conduct. Defendants all move to dismiss the claims against them. For the following reasons, those motions are granted.

---

[8] Declaration of Seth Levine [20-cv-3135, Dkt. 69] ("Levin Decl."), Ex. O; *iAnthus Capital Holdings, Inc. (Re)*, 2020 BCSC 1484.

[9] Second Declaration of Seth Levine [20-cv-3135, Dkt. 80], Ex. A; *iAnthus Capital Holdings, Inc. v. Walmer Capital Limited*, 2021 BCCA 48.

[10] Levin Decl., Ex. R-T.

5

## Discussion

I. Section 10(b) and Rule 10b-5

"Section 10(b) of the Securities Exchange Act does not apply beyond U.S. borders."[11] Accordingly, the Supreme Court in *Morrison v. Naitonal Australia Bank Ltd.*, instructed courts to limit its application to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."[12]

Whether plaintiffs' claims are sufficiently domestic under *Morrison* "is a merits question" that properly is considered on a motion to dismiss under Rule 12(b)(6).[13] To survive such a motion, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[14] In determining whether this standard is met, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiffs' favor.[15] In addition, the Court may consider "any written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as . . .

---

[11] *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 163 (2d Cir. 2021).

[12] *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010).

[13] *Id.* at 254.

[14] *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[15] *ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."[16] The Court may consider also "matters of which judicial notice may be taken."[17]

### A. Domestic Exchange

Under the first prong of *Morrison*, Section 10(b) is properly applied to "transactions in securities listed on domestic exchanges."[18] According to the amended complaints, iAnthus' common shares are listed on the CSE and "trade in the United States over-the-counter market on the OTCQX, part of the OTC Markets Group."[19] Plaintiffs do not contend that the CSE is a domestic exchange. Instead, the parties dispute whether the OTCQX qualifies as such.

According to the Securities and Exchange Commission's ("SEC") implementing regulations under the Exchange Act, an "exchange" is limited to an organization, association, or group of persons who (1) bring "together the orders for securities of multiple buyers and sellers" and (2) use "established, non-discretionary methods . . . under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade."[20] In contrast, securities traded over-the-counter "trade[] between brokers and dealers who negotiate directly" and

---

[16] *City of Pontiac*, 752 F.3d at 179.

[17] *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[18] *Morrison*, 561 U.S. at 267.

[19] Cons. Am. Compl. ¶ 21; Hi-Med Am. Compl. at ¶ 11.

[20] *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 946 (9th Cir. 2018) (*citing* 17 C.F.R. § 240.3b-16(a)(1)-(2)).

"[n]ot . . . on an organized securities exchange" or other order-matchmaking service.[21] Over-the-counter markets "are not national securities exchanges within the scope of *Morrison*" because "the stated purpose of the [Exchange] Act refers to 'securities exchanges' and 'over-the-counter markets' separately, which suggests that one is not inclusive of the other" and "a 'national securities exchange' is explicitly listed in Section 10(b)—to the exclusion of the OTC markets."[22] Accordingly, "over-the-counter transactions" in iAnthus' common stock "are, by definition, those that do not occur on an exchange" within the meaning of *Morrison*.[23]

That conclusion is not altered by plaintiffs' argument that securities listed on the OTCQX trade through OTC Link, which is registered with the SEC.[24] As plaintiffs acknowledge,

---

[21] BLACK'S LAW DICTIONARY 1331 (11th ed. 2019). *See also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 427 (S.D.N.Y. 2019) (defining "over-the-counter" as "meaning that counterparties trade directly with each other, without an intermediating exchange."). The investment education website Investopedia explains that trades on over-the-counter markets are made "directly by a network of dealers" instead of an "order matchmaking service as with the NYSE." *OTCQX*, INVESTOPEDIA, https://www.investopedia.com/terms/o/otcqx.asp (last visited Aug. 27, 2021).

[22] *United States v. Georgiou*, 777 F.3d 125, 134-5 (3d Cir. 2015).

[23] *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 340 (S.D.N.Y. 2015).

Plaintiffs seek to distinguish *In re Petrobras* as concerning the over-the-counter bond market but fail to explain why that distinction is relevant. Contrary to plaintiffs' arguments, the over-the-counter markets do not qualify as "exchanges" under the Exchange Act regardless of their listing or disclosure requirements. Accordingly, such distinctions among various over-the-counter markets are irrelevant to this analysis.

[24] The Court takes judicial notice of the fact that securities on the OTCQX are quoted on OTC Link as a fact that is "generally known" within this district. Fed. R. Evid 201(b)(1). In addition, various SEC publications explain that securities quoted on OTC Link include those on the OTCQX market. *See e.g., Notice of Proposed Conditional Exemptive Ord. for Certain Broker-Dealer Quotations on an Expert Mkt.*, SEC Release No. 90769 (Dec. 22, 2020) (listing the market tiers for securities quoted on OTC Link as: the OTCQX Best

8

OTC Link is registered with the SEC as an "alternative trading system" not an exchange.[25] "As an alternative trading system, OTC Link is separately regulated by the SEC and is specifically exempt from the Exchange Act's definition of 'exchange.'"[26] Accordingly, neither the OTCQX or OTC Link qualifies as an exchange under the Exchange Act.

As the CSE is not "domestic" and the OTCQX is not an "exchange," transactions in iAnthus' stock do not qualify as "transactions in securities listed on domestic exchanges" under *Morrison's* first prong.[27] Accordingly, to state a claim, plaintiffs' transactions must qualify as a "domestic transactions in other securities" under *Morrison's* second prong.[28]

---

Market, the OTCQB Venture Market, the Pink Open Market, and the Expert Market.). The Court may take judicial notice of SEC materials, including SEC releases under Fed. R. Evid. 201(b)(2). *See In re UBS Auction Rate Sec. Litig.*, No. 08-cv-2967 (LMM), 2010 WL 2541166, at *12 n. 9 (S.D.N.Y. June 10, 2010).

[25] Declaration of Michael Grunfeld [20-cv-3135, Dkt. 74] ("Grunfeld Decl.") at ¶ 11.

*See also Alternative Trading System ("ATS") List*, U.S. SEC. & EXCH. COMM'N, https://www.sec.gov/foia/docs/atslist.htm (last visited Aug. 27, 2021) (listing alternative trading systems registered with the SEC for each month from January 2009 through July 2021); *National Securities Exchanges*, U.S. SEC. & EXCH. COMM'N, https://www.sec.gov/fast-answers/divisionsmarketregmrexchangesshtml.html (last visited Aug. 27, 2021) (listing registered national securities exchanges). As noted previously, the Court may take judicial notice of such SEC publications. *See e.g., Stoyas*, 896 F.3d at 946 n.17 (taking judicial notice of the SEC's list of registered alternative trading systems).

[26] *Id.* at 946-7. *See also Georgiou*, 777 F.3d at 134 (explaining that over-the-counter markets are not an "exchange" under *Morrison* because, among other reasons, the SEC's list of national exchanges does not include any over-the-counter markets).

[27] *Morrison*, 561 U.S. at 267.

[28] *Id.*

B.  *Domestic Transactions*

Transactions are domestic under *Morrison* only "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States."[29] "Conclusory assertions that irrevocable liability has been incurred or that title has passed are insufficient" to bring a claim within *Morrison*.[30] Moreover, "[t]he location or residency of the buyer, seller, or broker will not necessarily establish the situs of the transaction."[31] Instead, in order to state a legally sufficient claim, plaintiffs must allege specific facts "including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money."[32] Absent such facts, "the mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions."[33] Finally, to plead a domestic transaction, plaintiffs' allegations must relate to the "transactions themselves" and not merely the "actions needed to carry out the transactions."[34]

In this case, three different transactions are at issue. First, Silva alleges that he purchased shares of iAnthus' common stock. Second, Hi-Med alleges that it obtained shares of iAnthus' common stock through a transaction between iAnthus and MPX Bioceutical Corporation

---

[29] *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012).

[30] *In re Petrobras*, 150 F. Supp. 3d at 340.

[31] *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017).

[32] *Absolute Activist*, 677 F.3d at 70.

[33] *Id.*

[34] *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014).

10

("MPX"). Third, Hi-Med alleges that it purchased a convertible debenture from iAnthus. For the following reasons the Court concludes that plaintiffs have not alleged sufficiently that any of these is domestic under *Morrison*.

### 1. Silva's Stock Purchases

Silva alleges only that he "acquired iAnthus securities" "as set forth in his Certification filed with the Court."[35] That certification – which he filed in connection with his motion for appointment as lead plaintiff – includes a document purporting to list all of his transactions in iAnthus' stock.[36] The transactions are listed under the heading: "iAnthus Capital Holdings, Inc. (ITHUF)."[37] It does not otherwise indicate where or how any of those transactions were made.

ITHUF is the ticker symbol for iAnthus' stock on the OTCQX market.[38] However, the Court does not agree that listing Silva's transactions under that symbol – particularly on a document from an unidentified source – means that those transactions occurred through the OTCQX market. In fact, Silva has not provided the Court with any basis to infer that the use of a domestic

---

[35] Cons. Am. Compl. at ¶ 20.

[36] Declaration of Jeremy Lieberman [20-cv-3135, Dkt. 34], Ex. 3 at 3-8.

The shareholder certification does not indicate where the list of transactions was obtained from, or whether the list was prepared specifically for this litigation.

[37] *Id.*

[38] Cons. Am. Compl. at ¶ 21.

ticker symbol is indicative of where securities were purchased.[39] At most, Silva's allegations support an inference that he purchased shares that trade also in the United States over-the-counter market. But that plainly is insufficient to allege a domestic transaction.

In any event, even if the Court properly could infer that Silva purchased iAnthus' stock through trades in the United States over-the-counter market, the "mere assertion that transactions 'took place in the United States,'" is insufficient to plead a domestic transaction.[40] Trades on the over-the-counter market occur through broker-dealers who "negotiate directly," "through telephone or computer negotiations."[41] Accordingly, the mere fact that a trade was made

---

[39] In fact, the OTC Markets Group explains that "many U.S. investors prefer to see quotes in U.S. dollars during their regular trading hours. To provide this access and to facilitate trade reporting, broker-dealers create trading symbols, or tickers, of foreign securities in the U.S. These tickers are 5 letters long and end with the letter F." *FAQ on F Shares*, OTC MARKETS, https://www.otcmarkets.com/learn/faqs (choose "What is an F Share?"; then follow "Read our FAQ on F Shares" hyperlink) (last visited Aug. 27, 2021). Accordingly, "[w]hen a US investor researches and trades a non-US security, it is frequently through the F share ticker as US brokerage accounts often only display US ticker symbols." *Id.* In addition, a FINRA proposed rule change regarding reporting requirements for over-the-counter transactions explains that "a firm may receive an order for [a foreign] security in the U.S. symbol and, at the time the order is received, the firm is uncertain whether the order will be executed in the U.S. or in the foreign market." *FINRA Proposed Rule Change Relating to the Reporting of Foreign Equity Securities*, 72 Fed. Reg. 44899-01 (Aug. 3, 2007).

[40] *In re Petrobras*, 150 F. Supp. 3d at 340-1 (*quoting Absolute Activist*, 677 F.3d at 70).

[41] BLACK'S LAW DICTIONARY 1331 (11th ed. 2019). *See also* John Downes and Jordan Elliot Goodman, BARRON'S DICTIONARY OF FINANCE AND INVESTMENT TERMS 529 (9th ed. 2014) (brokers on the over-the-counter market "conduct[] [trades] by phone or, now, electronic device."). The SEC's Office of Investor Education and Advocacy describes OTC Link as an "electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter (OTC) securities" and explains that "'Market makers' and other broker-dealers who buy and sell OTC securities can use OTC Link ATS to publish their bid and ask quotation prices." OTC Link LLC, *Fast Answers*, U.S. SEC. & EXCH. COMM'N, https://www.sec.gov/fast-answers/answerspinkhtm.html (last visited Aug. 27, 2021). The OTC Markets Group website likewise explains that "broker-dealers

through the United States over-the-counter market does not indicate where the parties to that transaction incurred irrevocable liability or where title passed. Instead, Silva must include specific "allegations concerning the location of the transactions themselves," and "the structure of [over-the-counter] transactions," including facts "concerning the formation of the contracts, the placement of orders, the passing of title[,] . . . the exchange of money" or other "detail sufficient to discern whether these, or perhaps other additional factors, are relevant to" determining the situs of over-the-counter transactions.[42] As Silva does not allege any such facts, he has failed to plead a domestic transaction.

In opposing defendants' motions to dismiss, Silva submitted a declaration in which he claimed for the first time that he purchased iAnthus' common stock through his online TD Ameritrade account while he was in Louisiana.[43] He argues that this demonstrates that his transactions were domestic because TD Ameritrade is a United States brokerage and because he did not have discretion to revoke or cancel transactions placed through this account.[44] However, these facts are not alleged in the consolidated amended complaint, nor do they appear in any document

---

[42] view and publish quotes and negotiate trades in OTCQX® . . . securities on . . . OTC Link® ATS, an interdealer quotation and trade messaging system." *OTC Link ATS*, OTC MARKETS, https://www.otcmarkets.com/otc-link/overview (last visited Aug. 27, 2021).

*Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *29 (S.D.N.Y. Feb. 21, 2017) (complaint failed to allege a domestic transaction where it stated only that "plaintiffs are U.S. residents who engaged in LIFFE Euribor futures transactions through LIFFE Connect terminals located in the United States") (quoting *Absolute Activist*, 677 F.3d at 70).

[43] Grunfeld Decl., Ex. 7.

[44] Silva Opp. at 27.

that is properly before the Court on this motion. Accordingly, these facts cannot demonstrate that Silva alleged adequately that he purchased shares of iAnthus' stock in a domestic transaction.[45]

As Silva's allegations fail to plead a "transactions in securities listed on domestic exchanges" or a "domestic transactions in other securities" his claims under Section 10(b) and Rule 10b-5 must be dismissed.[46]

2.   *Hi-Med's Stock Acquisition*

Hi-Med does not allege that it purchased any shares of iAnthus' stock. Instead, according to its amended complaint, it held debt and equity in MPX – another Canadian cannabis company – which were converted into shares of iAnthus' common stock when MPX was acquired

---

[45] In any case, the Court is not persuaded that the facts in Silva's declaration allege sufficiently that his purchases of iAnthus' shares constituted a domestic transaction. At most, his declaration indicates that he was in the United States when he initiated the purchase of iAnthus' stock and that he made those transactions through a United States brokerage. But "[t]he location or residency of the buyer, seller, or broker will not necessarily establish the situs of the transaction." *In re Petrobras.*, 862 F.3d at 262. In particular, merely alleging that TD Ameritrade is based in the United States "fails to allege that [it] acted in the United States to incur liability for the sales." *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 294-95 (2d Cir. 2021). For example, Silva does not address whether TD Ameritrade fulfilled his orders in the United States over-the-counter market, as opposed to trading on the CSE or referring trades to Canadian brokerages. In addition, Silva's declaration fails to address the formation of contracts, or when trades otherwise become binding, when placed through an online TD Ameritrade account. *See e.g., Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018) (plaintiffs alleged that "trades bind the parties on matching," and "that the express view of CME Group is that 'matches [on CME Globex] are essentially binding contracts' and '[m]embers are required to honor all bids or offers which have not been withdrawn from the market.'"). Without providing any such facts, Silva's assertion that he did not have "discretion" to cancel transactions once he placed an order on his TD Ameritrade account amounts to nothing more than a "[c]onclusory assertion[] that irrevocable liability has been incurred." *In re Petrobras*, 150 F. Supp. 3d at 340.

[46] *Morrison*, 561 U.S. at 267.

by iAnthus in 2018.[47] The arrangement agreement governing that transaction (the "Arrangement Agreement") makes clear that iAnthus and MPX were Canadian companies and that the transaction was governed by Canadian law.[48]

Generally, the acquisition of shares through a merger of foreign entities is not a domestic transaction.[49] That is the case here, as Hi-Med fails to allege "that the parties to the merger incurred irrevocable liability in the United States."[50] In fact, the only alleged connection between the transaction and the United States is Hi-Med's assertion that its ownership of iAnthus' stock was "memorialized" in Direct Registration Certificates sent to Hi-Med in the United States.[51] However,

---

[47] Hi-Med Am. Compl. at ¶¶ 27, 29, 39.

[48] Arrangement Agreement [Dkt. 62-11] at 4; § 8.9.

The Arrangement Agreement is submitted by Hi-Med in support of his opposition to defendants' motions to dismiss, and is properly considered as a document that Hi-Med "either possessed or knew about and upon which [it] relied in bringing the suit." *City of Pontiac*, 752 F.3d at 179.

[49] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 265 (2d Cir. 2016) (explaining that the location of American plaintiffs who acquired shares through a foreign merger was "not relevant to the question of whether the merger qualifies as a 'domestic purchase or sale,'" because the plaintiffs were not parties to the merger).

[50] *Id.*

While Hi-Med alleges that it entered into a voting agreement that required it to vote in favor of the merger (Hi-Med Am. Comp. ¶ 27), it does not contend that it executed that agreement in the United States. In any case, the execution of that agreement is not relevant to the situs of the transaction between iAnthus and MPX. Merely alleging "some acts that ultimately result in the execution of the transaction abroad [took] place in the United States" are insufficient to allege domestic transaction. *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F.Supp.2d 532, 541 (S.D.N.Y. 2013).

[51] Hi-Med Am. Comp. at ¶ 29.

15

according to the amended complaint, the Direct Registration Certificates merely "memorialized" Hi-Med's ownership of iAnthus' stock.[52] Their delivery in the United States, assuming that occurred as alleged, is insufficient to establish that the transaction itself or the passage of title occurred in the United States.[53]

Next, Hi-Med claims that it obtained iAnthus' stock in a domestic transaction because its Conversion Notice, in which it "irrevocably elect[ed] to convert [its MPX Debentures]," was executed in the United States.[54] The Court disagrees. Even assuming that the Conversion Notice was incorporated by reference in Hi-Med's amended complaint – a doubtful assumption, as Hi-Med does not explain where the Conversion Notice is referenced in its complaint – it is not indicative of a domestic transaction. As an initial matter, the Conversion Notice does not indicate that it was executed in the United States, and the Court cannot properly rely on Hi-Med's assertions in its opposition brief to establish otherwise.[55]

In any case, Hi-Med has not explained how the Conversion Notice is relevant to its acquisition of iAnthus' stock. Hi-Med alleges that it obtained iAnthus' stock through "the

---

[52] *Id.*

[53] *See In re Petrobras*, 150 F. Supp. 3d at 341 (allegations of "a 'transfer' rather than a purchase" are insufficient to plead a domestic transaction).

[54] Hi-Med Opp. [Dkt. 61] at 24 (*quoting* Conversion Notice, Lomuscio Decl., Ex. 7).

[55] The Conversion Notice does direct that the relevant shares be issued to Hi-Med at a New Jersey address. *Id.* at 2. However, Hi-Med does not point to any cases suggesting that title passes upon delivery of shares. In fact, Hi-Med appears to argue that the opposite it true, as it cites to a District of Connecticut decision explaining that "an executed document which specifically expresses the buyer's ownership interest would constitute the transfer of title, even where the stock certificates are to be transferred at a later time." *SEC v. Ahmed*, 308 F. Supp. 3d 628, 667 (D. Conn. 2018).

conversion of MPX's debt and equity into iAnthus' common shares" pursuant the Arrangement Agreement between MPX and iAnthus. It has not alleged or argued that its execution of the Conversion Notice created irrevocable liability for that transaction nor could it, as the transaction at issue was between iAnthus and MPX, not Hi-Med. Accordingly, the Conversion Notice does not indicate whether Hi-Med obtained iAnthus' shares in a domestic transaction.

For each of the forgoing reasons, Hi Med has failed to allege that it acquired shares of iAnthus' common stock in a domestic transaction.

### 3. *Hi-Med's Debenture*

Hi-Med alleges that it purchased $5 million of unsecured convertible debentures from iAnthus pursuant to a debenture agreement (the "Hi-Med Debenture").[56] Its amended complaint does not include any facts indicating where that purchase occurred. Hi-Med nonetheless argues that the Hi-Med Debenture was a domestic transaction because its terms indicate that title passed in the United States.[57] Once again, the Court disagrees.

First, Hi-Med emphasizes that iAnthus "acknowledge[d] itself indebted and promise[d] to pay to or to the order of HI-MED LLC at 1001 N. US Highway 1, Suite 800, Jupiter, Florida, USA 33477 . . . the principal amount of five million dollars ($5,000,000)."[58] However, that

---

[56] Hi-Med Am. Compl. at ¶ 32.

[57] Hi-Med Opp. at 25.

[58] Hi-Med Unsecured Convertible Debenture, Lomuscio Decl., Ex. 8 at 1.

statement merely reflected iAnthus' agreement to *repay* the principal on the debenture at Hi-Med's United States address. That is entire irrelevant to the passage of title to the Hi-Med Debenture.

Equally unpersuasive is the fact that the terms and conditions attached to the Hi-Med Debenture required Hi-Med to send any notices or communications to iAnthus' office in the United States.[59] At most, that indicates that iAnthus operated in the United States – a fact that neither party disputes. However, a party's residence or location is not indicative of where a transaction occurs.[60] Accordingly, Hi-Med fails to allege that its purchase of the debenture constitutes a domestic transaction under *Morrison*.

As Hi-Med has not alleged a transaction in securities traded on a domestic exchange or a domestic transaction, its claims under Section 10(b) and Rule 10b-5 are dismissed.[61]

II. *Common Law Claims*

The Court has supplemental jurisdiction over Hi-Med's common law claims under 28 U.S.C. § 1367.[62] Nevertheless, the Court "may decline to exercise supplemental jurisdiction"

---

[59] *Id.* at § 9.3.

[60] *Absolute Activist*, 677 F.3d at 70.

[61] Neither plaintiff sufficiently has alleged a domestic transaction. Accordingly, the Court does not consider whether their claims in any case would be dismissed as "predominantly foreign" under *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014). In particular, given the sparsity of allegations regarding the relevant transactions, the Court declines at this stage to consider whether those transactions were "predominantly foreign."

[62] Hi-Med Am. Compl. at ¶ 7.

if it "has dismissed all claims over which it has original jurisdiction."[63] In considering whether to exercise supplemental jurisdiction, the Court "balances the traditional values of judicial economy, convenience, fairness, and comity."[64] "In weighing these factors, the [Court] is aided by the Supreme Court's additional guidance . . . that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'"[65]

Here, the Court has dismissed all of Hi-Med's federal-law claims, and the discretionary factors all point toward declining to exercise supplemental jurisdiction. Hi-Med has filed a related law suit in Canadian court. Its claims arise from the Hi-Med Debenture, which is governed by Canadian law. Accordingly, adjudicating Hi-Med's common law claims in this Court would be inefficient for the parties and the Court, and perhaps risk conflicting with various Canadian proceedings, the precise status of which has not been disclosed to the Court by the litigants before it. The Court therefor declines to exercise supplemental jurisdiction over Hi-Med's common law claims.[66]

---

[63] 28 U.S.C. § 1367(c)(3).

[64] *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (internal quoting marks omitted) (*quoting Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

[65] *Id.* (*quoting Cohill*, 484 U.S. at 350 n. 7).

[66] The dismissal of Hi-Med's common law claims is without prejudice to the extent that Hi-Med ultimately alleges a viable federal claim.

## *Conclusion*

For the forgoing reasons, defendants' motions to dismiss [No. 20-cv-3135, Dkts. 61, 64, 66, 67; No. 20-cv-3898, Dkts. 47, 50, 52, 57] are granted. Plaintiffs may move for leave to file proposed second amended complaints, which shall be attached to any such motion, on or before September 30, 2021.

SO ORDERED.

Dated:   August 30, 2021

_____
Lewis A. Kaplan
United States District Judge