**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE iANTHUS CAPITAL HOLDINGS, INC. SECURITIES LITIGATION | No.: 1:20-cv-03135-LAK |
| | **JURY TRIAL DEMANDED** |
| THIS DOCUMENT RELATES TO: SECURITIES CLASS ACTION (CASE Nos: 1:20-cv-03135 AND 1:20-cv-03513) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE**
**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENT**

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL BACKGROUND ...................................................................................... 4

        A.      Plaintiff's Transactions in iAnthus Stock Took
                Place in the United States ........................................................................... 5

        B.      iAnthus's Business ...................................................................................... 6

        C.      Ford's Conflicts of Interest ......................................................................... 7

        D.      Defendants Misrepresented GGP as Making an Equity Investment ..................... 11

        E.      iAnthus Did Not Fund the Escrow Account That it Agreed to With GGP ........... 13

        F.      Defendants' False and Misleading Statements ............................................. 13

                1.      Statements About Conflicts of Interest ........................................ 13

                2.      Descriptions of iAnthus's Debt and GGP's Equity Investment ............... 14

                3.      Statements About the Availability of Financing ...................................... 15

                4.      Escrow Statements ........................................................................ 16

                5.      Statements of Full Disclosure ................................................................. 17

                6.      Statements by GGP ....................................................................... 17

        G.      Defendants Profited From Their Fraud ..................................................... 18

        H.      Defendants' Fraud Caused Substantial Losses to iAnthus's Shareholders ........... 18

        I.      Defendants Improperly Rely on Extrinsic Information ..................................... 18

                1.      Defendants' Improper Assertions Related to the Exit Fee ........................ 19

                2.      Defendants' Improper Assertions Related to
                        the Canadian Proceedings ............................................................. 20

                3.      Defendants' Improper Factual Assertions
                        Related to iAnthus's Collapse ....................................................... 21

                4.      The Court Should Reject Defendants' Extraneous
                        Factual Assertions ......................................................................... 22

III.    ARGUMENT ............................................................................................................ 23

        A.      The Complaint Satisfies *Morrison* .......................................................... 23

                1.      Defendants Concede That Plaintiff Alleges Domestic Transactions ........ 23

                2.      Plaintiff's Claims Are Not "Predominantly Foreign" ............................. 24

        B.      The Doctrine of *Forum Non Conveniens* Does Not Apply ................................ 29

        C.      The Complaint Adequately Pleads False and Misleading Statements ................. 35

                1.      The iAnthus Defendants' Materially False and Misleading
                        Statements About Conflicts of Interest ................................................... 36

                2.      Materially False and Misleading Descriptions of iAnthus's Debt ........... 41

a) Descriptions of iAnthus's Debt Were Materially False and Misleading Because of Ford's Self-Dealing ................................ 42

b) Descriptions of iAnthus's GGP Loans Were Materially False and Misleading Because of the Exit Fee............ 43

c) The GGP Defendants' Statements in Press Releases About GGP's Loans Were Materially False and Misleading ....... 47

3. The iAnthus Defendants' Materially False and Misleading Statements About the Availability of Financing...................................... 48

4. Defendants' Escrow Statements Were Materially False and Misleading .................................................................. 52

5. Defendants' Assurances of Full Disclosure Were False and Misleading .................................................................. 53

a) The iAnthus Defendants' Statements of Full Disclosure.............. 53

b) The GGP Defendants' Statements of Full Disclosure .................. 54

D. The Complaint Pleads a Strong Inference of Scienter ......................................... 56

1. The Complaint Adequately Pleads Defendants' Motive and Opportunity...................................................................... 56

2. The Complaint Pleads a Strong Inference of Conscious Misbehavior and Recklessness................................................ 59

3. The Core Operations Doctrine Supports a Strong Inference of Scienter .................................................................. 62

4. The Complaint Alleges a Strong Inference of Corporate Scienter ........... 62

5. A Holistic View Supports a Strong Inference of Scienter ........................ 63

E. The GGP Defendants "Made" Their Statements "In Connection With" the Purchase or Sale of iAnthus Securities ............................ 64

F. The Presumption of Reliance Applies .................................................................. 65

G. The Complaint Adequately Pleads Economic Loss and Loss Causation ............. 67

H. The Complaint Adequately Pleads Scheme Liability ........................................... 69

I. The Complaint Adequately Pleads Control Person Liability............................... 70

IV. CONCLUSION.............................................................................................................. 70

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
  1997 WL 317365 (S.D.N.Y. June 12, 1997) ....................................................44, 46

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009)..............................................................57, 59

*Affiliated Ute Citizens of Utah v. United State*s,
  406 U.S. 128 (1972)................................................................................................67

*Alki Partners, L.P. v. Vatas Holding GmbH*,
  769 F. Supp. 2d 478 (S.D.N.Y. 2011)....................................................................67

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ..............................................................................38, 45

*Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*,
  18 F. Supp. 3d 482 (S.D.N.Y. 2014)......................................................................50

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................23

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................................3, 46, 66, 67

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................23

*Billhofer v. Flamel Techs., SA.*,
  663 F. Supp. 2d 288 (S.D.N.Y. 2009).....................................................................23

*Black v. Finantra Cap.*,
  418 F.3d 203 (2d Cir. 2005).....................................................................................67

*Blank v. TriPoint Glob. Equities, LLC*,
  338 F. Supp. 3d 194 (S.D.N.Y. 2018)......................................................................57

*Bohn v. Bartels*,
  620 F. Supp. 2d 418 (S.D.N.Y. 2007).....................................................................33

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
  2021 WL 2853284 (S.D.N.Y. July 8, 2021) (GGP Mem. ) ...................................46

*Burke v. China Aviation Oil Corp.*,
   421 F. Supp. 2d 649 (S.D.N.Y. 2005)......................................................................67

*Butler v. United States*,
   992 F. Supp. 2d 165 (E.D.N.Y. 2014) ....................................................................24

*Bybee v. Oper der Standt Bonn*,
   899 F. Supp. 1217 (S.D.N.Y. 1995).......................................................................34

*Caiola v. Citibank, N.A., New York*,
   295 F.3d 312 (2d Cir. 2002)..................................................................................54

*Christine Asia Co. v. Ma*,
   718 F. App'x 20 (2d Cir. 2017) .............................................................................62

*Citibank, N.A. v. K-H Corp.*,
   745 F. Supp. 899 (S.D.N.Y. 1990) (GGP Mem. ) ..................................................65

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
   957 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................22

*City of Brockton Ret. Sys. v. Avon Prod., Inc.*,
   2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).........................................................50

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020).....................................................................45

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   129 F. Supp. 3d 48 (S.D.N.Y. 2015).......................................................................69

*Derensis v. Coopers & Lybrand Chartered Accts.*,
   930 F. Supp. 1003 (D.N.J. 1996) ...........................................................................32

*DeYoung v. Beddome*,
   707 F. Supp. 132 (S.D.N.Y. 1989) ....................................................................31, 34

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018)..........................................................42, 45, 50

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)..........................................................................................68, 69

*E.ON AG v. Acciona, S.A.*,
   468 F. Supp. 2d 559 (S.D.N.Y. 2007)......................................................................31

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...................................................................................51

iv

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
  343 F.3d 189 (2d Cir. 2003) .................................................................................................. 69

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  783 F.3d 395 (2d Cir. 2015) .................................................................................................. 69

*First Union Nat. Bank v. Paribas*,
  135 F. Supp. 2d 443 (S.D.N.Y. 2001) ............................................................................. *passim*

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................................... 50

*GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*,
  838 F.3d 214 (2d Cir. 2016) .................................................................................................. 35

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) ....................................................................................... 39, 45, 57

*Gauquie v. Albany Molecular Rsch.*,
  2016 WL 4007591 (E.D.N.Y. July 26, 2016) ....................................................................... 62

*Ge Dandong v. Pinnacle Perf. Ltd.*,
  966 F. Supp. 2d 374 (S.D.N.Y. 2013) ................................................................................... 33

*Gentry v. Kaltner*,
  2020 WL 1467358 (S.D.N.Y. Mar. 25, 2020) ....................................................................... 22

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
  141 S. Ct. 1951 (2021) .......................................................................................................... 37

*Guidi v. Inter-Cont'l Hotels Corp.*,
  224 F.3d 142 (2d Cir. 2000) ............................................................................................. 32, 33

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holds., Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019) ................................................................................... 52

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010) .................................................................................................. 23

*IBEW Loc. 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*,
  2012 WL 928402 (D. Vt. Mar. 19, 2012) .............................................................................. 41

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) ....................................................................... 68

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  265 F.R.D. 157 (S.D.N.Y. 2010) .......................................................................................... 66

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................................62

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).......................................................52

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)..................................................................34

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)....................................................................51

*In re BofI Holding, Inc. Sec. Litig.*,
  2017 WL 2557980 (S.D. Cal. May 23, 2017)........................................................50

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008).............................................................20, 69

*In re Carter-Wallace*,
  150 F.3d 153 (2d Cir. 1998).................................................................................64

*In re CINAR Corp. Sec. Litig.*,
  186 F. Supp. 2d 279 (E.D.N.Y. 2002) ................................................................34

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010)..................................................................44

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................37, 51, 70

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) ...............................................................40

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
  2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) .........................................................68

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)..................................................................41

*In re ForceField Energy Inc. Sec. Litig.*,
  2015 WL 4476345 (S.D.N.Y. July 22, 2015) .......................................................67

*In re GE Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)..................................................................64

*In re GeoPharma, Inc. Sec. Litig.*,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006)..................................................................58

*In re Glob. Brokerage, Inc.*,
  2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) ..............................................................42, 44, 51

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ........................................................................62

*In re ITT Educ. Servs. Sec. Litig.*,
  34 F. Supp. 3d 298 (S.D.N.Y. 2014)....................................................................................41

*In re JPMorgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. Mar. 28, 2005).................................................................41

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................................................................................53

*In re LendingClub Sec. Litig.*,
  254 F. Supp. 3d 1107 (N.D. Cal. 2017) ..................................................................39, 40, 43

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018)..................................................................................29

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)..................................................................................42

*In re MCI Worldcom, Inc. Sec. Litig.*,
  93 F. Supp. 2d 276 (E.D.N.Y. 2000) ..............................................................................59, 60

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015) .................................................................................39

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .....................................................................49

*In re Nevsun Res. Ltd.*,
  2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013).....................................................................62

*In re Nortel Networks Corp. Sec. Litig.*,
  238 F. Supp. 2d 613 (S.D.N.Y. 2003) (GGP Mem. ) ...........................................................65

*In re Par Pharm., Inc. Sec. Litig.*,
  733 F. Supp. 668 (S.D.N.Y. 1990) ......................................................................................49

*In re Parmalat Sec. Litig.*,
  2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)......................................................................66

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005)..................................................................................67

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)........................................................................37, 50

*In re Poseidon Concepts Sec. Litig.*,
2016 WL 3017395 (S.D.N.Y. May 24, 2016) ................................................... *passim*

*In re Refco Inc. Sec. Litig.*,
2010 WL 11500542 (S.D.N.Y. Oct. 22, 2010) .......................................................45

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................61

*In re Royal Grp. Techs. Sec. Litig.*,
2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005) .......................................................32

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)......................................................................................35

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................................61

*In re Smith Barney Transfer Agent Litig.*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012).................................................................65, 70

*In re Teva Sec. Litig.*,
512 F. Supp. 3d 321 (D. Conn. 2021)......................................................................31

*In re Tezos Sec. Litig.*,
2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) .........................................................24

*In re Thornburg Mortg., Inc. Sec. Litig.*,
683 F. Supp. 2d 1236 (D.N.M. 2010) .....................................................................46

*In re Tronox, Inc. Sec. Litig.*,
2010 WL 2835545 (S.D.N.Y. June 28, 2010) ........................................................67

*In re UBS Auction Rate Sec. Litig.*,
2010 WL 2541166 (S.D.N.Y. June 10, 2010) ........................................................67

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020) ........................................................36

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)......................................................................42

*In re VEON Ltd. Sec. Litig.*,
2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)........................................................63

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016).................................................................65

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)....................................................................35, 51, 69

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...........................................................31

*Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*,
   688 F. Supp. 2d 229 (W.D.N.Y. 2010) ...............................................................57

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)............................................................................................65

*Johnson v. Sequans Commc'ns S.A.*,
   2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ........................................................53

*Khoja v. Orexigen Therapeutics*,
   899 F.3d 988 (9th Cir. 2018) .........................................................................22, 23

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*,
   2002 WL 432390 (S.D.N.Y. Mar. 20, 2002) .......................................................32

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)..................................................................51

*Lasker v. UBS Sec. LLC*,
   614 F. Supp. 2d 345 (E.D.N.Y. 2008) .................................................................31

*Last Atlantis Cap. v. AGS Spec. Parts.*,
   749 F. Supp. 2d 828 (N.D. Ill. Nov. 4, 2010) .....................................................64

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005).................................................................................70

*Lewy v. SkyPeople Fruit Juice, Inc.*,
   2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)................................................40, 62

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015)..................................................................47

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011).................................................................................45

*Livingston v. Shore Slurry Seal*,
   98 F. Supp. 2d 594 (D.N.J. 2000) .......................................................................38

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
   797 F.3d 160 (2d Cir. 2015)........................................................................63, 71

*Lorenzo v. SEC,*
   139 S. Ct. 1094 (2019)........................................................................................70

*McIntire v. China Mediaexpress Holdings, Inc.,*
   927 F. Supp. 2d 105 (S.D.N.Y. 2013)..........................................................41, 60

*Meyer v. JinkoSolar Holdings Co.,*
   761 F.3d 245 (2d Cir. 2014)...............................................................23, 41, 42, 46

*Morrison. Giunta v. Dingman,*
   893 F.3d 73 (2d Cir. 2018)...............................................................23, 24, 25, 26

*Morrison v Nat'l Austl. Bank Ltd.,*
   561 U.S. 247 (2010)..................................................................................... *passim*

*Mucha v. Volkswagen Aktiengesellschaft,*
   540 F. Supp. 3d 269 (E.D.N.Y. 2021) ..........................................................30, 31

*Muller-Paisner v. TIAA,*
   289 F. App'x 461 (2d Cir. 2008) ..........................................................................35

*Murray v. Brit. Broad. Corp.,*
   81 F.3d 287 (2d Cir. 1996)...................................................................................33

*Muzinich & Co. v. Raytheon,*
   No. CV-01-284-S-BLW, 2002 U.S. Dist. LEXIS 26962 (D. Idaho Apr. 30,
   2002) ...................................................................................................................65

*Myun-Uk Choi v. Tower Rsch. Cap. LLC,*
   890 F.3d 60 (2d Cir. 2018)...................................................................................24

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000).........................................................................56, 62

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.,*
   2020 WL 3268531 (S.D.N.Y. June 17, 2020) ......................................................50

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
   575 U.S. 175 (2015)............................................................................................52

*Palin v. N.Y. Times Co.,*
   940 F.3d 804 (2d Cir. 2019).................................................................................22

*Panther Partners Inc. v. Jianpu Tech. Inc.,*
   2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)......................................................46

x

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,*
    763 F.3d 198 (2d Cir. 2014)..................................................................... *passim*

*Pehlivanian v. China Gerui Advanced Materials Grp.,*
    2016 WL 2859622 (S.D.N.Y. May 16, 2016) ...........................................46

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
    *Arbitron Inc.,*
    741 F. Supp. 2d 474 (S.D.N.Y. 2010)......................................................61

*Prime Int'l Trading, Ltd. v. BP P.L.C.,*
    937 F.3d 94 (2d Cir. 2019).......................................................................29

*Ret. Ass'n v. comScore, Inc.,*
    268 F. Supp. 3d 526 (S.D.N.Y. 2017).......................................................61

*Ret. Sys. of Gov't of V.I. v. Blanford,*
    794 F.3d 297 (2d Cir. 2015)......................................................................56

*Ret. Sys. v. Bank of Am. Corp.,*
    874 F. Supp. 2d 341 (S.D.N.Y. 2012).......................................................63

*Ret. Sys. v. EnergySolutions, Inc.,*
    814 F. Supp. 2d 395 (S.D.N.Y. 2011).......................................................65

*Richman v. Goldman Sachs Grp.,*
    868 F. Supp. 2d 261 (S.D.N.Y. 2012).......................................................37

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000)........................................................................41

*Rubenstein v. Cosmos Holdings, Inc.,*
    2020 WL 3893347 (S.D.N.Y. July 10, 2020) ...........................................24

*S.E.C. v. Goldman Sachs & Co.,*
    790 F. Supp. 2d 147 (S.D.N.Y. 2011).......................................................44

*Salvani v. ADVFN PLC,*
    50 F. Supp. 3d 459 (S.D.N.Y. 2014), *aff'd*, 628 F. App'x 784 (2d Cir. 2015).......................67

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,*
    75 F.3d 801 (2d Cir. 1996)........................................................................58

*ScripsAmerica, Inc. v. Ironridge Glob. LLC,*
    119 F. Supp. 3d 1213 (C.D. Cal. 2015) ....................................................67

*SEC v. Kueng,*
    2010 WL 3026618 (S.D.N.Y. July 30, 2010) ...........................................22

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) (cited by iAnthus Mem. ) ...........................................................57

*Speakes v. Taro Pharm. Indus., Ltd.*,
    2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018) ............................................................................68

*Staehr v. Hartford Fin. Servs. Grp.*,
    547 F.3d 406 (2d Cir. 2008) ....................................................................................................22

*Stoyas v. Toshiba Corp.*,
    424 F. Supp. 3d 821 (C.D. Cal. 2020) ...............................................................................24, 31

*Stoyas v. Toshiba Corp.*,
    896 F.3d 933 (9th Cir. 2018) ..................................................................................................25

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ......................................................................................................56

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...........................................................................................................56, 63

*Tobia v. United Grp. of Cos., Inc.*,
    2016 WL 5417824 (N.D.N.Y. Sept. 22, 2016) ....................................................................36, 64

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ....................................................................................................52

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
    2019 WL 2521834 (D. Colo. June 18, 2019) ...........................................................................36

*United Bank for Afr. PLC v. Coker*,
    2003 WL 22741575 (S.D.N.Y. Nov. 18, 2003) ......................................................................34

*United States v. Georgiou*,
    777 F.3d 125 (3d Cir. 2015) ....................................................................................................24

*United States v. Isaacson*,
    752 F.3d 1291 (11th Cir. 2014) ...............................................................................................24

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ......................................................................................................24

*Valentini v. Citigroup, Inc.*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011) .....................................................................................69

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ......................................................................................................67

xii

*Weiss v. Amkor Tech., Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) ......................................................................................61

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)......................................................................................41

*Wu v. Stomber*,
    883 F. Supp. 2d 233 (D.D.C. 2012), *aff'd,* 750 F.3d 944 (D.C. Cir. 2014)............................24

**Rules**

Fed. R. Civ. P. 8............................................................................................................................68

Fed. R. Civ. P. 9....................................................................................................................35, 68

Fed. R. Civ. P. 12..........................................................................................................................23

Fed. R. Civ. P. 15..........................................................................................................................71

Fed. R. Civ. P. 44.1.......................................................................................................................34

Lead Plaintiff Jose Antonio Silva ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to the Motions to Dismiss of Defendants iAnthus Capital Holdings, Inc. ("iAnthus" or the "Company") and Julius Kalcevich (ECF Nos. 99-101), Hadley C. Ford (ECF Nos. 97-98), and Gotham Green Partners, LLC ("GGP") and Jason Adler (ECF Nos. 93-94).[1]

## I.    INTRODUCTION

iAnthus is a cannabis company that purports to own "best-in-class" licensed cannabis businesses throughout the United States. SAC ¶ 54. This action arises out of Defendants' fraudulent misrepresentations concerning iAnthus's $156 million in debt that it raised during the Class Period. iAnthus's shareholders trusted Defendants that iAnthus took on this debt without any conflicts of interest. Investors were therefore shocked to learn that Defendant Hadley Ford, iAnthus's CEO, engaged in egregious self-dealing by taking hundreds of thousands of dollars in personal payments in connection with iAnthus's loans. Defendants also misrepresented a key term of iAnthus's transactions with GGP—the Company's main lender: a secret $10 million exit fee (the "Exit Fee") that fundamentally altered the nature of GGP's stake in the Company by protecting the entire downside risk of a $10 million equity investment that GGP purported to make in iAnthus.

The Court dismissed the prior complaint based on its holding that Plaintiff did not adequately allege that his transactions satisfied the domesticity requirements of *Morrison v Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010), but permitted Plaintiff to seek leave to amend the complaint to address those issues. (ECF No. 81). Plaintiff then filed the Second Consolidated Amended Class Action Complaint ("SAC" or "Complaint," ECF No. 91), which adds detailed allegations

---

[1] "SAC ¶ _" references are to the SAC (ECF No. 91). Capitalized terms have the same meaning as in the SAC. iAnthus and Kalcevich's memorandum of law in support of their motion to dismiss (ECF No. 100) is referred to herein as the "iAnthus Mem."; and the GGP Defendants' memorandum of law in support of their motion dismiss (ECF No. 94) is referred to herein as "GGP Mem." iAnthus, Kalcevich, and Ford are referred to collectively as the "iAnthus Defendants." GGP and Adler are referred to collectively as the "GGP Defendants." Internal citations, quotation marks, and brackets are omitted from quotations, and emphases are added, unless otherwise noted below.

explaining why Plaintiff's transactions in iAnthus stock took place in the United States ("U.S."). This includes information showing that Plaintiff and all of the brokers that participated in his transactions were in the U.S. and that iAnthus took affirmative steps to have its stock listed on the U.S. OTC market so that the Company could market its stock to U.S. investors. iAnthus's stock even traded more heavily on the U.S. OTC market than it did on the Canadian Securities Exchange.

Faced with these compelling allegations of the domestic nature of Plaintiff's transactions in iAnthus securities, Defendants concede that Plaintiff engaged in "domestic transactions" under *Morrison*. Defendants try instead to argue that Plaintiff's transactions were "predominantly foreign" under *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014). There is no basis whatsoever to apply *Parkcentral* here. The Second Circuit in *Parkcentral* cabined its holding to the "the particular character of the unusual security at issue," which involved derivative securities related to a foreign-based company that the company itself did not even issue. *Id.* at 202. That is very far removed from the facts here, which involve shares in a company that conducted its business exclusively in the U.S. and that went out of its way to have its shares listed on the U.S. OTC market so that it could market its stock to investors in the U.S.

Defendants' *forum non conveniens* argument fails for similar reasons and also does not apply to a scenario that satisfies *Morrison*. Plaintiff should be afforded the protection of the U.S. securities laws in a U.S. court because iAnthus chose to market its stock to U.S. investors. In addition, iAnthus, Ford, GGP, and Adler are all based in New York and iAnthus operates exclusively in the U.S. The issues that Defendants raise concerning certain activities in Canada often arise in other cases and do not overcome the strong reason to keep this action in the U.S.

In their motions to dismiss, Defendants concede the key factual allegations in the Complaint. They acknowledge (as they must) the Special Committee's finding that Ford received

$160,000 in personal payments from Adler and a "non-arm's length party." Defendants also concede that they did not disclose the Exit Fee until after the Class Period.

But Defendants make other assertions that improperly seek to resolve factual issues in their favor. For example, Defendants argue that they did not make any misstatements concerning Ford's self-dealing because, according to Defendants, he did not accept any payments until the $100,000 that Adler gave him on December 21, 2019. This timing argument ignores the multiple sources that plausibly allege that Ford also received payments from the broker for iAnthus's $60 million in unsecured debt that it raised in 2019, as well as prior payments from Adler. Defendants also ignore their continued misrepresentation of iAnthus's relationship with GGP contemporaneously with, and after, Adler's $100,000 payment in December 2019.

In addition, Defendants attempt to portray GGP's Exit Fee as immaterial because it depended on iAnthus defaulting on its debt. But the existence of the Exit Fee was plainly an important historical fact that Defendants misrepresented when describing GGP's loans. The fact that the accrual of the Exit Fee was contingent on future events does not make it immaterial because the test for materiality accounts for the significance of "contingent or speculative information or events." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). GGP's Exit Fee is extremely significant because it fundamentally altered the nature of GGP's investment in iAnthus.

Defendants also raise several factual issues that arose in iAnthus's restructuring proceeding in Canada to argue that GGP acted fairly toward iAnthus. In addition to being extraneous factual assertions that cannot be considered at this stage, those separate proceedings are irrelevant *to* the claims at issue here. The objection that investors raised to iAnthus's restructuring dealt with the fairness of the process after iAnthus was already in default in March 2020 and was forced to restructure the company. The claims here, in contrast, relate to iAnthus's conduct leading up to

3

that time, starting in May 2018. The Complaint focuses on Defendants' misrepresentations about iAnthus's relationship with its lenders that misled investors about the risks the Company faced from those lenders' stakes in the Company and iAnthus's ability to meet its financing needs. If Defendants had truthfully disclosed Ford's conflicts of interest or GGP's secret $10 million Exit Fee, investors would have known the actual risk iAnthus's lenders would take over the Company.

Next, the Complaint adequately pleads a strong inference of Defendants' scienter based on their motive and opportunity to commit fraud and their knowledge or recklessness as to their misstatements. Defendants respond by repeating their unsupported factual arguments concerning the falsity of their statements, but they cannot deny that Ford and Adler, by definition, knew firsthand of their dealings with each other and stood to reap large financial benefits from them.

Defendants also raise an assortment of other arguments based on blatant mischaracterizations of the relevant caselaw. As explained further below, Defendants made the misstatements at issue "in connection with" investors' transactions in iAnthus stock; the Complaint adequately alleges that the fraud-on-the-market presumption of reliance applies based on standard principles that apply to securities class actions; and Defendants' misstatements caused iAnthus's stock to fall substantially when the truth about iAnthus's relationship with its lenders was revealed and when the risks that Defendants concealed materialized.

Now that Defendants concede that the Complaint adequately alleges a "domestic transaction" under *Morrison*, they cannot avoid the merits of Plaintiff's claims. The Complaint adequately alleges securities violations arising out of Defendants' many misrepresentations of iAnthus's relationship with its lenders for the reasons described below.

## II.   FACTUAL BACKGROUND

On August 30, 2021, the Court granted Defendants' motions to dismiss Plaintiff's Consolidated Amended Class Action Complaint solely on the basis that it did not satisfy *Morrison*

4

*v Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). (ECF No. 81). The Court permitted Plaintiff to move for leave to file a second amended complaint. Defendants did not oppose Plaintiff's motion for leave to amend and Plaintiff filed the SAC on November 3, 2021. (ECF Nos. 82-84, 90-91).

### A.     **Plaintiff's Transactions in iAnthus Stock Took Place in the United States**

The SAC adds abundant specific factual allegations explaining why Plaintiff's transactions in iAnthus stock during the Class Period satisfy *Morrison*. These include Plaintiff's location in Louisiana when he conducted these transactions (SAC ¶¶ 21, 23), the location of TD Ameritrade, his securities broker (SAC ¶¶ 21, 24), the fact that Plaintiff transacted in ITHUF shares that traded in the U.S. OTC marketplace (SAC ¶ 22), and information from TD Ameritrade explaining that Plaintiff's transactions in iAnthus stock took place in the U.S. TD Ameritrade, the broker through which TD Ameritrade routed Plaintiff's transactions, and the contra and clearing firm for these trades were all located in the U.S. SAC ¶¶ 21, 24-31. In addition to providing these specific examples, TD Ameritrade explained to Plaintiff why his transactions in ITHUF stock were fulfilled domestically based on TD Ameritrade's business practices. SAC ¶ 32.

Furthermore, many aspects of iAnthus's ITHUF shares being listed on the OTCQB and OTCQX markets confirm that Plaintiff's transactions in iAnthus stock took place in the U.S. This includes the location of the OTC Markets Group (which runs the OTCQB and OTCQX markets) (SAC ¶ 35) and the way securities are traded and regulated on its markets (SAC ¶¶ 36-38, 43-44). In addition, the OTC Markets Group explains that "Canadian or DTC eligible F Shares"—such as iAnthus's ITHUF shares—are "settled, cleared and custodized" in the U.S. SAC ¶ 41.

iAnthus even went out of its way to obtain eligibility with the Depository Trust Company ("DTC") in the U.S. so that its common shares could be listed on the OTC markets. SAC ¶¶ 39-40. The Company advertised to investors that it obtained eligibility with the DTC for its common

shares to be listed on this OTC market and that it was "named to the 2019 OTCQX® Best 50," which required iAnthus to meet the OTCQX market's "high financial standards." SAC ¶¶ 39, 45.

Lastly, trading data makes clear that iAnthus's ITHUF shares traded on the U.S. OTC market as a distinct market from the Canadian Securities Exchange. During the last year of the Class Period, a *higher volume* of ITHUF stock (150 million shares) traded on the OTC market as compared to trading of IAN stock on the CSE (133 million shares). SAC ¶ 42.

These facts leave no doubt—and Defendants do not contest—that Plaintiff's transactions in iAnthus stock took place in the U.S.

### B.    iAnthus's Business

iAnthus advertises that it provides its "Shareholders with diversified exposure to best-in-class licensed cannabis cultivators, processors and dispensaries throughout the United States." SAC ¶ 54. Defendant Ford founded iAnthus in 2013 and served as the Company's CEO and as a Director until he was fired on April 27, 2020 because of his self-dealing. SAC ¶¶ 46, 55. Kalcevich served as iAnthus's CFO and as a Director until December 5, 2019. SAC ¶ 47.

iAnthus's business model depends on its acquiring licensed cannabis facilities to add to its portfolio. SAC ¶ 56. The Company needed to raise additional capital to fund its expansion strategy. SAC ¶ 57. Defendants highlight this fact to suggest that shareholders were aware of the risks involved with iAnthus's business. (iAnthus Mem. at 1, 5-6). This misses the point because iAnthus's need for funding does not give Defendants license to misrepresent key aspects of the Company's financing transactions. This case centers on Defendants' misrepresentation of the nature of the $156 million in debt that iAnthus raised to support its basic business model. SAC ¶¶ 71, 77-85. The fact that the ability to obtain financing was so crucial for iAnthus shows why the terms of its financing transactions was so important to shareholders. Investors depended on

6

iAnthus truthfully describing the nature of this crucial financing. Instead, Defendants misrepresented key terms of these transactions and Ford's self-dealing.

### C.  Ford's Conflicts of Interest

GGP was iAnthus's main lender, providing $96 million in senior secured debt through three rounds of financing at an extremely high 13% interest rate. This includes 1 - $40 million that iAnthus borrowed on May 14, 2018, SAC ¶ 60; 2 - $20 million on September 30, 2019, SAC ¶ 65; and 3 - $36.15 million on December 20, 2019, SAC ¶ 67. Defendants described GGP's last two financings as the beginning of a $100 million financing plan with GGP. SAC ¶¶ 67, 83. But GGP never provided the final $43.85 million of this plan. SAC ¶¶ 109-10, 117. iAnthus's remaining $60 million in debt that it raised during the Class Period came from unsecured debt that it raised on March 18, 2019 and May 2, 2019 from other parties, including Oasis Investments II Master Fund Ltd. ("Oasis") and Hi-Med LLC ("Hi-Med"). SAC ¶¶ 68-70.

All of this $156 million in debt was tainted by Ford's self-dealing. On March 31, 2020, a tipster on the website *Stockhouse.com* revealed that Ford had engaged in multiple undisclosed personal transactions through his role as iAnthus's CEO, including that he:

- "agreed [to] all the terms of $95MM of iAnthus' Gotham Green[] loans notes. However he didn't disclose that he personally owes money to Jason Adler who heads up Gotham Green. He hasn't even disclosed the last personal loan from Jason Adler to Hadley Ford for $100k that isn't even formalised. An informal loan is often considered a bribe";

- "nominated Randy Maslow be a director of Ianthus with a salary of $400k a year, but he didn't disclose that he owed money to Randy";

- "engaged with a broker David Rozinov to raise funding, however Ford didn't disclose that he personally owes David $300,000"; and

- "arranged for iAnthus to pay $150,000 a year to his sister who doesn't really work for the company."

SAC ¶ 104. On April 6, 2020, iAnthus announced, along with its default on its debt, that its Board formed a Special Committee to "investigate any potential conflicts of interest and/or required

7

disclosures with respect to [Ford] and certain related parties[.]" SAC ¶ 95. The Company initiated this investigation because of the March 31, 2020 *Stockhouse* report that Ford "is or has been acting in a conflict of interest and has misused iAnthus' resources to his own benefit." SAC ¶ 95.

On April 27, 2020, just three weeks after iAnthus formed the Special Committee, the Company announced that the Committee found, and the Board accepted, that "Ford entered into two undisclosed loans (one loan for US$100,000.00 with a related-party and the other for US$60,000.00 with a non-arm's length party) and those loans created a potential or apparent conflict and should have been disclosed to the Board in a timely way." SAC ¶ 96. The Board also determined that on December 21, 2019, the day after iAnthus closed its third loan with GGP, Adler (GGP's Managing Member, SAC ¶ 49), "entered into a loan for the principal sum of US$100,000, documented by an email. The loan bore no interest and was to be repayable on March 31, 2020." While Defendants characterized this payment from Adler to Ford as a non-interest loan, it bears far more resemblance to a simple $100,000 personal payment. On August 14, 2020, when iAnthus belatedly disclosed its financial results for the first quarter of 2020, it revealed that this loan still had "not been repaid and remains outstanding." SAC ¶ 97. When iAnthus announced the Special Committee's findings, the Board fired Ford because his "failure to disclose such personal loans to the Board was a breach of the Company's conflict policies and other obligations." SAC ¶ 98.

Defendants mischaracterize Ford's personal payments in several ways. The iAnthus Defendants argue that his $100,000 payment "from Adler took place after all of the Amended Complaint's alleged misstatements." (iAnthus Mem. at 20). This is wrong for multiple reasons. *First*, the SAC plainly alleges misstatements after Adler's December 21, 2019 payment, including in iAnthus's December 30, 2019 Material Change Report (SAC ¶¶ 265-68) and in GGP's January 10, 2020 Required Disclosure (SAC ¶¶ 272-78), both of which described GGP's $36 million

8

financing in December 2019. *Second*, Adler made the December 21, 2019 payment to Ford just one day after GGP's financing was announced on December 20, 2019. SAC ¶ 97. It is therefore highly misleading for Defendants to argue that this $100,000 payment from Adler took place "after all rounds of financing from Gotham." (iAnthus Mem. at 19). The most plausible inference is that Ford and Adler knew about this payment the prior day, when iAnthus described GGP's $36 million financing. SAC ¶¶ 67, 261. Otherwise, all defendants could easily evade responsibility for self-dealing by waiting a single day after a transaction closes to exchange improper payments.

In addition to misrepresenting the timing of Adler's $100,000 payment to Ford, Defendants underplay the significance of Ford's other acts of self-dealing. The Special Committee revealed that Ford entered into an additional "undisclosed loan" for "$60,000.00 with a non-arm's length party." SAC ¶ 96. The GGP Defendants admit that this $60,000 was "from a broker who was involved with the Hi-Med/Oasis financing." (GGP Mem. at 10 n.7).

Multiple other sources corroborate that this $60,000 payment came from David Rozinov, the broker for iAnthus's $60 million in unsecured debt from lenders other than GGP. *First*, the Special Committee stated that it was able to substantiate "[t]wo allegations" from the *Stockhouse* report. SAC ¶ 101. The only *Stockhouse* allegation that could qualify as a loan with a "non-arm's length party" who was not a "related party" is Ford's payments from Rozinov. SAC ¶ 104. *Second*, Hi-Med revealed in its parallel complaint against iAnthus that the $60,000 loan that the Special Committee identified was from Rozinov, who brokered iAnthus's $60 million in unsecured debt in March and May 2019. SAC ¶ 102. Hi-Med purchased $5 million of that debt and thus knows firsthand of Rozinov's role as the broker for that loan. *Id. Third*, iAnthus has disclosed a promissory note with Rozinov for $475,000 that was outstanding as of May 14, 2018. SAC ¶ 103. *Fourth*, iAnthus paid $1.6 million in "finder fees" to an undisclosed party in connection with its

9

$60 million in unsecured financing. SAC ¶¶ 68-69. These facts strongly show—and easily support the plausible inference—that Ford's $60,000 payment was from Rozinov and was a kickback in connection with iAnthus's $60 million in unsecured debt that it raised in 2019.

Furthermore, the full set of allegations disclosed in the March 31, 2020 *Stockhouse* report should be credited. SAC ¶ 104. This includes Ford's receipt of multiple "loans" from Adler of GGP, not just the $100,000 payment that this report described as the most recent one that Ford received. *Id.* Similarly, *Stockhouse* revealed that Ford owed Rozinov $300,000, not just the $60,000 that the Special Committee found. *Id.* The *Stockhouse* report is particularly credible because the Special Committee and Hi-Med confirmed several of its specific allegations—namely Ford's latest $100,000 payment from Adler and Ford's $60,000 loan from Rozinov—based on the evidence that they were able to access. SAC ¶ 105. The Committee did not conduct a comprehensive investigation of all of Ford's dealings. Rather, its findings were based only on what it was able to "substantiate" from email documentation after a brief three-week investigation during which the Committee was also busy with exploring "strategic alternatives" for iAnthus. SAC ¶¶ 95-96, 101. The Company and the Committee also chose not to disclose any further details of Ford's $60,000 loan from "a non-arm's length party" that they did not identify. *Id.*

The completeness of the Special Committee's investigation is called into question even further because on May 8, 2020—less than two weeks after the investigation—Mark Dowley, a Committee member, resigned from iAnthus's Board. SAC ¶¶ 99, 334. Dowley's term as a Director was scheduled to run at least through 2020. *Id.* Even so, iAnthus did not provide any explanation for his sudden resignation. The most plausible explanation for Dowley's abrupt departure is that he was not comfortable with the Committee's cursory investigation into Ford's misconduct. Ford's personal payments from Adler are also consistent with the observations of former iAnthus

10

employees. SAC ¶¶ 106-07. An employee who worked directly with Ford as an assistant at iAnthus's headquarters in New York from early 2018 until early 2020 (CW 1) observed that Ford and Adler were "good friends" who met regularly outside of the office for dinner. SAC ¶ 106.[2]

### D.    Defendants Misrepresented GGP as Making an Equity Investment

Defendants portrayed GGP as providing not just loans, but also as making a significant equity investment in iAnthus that made GGP's interests aligned with those of iAnthus's shareholders. Defendants gave the false impression that GGP was making a substantial equity investment in iAnthus by including a purported $10 million equity investment alongside GGP's $40 million in debt that it lent iAnthus on May 14, 2018. Analysts bought into this portrayal of the GGP's financing. For example, after Defendants announced GGP's $100 million financing plan in September 2019, Beacon Securities Limited noted that "GGP is already a major investor in" iAnthus and "**view[ed] the follow on investment by an existing major shareholder as very favourable**." SAC ¶ 85 (emphasis in original); *see also* SAC ¶¶ 81-82, 84, 88-89 (Kalcevich assuring investors on November 21, 2019 that "*we're a big equity play for them*").

But Defendants misrepresented the true nature of GGP's investment. They did not disclose that the loan documents between iAnthus and GGP provided for the secret Exit Fee whereby iAnthus would pay GGP $10 million, plus 13% interest, if the Company did not repay the entire $40 million in secured debt that GGP lent on May 14, 2018. SAC ¶ 63. The Exit Fee corresponded exactly to GGP's supposed $10 million equity investment that it made in iAnthus alongside its $40 million loan. Indeed, upon payment of the Exit Fee, GGP was required to return the 3.9 million

---

[2] Defendants point to the Special Committee's vaguely worded statement that it "did not find a basis to conclude that Ford's conduct in the face of the potential or apparent conflict impacted the terms, timing, or negotiations the Company had with the related-party or the non-arm's length party." (iAnthus Mem. at 7, 19). But this statement is limited by what the Committee had a "basis" to conclude based on the narrow scope of its investigation. The Committee even equivocated on whether Ford's blatant self-dealing constituted a conflict of interest.

11

shares that it was issued under its $10 million "equity financing that closed concurrently with" its May 2018 secured notes. SAC ¶ 63. GGP thus did not face the downside risk from its purported $10 million equity investment because it was protected entirely by the Exit Fee.

Defendants *admit* that they did not disclose GGP's Exit Fee until after the Class Period.[3] The iAnthus Defendants acknowledge that while its lending agreement with GGP included three vague references to a "separate 'Fee Letter'" that were buried among that 152-page document, iAnthus did not disclose "the fee letter itself" or the specific unnamed fees that it covered. (iAnthus Mem. at 6 (citing Ex. I at 5, 9, 14) and 23). Defendants also admit that the secret Exit Fee corresponded exactly to the 3.9 million shares that iAnthus issued GGP, which was the entirety of GGP's supposed $10 million equity investment. (iAnthus Mem. at 23 and Ex. J at 15).  Then, when iAnthus disclosed its results for the first quarter of 2020 after the Class Period, on August 14, 2020, it revealed that as of March 31, 2020, iAnthus owed not just $10 million for the Exit Fee, but $12.5 million, after accounting for the fee's 13% interest. SAC ¶ 63. iAnthus's investors were therefore misled into believing that GGP put $10 million at risk by investing in iAnthus's stock when, in reality, the Exit Fee not only protected that entire $10 million "equity" investment, but allowed GGP to profit even further by accruing 13% interest if iAnthus defaulted on its debt.

Defendants even continue to misrepresent the Exit Fee in their motions. They argue that the fee "did not accrue any amounts" through 2019. (iAnthus Mem. at 6, 24; GGP Mem. at 9 n.5, 21). But iAnthus disclosed in its results for the first quarter of 2020 that when GGP waived its right to cash interest payments due on September 30, 2019, "the interest payment accrued on September 30, 2019, for the Exit Fee was added to the principal balance of the fee." (Declaration of M. Grunfeld filed herewith ("Grunfeld Decl."), Exhibit 1 at 19). This accrual increased the Exit

---

[3] iAnthus first revealed the Exit Fee after the Class Period, when it belatedly reported its financial results for 2019 on July 31, 2020. (*See* iAnthus Mem. at 6 and Ex. J); SAC ¶¶ 63, 122, 147.

Fee to $10.339 million and resulted in iAnthus owing $12.5 million under the fee as of March 31, 2020. *Id.*; SAC ¶ 63.

**E.     iAnthus Did Not Fund the Escrow Account That it Agreed to With GGP**

iAnthus promised in each of its first two lending agreements with GGP that iAnthus would put $5.27 million in an escrow account so that those funds would be available to pay iAnthus's interest obligations. SAC ¶ 133. While iAnthus disclosed that its escrow funds from its May 2018 loan were "fully released" on March 5, 2019, iAnthus never disclosed that the escrow funds that it promised in its September 30, 2019 loan were released or never funded at all. SAC ¶¶ 134-35. If iAnthus had these funds in escrow as promised, it would not have defaulted on its debt.

The only financial statement that iAnthus released during the Class Period that covered its September 2019 loan from GGP plainly referenced the escrow having been released only in connection with the Company's May 2018 loan. (*See* iAnthus Mem. at 27-28 and Ex. G thereto at 16). iAnthus appears to argue that it was not obligated to withhold any additional escrow funds under its September 2019 loan from GGP. (iAnthus Mem. at 27). But iAnthus does not point to any provisions of its September 2019 loan agreement. The plain language of that agreement warranted that iAnthus would place $5.27 million in escrow. SAC ¶ 133. Under iAnthus's interpretation, this provision referred to funds that were already released over six months before the agreement was signed. This explanation does not make sense.

**F.     Defendants' False and Misleading Statements**

Defendants made several categories of false and misleading statements based on Ford's self-dealing and GGP's secret $10 million Exit Fee.

**1.     Statements About Conflicts of Interest**

Throughout the Class Period, iAnthus purported to disclose in its quarterly and annual financial reports all "Transactions with Related Parties" and "Related Party Transactions." SAC

13

¶¶ 175-76, 182-83, 191, 193, 209-10, 219-20, 228, 250. These disclosures described several transactions that iAnthus had engaged in with related parties, including a CAD$500,000 loan to Ford, but did not disclose Ford's related-party transactions with Adler or Rozinov. *Id.*

Similarly, iAnthus's 2018 Annual Information Form affirmed that none of its directors or executive officers "had any material interests, direct or indirect, in any transaction within the three most [recent years] or during the current year that has materially affected or is reasonably expected to materially affect the Company." SAC ¶ 211. iAnthus's 2018 Annual Report and Annual Information Form also assured, in a section on conflicts of interest, that its executive officers' and directors' outside business activities may "not materially or adversely interfere with their duties." SAC ¶¶ 212-13. iAnthus also misrepresented its relationship with GGP as "Arm's length" in regulatory filings. SAC ¶ 158. None of these materials disclosed Ford's self-dealing.

iAnthus also misleadingly touted its corporate governance practices. On October 17, 2019, it announced "five new independent Directors" as part of its "Emphasis on Corporate Governance and Oversight." Ford emphasized the Company's "best-in-class Board in Cannabis," noting that "[n]o one told us to do this. It was not required by anyone. But it's the right way to comport yourself, when you've been entrusted with capital from public investors." SAC ¶¶ 269-70.

All of these statements about conflicts of interest and corporate governance were false and misleading in light of Ford's undisclosed self-dealing with Adler and Rozinov.

2.    Descriptions of iAnthus's Debt and GGP's Equity Investment

iAnthus described in detail its $156 million in debt that it raised during the Class Period, including its $96 million in debt from GGP and its $60 million in debt from other lenders. All of these statements were misleading because they did not disclose the payments that Ford received in connection with these loans or GGP's secret Exit Fee. SAC ¶¶ 149(i)-(ii). iAnthus also emphasized the importance of GGP's and the unsecured lenders' financing to its operations. SAC

14

¶¶ 151-52, 196-200, 206, 229-30, 234, 262-63. And iAnthus filed Material Change Reports with Canadian securities regulators that misleadingly described its loans while failing to disclose Ford's conflicts or GGP's Exit Fee. SAC ¶¶ 165-67, 198-00, 241-45, 265-267.

Defendants also falsely described GGP as making a $10 million equity investment even though the Exit Fee removed the risk of that investment. SAC ¶¶ 153, 166-67, 171, 179, 190, 205, 234, 262-63. Similarly, iAnthus misrepresented GGP's investment as "a big equity play for them, it's structured as . . . debt, but they're not in [it] for the lending returns." SAC ¶ 257.

In addition, iAnthus told investors on October 10, 2019, that GGP "waived its right to receive the quarterly cash interest payment due on September 30, 2019 and" would instead receive the interest as a "payment in kind." SAC ¶ 245. Defendants did not disclose that this event triggered the accrual of additional debt under GGP's Exit Fee. SAC ¶¶ 246, 252; (*see supra* at 12-13).

### 3. Statements About the Availability of Financing

iAnthus falsely reassured investors that it had adequate access to financing based on its historic financings from GGP and its unsecured lenders. For example, on September 30, 2019, iAnthus held a special investor conference call to announce its $100 million financing plan with GGP. Ford told investors that GGP's financing gave iAnthus "capital ***certainty***" SAC ¶ 233, "our ability to build our markets is ***certain***" SAC ¶ 234, and "[w]e have no financing concerns" SAC ¶ 235. Then, on iAnthus's conference call for the third quarter of 2019 on November 21, 2019, an analyst asked whether GGP would "actually follow through" on its financing. Ford responded:

> ***I don't lose any sleep about the availability of money from Gotham.*** It's the reason we picked them as our partner a year and a half ago, [they have] been tremendously supportive, and have always followed through on everything they've always said they're going to do. I can't speak to their structure and internal dynamic, but ***I do know them personally, they never say something unless they can deliver it and I have full confidence that, if we do need [the] capital, that it will be there.***

15

SAC ¶¶ 88, 256. Kalcevich also told investors that iAnthus had other financing options that GGP would approve and "nothing [is] off the table." SAC ¶¶ 257-59; *see also id.* ¶¶ 229-36, 254-64.

In addition, iAnthus promoted, in each of its financial reports, GGP's financing and, after March 2019, the Company's unsecured debt, as demonstrating that iAnthus "has historically had, and continues to have, access to equity and debt financing." SAC ¶¶ 172, 180, 189-90, 207, 218, 250. Ford also promoted his "disciplined" approach to raising capital because "when you're public, it's not your money, we're just stewards of the capital" for shareholders. SAC ¶ 194.

All of these statements were false and misleading because if investors had known about Ford's self-dealing or GGP's Exit Fee they would have known not to be "certain" about GGP's $100 million financing plan or that iAnthus's historical financing showed that the Company had adequate access to financing. Moreover, investors would have known that iAnthus's historical financing put it at greater risk because of GGP's Exit Fee. Former employees confirm the tenuous nature of iAnthus's financing. A senior executive from 2017 until February 2019 (CW 3), who interacted with Ford and Maslow, explained that Ford and Kalcevich "chased after creative financing" and Ford kept information about the relationship with GGP "close to the vest." SAC ¶ 128. Similarly, a Director of Business Strategy (CW 2) questioned GGP's funding, noting that "with a finance team this seasoned in place, it makes you scratch your head." SAC ¶ 129.

4.    Escrow Statements

iAnthus publicly filed its loan agreement that contained the terms of its September 30, 2019 loan from GGP. This agreement contained the provision described above that required iAnthus to place $5.27 million into an escrow account to ensure the funds would be available to pay the Company's interest obligations. SAC ¶¶ 239-40. iAnthus also falsely represented in its financial report for the third quarter of 2019 that it "was in compliance with all covenants" in its notes that it issued to GGP on September 30, 2019. SAC ¶ 251.

16

5.      Statements of Full Disclosure

In each Material Change Report that iAnthus filed for its loans, it confirmed that it gave a "Full Description of Material Change" and that "[n]o information has been omitted" (or stated "Not applicable" under "Omitted Information"). SAC ¶¶ 165-67, 198-200, 241-43, 265-67. iAnthus also falsely represented none of the representations in its agreements with GGP "contain any untrue statement of a material fact or omit to state any material fact necessary to make such statement or representation not misleading to a prospective lender or purchaser of securities of the Company seeking full information as to the Company's" business. SAC ¶¶ 163, 237-38. These assurances were false because iAnthus did not disclose Ford's self-dealing or GGP's Exit Fee.

6.      Statements by GGP

The Complaint specifies for each statement alleged to be false and misleading, who the speaker was, and when and where they made the statement. The statements described above were made by iAnthus and either Ford or Kalcevich. The Complaint separately alleges specific misstatements made by GGP and Adler on its behalf. SAC ¶¶ 155, 231 (press releases announcing GGP's financings); SAC ¶¶ 161, 237 (GGP's loan agreements that Adler signed).

In addition, GGP filed a Required Disclosure by an Eligible Institutional Investor ("Required Disclosure") that gave misleading descriptions of each financing. SAC ¶¶ 272-73. These forms also required GGP to disclose the material terms of any "agreement, arrangement or understanding" that altered its "economic exposure" to the iAnthus securities at issue and to "[d]escribe the material terms of any agreements, arrangements, commitments or understandings." SAC ¶¶ 274, 277. GGP did not disclose Adler's payments to Ford or the Exit Fee.

Lastly, GGP misleadingly stated that it waived its right to receive the quarterly cash interest payment that was due on September 30, 2019, which would be added to the loan principal, but did not disclose that this event also triggered the accrual of the Exit Fee. SAC ¶¶ 279-80.

17

## G.    Defendants Profited From Their Fraud

Ford profited from his fraud in several ways. He received hundreds of thousands of dollars in payments through self-dealing. Ford also sold iAnthus stock for net proceeds of $1.48 million at prices far higher than the price after Defendants' fraud was revealed. SAC ¶¶ 146, 326.

Ford and Kalcevich also stood to profit substantially by lowering the strike price of 9.65 million options for Company insiders (including 1.72 million for Ford and 1 million for Kalcevich) in April 2019. SAC ¶¶ 143, 145. Their plan failed only because shareholders were outraged by this effort to make a short-term profit while the Company's stock price was falling. SAC ¶¶ 120-21.

Then, in March 2020, Ford proposed a management buyout that would give him and Maslow 10% of the Company and an additional 10% to employee stock options. SAC ¶¶ 138-39.

GGP and Adler also profited substantially, including by removing the risk from their equity investment, receiving very favorable financing terms by bribing Ford, and using their secured position to take control of iAnthus on very favorable terms. SAC ¶¶ 113-118, 290.

## H.    Defendants' Fraud Caused Substantial Losses to iAnthus's Shareholders

iAnthus's stock price declined dramatically as a result of Defendants' fraud, falling 62% just on the day that the Company announced the investigation of Ford's self-dealing. SAC ¶¶ 305-08. The stock price also dropped in response to other disclosures related to iAnthus's financing transactions that allowed its lenders to take over the Company. *See* Complaint § VI.

## I.    Defendants Improperly Rely on Extrinsic Information

Defendants append 64 exhibits, spanning approximately 900 pages, to their motions. These documents are factual materials outside the Complaint that the Court cannot consider. But even if the Court were to consider these documents, they do not support Defendants' arguments.

18

### 1.   Defendants' Improper Assertions Related to the Exit Fee

Defendants misleadingly state that the "exit fee has not been enforced to date" and that the "fee was never paid" because GGP "agreed to 'forbear from further exercising any rights . . .' as part of the Recapitalization." (iAnthus Mem. at 6, 24). But the July 13, 2020 press release that Defendants cite makes no mention of the Exit Fee. Rather, it notes that GGP and iAnthus's other lenders "will forbear from" further pursuing "any events of default" in exchange for iAnthus's agreeing to their restructuring. (iAnthus Ex. L at 2). Defendants cannot seriously contend that GGP simply forgave the Exit Fee as an act of charity. Rather, the $12.5 million that iAnthus owed under the fee contributed to GGP obtaining such a favorable deal in the restructuring. SAC ¶¶ 116-117 iAnthus acknowledges that GGP withdrew "any enforcement" of iAnthus's default in exchange for what GGP would receive in the restructuring. (iAnthus Mem. at 8).

Defendants also make the equally untenable factual argument that the $10 million Exit Fee (plus 13% interest) is not significant because it was not due until iAnthus defaulted on GGP's loans. (iAnthus Mem. at 22-24; GGP Mem. at 20-21).[4] According to Defendants' rationale, all events that are contingent on a future default are inherently irrelevant to investors. This is plainly wrong. For example, investors would undoubtedly care about an onerous secret provision providing that shareholders would be automatically wiped out in the event of a future default, regardless of the value of the Company's assets. Defendants must then be arguing that the

---

[4] iAnthus similarly argues that Defendants believed the Exit Fee would not be paid because it was "more likely than not that GGP would exercise the conversion option" (iAnthus Mem. at 6, 24). This is belied by the very documents that iAnthus attaches to its motion. GGP was extremely unlikely to exercise the conversion option because iAnthus's stock price was just $1.41 per share when iAnthus and GGP made their second loan agreement on September 30, 2019, and continued to decline as Defendants made additional misstatements after that time. SAC ¶¶ 284-86. Yet the "conversion option" required GGP to pay a "conversion rate of $3.08 per share," which was multiple times the stock's actual value. (iAnthus Ex. H at 21). iAnthus's assertion about the likelihood that GGP would exercise the conversion option is completely implausible. Moreover, what matters to investors is not Defendants' belief about the Exit Fee— which Defendants never disclosed—but rather the objective significance of the fee to a reasonable investor.

19

particular terms of the Exit Fee are insignificant. Elsewhere, GGP argues that the Exit Fee was "inconsequential because the default meant that repayment of the entire $97.5 million loan was immediately due." (GGP Mem. at 20 n.12). That argument does not make sense in light of the Exit Fee's substantial size—which added significantly to GGP's claim on iAnthus's assets—and the fact that it nullified GGP's purported $10 million equity investment.

### 2.   Defendants' Improper Assertions Related to the Canadian Proceedings

Defendants also raise improper factual assertions related proceedings in Canada arising out of iAnthus's collapse. (iAnthus Mem. at 7-10; GGP Mem. at 11-12). In addition to being extrinsic to the Complaint, these proceedings raise facts that support Plaintiff's allegations.

For *example*, the Canadian court initially rejected iAnthus's restructuring because the deal sought to extinguish claims of former shareholders. The agreement that was ultimately approved allows shareholders to pursue claims for "gross negligence, fraud or willful misconduct." (iAnthus Ex. O ¶¶ 21, 38). Moreover, the Canadian court noted that one of the objectors to the restructuring attested to "an alleged $10 million side deal between iAnthus and Gotham Green." (GGP Ex. 26 ¶ 46).[5] The Canadian court also noted that only 59% of iAnthus's shareholders unrelated to the Company voted for the restructuring. (GGP Ex. 26 ¶ 51). This is an extraordinarily low figure considering that the 41% that voted against the plan stood to receive *nothing* if it was not approved. (*Id.* ¶ 6). In addition, the Canadian court was focused on the time period when iAnthus's restructuring agreement was being negotiated *after* iAnthus's default in March 2020 (*see* iAnthus Ex. W and GGP Ex. 26 ¶¶ 42, 48-49), not the earlier activities that put iAnthus's lenders in such a

---

[5] While the Canadian court described the evidence as hearsay, that is not the standard here. *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 171-72 n.9 (S.D.N.Y. 2008) (rejecting defendant's argument that allegations contained "inadmissible hearsay"). Furthermore, the Canadian court did not address the record here, where Defendants *admit* that the $10 million Exit Fee existed and was not disclosed until after the Class Period.

strong position leading up to these proceedings. SAC ¶¶ 58, 109, 127.[6]

Defendants also argue that GGP did not have an "invidious" plot to takeover iAnthus because its recapitalization was held to be fair. (*See* iAnthus Mem. at 33; GGP Mem. at 15-16). This misses the point. Even if iAnthus needed to be restructured based on its condition at the time of its default, Defendants' prior conduct during their earlier transactions that they misrepresented allowed iAnthus's lenders to be in such a favorable position in the restructuring. Those earlier actions put GGP in a position to take over nearly half the Company while maintaining almost all of the debt that iAnthus owed it. SAC ¶¶ 58, 109, 116-17, 126-27.

### 3.   Defendants' Improper Factual Assertions Related to iAnthus's Collapse

Defendants also repeatedly try to attribute iAnthus's decline to the COVID-19 pandemic rather than Defendants' fraud. (*See* iAnthus Mem. at 1, 6-7, 11, 25, 30, 32-33). This alternative explanation does not change the false and misleading nature of Defendants' statements concerning iAnthus's relationship with its lenders or the resulting drop in iAnthus's stock price. In fact, CW 3, a senior executive at iAnthus who interacted directly with Ford, saw through this excuse. CW 3 explained that iAnthus's restructuring was a result of Ford's and Kalcevich's "chas[ing] after creative financing" and "is not a function of Covid." SAC ¶ 128. The weakness of Defendants' excuse is highlighted by the fact that GGP reneged on the remaining $44 million of its $100 million financing plan, but was still able to provide another $14 million in financing as part of the restructuring agreement when that funding allowed GGP to substantially improve its position at the expense of iAnthus's shareholders. SAC ¶¶ 109-10, 113, 116-17.

---

[6] Defendants also note a recent dispute between iAnthus and its lenders concerning the terms of the restructuring agreement. (iAnthus Mem. at 9-10; GGP Mem. at 12-13). That dispute, which first arose in August 2021—over a year after the Class Period and long after Ford left the Company—has no bearing on this action other than to highlight that iAnthus has received better offers than what GGP provided in the restructuring agreement.

4.      The Court Should Reject Defendants' Extraneous Factual Assertions

The iAnthus Defendants argue that the Court should take judicial notice of the many documents that they submit with their motion. (iAnthus Mem. at 3 n.2). But the Second Circuit allows judicial notice only where the defendant does not offer the documents for "the truth of their contents." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008); *see also Gentry v. Kaltner*, 2020 WL 1467358, at *6 (S.D.N.Y. Mar. 25, 2020) (same). Moreover, just because a document is referenced in the Complaint, that does not make the entire document subject to incorporation by reference. *See Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998-99 (9th Cir. 2018) (noting "overuse and improper application" of incorporation-by-reference).

Defendants' voluminous exhibits offer extraneous facts for their truth, including the assertions that iAnthus's restructuring is "fair" (iAnthus Mem. at 2, 9, 14, 33; GGP Mem. at 12 n.9, 16); GGP would "more likely than not . . . exercise the conversion option" (iAnthus Mem. at 6, 24; GGP Mem. at 9 n.5); and the pandemic caused iAnthus's downfall (iAnthus Mem. at 1, 6-7, 11, 25, 32-33). The Court should not consider these extrinsic materials because it may not "rel[y] on matters outside the pleadings" on a motion to dismiss. *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 289 (S.D.N.Y. 2013) (striking exhibits as evidence related to scienter); *SEC v. Kueng*, 2010 WL 3026618, at *2 (S.D.N.Y. July 30, 2010) (excluding factual assertions outside the complaint).

Furthermore, even if Defendants' alternative factual assertions could be considered (which they cannot), the sources that they cite do not support their contentions or defeat the plausible inferences raised in the Complaint. These types of factual issues are precisely why defendants cannot introduce new facts outside the Complaint at this stage. "[T]he point of discovery [is] to see whether plaintiff's well-pleaded factual allegations are true." *Billhofer v. Flamel Techs., SA.*, 663 F. Supp. 2d 288, 304 (S.D.N.Y. 2009); *see also Orexigen Theraps.*, 899 F.3d at 1003 (holding

22

"it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute . . . well-pleaded" facts).

### III.    ARGUMENT

On a Rule 12(b)(6) motion to dismiss, the court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014). To survive the motion, a complaint must allege "enough facts to state a claim … that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must assume the truth of all well-pleaded factual allegations. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

#### A.    The Complaint Satisfies *Morrison*

The U.S. securities laws apply to "domestic" transactions, including 1 – for "securities listed on domestic exchanges [] and [2 -] domestic transactions in other securities." *Morrison v Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010). Meeting either test with allegations that are "plausible on [their] face" satisfies *Morrison*. *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).

##### 1.    Defendants Concede That Plaintiff Alleges Domestic Transactions

The Court dismissed the prior complaint solely on the basis that it did not satisfy *Morrison*. (ECF No. 81). Plaintiff has added ample allegations in the SAC detailing why his transactions in iAnthus stock are "domestic transactions." These include the U.S. presence of Plaintiff, his broker (TD Ameritrade), the cash in his brokerage account, all of the brokers that served other functions in completing his orders for specific transactions, TD Ameritrade's general practices, and the interaction of the specific OTC markets at issue with ITHUF stock. (*See supra* at 5-6).

Every single part of these transactions occurred in the U.S. Given this overwhelming support, Defendants concede that Plaintiff engaged in domestic transactions under *Morrison*. (*See* iAnthus Mem. at 12-13; GGP Mem. at 14, 16). The Court should not "make arguments for

23

dismissal that Defendants chose not to present." *Rubenstein v. Cosmos Holdings, Inc.*, 2020 WL 3893347, at *11 (S.D.N.Y. July 10, 2020) (holding complaint satisfied *Morrison*).

While the Court does not need to address the issue further, many cases firmly qualify Plaintiff's purchases of iAnthus stock as "domestic transactions." *See Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 63, 67 (2d Cir. 2018) (holding transactions were domestic because they could not be revoked when they "matched with a counterparty by an electronic trading platform" in Illinois, even though they did not clear and settle until the following day in Korea); *In re Poseidon Concepts Sec. Litig.*, 2016 WL 3017395, at *12 (S.D.N.Y. May 24, 2016) (holding a Florida resident who bought Poseidon stock on the OTC market "through a local office of his broker" and alleged they could not revoke acceptance, adequately alleged domestic transactions).[7]

The Complaint also adds more allegations explaining why the OTC markets at issue here qualify as domestic exchanges. SAC ¶¶ 34-38, 43-44. *See also Rubenstein v. Cosmos Holdings, Inc.*, 2020 WL 3893347, at *10-11 (S.D.N.Y. July 10, 2020); *United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2014). But the Court does not need to address this issue because Defendants concede that Plaintiff engaged in "domestic transactions."

> 2.    Plaintiff's Claims Are Not "Predominantly Foreign"

Defendants resort to arguing that this action is "so predominately foreign as to be

---

[7] *See also United States v. Vilar*, 729 F.3d 62, 77-78 n.11 (2d Cir. 2013) (holding that "territoriality under *Morrison* concerns where, physically, the purchaser or seller committed him or herself"); *Giunta*, 893 F.3d at 76-82 (holding a complaint sufficiently pleaded domesticity where one of the parties was located in the U.S. and U.S. dollars were wired using a bank account located in New York); *United States v. Georgiou*, 777 F.3d 125, 135-36 (3d Cir. 2015) (holding that a foreign entity's purchase of securities not listed on a U.S. exchange, through U.S. market makers acting as intermediaries for the foreign entities, was considered a "domestic transaction"); *Butler v. United States*, 992 F. Supp. 2d 165, 178 (E.D.N.Y. 2014) (holding *Morrison* satisfied where "[c]ontracts were not executed with both parties present in a single location" but "Butler bought and sold securities from the Credit Suisse office in New York"); *Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 826–27 (C.D. Cal. 2020) (holding plaintiffs adequately alleged domestic transactions based on "[a]llegations regarding the location of the broker, the tasks carried out by the broker, the placement of the purchase order, the passing of title, and the payment made"); *In re Tezos Sec. Litig.*, 2018 WL 4293341, at *8 n.13 (N.D. Cal. Aug. 7, 2018) (holding "the sale takes place in both the location of the seller and the location of the buyer"); *Wu v. Stomber*, 883 F. Supp. 2d 233, 252-53 (D.D.C. 2012) (holding domestic transaction adequately alleged where U.S. broker-dealers were involved), *aff'd,* 750 F.3d 944 (D.C. Cir. 2014).

impermissibly extraterritorial" under *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014). (iAnthus Mem. at 12-15; GGP Mem. at 14-16).

The claims here, unlike in *Parkcentral*, are based entirely on U.S.-focused activities. In *Parkcentral*, hedge funds entered into swap agreements referencing shares of a German company trading only on foreign exchanges. 763 F.3d at 201. The Court found the transactions to be "predominantly foreign," but described its holding as based "in some part on the particular character of the unusual security at issue" and cautioned against "perfunctorily appl[ying]" its holding "to other cases based on the perceived similarity of a few facts." *Id.* at 202, 216-17. The *Parkcentral* defendants had "no alleged involvement in plaintiffs'" swap agreements with third parties. 763 F.3d at 201. Here, Plaintiff bought shares issued by iAnthus, not a derivative security.

Courts regularly distinguish *Parkcentral* as dealing with a unique scenario. *See Giunta*, 893 F.3d at 82–83 (rejecting argument that transaction was "predominantly foreign" where "substantial domestic contacts" existed related to formation of agreement, even though transaction involved entities in the Bahamas); *Poseidon Concepts*, 2016 WL 3017395, at *1, 8, 13 (holding *Parkcentral* did not apply to U.S. plaintiff that purchased stock of Canadian issuer on U.S. OTC market); *Atlantica Holds.*, 2015 WL 144165, at *8 (refusing to extend *Parkcentral*'s holding to subordinated notes); *see also Stoyas v. Toshiba Corp.*, 896 F.3d 933, 950 (9th Cir. 2018) ("*Parkcentral* is distinguishable on many grounds").

Plaintiff also alleges substantial domestic contacts that preclude the application of *Parkcentral*. He is a U.S. resident and was in the U.S. when he bought his iAnthus stock. This, and the other facts described above supporting Plaintiff having conducted "domestic transactions," go beyond the bare minimum and show that every step of his transactions in iAnthus stock occurred in the U.S. In addition, iAnthus went out of its way to obtain eligibility with the DTC in the U.S.

25

so that its common shares could be listed on the OTC market. SAC ¶ 39; *see also* SAC ¶¶ 34-38 (describing U.S. OTC markets at issue here). iAnthus promoted this trading option to investors, highlighting that companies must "demonstrate compliance with U.S. securities laws" and meet other rigorous standards to qualify for the OTCQX market. SAC ¶¶ 39, 45. In fact, iAnthus's stock traded ***more heavily*** on the OTC market than on the Canadian Securities Exchange. SAC ¶ 42. Moreover, iAnthus's ITHUF stock on the OTC market "settled, cleared and custodized" in the U.S. SAC ¶ 41. All of these points constitute "substantial domestic contacts" that preclude Plaintiff's transactions from being "so predominately foreign." *Giunta*, 893 F.3d at 83-83; *see also Atlantica Holdings*, 2015 WL 144165, at *8 (*Parkcentral* "cabin[ed] its holding to the facts of the case").

This action is even further connected to the U.S. because both iAnthus and GGP operated domestically. iAnthus is based in New York and operates ***exclusively*** in the U.S. cannabis industry. SAC ¶¶ 54-56. GGP is also based in the New York. SAC ¶¶ 85. Ford worked out of iAnthus's headquarters in New York City and regularly met with Adler in New York. SAC ¶ 106. Defendants even acknowledge that "iAnthus, as a business, engages in domestic activities" and they do not dispute "that iAnthus's 'principal executive offices' are in New York." (iAnthus Mem. at 14).

Defendants argue that this case is "predominantly foreign" because it deals with "Canadian securities filings by a Canadian company whose securities are listed on a Canadian exchange, and those securities are the subject of several Canadian actions and a Canadian restructuring proceeding." (iAnthus Mem. at 13; GGP Mem. at 14-16). But the mere fact that iAnthus chose to list its securities on the CSE (and therefore took related corporate actions in Canada) alongside the OTC market does not overtake the substantial U.S. contacts described above. *Parkcentral* involved an alleged fraud in Germany and does "not suggest that the presence of some foreign element in a transaction necessarily means that Congress did not intend to include it in the coverage of § 10(b)."

*Poseidon Concepts*, 2016 WL 3017395, at *13 (quoting *Parkcentral*, 763 F.3d at 216).

All of the factors that Defendants raise were present in *Poseidon Concepts*. The defendant there was "a reporting issuer in Canada" that "was therefore required to issue and file on the System for Electronic Document Analysis and Retrieval ('SEDAR')." 2016 WL 3017395, at *1. Poseidon also filed for bankruptcy in Canada and there were other "parallel proceedings" there. *Id.* at *2, 5. The court still held that *Parkcentral* did not apply, and rejected defendants' *forum non conveniens* argument, because parallel actions in Canada do "not obviate [U.S.] interests in enforcing securities laws in American courts on behalf of [U.S.] investors." *Id.* at *10, 13.

This action has even greater connection to the U.S. than did the facts in *Poseidon* because this action was filed before the Canadian class action rather than as a "tagalong" action and because iAnthus is headquartered in and operates exclusively in the U.S. (whereas Poseidon's "head administrative offices" were in Canada and it operated across North America). 2016 WL 3017395, at *1; *see* SAC ¶¶ 33, 54, 56, 81-82, 106.[8]

Defendants argue that a decision here "risks conflict with the decisions of Canadian courts." (iAnthus Mem. at 13). That is not a reason to throw out Plaintiff's claims given all of their contacts with the U.S. *See Poseidon Concepts*, 2016 WL 3017395, at *10. This argument also does not provide any basis for favoring one action over the other. Moreover, there are important differences between this action and the Canadian class action. The Canadian action is against only the iAnthus Defendants and not GGP or Adler. (*See* iAnthus Ex. S). That action also differentiates between shareholders that purchased iAnthus stock before and after April 12, 2019. The earlier purchasers must prove that the defendants induced them to hold iAnthus's securities. (*See* iAnthus

---

[8] This action was filed on April 20, 2020. (ECF No. 1). The proposed Canadian class action was not filed until September 27, 2021. (GGP Exs. 34-35 and iAnthus Ex. S). While a different Canadian class action was dated September 21, 2020 (GGP Ex. 25), these actions were "*de facto* consolidat[ed]" and the earlier action was "defunct" because it was "not served within the time period required." (GGP Ex. 34 and GGP Mem. at 13).

27

Ex. S ¶ 1(c)-(d) (defining separate classes based on purchase date) and ¶ 2 (different causes of action for each class)). These differences are crucial because the claim brought on behalf of the earlier purchasers (which the Canadian action appears to bring because of the statute of limitations on the secondary market claim for later purchasers), requires plaintiffs to prove individual reliance, which precludes the ability to bring the entire case as a class action. (*See* Grunfeld Decl., Ex. 2 (*Take-aways from the SCC's [Supreme Court of Canada's] decision in CIBC v. Green*) (explaining that for common law misrepresentation claims, "issues of reliance and damages will have to be determined at individual trials"))). Defendants really are just trying to forum shop so that the claims at issue here will proceed in a much more limited way under Canada's securities laws.

Defendants also argue that Plaintiff's claims conflict with the findings that have already been made "in iAnthus's Canadian restructuring cases." (iAnthus Mem. at 13; GGP Mem. at 15-16). This argument misunderstands Plaintiff's claims. Defendants point to statements from the Canadian proceeding concerning the fairness of iAnthus's restructuring. (iAnthus Mem. at 13-14). These findings are entirely consistent with the Complaint because they focus on iAnthus's financial situation *after* it defaulted on its loans in March 2020. That is a different issue than whether Defendants misrepresented iAnthus's lending agreements going back to May 2018. Those earlier misrepresentations put GGP in such a favorable position that it was able to take advantage of when iAnthus defaulted after GGP failed to provide the last $44 million of its $100 million financing plan. (*See supra* at 21).

Furthermore, the factual findings that the Canadian restructuring court made relate to issues that are no different than the types of factual issues that might arise in a bankruptcy proceeding in the U.S. These factual issues do not implicate foreign laws and do not pose any different concerns than if there were factual findings in a parallel U.S. bankruptcy proceeding.

iAnthus does not cite any cases other than *Parkcentral* itself in support of Defendants' "predominantly foreign" argument. (iAnthus Mem. at 14).[9] But *Parkcentral* held that "[t]he potential for incompatibility between U.S. and foreign law is just one" factor to consider. 763 F.3d at 216-17. Subsequent cases make clear that *Parkcentral* is "cabin[ed]" to its facts. *Atlantica Holdings*, 2015 WL 144165, at *8. The allegations here relate to a company that is based in the U.S. and that went out of its way to market its securities to U.S. investors, which were then, unsurprisingly, purchased by a plaintiff in the U.S. That is precisely the type of scenario that the U.S. securities laws are intended to govern and that Defendants should not be able to evade.

## B.    The Doctrine of *Forum Non Conveniens* Does Not Apply

Defendants raise the same facts from their *Parkcentral* argument to argue that this action should be dismissed under the doctrine of *forum non conveniens*. (iAnthus Mem. at 15-18; GGP Mem. at 14-16). This argument fails for similar reasons. The *forum non conveniens* analysis involves three steps: First, "a court determines the degree of deference properly accorded the plaintiff's choice of forum. [Second], it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Lastly, a court balances 'public interest factors' and 'private interest factors.'" *Poseidon Concepts*, 2016 WL 3017395, at *8.

The court in *Poseidon Concepts* explained that a lead plaintiff's choice of this District as opposed to a foreign country "is entitled to significant deference" for "claims [that] arise under U.S. securities laws," because "[s]ecurities litigation is regularly litigated in New York, which is the nation's financial center. As a result, its bar and courts are well-versed in suits of this nature."

---

[9] GGP's cases are equally irrelevant. (GGP Mem. at 14-16). In *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019), the Court addressed whether *Parkcentral* applies to claims under the Commodities Exchange Act ("CEA"). The case involved derivatives that were traded internationally, the underlying misconduct was "entirely foreign," and the pricing of the futures at issue was four steps removed from the defendants. *Id.* at 106-07. Similarly, *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885 (S.D.N.Y. 2018), dealt with the CEA, "foreign bad acts," and defendants that did not issue the commodities at issue. *Id.* at 918-19. On the other hand, claims against other defendants alleged to have "manipulated the domestic markets in which Plaintiffs traded" were actionable. *Id.* at 920.

2016 WL 3017395, at *9. These same factors support conducting this litigation here.

Defendants' *forum non conveniens* argument also fails because they have not met their burden to "show that the balance of the private and public convenience factors 'tilt[s] **strongly** in favor of the foreign forum.'" 2016 WL 3017395, at *9. The facts here are even more in Plaintiff's favor than they were in *Poseidon Concepts* because the key evidence and witnesses here are located in New York (where iAnthus, Ford, and GGP are based) and iAnthus does business exclusively in the U.S. SAC ¶¶ 33, 54, 56, 81-82, 106. Poseidon, in contrast, "was a Canadian corporation with head administrative offices in Calgary, Alberta," that engaged in business "across North America." 2016 WL 3017395, at *1-2.

Furthermore, and "more importantly, there is a strong interest in having American courts interpret and apply U.S. securities law." *Poseidon Concepts*, 2016 WL 3017395, at *10. Courts regularly hold that this factor by itself requires that securities class actions stay in the U.S. One court recently held that "[a]lthough the majority of the witnesses and evidence are located in Germany, . . . [t]his Court and the public at large have a strong interest in ensuring a domestic means of redress for victims of fraud in the United States securities markets." *Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, at 290 (E.D.N.Y. 2021). The securities in *Mucha* traded "on an OTC market in the [U.S.]" and Volkswagen's "reports containing the alleged material misstatements or omissions were not filed with the SEC." *Id.* at 287. The court held:

> Defendants have availed themselves of the [U.S.] banking system in marketing securities in a foreign market to United States investors. This factor weighs heavily against dismissal. Defendants bear a heavy burden in the *forum non conveniens* analysis. In balancing the factors discussed above, they do not tilt heavily in Defendants' favor. Accordingly, the Defendants' motion to dismiss on *forum non conveniens* grounds is denied." *Id.* at 290-91.

The facts here are exactly the same. iAnthus's stock traded on the U.S. OTC market and iAnthus actively marketed its stock to U.S. investors. (*See supra* at 5-6). The fact that the documents containing the alleged misstatements were not filed with the SEC does not override the

30

strong interest in a U.S. court applying the U.S. securities laws to protect U.S. investors from fraud. *See also In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*, 2017 WL 66281, at *10 (N.D. Cal. Jan. 4, 2017) (rejecting *forum non conveniens* argument where the U.S. "undoubtedly has an interest in protecting domestic investors from fraud[]"); *E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 559, 588 (S.D.N.Y. 2007) (noting "strong interest in having an American court interpret and apply U.S. securities law claims").

The factors that Defendants cite do not provide the type of evidence that is required to show that they are "strongly in favor of the foreign forum," *Poseidon Concepts*, 2016 WL 3017395, at *9, or that they "tilt heavily in Defendants' favor," *Mucha*, 540 F. Supp. 3d at 291. iAnthus argues that "Plaintiff's status as a class plaintiff substantially reduces the deference given to his choice of forum." (iAnthus Mem. at 15). But the cases they cite do not address the interest of U.S. courts resolving claims under the U.S. securities laws that arise out of domestic transactions.[10]

An action that satisfies *Morrison* should not dismissed to a foreign country on *forum non conveniens* grounds because that would prevent plaintiffs from availing themselves of the U.S. securities laws for claims that are domestic under *Morrison*. *See In re Volkswagen*, 2017 WL 66281, at *8 (holding plaintiffs "are entitled to considerable deference to their forum choice" particularly because "the case has sufficient connections to the United States" under *Morrison*); *In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 359 (D. Conn. 2021) (holding that "[c]learly, the United States is the place" to litigate claims under both U.S. *and* Israeli securities laws); *Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 829 (C.D. Cal. 2020) (same as to U.S. and Japanese securities claims).

---

[10] *DeYoung v. Beddome*, 707 F. Supp. 132, 135 (S.D.N.Y. 1989), which iAnthus cites (iAnthus Mem. at 15-17), was decided prior to *Morrison* and involved the merger of two Canadian companies, where all relevant actions took place in Canada and two Canadian government agencies approved the transaction. *Id.* at 134, 138-39. *Lasker v. UBS Sec. LLC*, 614 F. Supp. 2d 345, 358-59 (E.D.N.Y. 2008), has nothing to do with the issues here because it involved the choice between two U.S. states, not a U.S. versus foreign forum, and rejected the *forum non conveniens* argument.

31

Defendants' *form non conveniens* argument, in contrast, relies on pre-*Morrison* cases and non-securities cases that dealt with entirely different causes of action. Defendants tellingly do not cite any cases that satisfied *Morrison* but were dismissed for *forum non conveniens*.

iAnthus also argues that Canada is an "adequate alternative forum." (iAnthus Mem. at 15-16). But the unavailability of the fraud-on-the-market presumption for class members that purchased iAnthus stock before April 12, 2019 makes Canada an inadequate forum. *See Derensis v. Coopers & Lybrand Chartered Accts.*, 930 F. Supp. 1003, 1008 (D.N.J. 1996) (holding "a class action may not be the appropriate method of resolving the dispute" because "Canada does not recognize the fraud-on-the-market theory").[11] Moreover, the question of whether Canada is an "adequate alternative forum" is merely a "threshold issue" that does not support dismissal where the other factors weigh in plaintiff's favor. *See Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, 2002 WL 432390, at *6-7 (S.D.N.Y. Mar. 20, 2002) (holding that "even if Norway were an adequate forum, neither the private nor public interest factors weigh sufficiently towards dismissal").

Next, iAnthus is wrong—and does not cite any legal support for its contention—that proceeding in Canada would be "quicker or less expensive." (iAnthus Mem. at 16). Even if Kalcevich resides in Canada, more—and more important—witnesses and evidence are in New York, where iAnthus, Ford, and GGP are based. SAC ¶¶ 33, 54, 56, 81-82, 106.

Defendants also argue that the case should proceed in Canada because of the parallel Canadian actions. (iAnthus Mem. at 16-17; GGP Mem. at 14-16). But this factor is not significant in the *forum non conveniens* analysis. *See Guidi v. Inter-Cont'l Hotels Corp.*, 224 F.3d 142, 148 (2d Cir. 2000) (explaining that "[t]he existence of related litigation . . . is not listed as a relevant

---

[11] In *In re Royal Grp. Techs. Sec. Litig.*, 2005 WL 3105341, at *2 n.3 (S.D.N.Y. Nov. 21, 2005), which Defendants cite, the plaintiffs did not "cite[] any specific provision of Canadian law that would impede plaintiffs from pursuing this action in Canada." Plaintiff has cited such a provision here regarding the presumption of reliance.

factor in the *forum non conveniens* analysis"); *Ge Dandong v. Pinnacle Perf. Ltd.*, 966 F. Supp. 2d 374, 386 (S.D.N.Y. 2013) (rejecting argument that "parallel actions in Singapore" required dismissal). Other litigation in Canada cannot override all of the connections this action has to the U.S. and it certainly "does not obviate [U.S.] interests in enforcing securities laws in American courts on behalf of [U.S.] investors." *Poseidon Concepts*, 2016 WL 3017395, at *10.

Moreover, the unavailability of the presumption of reliance for a substantial portion of the class in the Canadian action means that Canada is a *less* efficient forum for these claims because they cannot be resolved on a class-wide basis. Even if that legal regime does not render the alternative forum inadequate, it negates Defendants' argument concerning the efficiency of proceeding in Canada. This action was also filed *before* the Canadian action. (*Supra* at 27-28).[12]

The Canadian proceedings relating to iAnthus's restructuring also do not support transferring this action to Canada. As explained above, any factual findings that the court might have made in that action are no different than factual findings of any other court. In addition, the only ongoing proceeding that Defendants cite related to the restructuring is a private dispute between iAnthus and GGP over whether GGP may extend the date for the closing of that transaction. (iAnthus Mem. at 10). These separate proceedings do not raise any special interest in having a Canadian court decide Plaintiff's securities class action based on an earlier set of events. Under Defendants' logic, any time a company is undergoing a restructuring in a foreign court, a U.S. securities class action would not be permitted to proceed. That is plainly not the law. *Guidi*,

---

[12] The cases that Defendants cite dealt with situations that had little connection to the U.S. (*See* iAnthus Mem. at 17 (citing *Murray v. Brit. Broad. Corp.*, 81 F.3d 287, 293 (2d Cir. 1996) (holding "[w]e are, quite frankly, at a loss to see how this lawsuit has any but the most attenuated American connection" and "[t]he crux of the matter . . . involves a dispute between British citizens over events that took place exclusively in the United Kingdom") and *Bohn v. Bartels*, 620 F. Supp. 2d 418, 433 (S.D.N.Y. 2007) (addressing "personal injury accident that occurred in Portugal between two residents of Portugal")).

33

224 F.3d at 148; *Poseidon Concepts*, 2016 WL 3017395, at \*10.[13]

Defendants also mischaracterize the role of Canadian law here. GGP devotes a great deal of attention to the nature of the Required Disclosure form under Canadian securities law. (GGP Mem. at 7-9, 15-18). Plaintiff's claims, however, are not based on the technical requirements of Canadian law, but rather, on whether the statements that Defendants made in plain English are false and misleading under Section 10(b). *See* SAC ¶¶ 272-80 (explaining why statements in GGP's Required Disclosures were false and misleading). While iAnthus cites to two paragraphs of the 368-paragraph Complaint referencing disclosure duties under Canadian securities law (iAnthus Mem. at 17 n.2), the Court does not need to address that issue at all because Plaintiff's claims are focused on how Defendants made materially false and misleading statements based on the plain meaning of what they said.[14] (*See infra* at 54 n.24). The Canadian securities class action is similarly based on claims alleging statements "containing misrepresentations." (iAnthus Ex. S ¶ 2). GGP and Adler are not even defendants in the Canadian action (*see* iAnthus Ex. S), which means that Plaintiff's claims related to statements that the GGP Defendants made in their Required Disclosures will not be addressed at all—much less in a more efficient way—in that matter.[15]

---

[13] The cases that Defendants cite (iAnthus Mem. at 17) dealt with situations that had much deeper connections to the foreign forum and did not involve class actions under Section 10(b). *See First Union Nat. Bank v. Paribas*, 135 F. Supp. 2d 443, 445, 454 (S.D.N.Y. 2001) (addressing massive fraud perpetrated in London, including on plaintiff's London branch, that was under investigation by the London police and "resulted in a number of arrests," where most of the evidence was located in London, and any connection to the U.S. was "utterly tangential"); *see also supra* at 31 n.10 (discussing *DeYoung*).

[14] While addressing foreign law is not necessary in this action, even if a narrow issue of foreign law arises, that does not support dismissal of the entire action. *See In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 301 (E.D.N.Y. 2002) (rejecting *forum non conveniens* argument because "for the most part, [U.S.] securities law [applies], not Canadian tax law" apply and "[t]o the extent [the] Court will be asked to interpret Canadian law, . . . it does not create an issue of great concern."); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 636 (S.D.N.Y. 2017) ("in determining an issue of foreign law, courts 'may consider any relevant material or source'" (quoting Fed. R. Civ. P. 44.1)).

[15] The cases that GGP cites do not support dismissal here. (*See* GGP Mem. at 15-16 (citing *United Bank for Afr. PLC v. Coker*, 2003 WL 22741575, at \*3 (S.D.N.Y. Nov. 18, 2003) (addressing libel claim and holding that courts accord "great weight to the first filed suit"—Plaintiff's action here—and that "most, if not all" of the evidence was in Nigeria) and *Bybee v. Oper der Standt Bonn*, 899 F. Supp. 1217, 1223-24 (S.D.N.Y. 1995) (addressing breach of contract and

34

In sum, this securities class action relates to domestic purchases by a U.S. plaintiff of iAnthus stock that the Company marketed to U.S. investors through the U.S. OTC market, which was the primary market for trading in iAnthus stock. In addition, iAnthus operated exclusively in the U.S. and the key Defendants are based in the U.S. There is an exceedingly strong interest here in U.S. investors receiving the protection of the U.S. securities laws in a U.S. court.

## C.    The Complaint Adequately Pleads False and Misleading Statements

The elements of a claim brought under Section 10(b) and Rule 10b-5 include 1 – a material misrepresentation or omission by the defendant, 2 – in connection with the purchase or sale of a security, 3 – scienter, 4 – reliance, and 5 – economic loss and loss causation. *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016). In addition to prohibiting statements that are outright false, Section 10(b) prohibits "half-truths, or statements that are misleading by omission." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016).

Even under the pleading standards of Rule 9(b) and the PSLRA, "we do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Instead, a plaintiff must specify the fraudulent statements or omissions, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 463 (2d Cir. 2008).

The Complaint alleges that Defendants made false and misleading statements concerning 1 – conflicts of interest; 2 – their descriptions of iAnthus's debt; 3 – the availability of financing; 4 – the obligation to put funds in an escrow account; and 5 – affirmations of full disclosure. Defendants' arguments to the contrary misinterpret the applicable law and ask the Court to ignore

_____

tort claims arising out of "German language contract requiring performance in Germany and payment in German currency," involving "a significant [German] cultural institution," where German law likely governed entire dispute)).

35

the plausible inferences that logically follow from the specific allegations in the Complaint.

1.  The iAnthus Defendants' Materially False and Misleading Statements About Conflicts of Interest

Throughout the Class Period, iAnthus told investors that it disclosed all related party transactions and that its executive officers and directors did not have "any material interests" in any transaction "that has materially affected or is reasonably expected to materially affect the Company." SAC ¶¶ 175-76, 182-83, 191, 193, 209-10, 219-20, 228, 250 (Related Party Transactions); SAC ¶¶ 211-13 (statements about material interests). iAnthus also described its relationship with GGP as "Arm's length." ¶ 158. (*Supra* at 13-14)

These are outright false statements because Ford's receipt of hundreds of thousands of dollars in connection with iAnthus's financing was exactly the type of "related party transaction" or "material interest" that iAnthus told investors did not exist. (*See supra* at 7-11). Ford's payments also meant that iAnthus did not have an "Arm's length" relationship with GGP. These disclosures also misleadingly described specific related-party transactions Ford engaged in while omitting his related-party transactions with Adler and Rozinov.

The law is clear that defendants may not make statements about conflicts of interest that contradict or fail to disclose conflicts that existed at the time. *See In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *7, 18 (E.D.N.Y. May 20, 2020) (holding complaint adequately alleged misstatements related to "Vale's third-party dam safety auditor having a conflict of interest as early as 2018"); *Tobia v. United Grp. of Cos., Inc.*, 2016 WL 5417824, at *11 (N.D.N.Y. Sept. 22, 2016) (holding that "while the 2011 Form ADV disclosed that the PageOne Defendants might have conflicts of interest because they received certain compensation and fees for recommending investments, Plaintiffs plausibly allege that it did not reveal the true nature and extent of their conflict"); *Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, 2019 WL 2521834, at *3 (D. Colo.

36

June 18, 2019) (holding plaintiffs adequately alleged "defendants gave misleading information regarding the loans" by failing to disclose that the recipients "were related parties").

iAnthus also made misstatements touting the Company's corporate governance practices. On October 17, 2019, when the Company discussed its "Emphasis on Corporate Governance and Oversight," Ford emphasized iAnthus's "best-in-class Board in Cannabis," highlighting that "[n]o one told us to do this. . . . But it's the right way to comport yourself, when you've been entrusted with capital from public investors." SAC ¶¶ 269-70. The Supreme Court recently held that district courts "must take into account all record evidence" concerning the significance of statements about its integrity and conflict-of-interest policies when assessing price impact at class certification. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021). By assigning the assessment of the significance of these statements to a fact-specific inquiry that requires the application of expert testimony in the context of class certification, the Court acknowledged that these types of statements are actionable at the pleading stage. *Id.* at 1960.

As the district court held earlier in that case, a defendant cannot "pass off its repeated assertions that it complies with the . . . law, values its reputation, and is able to address 'potential' conflicts of interest as mere puffery." *Richman v. Goldman Sachs Grp.*, 868 F. Supp. 2d 261, 277 n.6, 279-80 (S.D.N.Y. 2012); *see also In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 464 (S.D.N.Y. 2017) (holding "repeated references to its ethics and integrity" were actionable); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 375, 380-81 (S.D.N.Y. 2015) (holding statements about "integrity" of management and adequacy of internal controls were actionable where "management was well aware of the extensive corruption"). Investors would understand from iAnthus's portrayal of exemplary corporate governance practices, that Ford was not taking secret personal payments in connection with the Company's $156 million in debt.

37

Defendants' main response is to focus on the timing of Ford's improper payments. They argue incorrectly that Ford's loans "took place *after* all of the Amended Complaint's alleged misstatements." (iAnthus Mem. at 20 (emphasis in original)). Defendants base this contention on the Special Committee's finding that Adler's loan "was entered into on December 21, 2019, after all rounds of financing from Gotham." (iAnthus Mem. at 19). But the Special Committee also determined that Ford took a separate $60,000 loan from an individual that the Company chose not to name. Defendants assert that "Plaintiff does not specify the timing or terms of" this loan. (iAnthus Mem. at 22). In fact, the Complaint pleads specifically, based on multiple sources, that this additional payment was from Rozinov in connection with iAnthus's $60 million in unsecured debt that he brokered. (*See supra* at 9-10). The GGP Defendants even admit that this $60,000 was "from a broker who was involved with the Hi-Med/Oasis financing." (GGP Mem. at 10 n.7).

The Court should not ignore the common-sense inference from the facts alleged because "[a]lthough pleading standards are heightened for securities fraud claims, we must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021). Moreover, iAnthus reported the Special Committee's findings regarding this $60,000 loan and chose not to disclose further details about it. SAC ¶¶ 96, 101. Defendants may not benefit from iAnthus's inadequate disclosure of this information. *See Livingston v. Shore Slurry Seal*, 98 F. Supp. 2d 594, 597-98 (D.N.J. 2000) (holding courts "should not require plaintiffs to plead issues that may have been concealed by the defendants").

This evidence related to Rozinov eviscerates Defendants' timing argument as to all of their statements about conflicts that they made after iAnthus entered into its first agreement that Rozinov brokered in March 2019. Moreover, Defendants made their last statements about related party transactions on November 20, 2019, in connection with iAnthus's financial results for the

38

third quarter of 2019. SAC ¶ 250; *see also* SAC ¶ 175, 269-70. The Complaint plausibly alleges that Ford's $60,000 payment from Rozinov took place before these statements were made just several months prior to the March 31, 2020 *Stockhouse* report and subsequent Special Committee investigation.

Defendants other passing arguments, including that Rozinov was not a related party and that his payments to Ford are not material (iAnthus Mem. at 22), cannot be taken seriously because Rozinov was the broker for iAnthus's $60 million of unsecured debt and engaged in other transactions with the Company. (*See supra* at 9); *In re Montage Tech. Grp. Ltd. Sec. Litig*., 78 F. Supp. 3d 1215, 1225 (N.D. Cal. 2015) (holding plaintiffs allege sufficient "facts giving rise to the plausibility of a continued close relationship" to qualify as a "related party"). A "complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). The Complaint plausibly pleads that investors would consider Defendants' statements about related party transactions, conflicts of interest, and corporate governance practices materially false and misleading in light of Rozinov's secret payments to Ford. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (holding complaint adequately alleged "LendingClub's failure to disclose its relationship with Cirrix . . . was material" and that "setting aside the relatedness . . . , investors would also have been interested to know that millions of dollars of loans . . . were inflated artificially through self-dealing").

Moreover, Defendants improperly dismiss the other allegations in the *Stockhouse* report, including that the $100,000 payment that the Special Committee found was just the most recent in a series of payments that Adler made to Ford, and that Rozinov gave Ford not just $60,000, but

$300,000. ¶104. Defendants tar this as "conclusory" based on "an anonymous website report" and seek cover in the Special Committee's vague conclusions (iAnthus Mem. at 19, 21). But the *Stockhouse* allegations are far more substantial than Defendants recognize because the Special Committee corroborated key parts of the *Stockhouse* report based only on what the Committee was able to "substantiate" through documentary evidence that it was able to obtain in its brief investigation. (*See supra* at 10-11).

Mark Dowley's abrupt resignation from iAnthus's Board further calls the completeness of the Committee's investigation into question. (*Id.*). Ford's self-dealing is also consistent with CW 1's observation that Ford and Adler were "good friends" who met regularly for dinner. SAC ¶¶ 106-07.

All of this corroboration bolsters the credibility of the *Stockhouse* report. *See Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (holding other sources "tend to corroborate the findings of . . . unnamed 'investigators'"); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1235-36 (N.D. Ga. 2019) (holding "[n]ews articles, which frequently rely upon unnamed sources" are reliable); *In re LendingClub*, 254 F. Supp. 3d at 1118 (allegation "that 'at least one news report indicate[d]' that" CEO had relationship . . . that "'predated the IPO,' (without identifying the source of that report)," along with CEO's "willingness to engage in self-dealing," supported inference that parties could "'significantly influence' each other").

All of these allegations strongly support the inference that Ford took personal payments from Adler and Rozinov throughout the Class Period, and certainly before the iAnthus Defendants made their last statements about related party transactions, conflicts of interest, and corporate governance practices in October and November 2019. These allegations meet Plaintiff's burden to plead specific information supporting a plausible inference that Ford received payments in

connection with iAnthus's $156 million in debt during the Class Period. Defendants' contrary interpretation strains credulity and "conflate[s] pleading and proof." *McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 125 (S.D.N.Y. 2013); *see also JinkoSolar*, 761 F.3d at 249 (describing requirement to draw reasonable inferences in plaintiff's favor). Moreover, plaintiffs in securities fraud class actions are not required to plead "the exact date and time" of the fraud. *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000); *see also In re ITT Educ. Servs. Sec. Litig.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014) (holding the court need not "identify the precise moment at which the culpable inference overtook the innocent one"); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. Mar. 28, 2005) (plaintiffs need only "supply some factual basis . . . that the statements were false at some point during the time period alleged").[16]

Lastly, iAnthus argues that it timely disclosed Ford's self-dealing because the Special Committee announced its findings within four months of Ford's December 21, 2019 loan from Adler. (iAnthus Mem. at 21). This argument fails because iAnthus cannot extricate itself from Ford's misconduct. As iAnthus's CEO who made many of the statements at issue, Ford's culpability the moment that he engaged in self-dealing is attributable to the Company.

### 2.    Materially False and Misleading Descriptions of iAnthus's Debt

The iAnthus Defendants described in detail iAnthus's $156 million in debt that it raised during the Class Period, including its $40 million from GGP on May 14, 2018 along with the additional $10 million that GGP supposedly invested in the Company's equity; $20 million from GGP on September 30, 2019; $36.15 million from GGP on December 20, 2019; and iAnthus's $60

---

[16] The cases that Defendants cite, in contrast, dealt with plaintiffs that had no basis for their allegations. (*See* iAnthus Mem. at 21-22 (citing *IBEW Loc. 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*, 2012 WL 928402, at *13 (D. Vt. Mar. 19, 2012) (describing entirely "unsupported speculation"); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008) (complaint did "not specify what defendants did [or] who they did it with"); *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 219 (S.D.N.Y. 2020) (witnesses did not have the relevant knowledge)).

million from other lenders that it raised on March 18, 2019 and May 2, 2019. (*See supra* at 14-15). The iAnthus Defendants made these statements in Material Change Reports for each round of financing, SAC ¶¶ 165-67, 198-200, 241-246, 265-67; press releases, SAC ¶¶ 153, 196, 262-63; and quarterly and annual financial reports and conference calls, SAC ¶¶ 171, 179, 190, 205-06, 234, 252, 257. iAnthus described GGP's role in this financing as crucial to the Company's success. SAC ¶¶ 151-52; SAC ¶¶ 229-30 (describing GGP as "a leading financial investor in the U.S. cannabis sector" and making iAnthus "fully fund[ed]"); SAC ¶ 234 (GGP has "been a meaningful partner in our operating success to date"); SAC ¶¶ 262-63. And iAnthus described its unsecured debt as allowing the Company to "strengthen our balance sheet, deepen our investor base, and fund our growth capital." SAC ¶ 196.

a)    **Descriptions of iAnthus's Debt Were Materially False and Misleading Because of Ford's Self-Dealing**

Once defendants choose to speak about a topic, they have "a duty to tell the whole truth," including "to be both accurate and complete." *JinkoSolar*, 761 F.3d at 250. For this reason, when a company puts the "cause of its financial success at issue," its failure to disclose misconduct related to that performance is actionable. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005). This is especially true when the underlying misconduct involves self-dealing or similarly corrupt behavior. *See In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *9 (S.D.N.Y. Mar. 28, 2019) (holding plaintiffs adequately alleged defendant "it profited from positions taken by this market maker directly against those of FXCM's customers"); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442-44 (S.D.N.Y. 2018) (holding descriptions of company's success were actionable "because they suggested that CNO's successes were the result of legitimate factors" rather than bribery ); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 476 (S.D.N.Y. 2006) (statements were actionable based

42

on failure to disclose that defendant acted to maximize revenues through kickback scheme "rather than to serve the clients' best interests"); *LendingClub*, 254 F. Supp. 3d at 1118.

That is precisely what iAnthus did here. The iAnthus Defendants' descriptions of its debt omitted Ford's self-dealing in connection with those transactions. (*See supra* at 7-11 and 14-15). Defendants went beyond just describing the terms of the financing, which itself was misleading. They further put the nature of iAnthus's relationship with its lenders at issue by describing the crucial role that GGP played in supporting iAnthus and the importance of the unsecured debt to iAnthus's operations. (*See supra* at 14-15). Ford's secret payments that he received in connection with these transactions makes Defendants' descriptions of them misleading because reasonable investors would assume that iAnthus's CEO was not receiving undisclosed personal payments in connection with the Company's crucial financing. SAC ¶¶ 57, 77-85.

The iAnthus Defendants' timing arguments are particularly misplaced for these statements because iAnthus described its last round of financing with GGP on December 20 and 30, 2019. SAC ¶¶ 261-68. Even according to Defendants, these statements were made contemporaneously with and after Ford's December 21, 2019 $100,000 payment from Adler. (*See supra* at 8-9).

### b)    Descriptions of iAnthus's GGP Loans Were Materially False and Misleading Because of the Exit Fee

The iAnthus Defendants' description of the GGP debt was also false and misleading for the independent reason that these statements falsely characterized GGP as making a $10 million equity investment in iAnthus even though GGP's secret Exit Fee fundamentally altered the nature of GGP's funding. (*See supra* at 11-13, 15). iAnthus and Ford falsely described GGP's investment as "a big equity play for them, it's structured as a senior secured piece of debt, but they're not in [it] for the lending returns." SAC ¶ 257. They also explicitly described GGP's May 14, 2018 financing as including "$10 million of *equity*" and described GGP's "$50 million investment a

43

year ago." SAC ¶¶ 179-80, 234; *see also* SAC ¶ 166. And Defendants further misled investors by stating that GGP waived its right to a quarterly interest payment on September 30, 2019 without disclosing that this triggered the accrual of 13% interest under the Exit Fee. SAC ¶¶ 245-46, 252-53; (*see supra* at 12-13).

The law is clear that it is misleading to omit a key term that fundamentally alters the nature of the transaction being described. *See In re Citigroup Inc. Sec. Litig*., 753 F. Supp. 2d 206, 240 (S.D.N.Y. 2010) (disclosure of $43 billion CDO liability was misleading because it failed to disclose additional $10.5 billion in indirect exposure). This rule applies in particular when defendants falsely describe another party as taking an equity stake in a transaction. *See S.E.C. v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 161-62 (S.D.N.Y. 2011) (holding that after affirmatively representing Paulson as "a long equity investor"—"in order 'to be both accurate and complete[,]'" Defendants "had a duty to disclose Paulson had a different investment interest—that it was short"); *In re Glob. Brokerage*, 2019 WL 1428395, at *9 ("FXCM allegedly provided benefits to Effex that were not reported"). Defendants' description of GGP's $50 million financing in May 2018 was false and misleading because the $10 million piece that they described as an "equity" investment was actually protected entirely by the secret Exit Fee. Defendants' descriptions of GGP making an "equity" investment were particularly inaccurate because "[t]he distinction between investor and creditor is significant . . . . Permitting an equity investor to assume the position of a creditor, who relies on the existence of a corporation's assets in bankruptcy proceedings, would permit the investor to avoid the risks that come with investment, such as the risk of loss of assets." *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 1997 WL 317365, at *3 (S.D.N.Y. June 12, 1997).[17] That is exactly what iAnthus secretly permitted GGP to do here.

---

[17] How investors would understand Defendants' "equity" label for this part of GGP's financing in light of GGP's Exit Fee is, at the very least, a factual issue that cannot be decided at this stage. *See City of Warren Police & Fire Ret. Sys.*

Defendants respond that the Exit Fee was not material because it was contingent on future events, "iAnthus believed that it was more likely than not that GGP would exercise the conversion option on the Secured Notes," and iAnthus vaguely referenced a "Fee Letter" without describing its contents until after the Class Period. (*See* iAnthus Mem. at 23-24; GGP Mem. at 25-26). These arguments ask the Court to draw implausible inferences based on extraneous facts that cannot be considered, or decided in Defendants' favor, at this stage. (*See supra* at 19-20, 22).

Moreover, none of Defendants' factual arguments make their misstatements about the Exit Fee "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162; *Qihoo*, 19 F.4th at 151 (same). *First*, the Exit Fee was not an obscure contractual provision, but rather, equaled 25% of GGP's initial $40 million loan. Even in the context of their total relationship after GGP's subsequent loans, Defendants acknowledge that the Exit Fee "represented about 10% of GGP's investment in iAnthus and about 6% of iAnthus's total debt." (GGP Mem. at 26; *id.* at 20 n.12). The fee is therefore material based purely on its size. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011) (holding there is a "presumptive 5% threshold of materiality").

*Second*, the Exit Fee is material because of the qualitative way that it altered the fundamental nature of iAnthus's relationship with GGP. *See id.* at 718-19 (holding qualitative factors made investment material even though it fell "below the presumptive 5% threshold"). The Exit Fee was not just part of GGP's loan to iAnthus, but also corresponded to—and removed the risk from—GGP's supposed $10 million equity investment. Investors would certainly want to know that GGP's interests were not aligned with theirs in the way that Defendants represented.

---

*v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (holding definition of contract "renewal" is a factual issue); *DoubleLine Cap.*, 413 F. Supp. 3d 187, 210 (S.D.N.Y. 2019) (holding term "political risk" is a factual issue); *In re Refco Inc. Sec. Litig.*, 2010 WL 11500542, at *8 (S.D.N.Y. Oct. 22, 2010) (same as to "prime broker"), *report and recommendation adopted,* 2011 WL 6097724 (S.D.N.Y. Dec. 7, 2011).

That is why "[t]he distinction between investor and creditor is significant" as a matter of law. *ABF Cap. Mgmt.*, 1997 WL 317365, at *3. Indeed, analysts viewed GGP's equity investment as significant to their evaluation of iAnthus's financial health because it protected shareholders from GGP enforcing its security interest in iAnthus's assets.  SAC ¶ 85; *see also* SAC ¶¶ 81-84. Defendants were sensitive to that risk when they told investors that iAnthus was "a big equity play for [GGP], it's structured as a senior secured piece of debt, but they're not in [it] for the lending returns." SAC ¶ 257. *Third*, Defendants do not address the fact that Exit Fee started to accrue interest in September 2019. SAC ¶¶ 63 n.3, 245-46, 252-53, 279-80; (*see supra* at 12-13).

The fact that the Exit Fee was contingent on future events does not make it immaterial because the test for materiality specifically accounts for the significance of "contingent or speculative information or events." *Basic*, 485 U.S. at 238. Courts regularly hold that statements misrepresenting the risk of future events are actionable. *See JinkoSolar*, 761 F.3d at 251 (holding omitted information would "substantially affect a reasonable investor's calculations of probability" and cause investors "to make an overly optimistic assessment of the risk"); *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *11-13 (S.D.N.Y. Sept. 27, 2020) (holding defendants omitted "presently-existing risk" of regulation based on non-compliance).[18]

The iAnthus Defendants also disingenuously argue that they "ultimately disclosed this fee" (iAnthus Mem. at 24), even though they did not disclose the fee until *after the Class Period*. SAC ¶ 63; (*see supra* at 12). Similarly, Defendants' argument that "the exit fee was never paid" ignores

---

[18] The cases that Defendants cite merely stand for the uncontroversial proposition that there is no duty to disclose information that does not render any affirmative statements misleading. (*See* iAnthus Mem. at 23 (citing *Pehlivanian v. China Gerui Advanced Materials Grp.*, 2016 WL 2859622, at *9-10 (S.D.N.Y. May 16, 2016) (holding plaintiff did not explain "how these alleged omissions rendered any of Defendants' prior statements false or misleading") and *In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1258 (D.N.M. 2010) (holding provision was "commonplace," where plaintiffs did not allege that omission rendered other statements misleading)). Similarly, *Boluka Garment Co., Ltd. v. Canaan Inc.*, 2021 WL 2853284, at *6 (S.D.N.Y. July 8, 2021) (GGP Mem. at 25-26), dealt with a "non-binding" agreement. The Exit Fee was a binding part of GGP's loan.

the obvious fact that GGP did not waive the fee as an act of charity, but rather as part of an overall settlement of iAnthus's debts in the course of restructuring. (iAnthus Mem. at 24; *supra* at 19).[19]

Defendants also misunderstand why the Exit Fee made their statements false and misleading. There is nothing contingent about the existence of the Exit Fee, which was part of iAnthus and GGP's May 14, 2018 loan on the first day of the Class Period. Plaintiff does not argue that Defendants should have disclosed the risk that iAnthus might trigger the Exit Fee, but rather, that they misrepresented the nature of their agreements by concealing the Exit Fee itself and that it started to accrue interest in September 2019. If Defendants had told investors about that historical information, investors could have assessed the risk of GGP's financing for themselves.[20]

c)      *The GGP Defendants' Statements in Press Releases About GGP's Loans Were Materially False and Misleading*

The iAnthus Defendants made all of the statements described above in this Section. GGP and Adler made similarly false and misleading statements describing GGP's financings. These representations include Adler's statements in the press releases announcing GGP's financings promoting GGP's investments in iAnthus. SAC ¶ 155 (stating that iAnthus provides "a compelling growth and investment opportunity"), SAC ¶ 231 (stating "[w]e have viewed iAnthus as a key partner since our initial investment in May 2018" and "do not believe" iAnthus's recent progress "is reflected in the Company's current trading price").

These statements are false and misleading for the same reasons as the other statements described above and are described separately here for ease of reference to each set of Defendants.

---

[19] Defendants also argue that the Exit Fee was not material because the Company warned about "the difficulty of obtaining financing in the cannabis market." (iAnthus Mem. at 24). This general statement did not disclose anything about the Exit Fee. Moreover, this *increases* the fee's materiality because it highlights the importance to investors of the financing that Defendants misrepresented.

[20] *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144 (S.D.N.Y. 2015), which Defendants cite, is therefore irrelevant. (iAnthus Mem. at 22). The *Lipow* defendants were not required to disclose the risk that their contract might be invalidated in the future, but they did not hide any of the contract's key provisions. 131 F. Supp. 3d at 170.

47

A reasonable investor would interpret GGP's statements touting its investments in, and partnership with, iAnthus to mean that Adler was not making undisclosed payments to Ford and that iAnthus did not give GGP a secret $10 million Exit Fee that protected its equity investment.

GGP responds by repeating the same flawed arguments discussed above concerning the timing and materiality of Defendants' misconduct. (GGP Mem. at 21-26). These arguments fail for the reasons described above. (*Supra* at 38-47).

> 3.     The iAnthus Defendants' Materially False and Misleading Statements About the Availability of Financing

The iAnthus Defendants misrepresented the Company's access to financing in several ways. (*See supra* at 15-16). They falsely reassured investors that the Company had adequate access to financing based on a $100 million financing plan that the Company entered into with GGP in September 2019. Ford told investors when announcing this $100 million financing plan that the plan was "certain" and "[w]e have no financing concerns." SAC ¶¶ 233-35. Then, on November 21, 2019, Ford assured investors that he had "full confidence" in GGP's providing the full $100 million, and he did not "lose any sleep about the availability of money from Gotham," based on his "personal" relationship with GGP. SAC ¶ 256. Kalcevich also assured that GGP would allow iAnthus to access other types of financing because "we're a big equity play for them."

iAnthus also highlighted, in each of its financial reports during the Class Period, its prior financing from GGP and its unsecured lenders as examples of how iAnthus "has historically had, and continues to have, access to equity and debt financing." SAC ¶¶ 172, 180, 189-90, 207, 218, 250. And Ford told investors that iAnthus was "disciplined" in raising capital because they were acting as "stewards of the capital" for public shareholders. SAC ¶¶ 194, 215, 225, 258.

These statements were misleading because they put the source of iAnthus's ability to obtain financing "at issue," but failed to disclose that the historical sources that supported these

48

statements—iAnthus's prior loans from GGP and its other lenders—were tainted by Ford's self-dealing and GGP's secret Exit Fee. *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*6 (S.D.N.Y. Mar. 28, 2018) (holding "statements *explaining* income '**put the sources of [Mylan's] revenue at issue'**" and therefore "may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal" practices (emphasis in original)); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677–78 (S.D.N.Y. 1990) (statements "extolling Par's ability to obtain FDA approvals" and "projecting continued success in obtaining rapid approvals" were misleading because company obtained prior approvals through bribery).

Defendants are therefore wrong that their statements about prior financing were "simply true statements." (iAnthus Mem. at 26). Investors would assume from these statements promoting GGP's $100 million financing plan, iAnthus's ability to obtain financing based on its prior financing, Ford's "personal" relationship with GGP, and iAnthus's "disciplined" approach to being "stewards" of shareholders' capital, that Ford was not receiving large payments in connection with iAnthus's $156 million in financing and that GGP did not receive a secret Exit Fee.

Defendants also argue that their statements about iAnthus's availability of financing are inactionable "fraud by hindsight," puffery, forward-looking statements, and statements of opinion. (iAnthus Mem. at 25-27; GGP Mem. at 21-26). These arguments mischaracterize Plaintiff's allegations as "fraud by hindsight" based on Defendants' flawed timing arguments described above. (*See supra* at 38-47). Moreover, Plaintiff does not allege that Defendants' statements were false based on future events, but rather, that the Exit Fee and Ford's improper payments rendered Defendants' *subsequent* statements about the availability of financing false and misleading.

In addition, Defendants' statements about the availability of financing are not puffery because "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it

49

is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381; *see also Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) (holding statements were not puffery because they provided "a completely misleading description of" events). Defendants' statements are actionable because they stated that they had "full confidence" and "certain[ty]" about GGP fulfilling its $100 million financing plan, based other statements about the availability of financing on the historical facts of iAnthus's past financing, and described the Company's "disciplined" approach to financing. *See City of Brockton Ret. Sys. v. Avon Prod., Inc.*, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) (holding reasonable investor might rely upon defendant's "statements as a guarantee that" internal controls were implemented); *DoubleLine Cap.*, 323 F. Supp. 3d at 443 (holding statements are not puffery when "they are worded as guarantees or are supported by specific statements of fact"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 185 (S.D.N.Y. 2010) (statements about defendant's "disciplined" approach to lending were actionable); *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2557980, at *3 (S.D. Cal. May 23, 2017) (statements describing defendant "as a 'careful, prudent institution'" were actionable based on allegation that the bank "had a 'troubled identity that'" relied on "unlawful conduct"). Defendants' statements about iAnthus's ability to obtain financing gave investors the false impression based on Defendants' expressions of certainty and reliance on past conduct. Indeed, these statements were particularly important to investment analysts, who took comfort in GGP's involvement with iAnthus and in the Company's confidence in the availability of financing. SAC ¶¶ 81-85, 91-92.[21]

---

[21] The cases that Defendants cite dealt with statements that did not provide the level of assurance that Defendants provided here as to a specific, crucial business need, based on historical facts, and also held that other statements were actionable. (*See* iAnthus Mem. at 25-26 (citing *Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *13-14, 17 (S.D.N.Y. June 17, 2020) (holding statements that concealed an FDA warning letter ***were actionable***, because even if defendants did not have an "affirmative obligation" to disclose all material information, once they "cho[se] to speak," they "had a duty to be both accurate and complete"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79-80, 87 (S.D.N.Y. 2017) (holding statements describing "commitment to safety" ***were actionable***, while statements that dividend policy was a "priority" were not alleged to be false and other statements were plainly forward-looking); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d

50

In addition, a company's "specific statements" about matters that are "central to its financial condition" are actionable. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d at 463; *In re Glob. Brokerage*, 2019 WL 1428395, at \*9 (statements in which "FXCM portrayed its agency-trading model as 'fundamental to [its] core business philosophy'" were actionable); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (holding integrity "was at the heart" of defendant's business). iAnthus's ability to obtain financing was crucial to iAnthus's business, as Defendants acknowledge in their motions. SAC ¶¶ 57, 77-85, 81-85, 91-92; (*see supra* at 6).

Moreover, even if Defendants couched certain of these statements as supporting the ability to obtain future financing, statements can have both a forward-looking and an historical component. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (holding "safe-harbor provision does not protect . . . present representations . . . embedded within statements that Vivendi deems forward-looking"). Defendants' statements about iAnthus's historical financing and Ford's "personal" relationship with GGP were false and misleading because they did not tell investors about Ford's self-dealing in connection with those transactions or GGP's Exit Fee.

Defendants also did not warn about the specific risks at issue with iAnthus's ability to obtain financing. They argue that iAnthus cautioned that financiers "have approached the cannabis industry cautiously to date" and "there is neither a broader nor deep pool of institutional capital" available. (iAnthus Mem. at 26). This does not change the false impression that iAnthus gave about the availability of financing because it did not warn of the specific risk that iAnthus's executives might be engaged in self-dealing and or that its financing transactions might contain secret side agreements that alter the nature of these transactions. *See Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holds., Inc.*, 422 F. Supp. 3d 821, 847 (S.D.N.Y. 2019) (defendants did not

---

187, 205-206 (2d Cir. 2009) (addressing general statements about "focus on financial discipline" and "highly disciplined" risk management—not firm statements about the availability of a crucial resource)).

warn about "specific risks associated with" underinvestment in theaters).

Similarly, even if Defendants characterized certain statements about iAnthus's ability to obtain financing as opinions (*see* iAnthus Mem. at 26-27), they are actionable under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175 (2015), for the independent reasons that they 1 - contained embedded false statements fact concerning the Company's prior financing and 2 – would mislead a reasonable investor based on the omission of Ford's self-dealing and GGP's Exit Fee. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at \*17 (S.D.N.Y. Nov. 18, 2019) (holding statements of belief are actionable where "(1) the speaker did not hold the belief she professed, (2) the supporting fact[s] she supplied were untrue, or (3) the stated opinion, though sincerely held and otherwise true as a matter of fact, omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor" (quoting *Omnicare,* 575 U.S. at 194 and *Tongue v. Sanofi,* 816 F.3d 199 (2d Cir. 2016)).

4.    Defendants' Escrow Statements Were Materially False and Misleading

iAnthus's September 30, 2019 loan from GGP required iAnthus to place $5.27 million in an escrow account to ensure that the funds would be available to pay the Company's interest obligations to GGP. SAC ¶¶ 237-40. iAnthus disclosed this contractual provision and represented that the Company was in compliance with it. SAC ¶ 251. These statements were false because the escrow funds were not available when iAnthus defaulted on its debt to GGP. SAC ¶ 159.

Defendants only response is to misdirect attention to iAnthus's disclosure of the release of the escrow funds from iAnthus's *prior* agreement with GGP. (iAnthus Mem. at 27-28). The SAC acknowledges that this was disclosed. SAC ¶¶ 134-35. iAnthus's financial results for the third quarter of 2019, however, state only that the "restricted cash in escrow as part of the Tranche **One** Secured Notes . . . was fully released." (iAnthus Ex. G  at 16). This document defines the "Tranche One Secured Notes" as the notes from the May 14, 2018 agreement. The next page of the document

makes clear that the notes from iAnthus's September 30, 2019 loan are the Tranche **Two** Secured Notes.[22] The SAC specifies that Defendants' misstatements concerning the escrow funds relate to this second set of secured notes. SAC ¶¶ 239-40, 251.[23] iAnthus appears to dispute whether its September 30, 2019 loan agreement with GGP created an additional escrow obligation. (iAnthus Mem. at 27). But the plain wording of that agreement, which iAnthus clearly described as covering a separate tranche of secured notes, sets out iAnthus's escrow obligation. SAC ¶¶ 157-59.

 5. <u>Defendants' Assurances of Full Disclosure Were False and Misleading</u>

 a) ***The iAnthus Defendants' Statements of Full Disclosure***

Ford and Kalcevich signed certifications for iAnthus's periodic reporting during the Class Period, including that they "do not contain any untrue statement of a material fact or omit to state a material fact required . . . to make a statement not misleading" and that they "***fairly present in all material respects the financial condition, financial performance and cash flows of the issuer***." SAC ¶¶ 170, 178, 188, 204, 217, 227, 248. iAnthus also confirmed that it gave a "Full Description of Material Change" in its Material Change Reports describing its loans and that "***no information has been omitted***." SAC ¶¶ 165-67, 198-99, 241-43, 265-67. (*Supra* at 17). Kalcevich similarly signed a certification in connection with the May 14, 2018 loan affirming that "there is not material information concerning the Issuer which has not been publicly disclosed." SAC ¶ 159.

In addition, iAnthus represented in its loan agreements with GGP that none of the statements in the agreement "contain any untrue statement of a material fact or omit to state any material fact necessary to make such statement or representation not misleading" to investors

---

[22] iAnthus also cites its prior disclosure, made before the September 30, 2019 agreement, that the escrow existed; and its full-year 2019 results, which the Company filed after the Class Period and that do not disclose that the escrow funds from iAnthus's *second* GGP agreement were released or never funded. (*See* iAnthus Mem. at 27-28).

[23] Defendants' cases are irrelevant because the information at issue in them was actually disclosed. (iAnthus Mem. at 27-28 (citing *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 379 (E.D.N.Y. 2003) and *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *13 (S.D.N.Y. Jan. 17, 2013)).

"seeking *full information* as to the Company." SAC ¶¶ 161-63, 237-38. iAnthus also represented throughout the Class Period that it was "in compliance with all covenants" in its agreements with GGP. SAC ¶¶ 184-85, 221-22, 251.

All of these assurances of the *full* disclosure of all material information were plainly false and misleading because iAnthus did not disclose Ford's self-dealing and GGP's Exit Fee.[24]

### b) The GGP Defendants' Statements of Full Disclosure

The GGP Defendants made similar statements confirming that they disclosed all material information as those made by the iAnthus Defendants. GGP filed a Required Disclosure form following each of its three financings. These forms describe the iAnthus securities that GGP acquired. SAC ¶¶ 272-73. In each of GGP's Required Disclosures, it responded "N/A" to the question of whether GGP or "any of its joint actors is a party to an agreement, arrangement or understanding that has the effect of altering, directly or indirectly" GGP's economic exposure to the securities at issue. SAC ¶ 274. Similarly, these forms instructed GGP to "[d]escribe the material terms of any agreements, arrangements, commitments or understandings . . . , including but not limited to . . . finder's fees . . . [or] loan or option arrangements." SAC ¶ 277. These disclosures falsely stated that GGP did not have any side agreements, and that it disclosed all material terms, in connection with its transactions with iAnthus. These statements were false in light of Adler's payments to Ford and GGP's secret $10 million Exit Fee.

GGP also stated in its Required Disclosures that it waived its right to receive the cash interest payment that was due on September 30, 2019, and decided instead to receive such interest

---

[24] The falsity of these statements is not based on iAnthus's disclosure obligations under Canadian law (*see* iAnthus Mem. 17 n.2), but rather, on the plain language of iAnthus's *affirmative representations that it disclosed all material information* concerning its agreements with GGP and its unsecured lenders. *See Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) (holding once a defendant chooses to speak, it must "be both accurate and complete").

54

as a payment "in kind." SAC ¶ 279. This was false and misleading because it did not disclose that this event triggered the accrual of interest under the undisclosed Exit Fee. (*See supra* at 12-13).

In response, GGP repeats iAnthus's timing argument claiming that Adler's only payment to Ford occurred on December 21, 2019. (GGP Mem. at 23, 26). This argument fails for the reasons explained above. (*Supra* at 38-41, 43). GGP also ignores its January 10, 2020 Required Disclosure that it made *after* Adler made his December 21, 2019 payment to Ford. SAC ¶¶ 272-80.[25]

The GGP Defendants also argue that their Required Disclosures were accurate based on the specific wording of these forms. (GGP Mem. at 19-21). This argument is based on a strained reading of the form. GGP clearly stated in response to Item 3.7 that it was not "a party to an agreement, arrangement or understanding" that would alter the nature of its "economic exposure" to the iAnthus securities that the report covers. (GGP Exs. 4, 12, and 16). The Exit Fee plainly altered GGP's "economic exposure" to iAnthus. Moreover, Item 5 calls for the disclosure of all "material terms of any agreements, arrangements, commitments or understandings" that GGP had related to the securities at issue. (*Id.*). The Exit Fee is not a "standard default provision" (*see* GGP Mem. at 20 n.11) that Item 5 excludes, because the Fee provided not just that GGP could enforce its agreement in the event of default, but that GGP would be entitled to an extraordinary $10 million fee that accrues 13% interest and that negated entirely GGP's supposed $10 million equity investment.[26] Moreover, Section 3 of the form does not contain any exception for "standard default provisions" and Adler's payments to Ford are additional transactions that GGP omitted.

The GGP Defendants also incorrectly argue that "iAnthus did not accrue any amounts

---

[25] GGP also argues that the Exit Fee did not render their Required Disclosures false and misleading. (GGP Mem. at 22, 25-26). But this argument is based on Defendants' flawed materiality argument discussed above. (*Supra* at 43-47).

[26] The GGP Defendants also mischaracterize Item 5 as limited to agreements that "would give another person voting power or investment power over the securities." (GGP Mem. at 20 n.11). But the plain language of the form makes clear that this is just one type of information that must be disclosed, not the exclusive set of required information.

related to the Exit Fee" through December 2019. (GGP Mem. at 21). That is patently false because the Exit Fee started to accrue in September 2019. (*See supra* at 12-13).[27]

### D.    The Complaint Pleads a Strong Inference of Scienter

Scienter may be pled either by alleging facts (a) showing defendants' "motive and opportunity to commit fraud" or (b) "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Recklessness occurs when individuals "knew facts or had access to information suggesting that their public statements were" false. *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). The test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation" suffices. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). These allegations need not be "irrefutable" or "of the 'smoking-gun' genre, or even the 'most plausible of'" all inferences. *Id.* at 324. Rather, they must only be "cogent and at least as compelling as any opposing inference." *Id.*

#### 1.    The Complaint Adequately Pleads Defendants' Motive and Opportunity

A motive to commit fraud exists where a defendant has a financial incentive to make misrepresentations to investors. *See Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214-15 (S.D.N.Y. 2018) (holding incentive to obtain commissions constitutes motive); *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 179 (S.D.N.Y. 2009) (motive of obtaining business and selling notes suffices). The law is clear that "motive and opportunity" is an

---

[27] The GGP Defendants argue that the Required Disclosure forms cannot give rise to a duty to disclose under Section 10(b). (GGP Mem. at 17-18). The court does not need to address this issue because the Complaint adequately alleges that the GGP Defendants made affirmatively false and misleading statements in these forms. But the GGP Defendants' argument that foreign disclosure obligations cannot give raise to a duty to disclose also goes against the clear language of the Second Circuit's holding that "a duty to disclose under Section 10(b) can derive from statutes or regulations that obligate a party to speak." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015).

independently sufficient basis for scienter regardless of the defendant's conscious misbehavior or recklessness. *See Ganino*, 228 F.3d at 170; *TriPoint Glob. Equities*, 338 F. Supp. 3d at 215.

Ford's financial motive is particularly pronounced. He received hundreds of thousands of dollars in personal payments in connection with iAnthus's loans that are the subject of this action. (*See supra* at 7-11); SAC ¶ 323. These illicit payments establish Ford's scienter. *See Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*, 688 F. Supp. 2d 229, 246 (W.D.N.Y. 2010) (holding "unwarranted compensation package that [defendant] received as a bribe for her participation in the scheme" sufficed to plead motive). Defendants respond by rehashing their flawed falsity arguments that are discussed above. (*See* iAnthus Mem. at 30).[28]

Ford also received $1.48 million in net proceeds from the sale of stock during the Class Period at prices ranging from $5 per share to $1.25 per share—all of which were far higher than the Company's stock price of less than $.10 per share at the end of the Class Period or the $0.50 per share at which Ford tried to buy the Company in March 2020. SAC ¶¶ 139, 146, 326. Defendants try to downplay Ford's stock sales because he last sold shares on September 3, 2019. (iAnthus Mem. at 29-30). But this was less than four weeks before iAnthus and GGP announced their $100 million financing plan on September 30, 2019 that Ford misrepresented as providing iAnthus with financial certainty. (*See supra* at 15, 48). By this point, Ford already knew about his improper payments and GGP's secret Exit Fee. This sequence of events shows that Ford was cashing out on his stake in the Company while laying the groundwork for its demise.[29]

---

[28] The only case that Defendants cite concerning Ford's payments addresses a completely different situation where the defendants sought to "protect their executive positions," compensation, and prestige. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994) (cited by iAnthus Mem. at 30).

[29] Defendants assert that Kalcevich increased his stock ownership by less than five percent on July 11, 2019. (iAnthus Mem. at 29-30). This does not diminish the strong evidence of Ford's motive based on his sales. In *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996), which Defendants cite, the defendant's sales were not sufficient only "[i]n the context of [that] case," where the defendant did not "ha[ve] the opportunity" to commit fraud and the plaintiffs' claims failed for other, independent reasons. *Id.* at 814 & n.14.

57

In addition, Ford sought to profit even further by trying to buy the Company in March 2020 for a mere $0.50 per share, after its stock price was decimated by his misconduct. SAC ¶¶ 137-39, 329. Defendants argue that Ford's proposed management buyout does not demonstrate his improper motive because iAnthus's stock price proceeded to decline even further after his proposal failed. (iAnthus Mem. at 29). But a defendant's plan can support their motive even if it does not ultimately succeed, as long as "plaintiffs allege a scheme that has any chance of achieving its putative ends." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 443 (S.D.N.Y. 2006). Defendants' hindsight argument also does not make sense. If Ford succeeded, his buyout would have propped up iAnthus's stock price by injecting more cash into the Company and restructuring its debt. SAC ¶¶ 143-45. If Ford's attempt had succeeded, it would have been more than the "short respite from an inevitable day of reckoning" that Defendants assert. (iAnthus Mem. at 29).

Furthermore, Ford and Kalcevich both sought to profit by repricing 9.65 million stock options (including 1.72 million for Ford and 1 million for Kalcevich) after a sharp fall in iAnthus's stock price. SAC ¶¶ 143-45, 326. While the mere existence of stock options are not evidence of motive, Ford and Kalcevich tried—over strenuous shareholder objections—to lower the strike price of these options so they could make a short-term profit. *Id.* This effort failed only because shareholders continued to object after Ford tried to salvage the plan by characterizing it as a public relations issue and misrepresenting the options as impacting over 160 individuals even though over 60 percent of them were for iAnthus's top seven executives. SAC ¶¶ 145-46. These actions highlight Ford's and Kalcevich's placement of their own profit over shareholders' interests.

The Complaint also specifically alleges Adler's and GGP's motive. *First*, GGP's Exit Fee is a quintessential example of defrauding investors for financial gain because it involved hiding a $10 million payment (plus 13% interest) that GGP would receive in the event of default. *Second*,

the Complaint specifically alleges the GGP Defendants' motive to be in a better financial position as to their secured interest in iAnthus's assets. SAC ¶¶, 120-127, 332. GGP raises a strawman by arguing that it did not engage in a "planned coup." (GGP Mem. at 29-30). Regardless of whether Adler planned all along to take over iAnthus, he acted in his and GGP's *financial* interest by obtaining the Exit Fee at the start of GGP's relationship with iAnthus and by bribing Ford to obtain such a large secured interest in iAnthus's assets. SAC ¶¶ 58, 109, 127.

Moreover, GGP's assertion that it "repeatedly showed flexibility" (GGP Mem. at 29) toward iAnthus is belied by the fact that it reneged on its promise to complete its $100 million financing plan even though it had additional funds available. Instead of using its funds to aid iAnthus, GGP forced iAnthus into default by withholding that funding and provided additional financing only as part of the restructuring that allowed GGP to take over the Company. GGP could have provided that funding as part of its $100 million financing plan with iAnthus, but it chose instead to use those funds to take over the Company. That is precisely the type of motive that supports a strong inference of scienter. *See Abu Dhabi Commer. Bank*, 651 F. Supp. 2d at 179; *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 284 (E.D.N.Y. 2000) (holding that "being able to acquire a company for a significantly reduced price is a sufficient economic benefit").

2. The Complaint Pleads a Strong Inference of Conscious Misbehavior and Recklessness

The Complaint also pleads specific allegations supporting a strong inference of Defendants' conscious misbehavior and recklessness. That is an independent basis for pleading a strong inference of scienter. (*See supra* at 56-57).

Ford and Adler, by definition, knew of Adler's payments to Ford because they engaged in these payments. Ford was also aware of the payments he received from Rozinov. SAC ¶¶ 323,

59

331; (*supra* at 7-11). The SAC therefore pleads Ford's and Adler's scienter as to these payments.[30]

Defendants' scienter is further established by Ford's being fired for his misconduct and Dowley's abrupt resignation less than two weeks after iAnthus announced the Special Committee's findings of Ford's improper dealings. SAC ¶¶ 98, 334. Dowley's resignation right after he was involved in the Committee's investigation, and so soon into his term that was meant to add credibility to iAnthus's Board, adds to the inference that Ford's wrongdoing went far beyond the Committee's findings. *Id.* And the resignation of Beth Stavola—iAnthus's Chief Strategy Officer and its only Director other than Ford and Maslow to "accept" the Special Committee's findings—on August 4, 2020, raises even more suspicions about Defendants' activities and the Board's findings. SAC ¶¶ 148, 335; *see McIntire*, 927 F. Supp. 2d at 127 (holding resignation of CFO, board members, and auditor contribute to a strong inference of scienter).

Ford's, Kalcevich's, and Adler's scienter are also shown by their certifications that their many statements that they made on behalf of iAnthus and GGP, respectively, were true and did not omit any material information. SAC ¶¶ 320-22; *see also* SAC ¶¶ 157-59, 170, 178, 188, 204, 217, 227, 248, 272. Their decision to speak so forcefully and guarantee the accuracy and completeness of their statements in certifications and in response to analysts' questions about GGP's financing (SAC ¶¶ 256-58; *see also* SAC ¶¶ 194, 233-35), carry with them an obligation to investigate the truth of their statements and precludes them from pleading ignorance. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (defendants' attempts to placate concerns raised by analysts supported scienter); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552-53 (S.D.N.Y. 2017) (holding reaction to media inquiries supports inference that defendants "knew or consciously disregarded" falsity); *Plumbers*

---

[30] The cases that iAnthus cites dealt with different situations because Ford and Adler displayed their "participation in the fraud" and knowledge of these facts by virtue of their involvement in these payments. (*See* iAnthus Mem. at 31).

*& Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010) (holding CEO "speaking so positively" supported recklessness).

Confidential witnesses further support a strong inference of scienter because these witnesses—who include high-level employees that interacted directly with Ford—establish that Ford and Adler had a close personal friendship, Ford kept his relationship with GGP "close to the vest," and iAnthus's financing arrangements did not make sense. SAC ¶¶107, 324-25, 330.

All of these suspicious red flags add to the strong inference that Defendants acted with scienter. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 648, 658-59 (S.D.N.Y. 2007) (timing of transactions "would certainly have been suspicious to anyone who became aware of them").[31]

Ford, Adler, and Kalcevich also knew, and had access to information, about GGP's $10 million Exit Fee because it was a key feature of GGP's initial $40 million loan to iAnthus. (*See supra* at 11-13). Confidential witnesses, including a senior executive who specifically named Ford and Kalcevich as "chas[ing] after creative financing," explained that iAnthus's financing with GGP did not make financial sense and "make[] you scratch your head." SAC ¶¶ 128-29, 325.

The Complaint's allegations against Kalcevich are therefore based on more than just his role as CFO, as Defendants incorrectly argue. (iAnthus Mem. at 32). Moreover, given Kalcevich's central role as CFO in arranging iAnthus's financing, and Ford's control over iAnthus's relationship with GGP—which he kept "close to the vest" SAC ¶¶ 128, 324—"it is virtually inconceivable" that they would not have known about GGP's Exit Fee. *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017). Ford and Kalcevich also had access to this information and were reckless if they ignored it. *See Novak*, 216 F.3d at 308 (holding an "egregious refusal to see

---

[31] GGP argues that "[c]ommon social activities" do not support a strong inference of scienter. (GGP Mem. at 28-29). But the only case that GGP cites dealt with a married couple. *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 952 (D. Ariz. 2007). That is very different than the backroom dealings between Ford and Adler.

the obvious, or to investigate the doubtful" suffices); *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *14 (S.D.N.Y. Sept. 27, 2013); *Lewy*, 2012 WL 3957916, at *16 (defendant "overlooked or ignored" information that "she was or should have been aware" of).

### 3.     The Core Operations Doctrine Supports a Strong Inference of Scienter

A plaintiff may also support scienter allegations based "on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*,, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013); *see also Gauquie v. Albany Molecular Rsch.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (core operations doctrine supported scienter as to issues at key laboratory); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004).

Scienter may therefore be imputed to Ford and Kalcevich by virtue of their roles as iAnthus's CEO and CFO, and Directors, and to Adler as GGP's Managing Member of the closely held company. SAC ¶¶ 288-89. Defendants concede that iAnthus's business depended on its $156 million in debt and its ability to obtain further financing. (*See* iAnthus Mem. at 1, 4-6, 26, 33); SAC ¶¶ 57, 77-85. And GGP's $106 million financing of iAnthus was a substantial investment at the core of GGP's cannabis investing business. SAC ¶ 289. The importance of iAnthus's relationship with its lenders supports a finding that Defendants had knowledge of the key details of these relationships.

### 4.     The Complaint Alleges a Strong Inference of Corporate Scienter

iAnthus's and GGP's scienter are alleged based on the scienter of Ford and Kalcevich (for iAnthus) and Adler (for GGP). But even if the Individual Defendants' scienter is not adequately alleged in any regard, iAnthus's and GGP's scienter is adequately alleged because their statements dealt with iAnthus's financing deals that Defendants acknowledge were crucial to its business (*see*

62

*supra* at 6), and therefore "'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015); *see also Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012) (holding the person "whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement"); *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 n.3 (S.D.N.Y. Sept. 19, 2017) (holding "scienter of 'management level' employees can be attributed to the corporation").

5.      A Holistic View Supports a Strong Inference of Scienter

The inference of scienter need only be "at least as compelling" as Defendants' non-culpable inference. *Tellabs*, 551 U.S. at 324. This assessment must be made on a "holistic" basis "[w]hen the allegations are accepted as true and taken collectively." *Id.* at 326. Defendants' competing inference is that iAnthus "faced challenges managing its debt due to . . . COVID-19." (iAnthus Mem. at 33).[32] But that alternative explanation for iAnthus's demise—which CW 3 expressly rejected (SAC ¶ 128)—does not change the falsity of Defendants' statements that they made based on self-interested motives, and with conscious misbehavior and recklessness, when they put iAnthus in such a precarious financial position while blatantly misrepresenting key aspects of the Company's relationship with its lenders. Defendants also reference iAnthus's Canadian restructuring proceeding to argue that iAnthus did not favor GGP. (iAnthus Mem. at 33; GGP Mem. at 29). As explained above, these details are irrelevant because the restructuring proceeding focused on events after iAnthus's default in 2020, while the allegations here relate to Defendants' dealings with its lenders in 2018 and 2019. (*See supra* at 21). The inference that Defendants acted

---

[32] GGP blames iAnthus's default on the Company's dispute with Oasis. (GGP Mem. at 30). But that dispute relates to Defendants' misconduct at issue here and highlights the impropriety of iAnthus's relationship with GGP.  SAC ¶ 118.

63

culpably in those earlier dealings is not only at least as plausible as Defendants' opposing inference based on the SAC's allegations as a whole—which is all that Plaintiff is required to plead—it is the only sensible explanation of Defendants' misrepresentations concerning Ford's self-dealing and GGP's Exit Fee. *See In re GE Sec. Litig.*, 857 F. Supp. 2d 367, 394-98 (S.D.N.Y. 2012) (holding culpable explanations were at least as compelling as non-fraudulent ones).

**E.      The GGP Defendants "Made" Their Statements "In Connection With" the Purchase or Sale of iAnthus Securities**

The GGP Defendants—but ***not the iAnthus Defendants***—argue that they did not make their statements "in connection with" the purchase or sale of iAnthus securities because GGP's Required Disclosures (SAC ¶¶ 272-80) relate "to the private financing arrangements that GGP made with iAnthus." (GGP Mem. at 31).

This argument fails because the "in connection with" requirement is "broadly construed." *Tobia v. United Grp. of Cos., Inc.*, 2016 WL 5417824, at *13 (N.D.N.Y. Sept. 22, 2016). Courts regularly hold that publicly disclosed statements are made "regarding" securities transactions because "market professionals generally consider most publicly announced material statements." *In re Carter-Wallace*, 150 F.3d 153, 156 (2d Cir. 1998); *see also Last Atlantis Cap. v. AGS Spec. Parts.*, 749 F. Supp. 2d 828, 834 (N.D. Ill. Nov. 4, 2010) (holding that statements on company websites are actionable); *Muzinich & Co. v. Raytheon*, No. CV-01-284-S-BLW, 2002 U.S. Dist. LEXIS 26962, *10-11 (D. Idaho Apr. 30, 2002) (interpreting the "in connection with" requirement broadly).[33] GGP acknowledges that the purpose of the Required Disclosure form is to inform "the

[33] The court in *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003) (GGP Mem. at 31), held only that investors in JDSU could not bring a claim against Nortel based on Nortel's "statements about *its own* business performance and prospects." *Id.* at 622-24. The court recognized that in other circumstances, "misrepresentations by and about one company (Cendant) could be found to have been made 'in connection with' the purchase of shares in a different company." *Id.* at 624. GGP's statements are even more relevant because they were about GGP's interest in iAnthus. *Citibank, N.A. v. K-H Corp.*, 745 F. Supp. 899, 904 (S.D.N.Y. 1990) (GGP Mem. at 31), is even further afield because it was not addressing whether the alleged misrepresentation related to the company at issue.

market" about its interest in iAnthus's securities. (GGP Mem. at 8). That purpose easily satisfies Section 10(b)'s expansive "in connection with" requirement.

While GGP also asserts that Adler's statements in press releases (SAC ¶¶ 155, 231) do not satisfy the "in connection with" requirement, they really just repeat their falsity arguments. (GGP Mem. at 31-32). Furthermore, the GGP Defendants concede that their statements in loan agreements (SAC ¶¶ 161, 237) were made "in connection with" the sale of a security.

The GGP Defendants concede that they are responsible under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), for the statements that they—as opposed to the iAnthus Defendants—made. (GGP Mem. at 26-27). The law is also clear that GGP and Adler are responsible under *Janus* for statements that they disseminated or made themselves—such as GGP's Required Disclosures (which Adler signed (SAC ¶¶ 272-80)), GGP's agreements with iAnthus (that Adler also signed (SAC ¶¶ 161, 237)), and quotations that iAnthus attributed to Adler (SAC ¶¶ 155, 231)). *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) (holding "signatories of misleading documents 'made' the statements in those documents"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 541 (S.D.N.Y. 2016); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417-18 & n.9 (S.D.N.Y. 2011) (holding "attribution could be 'implicit from surrounding circumstances'").

### F.   The Presumption of Reliance Applies

This is a straightforward securities fraud class action where Plaintiff and the Class are entitled to the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). GGP argues that "the fraud on the market doctrine only applies 'where a defendant has a duty to disclose.'" (GGP Mem. at 33). This blatantly misquotes the case that GGP cites for this proposition, which held only that an *omission* may give rise to the fraud-on-the-market presumption where there is a duty to disclose and that the complaint did not allege that the

defendants "made a public misstatement." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 175 & n.11 (S.D.N.Y. 2010). Defendants here made the many misstatements described above.

GGP also argues that the fraud-on-the-market presumption does not apply because the OTCQX and OTCQB markets are not efficient. (GGP Mem. at 33). That is plainly wrong. The Complaint alleges multiple factors that establish an efficient market, which supports the presumption that Plaintiff and the Class relied on the integrity of the market price for iAnthus's stock. SAC ¶¶ 346-47. This includes that iAnthus's "stock was liquid and traded with moderate to heavy volume"; it traded on the OTCQX, OTCQB, and Canadian Securities Exchange; it was covered by multiple investment analysts; Defendants' misrepresentations would tend to induce a reasonable investor to misjudge the value of iAnthus's stock; and its stock reacted to news about the Company. SAC ¶¶ 293, 346-47. The fact that iAnthus's stock traded ***more heavily*** on the OTC market than on the CSE also supports the efficiency of the OTC market here. SAC ¶ 42.

Courts regularly hold that the presumption-of-reliance applies to transactions on different types of markets, not just the NYSE and NASDAQ, when the plaintiff relied on the integrity of the market price. For example, the court in *In re Parmalat Sec. Litig.*,, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008), found "plaintiffs' evidence and conclusions regarding market efficiency sufficiently persuasive" as to the OTC market *at the class certification stage*. *Id.* at *10. Moreover, the efficiency of the CSE, in addition to that of the OTC market, can independently support the presumption of reliance for Plaintiff's OTC transactions. *See Black v. Finantra Cap.*, 418 F.3d 203, 205-06, 209-10 (2d Cir. 2005) (holding presumption applied to privately negotiated transaction); *In re ForceField Energy Inc. Sec. Litig.*, 2015 WL 4476345, at *4 (S.D.N.Y. July 22, 2015) (plaintiff relied on the market price for an off-market exchange).

The law is also clear that the question "on a motion to dismiss is not whether plaintiff has proved an efficient market, but whether he has pleaded one." *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at \*5, 12 (S.D.N.Y. June 28, 2010); *see also Basic*, 485 U.S. at 249 n. 29 ("Proof of that sort is a matter for trial"); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 473 n.9 (S.D.N.Y. 2014) (holding "the question of whether a market is efficient" is "not meant to be answered on a motion to dismiss"), *aff'd*, 628 F. App'x 784 (2d Cir. 2015);  *In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166, at \*25 (S.D.N.Y. June 10, 2010) (same); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 508-09 (S.D.N.Y. 2005) (same).[34] Defendants tellingly do not cite any class action cases where the court held on a motion to dismiss that an OTC market was not efficient.[35]

### G.    The Complaint Adequately Pleads Economic Loss and Loss Causation

"Allegations of loss causation are evaluated under [Rule 8(a)'s] notice pleading standard." *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at \*16 (S.D.N.Y. Jan. 20, 2015). But regardless of whether Rule 9(b) or Rule 8(a) applies, "the securities fraud plaintiff's burden is not a heavy one." *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at \*10 (S.D.N.Y. Sept. 24, 2018). A plaintiff "must only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544

---

[34] In addition, the presumption of reliance under *Affiliated Ute* applies because Defendants had an independent duty to disclose all material information related to iAnthus's transactions with its lenders. *Affiliated Ute Citizens of Utah v. United State*s, 406 U.S. 128 (1972); SAC ¶¶ 352-53; *see Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (explaining *Affiliated Ute* presumption may apply to omissions that are not "directly related to the earlier statements").

[35] *See* GGP Mem. at 33 (citing *Burke v. China Aviation Oil Corp.*, 421 F. Supp. 2d 649, 653 (S.D.N.Y. 2005) (denying motion for service of process based on pre-*Morrison* conduct-and-effects test)). Defendants also mischaracterize *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478 (S.D.N.Y. 2011), which held, in an individual market manipulation action, that even if "the OTCBB was an efficient, free market," the plaintiffs, "by their own admissions, did not rely on that market" because they purchased stock "for the sole purpose" of reselling it "on a cost-plus basis." *Id.* at 493. *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213 (C.D. Cal. 2015), was also an individual market manipulation action and held primarily that the parties' agreement precluded the plaintiff from alleging individual reliance and that the presumption of reliance did not apply because the "alleged misrepresentations were part of an arm's length transaction" and the plaintiff specifically did not rely on public information. *Id.* at 1249, 1251. The court also applied the *Cammer* factors that courts apply *at class certification* in class actions. *Id.* at 1252.

U.S. 336, 347 (2005)).

The GGP Defendants argue that Plaintiff has not adequately alleged loss causation specifically as to the GGP Defendants' statements. (GGP Mem. at 33-34). Defendants therefore concede that loss causation is adequately alleged as to the iAnthus Defendants' statements.

The GGP Defendants do not address any of the multiple specific disclosures that the Complaint alleges caused iAnthus's stock price to drop upon the revelation of Defendants' fraud. (*See* GGP Mem. at 34). The Complaint alleges several corrective disclosures where the Company's stock price fell significantly in reaction to negative news that revealed Defendants' fraud. For example, iAnthus's stock price fell 16% after the *Stockhouse* report started to reveal Ford's self-dealing. SAC ¶¶ 305-06; *see In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085, at *6, 12-13 (S.D.N.Y. Aug. 29, 2012) (allegations based on report by "an anonymous blogger/analyst" supported loss causation). The stock price then fell 62% after its April 6, 2020 announcement that it was investigating Ford's "potential conflicts of interest." SAC ¶¶ 307-08.

Then, on June 23, 2020, iAnthus announced that GGP provided a demand for repayment of its debt. SAC ¶ 314. iAnthus's stock price fell approximately 18% in response to this news bringing the Company closer to bankruptcy. SAC ¶ 315. This action by GGP was a foreseeable result of the true nature of its investment in iAnthus, which was tainted by Ford's self-dealing and which Defendants misrepresented as being an "equity" investment. These allegations, as well as the Complaint's other specific allegations of loss causation (SAC ¶¶ 288, 291-92, 294-95, 300-02, 310-13, 316-17), satisfy Plaintiff's burden at this stage to provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.[36]

---

[36] *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 85 (S.D.N.Y. 2015), the only case that the GGP Defendants cite in support of their loss causation argument (GGP Mem. at 34), dealt with the very different situation where the complaint failed to account for "S & P's decision to downgrade the credit rating of the United States for the first time in history," which occurred in connection with a very small drop in the company's stock price.

68

The GGP Defendants try to attribute the decline in iAnthus's stock price to "iAnthus' decision to amass more and more debt and initiate litigation against another lender." (GGP Mem. at 34). This argument fails for three reasons. *First*, Defendants do not connect that rationale to the specific disclosures that support loss causation. *Second*, the law is clear that at this stage, the plaintiff is not required to identify "the exclusive cause of its losses; rather, it need only allege sufficient facts to raise a reasonable inference that [defendant's actions] caused an ascertainable portion of its loss." *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015); *see also Bristol Myers Squibb* 586 F. Supp. 2d at 166 (holding it is not necessary "to ascribe the actual amount of loss to one cause or another"); *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (holding whether loss was caused by an intervening event "not to be decided on" a motion to dismiss); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 321 (S.D.N.Y. 2011) (same).

*Third*, the Complaint pleads that iAnthus's default and subsequent restructuring that stood to nearly wipe out the Company's shareholders were the materialization of the precise risk that Defendants identify. iAnthus's collapse resulted from its misrepresenting the true nature of its onerous debt. SAC ¶¶ 291-92, 303; *see Vivendi*, 838 F.3d at 261-63 (holding materialization of the risk occurs where "events revealing the truth about the company's *risk* of bankruptcy caused investors to lose money"); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). GGP's alternative causal explanation of iAnthus's decline—in addition to being inadequate to rebut Plaintiff's allegations at this stage—is actually part of risk that Defendants concealed.

**H.    The Complaint Adequately Pleads Scheme Liability**

In addition to being liable for making false and misleading statements under Rule 10b-5(b), Defendants engaged in a fraudulent scheme in violation of Rules 10b-5(a) and (c) by making secret side deals in iAnthus's agreements with GGP and its other lenders. These activities include Ford's

69

payments from Adler and Rozinov, and GGP's Exit Fee. This constitutes a fraudulent scheme because Rule 10b–5(c) (making it unlawful to engage in any "act, practice, or course of business" that "operates . . . as a fraud or deceit," 17 C.F.R. § 240.10b–5) is "expansive" and "capture[s] a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019); *see also Eletrobras*, 245 F. Supp. 3d at 471-72 (applying scheme liability related to alleged bribery scheme).

Unlike in the cases that Defendants cite, their misstatements are not "the sole basis for" Plaintiff's claims. (iAnthus Mem. at 34; GGP Mem. at 30 n.14). The court in *In re Smith Barney* , 884 F. Supp. 2d 152, which Defendants cite, held that the plaintiffs adequately pled scheme liability by alleging that the defendants created an entity "in order to conceal a scheme designed to" divert cost savings. *Id.* at 161. Defendants here also "engaged in deceptive conduct separate from any alleged misstatements or omissions," *id.*, because they arranged loans containing secret side deals that favored Ford and iAnthus's lenders at the expense of the Company's shareholders. SAC ¶¶ 63-64, 96-107, 117-118, 126-27.

## I.      The Complaint Adequately Pleads Control Person Liability

The Complaint alleges that Ford and Kalcevich are liable under Section 20(a) as control persons of iAnthus and that Adler is liable as a control person of GGP. SAC ¶¶ 363-68. Each of these Defendants participated in the operation and management of their respective companies. *Id.* Defendants' arguments to the contrary are entirely dependent on their arguments under Section 10(b) and fail for the reasons discussed above. (*See* iAnthus Mem. at 34-35; GGP Mem. at 34-35).

## IV.   CONCLUSION

For all of these reasons, the Court should deny Defendants' motions in their entirety. In the alternative, Plaintiff respectfully requests leave to amend. *See Loreley*, 797 F.3d at 190 (describing "permissive standard" for leave to amend under Fed. R. Civ. P. 15(a)(2)).

Dated: February 3, 2022

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael Grunfeld*_____
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mgrunfeld@pomlaw.com

*Lead Counsel for Lead Plaintiff*

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-8209
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff*

71

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2022, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

*/s/Michael Grunfeld*_____
Michael Grunfeld

72