## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE iANTHUS CAPITAL HOLDINGS, INC. SECURITIES LITIGATION | No.: 1:20-cv-03135-LAK<br><br>Hon. Lewis A. Kaplan |
| THIS DOCUMENT RELATES TO:<br><br>No. 1:20-cv-03135-LAK (Jose Antonio Silva) | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS iANTHUS CAPITAL HOLDINGS, INC.'S, JULIUS JOHN KALCEVICH'S, AND HADLEY C. FORD'S MOTIONS TO DISMISS THE SECOND CONSOLIDATED <u>AMENDED CLASS ACTION COMPLAINT</u>

**PERKINS COIE LLP**

Adam R. Mandelsberg
Emily Cooper
1155 Avenue of the Americas, 22nd Fl.
New York, NY 10036-2711
212-261-6867
AMandelsberg@perkinscoie.com

*Attorneys for Defendant Hadley C. Ford*

**LEVINE LEE LLP**

Seth L. Levine
Chad P. Albert
5 Columbus Circle, 11th Floor
New York, New York 10019
Telephone: (212) 223-4400
Facsimile: (212) 223-4425
slevine@levinelee.com
calbert@levinelee.com

*Attorneys for Defendants iAnthus Capital Holdings, Inc. and Julius John Kalcevich*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

I.   THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE
     PLAINTIFF'S CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL ..................... 2

II.  THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR
     *FORUM NON CONVENIENS* .......................................................................................... 5

III. THE AMENDED COMPLAINT'S CLAIMS ARE MERITLESS ....................................... 9

     A.   None of the Alleged Misstatements or Omissions Is Actionable .............................. 9

          1.   Defendants' Statements Regarding Related Party Transactions Were
               Neither False Nor Misleading ...................................................................... 10

          2.   Defendants' Statements Regarding Gotham's Investments Were
               Neither False Nor Misleading ...................................................................... 12

          3.   Defendants' Statements Regarding the Availability of Financing Were
               Neither Misrepresentative Nor Material ....................................................... 14

          4.   Defendants' Statements Regarding the Escrow Provision of the
               2018 DPA Were Neither False Nor Misleading ............................................ 15

     B.   Plaintiff Fails to Allege Scienter ........................................................................... 16

          1.   Plaintiff Fails to Plead Motive and Opportunity .......................................... 16

          2.   Plaintiff Fails to Plead Conscious Misbehavior or Recklessness ................. 18

          3.   Plaintiff's Reliance on the Core Operations Doctrine Is Misplaced ............. 19

     C.   Plaintiff's Scheme Liability Claim Is Deficient ....................................................... 19

     D.   Plaintiff's Control Liability Claim Is Deficient ....................................................... 20

IV.  DISMISSAL SHOULD BE WITH PREJUDICE .............................................................. 20

CONCLUSION ...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### <u>Cases</u>

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ................................................................................. 4

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ................................................................................. 14

*Allstate Life Ins. Co. v. Linter Grp., Ltd.*,
    994 F.2d 996 (2d Cir. 1993) ................................................................................. 8

*Altayyar v. Etsy, Inc.*,
    731 F. App'x 35 (2d Cir. 2018) ........................................................................ 20

*Atlantica Holdings, Inc. v. BTA Bank JSC*,
    2015 WL 144165 (S.D.N.Y. Jan. 12, 2015) ........................................................ 3

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .............................................................................. 20

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
    986 F.3d 161 (2d Cir. 2021) ............................................................................. 4

*DeYoung v. Beddome*,
    707 F. Supp. 132 (S.D.N.Y. 1989) ............................................................. 6, 7, 8

*DiRienzo v. Philip Servs. Corp.*,
    294 F.3d 21 (2d Cir. 2002) ................................................................................. 6

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JPMorgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ......................................................... 16, 17, 18, 19

*Fagan v. Deutsche Bundesbank*,
    438 F. Supp. 2d 376 (S.D.N.Y. 2006) ............................................................... 7

*Gilstrap v. Radianz Ltd.*,
    443 F. Supp. 2d 474 (S.D.N.Y. 2006) ............................................................... 6

*Giunta v. Dingman*,
    893 F.3d 73 (2d Cir. 2018) ................................................................................. 3

*Goldman Sachs Group, Inc. v. Arkansas Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021) ..................................................................................... 12

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020) ................................................................ 12

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008) ................................................................ 11

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................. 13

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014) ................................................................ 10

*In re Manulife Fin. Corp. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2011).......................................................................... 9

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ............................................................... 14

*In re Poseidon Concepts Sec. Litig.*,
   2016 WL 3017395 (S.D.N.Y. May 24, 2016) ................................................ 3, 6

*In re Royal Grp. Techs. Sec. Litig.*,
   2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005) ................................................... 6

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012) ...................................................... 12, 19, 20

*Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*,
   688 F. Supp. 2d 229 (W.D.N.Y. 2010)............................................................... 16

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)............................................... 18, 19

*Kitaru Innovations Inc. v. Chandaria*,
   698 F. Supp. 2d 386 (S.D.N.Y. 2010) .............................................................. 6, 8

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ............................................................................ 19

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015) ........................................................... 13, 14

*Morrison v. National Australia Bank Ltd.*,
   561 U.S. 247, 130 S. Ct. 2869 (2010) ........................................................... 2, 4, 8

*Muller-Paisner v. TIAA*,
   289 F. App'x 461 (2d Cir. 2008) ...................................................................... 9

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
    416 F.3d 146 (2d Cir. 2005) ................................................................. 7

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175, 135 S. Ct. 1318 (2015) ................................................... 15

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ...................................... 13

*Parkcentral v. Glob. Hub Ltd. v. Porsche Auto. Holdings, SE*,
    763 F.3d 198 (2d Cir. 2014) ..................................................... Passim

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011) ................................................... 19

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ...................................... 19

*Zottola v. Eisai Inc.*, No. 20-cv-2600,
    2021 WL 4460563 (S.D.N.Y. Sept. 29, 2021) ...................................... 20

**Statutes**

15 U.S.C. § 78u-4(b)(2) .................................................................................. 16

**Rules**

Fed. R. Civ. P. 12 ............................................................................................ 1

Fed. R. Civ. P. 9 .............................................................................................. 1

Defendants iAnthus, Julius John Kalcevich, and Hadley C. Ford submit this reply in support of their motions to dismiss Plaintiff's Second Consolidated Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the doctrine of *forum non conveniens* (Dkt. Nos. 99 (iAnthus and Kalcevich), 97 (Ford)).  Unless otherwise stated, all defined terms in iAnthus's opening brief (Dkt. No. 100 (the "iAnthus MTD")) shall carry the same meaning in this reply brief.

## PRELIMINARY STATEMENT

Plaintiff's Opposition ("Opp.") confirms that this case—which involves Plaintiff's securities transactions in a Canadian company and intersects with several overlapping ongoing proceedings in Canada—should be dismissed for multiple reasons.

*First*, the Amended Complaint should be dismissed because Plaintiff's claims are "so predominantly foreign as to be impermissibly extraterritorial."  *Parkcentral v. Glob. Hub Ltd. v. Porsche Auto. Holdings, SE*, 763 F.3d 198, 216 (2d Cir. 2014).  Plaintiff brings claims under Section 10(b) based on Canadian securities filings by a Canadian company, and these claims squarely overlap, and already conflict, with various pending securities proceedings in Canada. Plaintiff has no answer to the impermissible "regulatory and legal overlap and conflict" between United States and Canadian securities regulation that Plaintiff's claims invite in this case.  *Id.*

*Second*, even if this case *can* be litigated here, it *should* be litigated in Canada.  It involves the Canadian securities of a Canadian company, and proceeding here would create an untenable risk of duplication and conflict with various Canadian proceedings.  All three *forum non conveniens* factors favor dismissal, and Plaintiff's counterarguments are without merit.  This Court should defer to Canada's interest in this matter and dismiss the case in favor of Canada.

*Third*, Plaintiff's securities claims are meritless.  Plaintiff attempts to construct a federal lawsuit out of a handful of disclosures that Plaintiff alleges, in hindsight, should have been made

earlier or "taint" earlier disclosures.  But Plaintiff fails to allege how any disclosure was materially false or misleading when made, or to articulate a factual basis to infer that Defendants intended to deceive iAnthus investors.  And his scheme and control liability claims are equally deficient.

I.  **THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF'S CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL**

"[A] domestic transaction is necessary but not necessarily sufficient to make § 10(b) applicable[.]" *Parkcentral*, 763 F.3d at 216.  Even where a plaintiff alleges a domestic transaction, securities claims can be "so predominantly foreign as to be impermissibly extraterritorial." *Id.* This is one such case.  Plaintiff seeks to invoke Section 10(b) even though his claims concern Canadian securities filings by a Canadian company whose securities are listed on a Canadian exchange.  What is more, the securities at issue are the subject of pending class-action and private litigations in Canada involving Plaintiff's same theories of liability, and have been the subject of prior and ongoing Canadian restructuring proceedings in which Canadian courts have already made findings in tension with Plaintiff's claims.  (*See* iAnthus MTD at 13–14.)

Here, as in *Parkcentral*, the significant "potential for regulatory and legal overlap and conflict" between Plaintiff's claims and iAnthus's extensive Canadian securities proceedings should "predominate" this Court's extraterritoriality analysis. *Parkcentral*, 763 F.3d at 216–17. In asking this Court to instead engage in the very "interference with foreign securities regulation" that the *Morrison* Court sought to avoid, *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 269, 130 S. Ct. 2869, 2886 (2010), Plaintiff makes several unavailing arguments.

*First*, Plaintiff attempts to distinguish (and unduly limit the applicability of) *Parkcentral*. Although *Parkcentral* may have concerned a "unique scenario" involving swap agreements (Opp. at 25), neither *Parkcentral*'s holding nor its motivating principles are limited to cases involving derivatives. *Parkcentral*, 763 F.3d at 202–03 ("Our ultimate conclusion . . . depends *in some part*

on the particular character of the unusual security at issue." (emphasis added)).  To the contrary, the *Parkcentral* court explicitly declined to create a "bright-line" test for extraterritoriality, *id.* at 217, and ultimately found that the concern over "[t]he potential for incompatibility between U.S. and foreign law . . . predominates in this case," *id.* at 216–17; *see also id.* at 216 ("[T]he application of § 10(b) to the defendants would so obviously implicate the incompatibility of U.S. and foreign laws that Congress could not have intended it *sub silentio*.").  Defendants thus seek dismissal of Plaintiff's claims based on the core comity concern motivating *Parkcentral*.[1]

*Second*, Plaintiff relies heavily on *In re Poseidon Concepts Sec. Litig.*, No. 13-cv-1213, 2016 WL 3017395, at *8 (S.D.N.Y. May 24, 2016).  (Opp. at 27.)  As an initial matter, *Poseidon* involved a motion to dismiss filed by KMPG LLP, Poseidon's auditor, after "Poseidon [was] no longer a named defendant in [the] case due to its bankruptcy."  *Poseidon*, 2016 WL 3017395, at *2.  Although there existed ongoing proceedings involving Poseidon abroad, *id.* at *5, KMPG did not raise these proceedings as a reason for *Parkcentral*'s application, *see* Memo. in Support of KPMG's MTD at 30–31, *In re Poseidon Concepts Sec. Litig.*, No. 13-cv-1213 (S.D.N.Y. 2016), 2015 WL 9412487; the court did not weigh such proceedings in its *Parkcentral* analysis, *Poseidon*, 2016 WL 3017395, at *12–13; nor was there any indication that those proceedings impermissibly overlapped with the issues facing the court.  Moreover, the *Poseidon* court in fact granted KMPG's motion to dismiss on other grounds, *id.* at *15, rendering as dicta its prior discussion of *Parkcentral*.  And to the extent the court suggested that *Parkcentral* did not apply because the relevant security was "not a derivative," *id.* at *13, Defendants submit that, as discussed above,

---

[1] For this reason, the cases that Plaintiff cites are distinguishable.  In neither *Giunta v. Dingman*, 893 F.3d 73 (2d Cir. 2018), nor *Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-cv-5790, 2015 WL 144165 (S.D.N.Y. Jan. 12, 2015), was the court confronted with foreign regulatory proceedings or litigation creating the potential for conflict between U.S. and foreign proceedings.

*Parkcentral* did not set forth such a "bright line" rule, and the Second Circuit has since applied it outside the derivative context. *See, e.g.*, *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 166–68 (2d Cir. 2021) (finding that *Parkcentral* requires a Court to "flexibly consider" whether a claim is "predominantly foreign," and applying *Parkcentral* to a private share offering).

*Third*, Plaintiff points to "substantial domestic contacts that preclude the application of *Parkcentral*." (Opp. at 25–26.)  Because *Parkcentral* considered the securities transactions "rather than surrounding circumstances," *Cavello Bay.*, 986 F.3d at 166, Plaintiff's allegations of these "substantial domestic contacts"—which concern Plaintiff's residence, iAnthus's past practice, the trading volume of its shares, and iAnthus and Gotham's general business operations—are of no moment.  And Plaintiff's "allegations that the [securities] were heavily marketed in the United States" likewise "do not satisfy . . . *Morrison*." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62, 70 (2d Cir. 2012).   Nor do the purported "facts . . . supporting Plaintiff having conducted 'domestic transactions'" (Opp. at 25), serve to dilute *Parkcentral*'s separate (and crucial) concerns of comity, as "a domestic transaction is necessary but not necessarily sufficient" to establish that Plaintiff's claims are not impermissibly foreign. *Parkcentral*, 763 F.3d at 216.

*Fourth*, Plaintiff contends that "important differences between this action and the Canadian class action" suggest that this action should remain in the United States. (Opp. at 27.)  Even were that true, the fact that Plaintiff may have an easier time litigating in the United States does not render his claims any less Canadian, nor does it obviate the central concerns of *Morrison* and *Parkcentral* over interfering with foreign proceedings involving foreign securities. *See Morrison*, 561 U.S. at 269, 130 S. Ct. at 2885–86; *Parkcentral*, 763 F.3d at 216.

*Fifth*, Plaintiff attempts to minimize the potential for conflict between this proceeding and the various parallel proceedings in Canada.  (Opp. at 28.)  But Plaintiff cannot dispute that the

4

parallel litigations in Canada involve identical theories of liability.  (*See* iAnthus MTD at 13–14.) And while Plaintiff argues that the regulatory proceedings relate to iAnthus's restructuring, and not preceding events, the Amended Complaint's theory is that iAnthus and Gotham concealed an improper relationship in view of improperly forcing, and profiting from, this restructuring (*see, e.g.*, 2AC ¶¶ 108, 117–119, 333), which conflicts with various Canadian findings that the transaction was "fair and reasonable," a "product of arm-length negotiations," and not the result of Gotham's "invidious" activity (iAnthus MTD at 13–14).  Moreover, Plaintiff ignores that one Canadian court in fact rejected the Amended Complaint's very version of preceding events, refusing to accept the argument that Ford's loan "calls into question whether Gotham . . . exerted . . . influence on iAnthus *prior to* the [transaction]."  (*Id.* at 14 (emphasis added).)

In sum, because Plaintiff's claims center on the Canadian securities and Canadian transactions of a Canadian company whose shares trade on a Canadian exchange, it is unsurprising that such claims overlap with Canadian regulatory and court proceedings, and Plaintiff cannot dispute that this overlap impermissibly creates the significant "potential for regulatory and legal overlap and conflict" with which *Parkcentral* was concerned.  *Parkcentral*, 763 F.3d at 216.

## II.     THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS*

Even if the Court declines to dismiss Plaintiff's claims pursuant to *Parkcentral*, it should dismiss them under the doctrine of *forum non conveniens*.  Courts evaluating *forum non conveniens* engage in a three-step analysis:

> First, the court must determine [ ] the degree of deference properly accorded the plaintiff's choice of forum.  Second, the court must consider whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, the court balances the private and public interests implicated in the choice of forum.

*Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 392–93 (S.D.N.Y. 2010) (citation and internal quotation marks omitted).  Here, the factors militate strongly in favor of dismissal, and Plaintiff's arguments in opposition are unconvincing.  The Court should therefore exercise its broad discretion to dismiss this case—which involves alleged misrepresentations by a Canadian company in its Canadian securities disclosures and is proceeding in parallel with ongoing, overlapping litigation in Canada—pursuant to the doctrine of *forum non conveniens*.

As to the first factor, Plaintiff argues that his choice of this District is entitled to significant deference.  (Opp. at 29–30.)  But Plaintiff fails to grapple with cases finding that "a plaintiff's choice of forum weighs far less heavily in a case such as this where plaintiffs sue strictly in a representative or derivative capacity" because "[p]laintiffs in such a case have only a small direct interest in a large controversy in which there are many potential plaintiffs[.]"  *DeYoung v. Beddome*, 707 F. Supp. 132, 138 (S.D.N.Y. 1989); *see also, e.g., Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 479 (S.D.N.Y. 2006) ("Plaintiffs' choice of forum is also entitled to less deference where, as here, they are suing in a representative capacity.").

With respect to the second factor, Plaintiff maintains that because "the fraud-on-the-market presumption for class members that purchased iAnthus stock before April 12, 2019" is unavailable, Canada is an inadequate forum.  (Opp. at 32.)  As courts have recognized, however, Canada is an adequate alternative forum.  *See In re Royal Grp. Techs. Sec. Litig.*, No. 04-cv-9809, 2005 WL 3105341, at *2 (S.D.N.Y. Nov. 21, 2005) ("[T]he Second Circuit has concluded that Ontario, Canada is an adequate forum to try class actions based on violations of federal securities laws." (citing *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21 (2d Cir. 2002))).[2]  And Plaintiff ignores that

---

[2] In *Poseidon*, a case Plaintiff relies on heavily, "the parties d[id] not dispute that Canada [was] an adequate alternative forum for th[at] litigation."  *Poseidon*, 2016 WL 3017395, at *8.

"[t]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, nor on identical remedies." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 158 (2d Cir. 2005) (alteration in original) (citation and internal quotation marks omitted); *see also, e.g., Fagan v. Deutsche Bundesbank*, 438 F. Supp. 2d 376, 383 (S.D.N.Y. 2006) ("[T]he fact that [foreign] courts may utilize different procedures regarding evidence does not mean that *forum non conveniens* is inappropriate . . . .").

Plaintiff's arguments as to the private interest similarly miss the mark.  Stating without explanation that "more" evidence will be located in this forum (Opp. at 32), Plaintiff ignores that his claims concern disclosures filed in Canada and Canadian restructuring proceedings.  Moreover, to the extent likely witnesses reside in this forum (*id.*), those witnesses will nevertheless be required to travel to Canada in connection with the overlapping Canadian proceedings, and the key issue for the "private interest" is one of burden and expense.  (*See* iAnthus MTD at 16.)  Plaintiff fails to acknowledge the tremendous drain on time and resources that litigating similar issues in two countries simultaneously will have on all parties.  Additionally, there are likely to be synergies and economies of scale achieved—such as obviating the continued retention of both Canadian and U.S. securities counsel—by having all related litigation in Canada.  Further, to the extent third-party discovery concerning Canadian documents and witnesses proves necessary, such documents and testimony will be outside of the Court's subpoena power and may require expensive and time-consuming liaising with Canadian courts or authorities.

As to the public interest, it is beyond question that "the interest of Canada in having controversies relating to one of its major corporations decided at home is substantial."  *DeYoung*, 707 F. Supp. at 139.  This is especially true where "Canada's government and courts have already taken an active role over the subject matter of this dispute."  *Id.*  Although, in a vacuum, U.S.

courts may certainly have an interest in adjudicating securities cases involving U.S. plaintiffs (Opp. at 30–31), Plaintiff is not free to ignore the ongoing Canadian litigations and regulatory proceedings relating to the very issues in this case.[3]  Under these circumstances, "[i]t would be highly intrusive for this Court to involve itself in a matter that has so heavily engaged the attention of both the executive and judicial authorities of Canada." *DeYoung*, 707 F. Supp. at 139; *see also Allstate Life Ins. Co. v. Linter Grp., Ltd.*, 994 F.2d 996, 1002 (2d Cir. 1993) ("[T]hat United States courts have an interest in enforcing United States securities laws . . . alone does not prohibit them from dismissing a securities action on the ground of forum non conveniens.").[4]

Finally, untethered to any specific factor in the *forum non conveniens* analysis, Plaintiff argues without support that the doctrine of *forum non conveniens* should not apply in securities cases found to satisfy *Morrison*.  (Opp. at 31–32.)  But Plaintiff fails to cite any case for this proposition, and for good reason: "the principle of forum non conveniens is simply that the court may resist imposition upon its jurisdiction even when jurisdiction is authorized," *Kitaru*, 698 F. Supp. 2d at 392 (citation omitted), and necessarily comes into play only where an action before the Court is otherwise not subject to dismissal.  The *Morrison* question is whether this Court *can* adjudicate Plaintiff's claims; *the forum non conveniens* question is whether this Court *should*.

---

[3] With respect to the regulatory proceedings, Plaintiff downplays the importance of iAnthus's restructuring in the *forum non conveniens* analysis and asserts that "[u]nder Defendants' logic, any time a company is undergoing a restructuring in a foreign court, a U.S. securities class action would not be permitted to proceed."  (Opp. at 33.) Plaintiff is fighting a straw man.  Defendants' argument is specific to *this* securities case and *this* restructuring because they are so closely intertwined.

[4] Plaintiff also contends that Defendants "mischaracterize the role of Canadian law here" because the Court will not need to address whether Defendants' disclosures complied with Canadian law.  (Opp. at 34.)  Although Plaintiff clearly intends to rely on Canadian law (*see* 2AC ¶¶ 352–53), it is an even more significant issue that different laws will be applied to the same Canadian securities filings.  A Canadian court determining that Defendants' disclosures were compliant under Canadian law and a U.S. court simultaneously determining that Defendants' disclosures ran afoul of U.S. law is exactly the type of conflict that the *Morrison* Court endeavored to avoid, *Morrison*, 561 U.S. at 269, 130 S. Ct. at 2885–86, and at the very least weighs in favor of this Court deferring to the Canadian forum in its discretion.

At bottom, this case belongs in Canadian court.  It involves a Canadian company, Canadian securities, Canadian disclosures, and overlaps with multiple proceedings in Canada.  And there exists a Canadian class action raising the same issues in this case, which is seeking certification on behalf of investors, like Plaintiff, "who acquired [iAnthus shares] in the secondary market." (iAnthus MTD at 18.)  Under these circumstances, Defendants respectfully request that this Court exercise its discretion and dismiss the case under the doctrine of *forum non conveniens*.

## III.   THE AMENDED COMPLAINT'S CLAIMS ARE MERITLESS

Although this Court need not (and should not) reach the merits of Plaintiff's claims, the Amended Complaint fails to state a claim under Section 10(b) or Section 20(a).  It fails to (a) allege a single actionable misrepresentation or omission by any Defendant or an adequately pled theory for "scheme liability," or (b) articulate a non-conclusory factual basis from which to draw an inference of scienter.  Its allegations concerning control liability are equally deficient.

### A.   None of the Alleged Misstatements or Omissions Is Actionable

Plaintiff acknowledges that his Section 10(b) claim is subject to the heightened "pleading standard of Rule 9(b) and the PSLRA," which demand that plaintiffs "specify the fraudulent statements or omissions, 'identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent.'"  (Opp. at 35 (quoting *Muller-Paisner v. TIAA*, 289 F. App'x 461, 463 (2d Cir. 2008)).)   Falling short of that standard, Plaintiff relies on conclusory and fraud-by-hindsight allegations that cannot support his claim, *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 99 (S.D.N.Y. 2011) ("It is well-established in the Second Circuit that a plaintiff alleging securities fraud may not substantiate a claim by pleading fraud by hindsight." (citation and internal quotation marks omitted)).  Specifically, Plaintiff centers his claims on allegations that two loans to Ford "tainted" nearly all of iAnthus's prior transactions, and that other, undisclosed loans must exist; and that, because iAnthus ultimately defaulted on its

loans, iAnthus should have disclosed even contingent contractual provisions in the documents surrounding its financing and equity transactions.  iAnthus's failure to disclose these loans (or their "taint") and certain provisions of its financing transactions, Plaintiff alleges, in turn renders false or misleading nearly all of iAnthus's disclosures relating to its financing transactions or corporate governance.  But Plaintiff's approach falls short because, for the reasons that follow, Plaintiff fails to plead with particularity facts showing that Ford's loans, the provisions of iAnthus's transaction documents, or any other issue identified by Plaintiff rendered any of iAnthus's disclosures false or misleading when made.

1. <u>**Defendants' Statements Regarding Related Party Transactions Were Neither False Nor Misleading**</u>

The Amended Complaint focuses on iAnthus's 2018 annual report and its quarterly filings in 2018 and the first three quarters of 2019.  (*See* 2AC ¶¶ 149–260.)  Plaintiff pronounces that those filings contained "outright false statements" in light of Ford's December 21, 2019 loan with Adler and other alleged transactions with Adler and Rozinov.  (Opp. at 36.)  In defending his Amended Complaint, Plaintiff cannot counter the fact that Ford did not even obtain a loan from Adler until December 21, 2019—following all rounds of financing from Gotham and each of the allegedly defective disclosures identified in the Complaint.[5]  (*Compare* 2AC ¶¶ 97 (noting that Ford received the loan on December 21, 2019), *with id.* ¶ 261 (alleging final misstatement on December 20, 2019).)  Plaintiff's Opposition, like his Amended Complaint, is centered on the notion that Ford's subsequent loan "tainted" iAnthus's earlier financing deals (Opp. at 7), but these types of "fraud by hindsight" tactics are not permitted.  *See In re Magnum Hunter Res. Corp. Sec.*

---

[5] Although Plaintiff argues that he "alleges misstatements after Adler's December 21, 2019 payment" (Opp. at 8), the Material Change Report that he relies upon was merely a summary of the December 20, 2019 transaction and did not purport to address the presence or absence of conflicts as of December 30.  (*See* 2AC ¶ 266 (noting that the Material Change Report "described the terms of iAnthus's December 20, 2019 agreement with [Gotham]").)

*Litig.*, 26 F. Supp. 3d 278, 290, 294–95 (S.D.N.Y. 2014) (noting that "without contemporaneous falsity, there can be no fraud" and finding plaintiff's allegations deficient on that basis).

Sidestepping facts inconvenient to his theory, Plaintiff also elides iAnthus's prompt investigation and disclosures *after* Ford volunteered to the Board of Directors that he had received the loan from Adler following the financing rounds.  In the span of three weeks, iAnthus's Board formed a Special Committee; the Committee rendered publicly-disclosed findings regarding the nature and impact of two previously undisclosed loans, including the Adler loan; and the Board accepted Ford's immediate resignation.  (*See* 2AC ¶¶ 95, 96, 98.)  Thus, as in *In re Elan Corp. Securities Litigation*, 543 F. Supp. 2d 187 (S.D.N.Y. 2008), Defendants properly availed themselves of "a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose ar[ose]."  *Id.* at 217.

Hamstrung in this lawsuit by the fact that Adler's loan rendered no disclosures false or misleading, Plaintiff points to a $60,000 loan that Ford purportedly received from Rozinov (2AC ¶ 102), but his allegations lack specificity regarding any aspect of that alleged transaction or why such loan is relevant to any disclosure (let alone a fact which would render any disclosure materially false or misleading).  The Amended Complaint merely incorporates by reference Hi-Med's conclusory allegations, and an anonymous website post published on March 31, 2020. (2AC ¶¶ 102, 104.)  Far from "eviscerate[ing] Defendants' timing argument" (Opp. at 38), Plaintiff's reliance on an anonymous online "report" that itself contains no detail regarding the timing of the alleged loan and first appeared more than three months *after* the latest alleged misleading disclosure demonstrates the central role of speculation in the Amended Complaint.[6]

---

[6] To the extent Plaintiff relies on Hi-Med's amended complaint to plausibly allege details with respect to the alleged Rozinov loan (2AC ¶ 102), Hi-Med's amended complaint alleges that that loan—like the Adler loan—occurred on

Plaintiff unsuccessfully grasps at straws to "demonstrate with specificity why and how" an alleged loan from Ford or Rozinov rendered any of Defendants' prior statements misleading. *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 381 (S.D.N.Y. 2020) (citation omitted). And Plaintiff's remaining baseless assertions—with no particularized facts—of unspecified "taint" (Opp. at 7, 49, 68), or unspecified additional loans (*id.* at 38–40), are precisely the sort of "speculation and conclusory allegations" that cannot sustain a securities fraud claim. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 158 (S.D.N.Y. 2012).[7]

### 2. Defendants' Statements Regarding Gotham's Investments Were Neither False Nor Misleading

Failing to establish an actionable misrepresentation with respect to any supposed "conflicts of interest" created by loans, Plaintiff pivots to iAnthus's disclosure of Gotham's "$10 million equity investment in iAnthus." (Opp. at 43). While acknowledging that Gotham indeed invested $10 million in iAnthus in May 2018 (along with $40 million in financing) and that iAnthus disclosed the entire 152-page 2018 DPA, Plaintiff nonetheless insists the company's contemporaneous disclosure somehow was misleading because it described Gotham's investment as equity (*id.* at 43), and did not disclose what Plaintiff repeatedly characterizes as a "secret $10

---

December 21, 2019. (*See* No. 20-cv-03898-LAK (Hi-Med LLC), Dkt. No. 80, at ¶ 48.) Further, Hi-Med seemingly no longer relies on the purported Rozinov loan to demonstrate that any of Defendants' statements were false or misleading. (*See* No. 20-cv-03898-LAK (Hi-Med LLC), Dkt. No. 91, at 37–38 (arguing only that that Adler's loans to Ford were material).)

[7] Plaintiff's reliance on *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021) (*see* Opp. at 37), is misplaced. That case does not stand for the proposition that *all* generic statements by a corporation or its officers can survive a motion to dismiss. Moreover, securities cases are fact dependent: the fact that plaintiffs' allegations in that case were sufficient to allege that generic statements about conflicts of interest and corporate governance were false or misleading when made in no way saves Plaintiff's deficient allegations here.

million exit fee" (*id.* at 1, 4, 13, 48, 54).[8]  But the exit fee never actually triggered and, in any event, constituted a highly speculative future occurrence as of the 2018 DPA.

"A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014).  Indeed, the decisions cited by Plaintiff are in accord.  *See, e.g.*, *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18-cv-9848, 2020 WL 5757628, at *11 (S.D.N.Y. Sept. 27, 2020) (noting, in addressing a Securities Act of 1933 claim, the difference between hypothetical risk (not actionable) and "presently-existing risk" (actionable)).

Taking all of Plaintiff's allegations as true for the purpose of this motion, there simply was no "presently-existing risk" of liability with respect to Gotham's prospective exit fee as of May 2018 which would have required disclosure.  While baldly asserting that "[t]here is nothing contingent about the existence of the Exit Fee" (Opp. at 47), Plaintiff ignores that Gotham's prospective fee was entirely contingent on several conditions precedent—including iAnthus failing to repay the loan as agreed and neither Gotham nor iAnthus converting the loan into equity—and that the fee in fact was never paid.[9]  Plaintiff seeks to make a federal case out of hypothetical case studies.  This case is on all fours with *Lipow v. Net1 UEPS Technologies, Inc.*, 131 F. Supp. 3d 144 (S.D.N.Y. 2015), in which Judge Ramos explained that a "speculative" liability cannot give

---

[8] Plaintiff also argues that the statements about Gotham's investments were false or misleading because of Ford's self-dealing.  (Opp. at 42–43.)  For the reasons discussed above, Plaintiff's allegations are insufficient to demonstrate that Ford engaged in any self-dealing *prior* to these investments, and Plaintiff therefore has failed to adequately allege that the statements were false or misleading when made.

[9] Significantly, Plaintiff has cited no case holding that a company must disclose all consequences of loan default or describe the minute details of every investor's equity investment.

rise to a disclosure violation under Section 10(b).[10]  *Id.* at 170–71; *see Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (finding no duty to disclose negative consequences from a failed factory inspection where it was not a "foregone conclusion" that consequences would materialize).

Finally, Plaintiff obscures iAnthus's eventual disclosure of the precise contours of the exit fee once circumstances suggested that the provision might be triggered.  (2AC ¶ 63; Dkt. No. 69-11 (FY 2019 MDA) at 15.)  Rather than confront the reality of iAnthus's disclosures fairly revealing events as they occurred, Plaintiff alleges baseless theories of fraud.

### 3.     Defendants' Statements Regarding the Availability of Financing Were Neither Misrepresentative Nor Material

Unable to identify any specific misrepresentations made by Defendants, Plaintiff grasps further for stray opinions expressed by Ford and Kalcevich on conference calls with investors in September and November 2019 regarding the availability of financing.  (Opp. at 48–52.)  Again, Plaintiff ignores that, at the time of these calls, neither of the Amended Complaint's supposed bases for "taint"—the loan from Adler and circumstances suggesting Gotham's exit fee would be triggered—had even occurred.  Nor does the Opposition sufficiently contest that Plaintiff's reliance on iAnthus's later default to render earlier financing-related statements misleading amounts to nonactionable fraud by hindsight.

In addition, Ford's and Kalcevich's comments constitute quintessential statements of opinion, which cannot predicate securities liability as a matter of law absent special circumstances

---

[10] Plaintiff's attempt to distinguish *Lipow* (Opp. at 47 n.20), fails because it proceeds on the counterfactual premise that Defendants knowingly "hid[]" the prospective Exit Fee liability.  The facts, as alleged by Plaintiff in the Amended Complaint, demonstrate precisely the opposite.  (*See* 2AC ¶ 63 (disclosing prospective exit fee liability on iAnthus's financials for the first quarter of 2020, after it first started to accrue interest).)  As in *Lipow* and the litany of cases on which that decision relied, Defendants had no obligation to disclose such a speculative liability before it was "substantially certain to occur during the relevant period."  *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006).

not present here.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 135 S. Ct. 1318 (2015).  By Plaintiff's admission, Ford pointed to the then-impending financing transaction with Gotham as a factor that he "firmly *believe[d]*" was "supporting our stock today" and expressed his "full *confidence* that, if we need to [sic] capital, that it will be there."  (2AC ¶¶ 233, 256 (emphasis added).)  Likewise, Kalcevich answered an investor's question about iAnthus's ability to pledge assets to raise additional capital, "I *think* anything's available."  (*Id.* ¶ 257 (emphasis added).)  Plaintiff fails to show—as he must—that these were *not* sincerely held beliefs when expressed, and cannot point to an allegation to support his conclusory suggestion that the comments "contained embedded false statements [sic] fact."  (Opp. at 52.)

### 4.    Defendants' Statements Regarding the Escrow Provision of the 2018 DPA Were Neither False Nor Misleading

Although the Complaint acknowledges that the 2019 DPA with Gotham was an "Amended and Restated" version of the 2018 DPA (2AC ¶¶ 237–39)—and thus that provisions of the 2018 DPA were either amended or outright restated in the amended agreement—the Opposition confuses the restatement of the "escrow provision" from the 2018 DPA with the creation of a new, additional escrow obligation in the 2019 DPA (Opp. at 52–53).  iAnthus's many disclosures confirm that the escrow under the 2018 DPA was both funded and released and that no additional escrow was withheld under the restated escrow provision of the 2019 DPA, and any suggestion of Plaintiff to the contrary is conclusory.  (*See* Dkt. No. 69-3 (FY 2018 AR) at 107; Dkt. No. 69-6 (Q1 2019 FS) at 16; Dkt. No. 69-7 (Q2 2019 FS) at 16; Dkt. No. 69-8 (Q3 2019 FS) at 16.)[11]

---

[11] Plaintiff's further suggestion that Ford's and Kalcevich's certifications in connection with periodic reporting during the Class Period should have disclosed Ford's supposed conflict of interest or the "secret exit fee" is entirely derivative of Plaintiff's other arguments.  (Opp. at 53–54.)  As discussed *supra* at pp.10–14, Plaintiff fails to state an actionable misrepresentation as to either proposed predicate for certification-related liability.

###### B.        Plaintiff Fails to Allege Scienter

The Amended Complaint illustrates the very problem Congress anticipated in curtailing claims of securities fraud supported only by skeletal allegations of supposed misrepresentations. *See* 15 U.S.C. § 78u-4(b)(2) (requiring that for each alleged securities-related act or omission, plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").   Plaintiff does not, and cannot, identify any basis—let alone a "cogent" and "compelling" one—to infer that any Defendant *intended* "to deceive, manipulate, or defraud" investors.   *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted).

###### 1.        Plaintiff Fails to Plead Motive and Opportunity

Rather than plead particularized facts showing that Defendants "benefitted in some concrete and personal way from the purported fraud," *id.* at 198 (citation omitted), Plaintiff rehashes unspecific allegations of fraud-by-hindsight.   Time and again, Plaintiff zeroes in on purported "personal payments in connection with iAnthus's loans." (Opp. 57.)   However, unlike the lone decision upon which Plaintiff relies—in which the defendant's controlling shareholder and CEO actively lobbied the company's board to "ignor[e] other sources of capital that were available" and, in exchange, received an outright "bribe," *Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*, 688 F. Supp. 2d 229, 233, 246 (W.D.N.Y. 2010)—here, the only loan from any potential related party whose terms and timing are specifically identified in the Complaint actually occurred *after* every transaction at issue.   *See supra* pp. 10–12.

The Amended Complaint repeatedly reaches and broadly asserts that Ford "received hundreds of thousands of dollars in personal payments in connection with iAnthus's loans" (Opp. at 57), but fails to specify the date or details of any such transaction (aside from the after-the-fact Adler loan).   Moreover, the Amended Complaint fails to identify any specific connection

whatsoever between iAnthus's transactions and these "hundreds of thousands of dollars in personal payments," much less a sufficiently "cogent" and "compelling" basis to conclude that *because* of those unspecified personal payments, Ford intended "to deceive, manipulate, or defraud" investors. *ECA*, 553 F.3d at 198 (citation omitted).

Plaintiff's alternative scienter allegations stand weaker still. (Opp. at 57–59.) Ford's sale of $1.48 million in stock over the course of a more than two-year Class Period is completely disconnected to the financing transactions at issue. Reminded that Ford's most recent stock sale occurred on September 3, 2019 (2AC ¶ 146)—seven months before iAnthus's April 2020 disclosure of default—Plaintiff nonetheless insists that the sale must be relevant because it occurred a month before iAnthus's September 30, 2019 investor call (Opp. at 57). But, as discussed *supra* at p. 15, Ford's comments on the investor call merely reflected his "belie[f]" that the Gotham financing transaction was "supporting our stock today." (2AC ¶ 233.) Ford made no assurances whatsoever on the call, and in any event, the stock sale already had occurred four weeks earlier. In urging the Court to derive scienter from Ford's sincerely professed "belie[f]" that the financing transaction would close, Plaintiff traffics in baseless distraction.[12]

Indeed, Plaintiff's loose allegations about Ford's and Maslow's going-private proposal demonstrate Defendants' *lack* of scienter: had the proposal been adopted, Ford's and Maslow's holdings in iAnthus would have been more than halved overnight. (2AC ¶¶ 137–39, 308.) Plaintiff acknowledges that the proposal was never effectuated but nonetheless speculates that Defendants harbored some unspecified ill motive yet failed to succeed because "iAnthus's stock price proceeded to decline even further" *after* the proposal. (Opp. at 58.) In the upside-down theory of

---

[12] Plaintiff's allegations and argument regarding stocks options (*see* 2AC ¶¶ 143–44; Opp. at 58), are equally deficient. Stock options are commonplace, and, in any event, these stock options pre-date the default by a year.

fraud offered by Plaintiff, the Complaint relies upon a proposal—to give management a 10% ownership of iAnthus for the price of $0.50 per share—made during the very same week when iAnthus's stock fell to "approximately $0.18 per share."   (2AC ¶¶ 138, 308.)   Instead of acknowledging Ford's and Maslow's proposal as seeking to address liquidity constraints, Plaintiff alleges, in conclusory fashion, speculative motives for Defendants' conduct, none of which are tied to facts, let alone particularized allegations.

A "reasonable person" would not infer scienter from the facts alleged but rather the "opposing inference," that Defendants did *not* intend to "deceive, manipulate, or defraud" investors.  *ECA*, 553 F.3d at 198 (citation omitted).

## 2.   Plaintiff Fails to Plead Conscious Misbehavior or Recklessness

Where, as here, the Amended Complaint "does not adequately plead motive, it must allege a degree of scienter 'approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts' and 'must detail specific contemporaneous data or information known to the defendants that was inconsistent with the representation in question.'"  *Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at *11 (S.D.N.Y. Mar. 30, 2012) (citation and internal quotation marks omitted).  Plaintiff fails to satisfy that substantial burden.

Instead, Plaintiff harkens back once again to Ford's loans.  (Opp. at 59–60.)  But the only loan Plaintiff has alleged in any detail occurred *after* the financing transactions at issue, and therefore cannot possibly shed light on any "contemporaneous" information as of the previous purported misrepresentations.  Plaintiff's other so-called "red flags" likewise are inapposite.  (Opp. at 60–62.)   Each of these scattershot, supposed bases for scienter—*e.g.*, the directors' resignations—occurred long after every misrepresentation alleged in the Amended Complaint or is insufficient as a matter of law.  Tellingly, Plaintiff fails to demonstrate how such "red flags" (*id.*

18

at 61), evince any "specific contemporaneous data" known to Defendants yet inconsistent with a single representation they made. *Janbay*, 2012 WL 1080306, at *11.

### 3.     Plaintiff's Reliance on the Core Operations Doctrine Is Misplaced

To the extent the core operations doctrine is even available in the wake of the PSLRA, *see Villare v. Abiomed, Inc.*, No. 19-cv-7319, 2021 WL 4311749, at *23 (S.D.N.Y. Sept. 21, 2021) ("The Second Circuit has not expressly determined if the 'core operations' doctrine remains applicable to provide scienter after the enactment of the PSLRA."), it is inapplicable here given the deficiencies of Plaintiff's other allegations*, Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) ("Here none of plaintiff's other allegations support an inference of scienter, and thus the 'core operations doctrine' cannot bolster it.").  Plaintiff's claim fails because he cannot identify a "cogent" and "compelling" basis to infer that *any* Defendant intended "to deceive, manipulate, or defraud" iAnthus's investors.  *ECA*, 553 F.3d at 198 (citation omitted).

### C.     Plaintiff's Scheme Liability Claim Is Deficient

Plaintiff attempts to salvage his untenable misrepresentations and omissions claim by invoking "scheme liability."  (Opp. at 69–70.)  But the scheme liability doctrine is inapposite where, as here, Plaintiff fails to allege—let alone with the heightened specificity demanded under the PSLRA—that Defendants committed separate deceptive acts distinct from supposed misstatements or omissions.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *Smith Barney*, 884 F. Supp. 2d at 161 ("Nevertheless, the three subsections of Rule 10b–5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric.").  Plaintiff's scheme allegations——"making secret side deals in iAnthus's agreements with [Gotham] and its other lenders" (Opp. at 69)—are duplicative of the alleged misrepresentations and omissions and improperly pled for the same

reasons set forth further in Defendants' accompanying reply to co-Plaintiff Hi-Med's opposition brief, incorporated here by reference.

### D. Plaintiff's Control Liability Claim Is Deficient

The Opposition's suggestion that Ford and Kalcevich are liable under Section 20(a) because they "participated in the operation and management" of iAnthus is meritless.  (Opp. at 70.)  The Amended Complaint lacks allegations that either Ford or Kalcevich culpably participated "in some meaningful sense" in the alleged fraud, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007), and general allegations about an individual's position, awareness, and knowledge are insufficient to establish control person liability, *see Smith Barney*, 884 F. Supp. 2d at 166.  Accordingly (and because Plaintiff has failed to state a claim under Section 10(b)), Plaintiff's Section 20(a) claims against Ford and Kalcevich should be dismissed.

## IV.   DISMISSAL SHOULD BE WITH PREJUDICE

Notwithstanding Plaintiff's request for leave to amend (Opp. at 70), Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.  Plaintiff has already amended his complaint and further amendment would be both inequitable and futile.  *See Zottola v. Eisai Inc.*, No. 20-cv-2600, 2021 WL 4460563, at *12 (S.D.N.Y. Sept. 29, 2021) ("The Second Circuit has indicated that 'when a plaintiff does not advise the district court how the complaint's defects would be cured . . .  it is not an abuse of discretion to implicitly deny leave to amend.'" (quoting *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 38 n.4 (2d Cir. 2018))).

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated: New York, NY
      March 21, 2022

Respectfully Submitted,

By:    /s/ Seth L. Levine    
    Seth L. Levine
    Chad P. Albert

**LEVINE LEE LLP**
5 Columbus Circle, 11th Floor
New York, New York 10019
Telephone: (212) 223-4400
Facsimile: (212) 223-4425
slevine@levinelee.com
calbert@levinelee.com

*Attorneys for Defendants iAnthus Capital Holdings, Inc. and Julius John Kalcevich*

By:    /s/ Adam R. Mandelsberg    
Adam R. Mandelsberg

**PERKINS COIE LLP**

Adam R. Mandelsberg
Emily Cooper
1155 Avenue of the Americas, 22nd Fl.
New York, NY 10036-2711
212-261-6867
AMandelsberg@perkinscoie.com

*Attorneys for Defendant Hadley C. Ford*

21