UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re

iANTHUS CAPITAL HOLDINGS, INC.                    20-cv-3135 (LAK)
SECURITIES LITIGATION


This document relates to:  20-cv-03135, 20-cv-03898

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                │
│ DOCUMENT                                 │
│ ELECTRONICALLY FILED                     │
│ DOC #:_____                    │
│ DATE FILED: 9/28/22                      │
└─────────────────────────────────────────┘
```

## MEMORANDUM OPINION

Appearances:

Jeremy Alan Lieberman
Michael Grunfeld
POMERANTZ LLP
*Attorneys for Lead Plaintiff Jose Antonio Silva*

Jonathan Temchin
Richard Joseph Lamar Lomuscio
TARTER KRINSKY & DROGIN LLP

Michael Paul O'Mullan
RIKER DANZIG SCHERER HYLAND PERRETTI LLP

*Attorneys for Plaintiff Hi-Med LLC*

Adam R. Mandelsberg
Emily Cooper
Adam Hugh Schuman
PERKINS COIE LLP
*Attorneys for Defendant Hadley C. Ford*

Seth L. Levine
Chad P. Albert
LEVINE LEE LLP
*Attorneys for Defendants iAnthus Capital Holdings, Inc.,*
*Julius John Kalcevich, Randy Maslow and Robert Galvin*

Carla M. Wirtschafter
James Sanders
Jason Mayer
Ian Marcus Turetsky
REED SMITH LLP
*Attorneys for Defendant Gotham Green Partners LLC*
*and Jason Adler*

Charles J. Falletta
Mark Steven Olinsky
SILLS CUMMIS & GROSS, P.C.
*Attorneys for Defendant Elizabeth Stavola*

LEWIS A. KAPLAN, *District Judge.*

These related cases are brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and regulations thereunder principally against iAnthus Capital Holdings Inc. ("iAnthus"), a Canadian corporation engaged in the cannabis business in the United States. Defendants move to dismiss on grounds including extraterritoriality, *forum non conveniens*, and because defendants' alleged statements and omissions do not state a cause of action for securities fraud pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6), and the Private Securities Litigation Reform Act ("PSLRA").

The Court granted defendants' prior motions to dismiss their first amended complaints in an August 30, 2021 opinion,[1] concluding that no plaintiff had pled facts sufficient to show a domestic purchase of iAnthus securities. The claims therefore were improper because the Exchange Act does not apply extraterritorially. Defendants now move to dismiss the second amended complaints against them. For the following reasons, those motions are granted in part and denied in part.

---

[1]    *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 20-cv-3135 (LAK) [Dkt. 81] ("Mem. Op.").

## *Background*

iAnthus is a Canadian company that owns and operates cannabis facilities in the United States. It is organized and exists under Canadian law, its registered office is in Canada, and its shares are listed on the Canadian Securities Exchange ("CSE") and trade over-the-counter in the United States.[2]

On April 6, 2020, iAnthus announced that it had defaulted on its debt, including interest due to its senior secured lender and most significant source of financing, Gotham Green Partners ("GGP").[3] Soon after, iAnthus revealed that its chief executive officer had accepted an interest-free loan from GGP's managing member one day after the final round of financing between their companies had closed.[4] iAnthus and GGP then negotiated a restructuring support agreement (the "Restructuring Transaction") designed to give GGP one half of iAnthus's equity in exchange for reducing iAnthus's debt and the provision of additional interim financing.[5] The agreement would leave pre-existing equity holders with very little of their original investments.[6]

---

[2] Second Consolidated Amended Complaint [20-cv-3135, Dkt. 91] ("SCAC") ¶ 33; Hi-Med Second Amended Complaint [20-cv-3898, Dkt. 80] ("Hi-Med SAC") ¶ 11.

[3] *Id.*; SCAC ¶¶ 58, 94; Hi-Med SAC ¶¶ 22, 56.

[4] SCAC ¶¶ 96-116.

[5] *Id.*

[6] *Id.*

4

The Supreme Court of British Columbia approved the Restructuring Transaction over shareholder objections in October 2020.[7]  The Court of Appeal of British Columbia dismissed an appeal from the Supreme Court's order on January 29, 2021.[8]  Other lawsuits have been brought against iAnthus in Canadian courts, at least one of them by iAnthus's largest shareholder Hi-Med LLC ("Hi-Med").[9]  And, in August 2021, GGP applied for an order from the Ontario Superior Court of Justice prohibiting iAnthus from terminating the Recapitalization Transaction after iAnthus purportedly received "other, better offers" for recapitalization.[10]  The court decided – subject to iAnthus's appeal, which was pending at the time these motions were filed – that iAnthus remains bound to continue in its agreement with GGP.[11]

The actions now before the Court are a consolidated class action led by plaintiff Jose Antonio Silva[12] and an individual action brought by Hi-Med.[13]  Plaintiffs allege – on a high level of generality – that iAnthus, GGP, and executives at both companies violated Section 10(b) of the

---

[7]      *See* Levine Decl. [20-cv-3135, Dkt. 101], Ex. W ¶ 99 (declining to approve the Restructuring Transaction because of its release and injunction provisions); Ex. X at Summary, ¶¶ 13-20 (noting the lower court's approval "after iAnthus amended part of the plan to narrow the scope of a release of claims").

[8]      *See id.*, Ex. X.

[9]      *See id.*, Exs. R-T.

[10]      *Id.*, Ex. Z ¶ 48.

[11]      iAnthus Mem. [20-cv-3135, Dkt. 100], at 10.

[12]      20-cv-3135 (LAK).

[13]      20-cv-3898 (LAK).

5

Exchange Act and Rule 10b-5 promulgated thereunder[14] by failing to disclose information regarding iAnthus's relationship with GGP and certain terms governing the financing that GGP provided. They claim that because of these undisclosed facts iAnthus defaulted on its loans to GGP and then positioned GGP to take over the company. Hi-Med asserts also common law claims based on the same conduct.[15]

*The Parties*

Lead plaintiff Silva is a resident of Louisiana.[16] He purchased iAnthus securities over the counter during the class period,[17] which extends from May 14, 2018 to July 10, 2020.[18] The proposed class includes "all those who purchased or otherwise acquired iAnthus securities during the Class Period[] and were damaged upon the revelation of the alleged corrective disclosures and the materialization of the undisclosed risks."[19] The class excludes defendants, "the officers and directors of [iAnthus], at all relevant times, members of their immediate families and their legal

---

[14]

SCAC ¶¶ 362-68 (asserting Section 20(a) violations against Ford, Kalcevich, and Adler); Hi-Med SAC ¶¶ 108-13 (asserting Section 20(a) violations against Ford, Kalcevich, Stavola, Galvin, and Maslow).

[15]

Hi-Med SAC ¶¶ 114-52 (asserting breach of contract claims); ¶¶ 153-67 (asserting tortious interference claims); ¶¶ 168-75 (asserting common law fraud claims).

[16]

SCAC ¶ 23.

[17]

*Id.* ¶ 21.

[18]

*Id.* ¶ 1.

[19]

*Id.* ¶ 340.

6

representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest."[20]

Plaintiff Hi-Med is a limited liability company organized under the laws of Florida with its principal office in Florida.[21]  Hi-Med's sole member is Kapex I, L.L.C. ("Kapex I") and the members of Kapex I are Dr. Krishna Singh and Martha Singh, both of Florida.[22]

As indicated above, defendant iAnthus is a Canadian company with its principal executive offices in New York.[23]  Defendant Hadley C. Ford is a co-founder of iAnthus and its former chief executive officer ("CEO") and director.[24]  Defendant Julius John Kalcevich is the chief financial officer ("CFO") of iAnthus and was formerly a director.[25]  Defendant Elizabeth Stavola was formerly the chief strategy officer of iAnthus.[26]  Defendant Robert Galvin formerly was a

---

[20]     *Id.*

[21]     Hi-Med SAC ¶ 10.

[22]     *Id.*

[23]     *See id.* ¶ 11.

[24]     SCAC ¶ 46.

[25]     *Id.* ¶ 47.

[26]     Hi-Med SAC ¶ 16.

director of iAnthus.[27]  Defendant Randy Maslow was a co-founder of iAnthus and, when the second amended complaints were filed, was the interim CEO and a director.[28]

Defendant GGP is a private equity firm focused on cannabis investments.[29]  GGP maintains its primary offices in California.[30]  Defendant Jason Adler is a managing member of GGP.[31]

*Factual Allegations*

Unless stated otherwise, the facts described below are alleged in lead plaintiff Silva's Second Consolidated Amended Complaint ("SCAC") and the Hi-Med Second Amended Complaint ("Hi-Med SAC") and the documents incorporated by reference therein.  The Court accepts these facts as true for purposes of this motion.

*iAnthus's Financing During the Class Period*

During the class period, GGP was iAnthus's main source of financing, largely in the form of secured debt at an interest rate of 13 percent.[32]  Its first loan came on May 14, 2018, when

---

[27]

*Id.* ¶ 17.

[28]

*Id.* ¶ 14.

[29]

*Id.* ¶ 48.

[30]

*Id.*; Hi-Med SAC ¶ 12.

[31]

SCAC ¶ 49.

[32]

*Id.* ¶ 58.

iAnthus raised $50 million from GGP consisting of a $40 million loan and a purchase of $10 million in iAnthus stock.[33]   This deal included an "'exit fee' whereby iAnthus would repay GGP $10 million, plus 13 [percent] interest, if [iAnthus] did not repay the entire $40 million" plus interest by May 2021.[34]   iAnthus did not reveal the existence of the exit fee until July 31, 2020.[35]   And, on August 14, 2020, it revealed that iAnthus owed $12.5 million for the exit fee as of March 31, 2020 "because the fee started to accrue interest as far back as September 30, 2019."[36]

On September 30, 2019, iAnthus announced that it had, by the end of 2018, borrowed an additional $20 million from GGP on the same terms as the earlier financing.[37]   The agreement also gave GGP the right to purchase additional notes of up to $66.5 million on the same terms.[38]   On December 20, 2019, iAnthus announced additional financing from GGP of $36.15 million.[39]

---

[33]
    *Id.* ¶¶ 60, 63.

[34]
    *Id.* ¶ 63.

[35]
    *Id.*

[36]
    *Id.*

[37]
    *Id.* ¶ 65.

[38]
    *Id.* ¶ 66.

[39]
    *Id.* ¶ 67.

iAnthus raised money from other lenders during the class period as well.  In 2019, it announced the issuance of $60 million in unsecured convertible debentures,[40] of which Hi-Med purchased $5 million in March 2019.[41]

Plaintiffs allege that iAnthus used the debt it issued during the class period to expand its operations rapidly through acquisitions that diluted the existing shareholders.[42]  Relevant to the claims at issue, iAnthus announced its purchase of MPX Bioceutical Corporation ("MPX"), another cannabis company, on October 18, 2018.[43]  The all-stock transaction was valued at $835 million.[44]

iAnthus made public statements in 2019 suggesting that a $100 million financing plan with GGP would support the company's growth and help it become profitable by 2020.[45] Defendants assured investors that the company was making money and that GGP would provide additional funding if needed.[46]  Plaintiffs allege that these statements "misled investors by

---

[40]     Id. ¶¶ 68-69.

[41]     Id. ¶ 70.

[42]     Id. ¶ 78.

[43]     Id. ¶ 73.

[44]     Id. ¶ 77.

[45]     Id.

[46]     Id. ¶¶ 88, 90.

10

misrepresenting the true nature of iAnthus's–and Ford's– relationship with GGP and its other lenders."[47]

*The Escrow Account*

In each of its first two lending agreements with GGP, in May 2018 and September 2019, iAnthus promised to place in escrow approximately $5.27 million to be available to fund its interest obligations.[48]  iAnthus first disclosed on April 12, 2019 that it "fully released" the funds relating to the first loan to iAnthus on March 5, 2019."[49]  Plaintiffs allege that iAnthus had no contractual basis for the release of these funds, and its release therefore is indicative of collusion between iAnthus and GGP.[50]  In addition, although iAnthus never disclosed a release of the escrow funds related to the second lending agreement, those funds nevertheless were unavailable to iAnthus upon its default in March 2020.[51]

*iAnthus's Default and Special Committee Investigation*

On April 6, 2020, iAnthus announced that it had failed to secure further financing "since [the last loan from GGP on] December 20, 2019, whether as part of the $100 million

---

[47]

     *Id.* ¶ 93.

[48]

     *Id.* ¶ 133.

[49]

     iAnthus 2018 Annual Report [20-cv-3135, Dkt. 96-8], at 8*; Id.* ¶ 134.  The Court takes judicial notice of the annual report which is publicly available via SEDAR.

[50]

     *Id.*

[51]

     *Id.* ¶ 135.

11

financing plan with GGP previously announced on September 30, 2019, or from other sources."[52] Failing to pay the $4.4 million in interest owed to GGP and its unsecured lenders on March 31, 2020, iAnthus defaulted under its secured notes with GGP and its other unsecured notes.[53]

Also on April 6, 2020, iAnthus disclosed that its board had formed a special committee to "investigate any potential conflicts of interest and/or required disclosures with respect to the Company's CEO and certain related parties."[54]  iAnthus stated that the investigation was spurred by a March 31, 2020 online report (the "Stockhouse Report") alleging that Ford had acted due to a conflict of interest.[55]

The Stockhouse Report was a short forum post by an anonymous user of the financial news website Stockhouse.com.  It alleged that Ford owed undisclosed debts to Adler, GGP's managing member, and iAnthus's debt broker David Rozinov of Star Capital Management, LLC. According to the Report, the "last personal loan" – presumably in a string of such loans – from Adler to Ford was for $100,000 and Ford owed Rozinov $300,000.[56]  The Report alleged also that Ford had improperly secured a director position for Maslow because he owed him money, and that he arranged a salaried, sham position with the company for his sister.[57]

---

[52]
     *Id.* ¶ 94.

[53]
     *Id.* ¶ 95.

[54]
     *Id.*

[55]
     *Id.*

[56]
     *Id.* ¶ 104.

[57]
     *Id.*

The special committee confirmed some but not all of the Report's allegations against Ford. iAnthus announced on April 27, 2020 that the special committee found and the board accepted the following: on December 21, 2019, Adler loaned Ford $100,000. The loan was interest-free and payable on March 31, 2020 and Ford had not repaid the loan.[58] The special committee found also, and the board accepted, that Ford received a separate $60,000 loan from a different, non-arm's length party.[59] The special committee concluded that Ford's failure to disclose the loans breached iAnthus's conflict policies and his obligations as an officer and director.[60] Ford was fired as a result.[61]

Based on an account of at least one confidential witness, plaintiffs allege that Ford and Adler were "good friends" and often met for dinner in New York.[62]

In line with the Stockhouse Report, plaintiffs allege that the $60,000 loan to Ford came from Rozinov.[63] Rozinov brokered iAnthus's $60 million in unsecured debt, including Hi-Med's $5 million in debentures.[64] iAnthus never disclosed the source of this loan to Ford.

---

[58]     *Id.* ¶¶ 96-97.

[59]     *Id.*

[60]     *Id.* ¶ 98.

[61]     *Id.*

[62]     *Id.* ¶ 106.

[63]     *Id.* ¶ 102; Hi-Med SAC ¶ 40.

[64]     SCAC ¶ 102.

The revelations relating to Ford's actions allegedly resulted in a 62 percent drop in iAnthus's stock on April 6, 2020 (the day iAnthus announced the formation of a special committee) and iAnthus's default on its debt and subsequent restructuring.[65]  Plaintiffs allege that iAnthus had other options – including the use of its reported assets or the sale of a dispensary – to repay its debts instead of defaulting and restructuring to the benefit of GGP.[66]  They therefore claim that defendants' decisions during this period were influenced by Ford's allegedly improper relationship with Adler and GGP.

*The Restructuring*

On June 23, 2020, iAnthus announced that GGP had made a demand for repayment.[67] iAnthus then announced on July 13, 2020 that it had entered into a restructuring agreement with GGP and 91 percent of its unsecured debentureholders.[68]  The plan would "wipe out" existing shareholders, instead granting almost half of iAnthus's equity to GGP and almost half to the unsecured debentureholders.[69]  In addition to at least 48.625 percent of iAnthus's equity, GGP would retain "$85 million in 8 [percent] five-year senior secured debt, [] $5 million in 'preferred equity' (which functions the same as unsecured debt), and [] provide $14 million in new senior secured debt

---

65

       *Id.* ¶ 108.

66

       *Id.* ¶¶ 118-124.

67

       *Id.* ¶ 111.

68

       *Id.* ¶ 112.

69

       *Id.*

14

for an additional $700,000 fee . . . as interim financing."[70]   iAnthus offered 2.75 percent of the company to shareholders in return for approval.   Hi-Med's equity stake in iAnthus would be eliminated.[71]   All told, the restructuring would reduce the principal amount of iAnthus's debt from $159.1 million to $121.4 million.[72]

As described above, the Restructuring Transaction was approved by Canadian courts. As of the time these motions were filed, its implementation was pending an appeal by iAnthus in litigation between it and GGP.

### Additional Self-Dealing

Plaintiffs allege various other acts of self-dealing by defendants.

iAnthus disclosed in 2017 that it extended a $500,000 (Canadian) loan to Ford at an interest rate of 2.5 percent upon maturity in June 2020.[73]   The company's financial report for the fourth quarter of 2019 shows that this loan's maturity date was extended to June 30, 2021 pursuant to Ford's termination agreement, and that the balance was "to be partially offset by compensation owed to Ford."[74]

---

[70]     *Id.* ¶ 113.

[71]     *Id.* ¶ 112 n.26; Hi-Med SAC ¶ 4.

[72]     SCAC ¶ 116.

[73]     *Id.* ¶ 141.

[74]     *Id.* ¶ 142.

Plaintiffs allege that iAnthus granted 7.2 million stock options to its executives and employees on April 23, 2019, and then cancelled those options and granted approximately 9.65 million new options at a lower exercise price on June 6, 2019.[75]  As the share price dropped defendants repriced the options to their short-term benefit and the detriment of the shareholders.

Ford received $1.48 million in net proceeds from his sales of stock during the class period after accounting for the cost of exercising his options.[76]  These sales – made both privately and on the public market – were for prices of between $1.25 and $5 per share, much higher than where the price of iAnthus stock would land at the end of the class period, just under $0.10 per share, after iAnthus announced its default.[77]  The last of Ford's sales were made on September 3, 2019.[78]

In March 2020, faced with impending default, Ford and Maslow "proposed a management buyout in which they would purchase iAnthus themselves," "on the cheap."[79] Although it never occurred, the proposed buyout would have compensated shareholders at 50 cents per share even though the stock price was $3.69 at the beginning of the class period.[80]

---

[75]

    *Id.* ¶ 143.

[76]

    *Id.* ¶ 146.

[77]

    *Id.*

[78]

    *Id.*

[79]

    *Id.* ¶ 137.

[80]

    *Id.* ¶ 139.

iAnthus also on January 10, 2020 repaid the full outstanding balance of its $10.8 million loan from Stavola, plus $24,000 in interest, on a note that would mature on January 19, 2020.[81]  This payment was first revealed on July 31, 2020.  Stavola resigned soon after.

## Discussion

### Extraterritoriality

The Supreme Court held in *Morrison v. National Australia Bank Ltd.* that courts may apply Section 10(b) of the Exchange Act only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."[82]  The Court granted the motions to dismiss the first amended complaints on the basis that plaintiffs' claims were impermissibly extraterritorial, but granted leave to replead their claims.

Whether plaintiffs' claims are sufficiently domestic under *Morrison* "is a merits question" that properly is considered on a motion to dismiss under Rule 12(b)(6).[83]  To survive such a motion, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[84]  In determining whether this standard is met, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiffs'

---

[81]

  *Id.* ¶ 147.

[82]

  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010).

[83]

  *Id.* at 254.

[84]

  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

17

favor.[85]  In addition, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as . . . documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."[86] The Court may consider also "matters of which judicial notice may be taken."[87]

### Domestic Exchange

*Morrison*'s first prong instructs that Section 10(b) may be applied to "transactions in securities listed on domestic exchanges."[88]  Plaintiffs allege that iAnthus shares are listed on the CSE and trade over-the-counter in the United States on OTCQX.[89]  The Canadian CSE is not a domestic exchange.  In deciding the prior motions to dismiss in this case, the Court considered and rejected plaintiffs' contention that OTCQX qualifies as a national exchange.[90]  Therefore, to state a claim, plaintiffs' transactions must qualify as "domestic transactions in other securities" under *Morrison*'s second prong.[91]

---

[85]      *ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[86]      *City of Pontiac*, 752 F.3d at 179.

[87]      *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[88]      *Morrison*, 561 U.S. at 267.

[89]      SCAC ¶ 33; Hi-Med SAC ¶ 11.

[90]      Mem. Op. at 6-8.

[91]      *Morrison*, 561 U.S. at 267.

*Domestic Transactions*

Transactions in securities not listed on domestic exchanges qualify as "domestic transactions in other securities" under the second prong of *Morrison* "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States."[92]  "Conclusory assertions that irrevocable liability has been incurred or that title has passed are insufficient" to plead a domestic transaction.[93]  Moreover, "[t]he location or residency of the buyer, seller, or broker will not necessarily establish" the situs.[94]  Instead, plaintiffs must allege specific facts "including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money."[95]  Finally, plaintiffs' allegations must relate to the "transactions themselves" and not merely the "actions needed to carry out the transactions."[96]

The three transactions addressed by the Court in its decision on the original motions to dismiss remain at issue here.  First, Silva alleges that he purchased shares of iAnthus's common stock.  Second, Hi-Med alleges that it obtained shares of iAnthus's common stock through a transaction between iAnthus and MPX.  Third, Hi-Med alleges that it purchased a convertible debenture from iAnthus.  For the following reasons the Court concludes that plaintiffs have alleged

---

[92]

       *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012).

[93]

       *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 340 (S.D.N.Y. 2015).

[94]

       *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017).

[95]

       *Absolute Activist*, 677 F.3d at 70.

[96]

       *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014).

sufficiently that Silva's stock purchases and Hi-Med's purchase of a debenture from iAnthus were domestic under *Morrison*, but Hi-Med's acquisition of stock through the iAnthus-MPX transaction was not.

### Silva's Stock Purchases

When the earlier motions to dismiss were filed, Silva had submitted to the Court only a certification purporting to list all of his transactions in iAnthus stock under the heading "iAnthus Capital Holdings, Inc. (ITHUF)" – ITHUF being the ticker symbol for iAnthus on OTCQX – without otherwise "indicat[ing] where or how any of those transactions were made."[97]  He then submitted a declaration with his opposition to those motions in which "he claimed for the first time that he purchased iAnthus'[s] common stock through his online TD Ameritrade account while he was in Louisiana."[98]

In granting defendants' motions to dismiss, the Court noted that, to plead a domestic transaction, Silva was obliged to "include specific 'allegations concerning the location of the transactions themselves,' and 'the structure of [over-the-counter] transactions,' including facts 'concerning the formation of the contracts, the placement of the orders, the passing of title[,] . . . the exchange of money' or other 'detail sufficient to discern whether these, or perhaps other additional factors, are relevant to' determining the situs of over-the-counter transactions."[99]  A list of

---

[97]  Mem. Op. at 10.

[98]  *Id.* at 12.

[99]  *Id.* (quoting *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *29 (S.D.N.Y. Feb. 21, 2017)).

transactions given under iAnthus's OTCQX ticker abbreviation without more certainly did not suffice. Even if the declaration had been properly submitted – which the Court found unnecessary to decide – it would have needed to know more than "that [Silva] was in the United States when he initiated the purchase[s] . . . and that he made those transactions through a United States brokerage."[100] *Morrison* requires that courts look to the situs of the transaction, not to the location of the buyer or broker.

In the SCAC, Silva alleges that he "made all of the[] transactions himself, directly through his TD Ameritrade online brokerage account."[101] Plaintiff's allegation that he became irrevocably bound to conduct the transactions "when they were filled in his brokerage account, which took place while he was in Louisiana" is conclusory and, without more, would not be sufficient to state a claim.[102] But Silva now has furnished additional information.

Silva now provides allegations concerning how TD Ameritrade processed the transactions. He alleges that he paid for the trades with funds in his TD Ameritrade account which were held by TD Ameritrade in the United States.[103] In at least two trades, TD Ameritrade routed the purchase through Susquehanna International Group ("Susquehanna"), Susquehanna "look[ed] for a broker to match the trades," and "E*TRADE was able to match the trades and fulfilled the

---

[100]

     *Id.* at 13 n.45.

[101]

     SCAC ¶ 21.

[102]

     *Id.* ¶ 23; *see In re Petrobras*, 150 F. Supp. 3d at 340.

[103]

     *Id.* ¶ 24.

21

orders."[104]  It was when E*TRADE fulfilled the trades that they became "final and could not be revoked" and plaintiff's "payments for his ITHUF shares were deducted from his TD Ameritrade account."[105]

        The facts pleaded, viewed in the light most favorable to the plaintiffs, are sufficient to show a domestic purchase under *Morrison*'s second prong because the trades allegedly became binding when E*TRADE fulfilled the orders, which it did domestically.[106]  Silva alleges that E*TRADE "'only processes domestic orders on domestic exchanges' and does not offer 'international trading' or access to international markets."[107]  And a representative from TD Ameritrade allegedly explained to Silva that "when it conducts transactions for securities of foreign companies that are listed on the U.S. OTC market that have a 5-digit tracker ending in "F" (such as ITHUF), it therefore routes th[ose] transactions through the U.S. and not a foreign exchange."[108]

---

104

        *Id.* ¶¶ 25 (December 20, 2019 purchase of 5,000 shares), 28 (February 25, 2020 purchase of 100 shares), 29 (describing the matching process).

105

        *Id.* ¶ 29.

106

        *See Choi v. Tower Research Capital LLC*, 890 F.3d 60, 67 (2d Cir. 2018) (holding that KRX night market trades "matched" in the United States and "cleared and settled" in Korea were domestic transactions within the meaning of *Morrison* based on plaintiffs' allegation that the trades were binding on the parties "on matching").

107

        SCAC ¶ 31 (internal citations omitted).

108

        *Id.* ¶ 32.

*Hi-Med's Stock Acquisition*

Hi-Med alleges that it acquired iAnthus stock in two transactions: the conversion of its debt and equity in MPX – another Canadian cannabis company – when MPX was acquired by iAnthus in 2018, and its purchase of $5 million in unsecured convertible debentures from iAnthus pursuant to a debenture agreement.[109]  On the previous motions to dismiss, the Court dismissed Hi-Med's claims in their entirety because Hi-Med failed to allege sufficiently that either acquisition was a domestic transaction.

First, the Court concluded that the conversion transaction was not domestic because "[g]enerally, the acquisition of shares through a merger between foreign entities is not a domestic transaction" and Hi-Med "failed to allege 'that the parties to the merger incurred irrevocable liability in the United States.'"[110]  The "only alleged connection between the transaction and the United States" presented by Hi-Med in its opposition to the first motions to dismiss was the "assertion that its ownership of iAnthus'[s] stock was 'memorialized' in Direct Registration Certificates sent to Hi-Med in the United States."[111]  In its SAC, Hi-Med omits the allegation that the Direct Registration Certificates "memorialized" its ownership of iAnthus shares, asserting instead that the certificates' delivery to Hi-Med at its offices in the United States constituted the legal passage of title.[112]  But without some explanation for why this is so, Hi-Med has failed to plead that delivery bears on where

---

[109]

Hi-Med SAC ¶¶ 26-39.

[110]

Mem. Op. at 14 (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 265 (2d Cir. 2016)).

[111]

*Id.*

[112]

*See* Mot. to Amend Am. Compl., 20-cv-3898 (LAK) [Dkt. 74], Ex. 3 (comparison of Hi-Med Am. Compl. to proposed Hi-Med SAC) ¶¶ 29-30.

the "transaction itself or passage of title" occurred.[113]  It is the situs of the transaction "between iAnthus and MPX" that is determinative.[114]

Second, the Court previously rejected Hi-Med's contention that "it obtained iAnthus'[s] stock in a domestic transaction because its Conversion Notice, in which it 'irrevocably elect[ed] to convert [its MPX Debentures],' was executed in the United States."[115]  Hi-Med attempts to bolster its allegations relating to the Conversion Notice in the SAC, claiming that the Conversion Notice was executed by Hi-Med in New Jersey, delivered to iAnthus at its New York office, and directed the common shares to be delivered to Hi-Med in New Jersey.[116]  None of this, however, changes the underlying fact that the relevant transaction was the "Arrangement Agreement between MPX and iAnthus," to which Hi-Med was not a party.[117]  Hi-Med has not pleaded any facts to suggest that the transaction between MPX and iAnthus was domestic.

For each of the foregoing reasons, Hi-Med has not alleged that it acquired shares of iAnthus's common stock through a domestic transaction.

---

[113]

Mem. Op. at 14.

[114]

*Id.* at 14 n.50.

[115]

Mem. Op. at 15 (citing Hi-Med. Opp. [20-cv-3898 (LAK), Dkt. 61] at 24 (quoting Conversion Notice, Lomuscio Decl. [Dkt. 62], Ex. 7)).

[116]

Hi-Med SAC ¶ 30.

[117]

Mem. Op. at 15-16.

*Hi-Med's Debenture*

Hi-Med's second alleged purchase is its acquisition of $5 million in unsecured convertible debentures from iAnthus pursuant to a debenture agreement (the "Hi-Med Debenture").[118] On the first motions to dismiss, the Court concluded that Hi-Med had not pled facts sufficient to show that the Hi-Med Debenture was a domestic purchase. Hi-Med's debenture-related allegations in the SAC are largely duplicative of those the Court already found wanting, including claims that iAnthus promised to repay the debenture to Hi-Med at its Florida address and that iAnthus was located in New York and Hi-Med was located in Florida and New Jersey at the time the agreement was made.[119]

Hi-Med's new allegations include that iAnthus and Hi-Med negotiated and executed the Hi-Med Debenture from their respective office locations in the United States, that Hi-Med purchased the Hi-Med Debenture using funds from its Florida bank account, and that Hi-Med had a right under the agreement to compel iAnthus to "issue, deliver and pass title" in its common stock to Hi-Med by delivering a conversion notice to its offices in New York.[120] That Hi-Med transferred payment for the debenture from a domestic bank account clearly does not show a domestic transaction because it says nothing about where the money was sent.[121] And Hi-Med's right to

---

[118]

Hi-Med SAC ¶ 32.

[119]

*Id.* ¶ 33.

[120]

*Id.*

[121]

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289 (2d Cir. 2021) (quoting *Loginovskaya*, 764 F.3d at 275) (holding that "the direction to transfer money using New York bank accounts to purchase [the asset at issue does not] suffice to demonstrate a domestic transaction").

25

trigger a future passage of title by delivering a notice to iAnthus's offices in the United States says nothing whatsoever about the nature of the debenture itself.

Hi-Med's claim that the Debenture was negotiated and executed by the parties at their respective offices in the United States, however, "evinc[es] contract formation" and gives rise to a plausible inference of a domestic transaction.[122] iAnthus argues that "the debenture itself makes clear that both title and liability passed from iAnthus in Canada . . . ."[123] But none of the contractual provisions listed by iAnthus addresses title or liability.[124] And irrevocable liability may be incurred through a contractual meeting of the minds even when "their obligations [may be] subject to a condition subsequent" before liability is incurred or title is passed.[125]

### Predominantly Foreign Claims

Notwithstanding plaintiffs' domestic purchases of iAnthus securities, defendants contend that the Second Circuit's decision in *Parkcentral Global Hub Ltd. v. Porsche Automobile*

---

[122]

> *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 167 (2d Cir. 2021); *see also U.S. v. Vilar*, 729 F.3d 62, 77-78 (2d Cir. 2013) (holding that the negotiation and execution of a contract in the United States rendered the transaction domestic).

[123]

> iAnthus Mem. [20-cv-3135, Dkt. 89], at 15.

[124]

> *Id.* (stating that "[the debenture] was issued from 'iAnthus Capital Holdings, Inc., a corporation incorporated under the laws of . . . Canada' . . . was to be 'governed by and interpreted in accordance with the laws of the Province of Ontario and the federal laws of Canada' . . . and stated that 'the securities represented hereby have not been registered under the United States Securities Act'").

[125]

> *Giunta v. Dingman*, 893 F.3d 73, 79-80 (2d Cir. 2018).

26

*Holdings SE* compels dismissal.[126] In *Parkcentral*, plaintiffs alleged that Porsche, a German company, and its executives "made various fraudulent statements and took various manipulative actions to deny and conceal its intention to take over [Volkswagen AG ("VW")]," also a German company.[127] Plaintiffs, "more than thirty international hedge funds, employed securities-based swap agreements pegged to the price of VW shares, which trade[d] on European stock exchanges, to bet that VW would decline in value."[128] When Porsche revealed its plan, "the price of VW shares rose dramatically, causing plaintiffs to suffer large losses."[129]

Affirming the district court's dismissal of that action, the Court of Appeals held that a domestic purchase of securities – such as plaintiffs' purchase of the relevant swaps – was a necessary "but not alone sufficient" condition to satisfy the *Morrison* standard. "[T]he imposition of liability under § 10(b) on these foreign defendants with no alleged involvement in plaintiffs' transactions, on the basis of the defendants' largely foreign conduct, for losses incurred by the plaintiffs in securities-based swap agreements based on . . . foreign securities would constitute an impermissibly extraterritorial extension of the statute."[130]

---

[126]     iAnthus Mem. [20-cv-3135, Dkt. 100], at 12-15; GGP Mem. [20-cv-3135, Dkt. 94], at 14-16.

[127]     *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 201 (2d Cir. 2014).

[128]     *Id.*

[129]     *Id.*

[130]     *Id.*

According to defendants, Silva and Hi-Med's claims are predominantly foreign because they arise out of "Canadian securities filings by a Canadian company whose securities are listed on a Canadian exchange" and because "those securities are the subject of several Canadian actions and a Canadian restructuring process . . . ."[131]  Plaintiffs counter that, unlike in *Parkcentral*, their claims "are based entirely on U.S.-focused activities."[132]  They highlight also *Parkcentral*'s limited reach; the Court of Appeals "described its holding as based 'in some part on the particular character of the unusual security at issue' and cautioned against 'perfunctorily appl[ying]' its holding 'to other cases based on the perceived similarity of a few facts.'"[133]

Indeed, *Parkcentral* is distinguishable.  The key difference, of course, is that the *Parkcentral* swaps referenced the price movements of foreign securities, while the iAnthus securities purchased by plaintiffs in this case were not derivative investments.  The VW shares referenced in the *Parkcentral* swap agreements traded only on foreign exchanges while iAnthus shares traded both on the CSE and over-the-counter in the United States.[134]  Thus, "[p]roviding a domestic forum [would] enhance confidence in U.S. securities markets [and] protect U.S. investors."[135]  And while the purported fraud by Porsche was perpetrated abroad and, at most, "directed into the United

---

[131]     iAnthus Mem. [20-cv-3135, Dkt. 100], at 12-13.

[132]     Silva Opp. [20-cv-3135, Dkt. 102], at 25.

[133]     *Id.* (quoting *Parkcentral*, 763 F.3d at 202, 216-17).

[134]     SCAC ¶ 33.

[135]     *Cavello Bay Reinsurance Ltd.*, 986 F.3d at 167 (internal citation omitted).

28

States" by defendants through their statements "in telephone calls or in visits,"[136] iAnthus is U.S.-based, and a significant portion of the deceptive conduct allegedly was perpetrated domestically.

Finally, defendants contend that plaintiffs' claims should be dismissed under *Parkcentral* because "the fact that the 'fraudulent acts alleged in the complaint have been the subject of . . . adjudication in [foreign] courts' creates the very 'potential for regulatory overlap and conflict' with which *Morrison* was concerned."[137] But the potential for "incompatibility between U.S. and foreign law is just one form of evidence that a particular application of the statute is extraterritorial" and "[i]t is neither a safe harbor nor the only relevant consideration in the extraterritoriality analysis."[138] Litigation indeed was ongoing in Canada at the time these motions were filed, but the substantial connection between the conduct at issue and the United States tilts in favor of this Court's adjudication of these matters.

*Forum Non Conveniens*

Defendants contend that these actions nevertheless should be dismissed pursuant to the doctrine of *forum non conveniens*. District courts have the discretion to dismiss a case for *forum non conveniens* subject to a three-factor analysis:

---

136

    *Parkcentral*, 763 F.3d at 208.

137

    iAnthus Mem. [20-cv-3135, Dkt. 100], at 13 (quoting *Parkcentral*, 763 F.3d at 216). GGP similarly argues that the claims against it should be dismissed because they arise from alleged misstatements and omissions made in Canadian disclosure forms. GGP Mem. [20-cv-3135, Dkt. 94], at 15.

138

    *Giunta*, 893 F.3d at 82 (quoting *Parkcentral*, 763 F.3d at 216-17)).

"At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum."[139]

*Deference to the Plaintiff's Choice of Forum*

"Any review of a *forum non conveniens* motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'"[140] "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."[141] The weight of this presumption varies according to the particular circumstances of the case. The Court of Appeals instructs:

"The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the

---

[139]

    *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).

[140]

    *Flynn v. Nat'l Asset Mgmt. Agency*, 42 F. Supp. 3d 527, 534 (S.D.N.Y. 2014) (quoting *Norex*, 416 F.3d at 154 (internal citation omitted)).

[141]

    *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 70-71 (2d Cir. 2001) (*en banc*) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

> defendant to gain dismissal for *forum non conveniens* . . . .  On the other hand, the
> more it appears that the plaintiff's choice of a U.S. forum was motivated by
> forum-shopping reasons . . . the less deference the plaintiff's choice commands and,
> consequently, the easier it becomes for the defendant to succeed on a *forum non*
> *conveniens* motion by showing that convenience would be better served by litigating
> in another country's courts."[142]

The Court therefore must assess the totality of the circumstances in determining the weight to be
given to the plaintiffs' choice of forum.

> "To facilitate totality review, *Iragorri* identified factors frequently relevant to
> determining whether a forum choice was likely motivated by genuine convenience:
> '[1] the convenience of the plaintiff's residence in relation to the chosen forum, [2]
> the availability of witnesses or evidence to the forum district, [3] the defendant's
> amenability to suit in the forum district, [4] the availability of appropriate legal
> assistance, and [5] other reasons relating to convenience or expense.' [*Iragorri*, 274
> F.3d] at 72.  Circumstances generally indicative of forum shopping, that is,
> plaintiff's pursuit not simply of justice but of "justice blended with some
> harassment," [citation omitted], include '[1] attempts to win a tactical advantage
> resulting from local laws that favor the plaintiff's case, [2] the habitual generosity
> of juries in the United States or in the forum district, [3] the plaintiff's popularity or
> the defendant's unpopularity in the region, or [4] the inconvenience and expense to

---

[142]      *Iragorri*, 274 F.3d at 71-72.

the defendant resulting from litigation in that forum.' *Iragorri*[], 274 F.3d at 72 [additional citation omitted]."[143]

*The Class Action*

Defendants contend that Silva's "choice of forum weighs far less heavily in a case such as this where plaintiffs sue strictly in a representative . . . capacity" because "[p]laintiffs in such a case have only a small direct interest in a large controversy . . . ."[144] But "[a]ffording less deference to representative plaintiffs does not mean they are deprived of all deference in their choice of forum."[145] Defendants do not suggest that Silva's U.S. residence is atypical of members of the purported class. And "plaintiffs offered quite a valid reason for litigating in federal court: this country's interest in having United States courts enforce United States securities laws."[146]

Silva's connection to the United States is bona fide. He is – and since at least the beginning of the class period has been – a resident of Louisiana.[147] Indeed this district likely is more convenient for plaintiff than defendants' proposed alternative Canadian forum. iAnthus and GGP

---

[143]

*Norex*, 416 F.3d at 155.

[144]

iAnthus Mem. [20-cv-3135, Dkt. 100], at 15 (quoting *DeYoung v. Beddome*, 707 F. Supp. 132, 138 (S.D.N.Y. 1989); *see also Lasker v. UBS Sec., LLC*, 614 F. Supp. 2d 345, 358 (E.D.N.Y. 2008) (noting that a class action plaintiff's choice of forum "is given less weight than if he were an individual plaintiff").

[145]

*DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002).

[146]

*Id.* at 28 (citing *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1002 (2d Cir. 1993)); *see* Silva Opp. [20-cv-3135, Dkt. 101], at 30.

[147]

SCAC ¶ 23.

32

have their principal places of business in New York and California, respectively.[148]  The relevant

witnesses and evidence are accessible to the Court.  To ask these U.S.-based defendants to litigate

in the federal courts does not risk harassment.[149]  Defendants have offered no evidence of bad faith

or forum shopping by Silva despite the parallel litigation ongoing in Canada at the time these

motions were filed.[150]

Thus, the totality of the circumstances weighs in favor of granting moderate

deference to Silva's chosen forum.

*The Hi-Med Action*

Hi-Med is a Florida company, with its principal office in Florida.[151]  Its connection

to the United States is bona fide.  Defendants nonetheless contend that the weight of Hi-Med's

---

[148]

    *Id.* ¶¶ 33 (alleging that iAnthus's "principal executive offices were at 505 Fifth Avenue, 23rd Floor, New York. NY 10017" during the class period), 48 ("GGP maintains its primary offices at 1437 4th Street Suite 200, Santa Monica, CA 90401.").

[149]

    It appears that only one defendant – Kalcevich, CFO of iAnthus – lives and works in Canada. iAnthus Mem. [20-cv-3135, Dkt.16], at 16.  The Court is mindful of the potential inconvenience to Kalcevich of litigating in the United States but, given the countervailing factors, declines to dismiss the claims against him from the suit for *forum non conveniens*.

[150]

    *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C.*, No. 03-cv-0200 (GEL), 2003 WL 21180421, at *3 (S.D.N.Y. May 20, 2003) (declining to find plaintiffs engaged in forum shopping when they "elected to file in the United States rather than [] join" a foreign litigation).

[151]

    Hi-Med SAC ¶ 10.

choice of forum should be discounted because Hi-Med "is forum shopping . . . having brought substantially the same claims in Canada."[152]

Hi-Med filed its initial complaint in this action against iAnthus on May 19, 2020.[153] It only later brought suit in the Supreme Court of British Columbia on June 29, 2020, claiming "various forms of relief under the British Columbia corporate law.[154] "Hi-Med is not asserting any claims against iAnthus in [the British Columbia] case under the laws of the United States."[155] The content of the two complaints thus is not identical. And even if Hi-Med chose to sue in federal court as well as in Canada at least in part to benefit from some litigation advantage,[156] such a choice would not sway the Court significantly one way or another.

Accordingly, Hi-Med's choice of a U.S. forum is entitled to deference.

*Adequate Alternative Forum*

At the second step of the *forum non conveniens* analysis, courts consider whether the defendants' proposed alternative forum is an adequate one.[157] Defendants submit that these disputes

---

[152]     iAnthus Mem. [20-cv-3898, Dkt. 89], at 19.

[153]     Hi-Med SAC ¶ 69.

[154]     *Id.* ¶ 70.

[155]     *Id.*

[156]     Plaintiffs' suggestion that Canada is not an adequate alternative forum because there the fraud-on-the-market presumption is unavailable for certain class members provides at least some evidence of forum shopping. *See* Silva Opp. [20-cv-3135, Dkt. 102], at 32.

[157]     *Norex.*, 416 F.3d at 153.

should be adjudicated in a Canadian court but plaintiffs do not agree that a Canadian court could adequately resolve them.

Plaintiffs' reasons for arguing that Canada is not an adequate alternative forum are unpersuasive. Silva submits that "the unavailability of the fraud-on-the-market presumption for class members that purchased iAnthus stock before April 12, 2019 makes Canada an inadequate forum."[158] But an alternative forum need not offer "the identical cause of action" nor "identical remedies" in order for that forum to be adequate.[159] Indeed, the Second Circuit has concluded on at least one occasion that Canadian courts may provide an adequate forum in which to try claims which would in the U.S. be adjudicated as federal securities law class actions.[160]

In addition to arguing that Canadian courts are not equipped to adjudicate federal securities law cases, Hi-Med contends that "the issues that are currently before the Canadian court relate exclusively to Canadian corporate law" and therefore that a Canadian forum would be inadequate.[161] This argument misapprehends the nature of the "adequate forum" inquiry. The question is not whether Canadian courts currently are adjudicating the issues raised in the instant case. It is whether the Canadian courts would be capable of doing so. Nothing in Hi-Med's briefing suggests this would not be the case.

---

[158]    Silva Opp. [20-cv-3135, Dkt. 102], at 32.

[159]    iAnthus Reply [20-cv-3135, Dkt. 109], at 6-7 (quoting *Norex*, 416 F.3d at 158).

[160]    *DiRienzo v. Philip Servs. Corp* ., 232 F.3d 49, 57-60 (2d Cir.2000), *vacated on other grounds by, DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21 (2d Cir.2002); *see also In re Royal Grp. Techs. Sec. Litig.*, No. 04-cv-9809, 2005 WL 3105341, at *2 (S.D.N.Y. Nov. 21, 2005).

[161]    Hi-Med Opp. [20-cv-3898, Dkt. 91], at 33.

35

For the above reasons, a Canadian court would be an adequate alternative forum to try these actions.

*The Public and Private Interest Factors*

The final consideration in a *forum non conveniens* analysis is the balance of the public interest and the private interests of the parties. These factors overlap significantly with those at play in the first step of the analysis. "Private interests may include such factors as the relative ease of access to sources of evidence, the availability of witnesses, and the enforceability of a judgment if one is obtained."[162] "The public interest may include such factors as court congestion, the interest in having local forums decide local disputes, avoiding the imposition of jury duty on persons within a community having little relation to the litigation, and a forum court's need to apply unfamiliar principles of foreign law."[163]

The public interest of the United States in adjudicating federal law claims such as these is strong. And no concerns arising from the private interests of the parties should preclude litigating these actions in this Court. Despite the Canadian litigation which was proceeding in parallel with these actions at the time these motions were filed, any potential for inconsistent judgments is remedied by the availability of the doctrine of issue preclusion, which applies between

---

[162] *Fasano v. Li*, 47 F. 4th ___, 2022 WL 3692850, at *8 (2d Cir. 2022) (citing *Gulf Oil Corp.*, 330 U.S. at 508-09).

[163] *Id.*

United States and Canadian courts. American courts "will normally accord considerable deference to foreign adjudications as a matter of comity."[164]

Accordingly, the Court concludes in its discretion that dismissal for *foreign non conveniens* is not warranted.

*Sufficiency of the Section 10(b) and Rule 10b-5 Claims*

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[165] Rule 10b-5 implements Section 10(b). "To succeed on a § 10(b) and Rule 10b-5 claim, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[166]

At the pleading stage, a plaintiff must satisfy also the heightened requirements of Rule 9(b) and the PSLRA. "These . . . require a plaintiff to specify the statements or omissions that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements

---

[164]

> *Maersk, Inc. v. Neewra, Inc.*, No. 05-cv-4356 (CM), 2010 WL 2836134, at *11 (S.D.N.Y. July 9, 2010), *aff'd sub nom. Maersk, Inc. v. Sahni*, 450 F. App'x 3 (2d Cir. 2011) (citing *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001)); *see also In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 732-33 (S.D.N.Y. 2007), *aff'd sub nom. Bondi v. Cap. & Fin. Asset Mgmt. S.A.*, 535 F.3d 87 (2d Cir. 2008).

[165]

> 15 U.S.C. § 78j(b).

[166]

> *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. V. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

were made, and explain why the statements were fraudulent."[167]   Conclusory or unsupported allegations are insufficient.[168]

*Material Misrepresentations and/or Omissions*

Section 10(b) and Rule 10b-5 require that the plaintiff allege that defendants made a "material misrepresentation or omission."[169]   To do so, plaintiff must plead facts that, if true, would be sufficient to show that the defendant either (1) made "an untrue statement of a material fact," or (2) "omit[ted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."[170]   A fact is material if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock]."[171]   An alleged omission is actionable only if the defendant had a duty to disclose the information at issue.[172]

---

[167]   *Muller-Paisner v. TIAA*, 289 F. App'x 461, 463 (2d Cir. 2008).

[168]   *ATSI Commc'ns*, 493 F.3d at 99.

[169]   *GAMCO Invs., Inc.*, 838 F.3d at 217.

[170]   17 C.F.R. § 240.10b-5(b).

[171]   *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994)) (internal quotation marks omitted).

[172]   *Chiarella v. United States*, 445 U.S. 222, 235 (1980).

*The Allegedly Material Misstatements and Omissions*

Plaintiffs allege that defendants made numerous material misstatements and omissions. The alleged misstatements and omissions by defendants fall into five categories: defendants' conflicts of interest; their descriptions of iAnthus's debt; statements concerning the availability of financing; statements as to its escrow obligations; and various affirmations of full disclosure.[173] Defendants argue that the statements and omissions are not actionable because they were not pled with particularity, constitute mere puffery, fall under statutory or judicial safe harbor provisions, and/or were not false or misleading when they were made. We examine each category of alleged misstatements and/or omissions in turn[174] and, given the substantial number of statements at issue, include at the end of this opinion a footnote indicating the Court's conclusions as to each allegedly false or misleading statement.

*Conflicts of Interest*

Plaintiffs allege that many of defendants' statements during the class period were materially false or misleading due to Ford's undisclosed conflicts of interest. According to plaintiffs, these conflicts arise from several purportedly improper transactions and relationships:

---

[173]     SCAC ¶¶ 149-280.

Hi-Med's allegations relating to its remaining claims include allegedly material misstatements and omissions falling under the categories of conflict of interest, the escrow accounts, and affirmations of full disclosure. *See* Hi-Med SAC ¶¶ 77-78, 80.

[174]     The alleged false or misleading affirmations are addressed in tandem with the substantive categories to which they pertain.

(a) Ford's loan or loans from Adler.  The special committee concluded, and the iAnthus board accepted, that Ford received a $100,000 from Adler on December 21, 2019.[175]  Plaintiffs allege also that Ford made additional, earlier, unspecified loans to Ford, but rely only on the Stockhouse Report to support this claim.

(b) Ford's relationship with Adler.  Plaintiffs allege, based on the testimony of a confidential witness quoted in the SCAC, that Ford and Adler were "good friends" and saw each other socially during the class period.[176]

(c) Ford's loan or loans from Rozinov.  The special committee concluded, and the iAnthus board accepted, that Ford received a $60,000 loan from a "non-arm's length party."[177]  Plaintiffs allege that this party was Rozinov, the debt broker who brokered iAnthus's unsecured debt issuances in March and May 2019.[178]  Plaintiffs allege also, based solely on the Stockhouse Report, that other loans must have existed also because Ford owed Rozinov a total of $300,000.[179]

Plaintiffs claim that these conflicts "tainted" many of defendants' statements during the class period, ranging from general expressions of confidence in GGP as a cannabis financing

---

[175]

SCAC ¶ 97.

[176]

*Id.* ¶ 106.

[177]

*Id.* ¶ 96.

[178]

*Id.* ¶ 102; Hi-Med SAC ¶ 48.

[179]

*Id.* ¶¶ 104-105.

leader and iAnthus's committed partner,[180] to certifications that the relationship between iAnthus and GGP was "arm's length,"[181] when, in fact, according to plaintiffs, it was not.

A statement or omission may be false or misleading only if the statement contradicts or fails to disclose conflicts which existed at the time when the statement was made.[182] It follows that plaintiffs must plead with some specificity when the alleged conflicts of interest emerged. The only allegation of a loan made to Ford for which a date is pleaded is the $100,000 loan from Adler. The Court cannot conclude that any statements or omissions by defendants were false or misleading due to Ford's $60,000 loan from Rozinov because plaintiffs have not pleaded facts sufficient to show when Rozinov loaned Ford the money.[183] Plaintiffs' allegations arising from the Stockhouse Report of additional loans are too vague to establish when – if at all – Ford incurred those debts. Therefore, only plaintiffs' claims alleging that defendants made a false or misleading statement or omission based on the $100,000 loan from Adler may be actionable.

---

[180]

> See, e.g., SCAC ¶¶ 150-53 (announcing GGP's first investment in iAnthus, praising GGP as a "long-term investor and leader within the cannabis investment community" and stating the predicting that the partnership would "create value" for iAnthus).

[181]

> See, e.g., id. ¶¶ 157-60.

[182]

> See In re Vale S.A. Sec. Litig., 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020) ("Whether a statement is false or misleading 'depends on the state of events when [the] statement is made . . . .'") (quoting In re Vivendi, 838 F.3d at 262).

[183]

> In opposition to these motions to dismiss, plaintiffs say that their amended complaints allege that the $60,000 Rozinov loan was made "in connection with with iAnthus's $60 million in unsecured debt the he brokered." Silva Opp. [20-cv-3135, Dkt. 102], at 38. Neither operative complaint contains this allegation. And while the Court understands that it is *possible* that Rozinov granted the loan to Ford in 2019 when he brokered iAnthus's $60 million in unsecued debt, the Court cannot conclude that it is *plausible*, let alone *pled with particularity* that Ford became conflicted because of Rozinov's loan on any particular date.

As pleaded in the operative complaints, Adler loaned Ford $100,000 on December 21, 2019, the day after iAnthus closed its final loan agreement with GGP.[184] Statements made before this date are not actionable on the basis of Ford's alleged conflicts of interest for the simple reason that plaintiffs have not pled facts sufficient to show that any self-dealing had occurred when those alleged misstatements or omissions were made. So, for example, iAnthus's description of its relationship to GGP as "[a]rm's length" in a May 14, 2018 filing with the CSE is not actionable because it was made over nineteen months before Adler made his loan to Ford.[185] Plaintiffs have alleged no facts to show that this statement was untrue at the time it was made. And the only remaining fact plaintiffs put forth to support the existence of Ford's conflicts before December 21, 2019 is that Ford and Adler were friendly and met regularly for dinner outside the office during the class period. But a social relationship between Ford and Adler, without more, cannot establish a conflict of interest.

Only two statements or omissions challenged for conflict of interest were made after the December 21, 2019 loan from Adler to Ford. Both arose from required disclosures relating to the final loan agreement between iAnthus and GGP of December 20, 2019 but were filed in the weeks following. The first was allegedly made by iAnthus in a December 30, 2019 material change report which "described the terms of iAnthus's December 20, 2019 agreement with GGP" and included an affirmation of full disclosure.[186] The second concerned a January 10, 2020 disclosure

---

[184]

SCAC ¶ 97; Hi-Med Sec. Am. Compl. ¶ 63.

[185]

SCAC ¶¶ 157-58.

[186]

Id. ¶¶ 265-68.

made by GGP which failed to disclose the Adler loan in response to a question that called for GGP to "[d]escribe the material terms of any agreements . . . between the eligible institutional investor [GGP] and a joint actor and among those persons and any person with respect to securities of the class of securities to which this report relates, including but not limited to . . . finder's fees . . . [or] loan or option agreements."[187] These claims by plaintiffs fail because the disclosures were not false or misleading based on the facts at the time of the December 20, 2019 loan between iAnthus and GGP to which they refer.

Accordingly, plaintiffs have failed to allege that defendants made any misstatements or omissions based on their purported conflicts of interest.[188]

*Descriptions of iAnthus's Debt*

Defendants made statements and disclosures throughout the class period regarding the nature of iAnthus's debt and fundraising activities in press releases, material change reports, and

---

[187]
    *Id.* ¶ 277.

[188]
    Any claims based on defendants' generalized statements about their ethical commitments to and/or emphasis on corporate accountability fail for the same reasons. A defendant's "references to its ethics and integrity" is actionable in certain circumstances, *In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 464 (S.D.N.Y. 2017), but absent well-pleaded allegations of corruption or a lack of accountability within iAnthus at the time of the relevant statements, the Court cannot conclude that such statements were false or misleading. *E.g.*, SCAC ¶ 233 (alleging that Ford emphasized iAnthus's "focus on accountability" on a September 30, 2019 conference call with investors); ¶¶ 265-68 (alleging that iAnthus announced in a October 17, 2019 press release its nomination of "five new independent Directors," with Ford stating "[t]his completes one of our main 2019 objectives; transforming our Board into a best-in-class Board . . . truly independent and highly experienced"); ¶¶ 270-71 (alleging that Ford, on iAnthus's earnings call for the third quarter of 2019, restated the plan "to move our Board of Directors to a majority of independent directors, who are wholly unaffiliated with any existing investor or manager").

quarterly and annual financial reports and conference calls.  Plaintiffs allege that defendants misstated the terms of the financing and mischaracterized GGP's relationship to iAnthus.  They allege also that certain statements regarding iAnthus's debt were misleading given Ford's self-dealing, but, as explained above, claims made solely on that basis must be dismissed.

iAnthus raised $156 million in debt during the class period.  During this time, iAnthus described the deals as follows: $40 million plus an additional $10 million of equity investment from GGP on May 14, 2018; $20 million from GGP on September 30, 2019; $36.15 million from GGP on December 20, 2019; and $60 million in unsecured debt from other lenders raised on March 18, 2019 and May 2, 2019.

Plaintiffs allege that defendants' repeated references to GGP's $50 million investment in iAnthus, including a $10 million equity investment via the purchase of iAnthus stock, are actionable because of a material omission.  GGP had secured also a "secret" exit fee of $10 million dollars plus 13 percent interest payable if and when iAnthus failed to repay the $40 million loan in full by May 2021.[189]  The exit fee allegedly was intended to protect GGP's equity investment because, were the exit fee provision to be triggered, GGP would be "required to return the approximately 3.9 million shares that it was issued in May 2018."[190]  iAnthus only disclosed the exit fee in its financial results for the fourth quarter of 2019, on July 31, 2020.  And, in March 2020, iAnthus disclosed that interest began to accrue on the exit fee on September 30, 2019 because "GGP

---

[189]      SCAC ¶ 63.

[190]      *Id.*

waived the $1.358 million in interest that was due at that time[] in exchange for adding that interest payment to the principal balance of its debt."[191]

Defendants contend that iAnthus had no duty to disclose the exit fee and that, in any case, the provision of the exit fee was immaterial. In their view, the fee was but one of many terms of the loan agreement and iAnthus had no obligation "to disclose all provisions or documents relating to the transaction, or to predict what might ultimately be material."[192] Instead, they assert that iAnthus acted appropriately when it disclosed the exit fee at the time the provision "became likely to be triggered."[193]

But these arguments miss the mark. Several facts point toward the exit fee's materiality and defendants' duty to disclose it. The fee was substantial in relation to the total capital loaned by GGP in this transaction, making up 20 percent of the total investment and 100 percent of the supposed equity investment, plus interest. And defendants' repeatedly emphasized the top-line $50 million number and GGP's $10 million "equity investment" as a selling point to other potential investors.[194] In the circumstances, defendants had a duty to disclose the exit fee because, by failing to do so, they allowed the public to believe the "half-truth" that GGP had made an investment of the magnitude described when in fact GGP had not made quite as large a bet on iAnthus as a reasonable

---

191

    *Id.*

192

    iAnthus Mem. [20-cv-3135, Dkt. 100], at 23 (citing *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 2016 WL 2859622, at *10 (S.D.N.Y. May 16, 2016)).

193

    *Id.* at 6.

194

    SCAC ¶¶ 150-53 (quoting iAnthus press release titled "[GGP] Invests $50 Million in iAnthus to Accelerate Growth Initiatives"), 165-76.

observer would be led to believe.[195] We agree with plaintiffs that a reasonable investor would view GGP's right to the exit fee as creating a "significant alteration[] of the 'total mix' of information made available,"[196] and therefore defendants' omissions on this point are actionable.

### The Availability of Financing to iAnthus

Defendants also made statements throughout the class period suggesting that iAnthus had access to financing adequate to meet its obligations and support its growth. Some of these statements emphasized iAnthus's close relationship with GGP and the belief that GGP would provide the full $100 million promised in it and iAnthus's financing plan.[197] Others highlighted iAnthus's prior financing from GGP "as examples of how iAnthus 'has historically had, and continues to have, access to equity and debt financing.'"[198] Plaintiffs allege that these statements were false and misleading both because of iAnthus's eventual default and because defendants failed to disclose certain information, described in more detail in the previous subsection, regarding the nature of the company's existing debts.

Defendants point out correctly that iAnthus's eventual default cannot support a finding that earlier statements were false because to do so would rely on impermissible "fraud by

---

195

    *In re Vivendi*, 838 F.3d at 239-40 (internal citation omitted).

196

    *Operating Local 649 Annuity Trust Fund*, 595 F.3d at 93 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).

197

    SCAC ¶¶ 233-35, 256.

198

    Silva Opp. [20-cv-3135, Dkt. 102], at 48 (quoting SCAC ¶ 172).

hindsight."[199]  Plaintiffs have not pled any factual matter sufficient to show that defendants knew their claims of access to financing were false when they made them.

In an attempt to save this claim, plaintiffs contend that these statements were false or misleading because they omitted facts that would have enabled observers to put the fact of past financing in the appropriate context, namely, defendants' conflicts of interest and the exit fee provision in the first loan agreement with GGP.  To the extent these omissions have been alleged with any specificity, plaintiffs have failed to allege facts which would have made the statements false or misleading because of the purported conflicts of interest.  However, for much the same reasons as discussed in the previous subsection, defendants' failure to disclose the exit fee in certain statements could have affected a reasonable investor's decision whether or not to invest.

Defendants counter that these statements were mere puffery, subject to the statutory safe harbor for forward-looking statements, expressions of opinion, and, in at least one case, simply true.[200]  Some of these statements certainly were puffery.  Ford's statements in a February 7, 2019 interview to the effect that iAnthus paid close attention to the cost of capital"[201] were "too general to cause a reasonable investor to rely upon them."[202]  Others, like Ford's answer to a question from an analyst on a November 21, 2019 conference call regarding the likelihood that GGP would

---

[199]
    *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 246 (S.D.N.Y. 2010).

[200]
    iAnthus Mem. [20-cv-3135, Dkt. 100], at 26.

[201]
    SCAC ¶ 194.

[202]
    *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)

"actually follow through" with the $100 million financing plan that "I have full confidence that, if we need [] capital, [] it will be there"[203] clearly are protected by the safe harbor.

Accordingly, only the relative few statements in which defendants relied on GGP's first financing as support for a claim or claims about availability of capital but omitted to mention the exit fee are actionable.

### iAnthus's Escrow Obligations

iAnthus and GGP's first two lending agreements, entered into on May 14, 2018 and September 30, 2019, allegedly included identical escrow provisions. iAnthus was obliged to place in escrow $5.27 to guarantee its interest payments to GGP. It is agreed that defendants, for a reason unknown to plaintiffs, released the May 14, 2018 debenture escrow funds to iAnthus during the first quarter of 2019.[204] The second, amended debenture agreement of September 30, 2019 contained the same provision for escrowed funds[205] but, given that no payments were forthcoming upon iAnthus's default, plaintiffs allege that defendants' disclosure of the contractual provision and its representations that it was in compliance with the escrow obligation were false.[206] The statements and omissions were material because a reasonable investor would understand that the supposedly escrowed funds offered protection against a potential default.

---

[203]  SCAC ¶ 256.

[204]  *Id.* ¶ 134.

[205]  *Id.* ¶ 133.

[206]  *Id.* ¶ 159; Hi-Med SAC ¶¶ 79-80.

Defendants have no clear answer to this allegation. Instead, they contest the premise that the amended debenture agreement's "restated" escrow provision "somehow created an additional escrow obligation."[207] That defendants may be able to produce evidence at a later stage of this litigation supporting its position is not inconceivable, but given the facts presented in the operative pleadings, plaintiffs have pleaded adequately the alleged materially false or misleading statements.

*Scienter*

A complaint under Section 10(b) must also "give rise to a 'strong' inference of scienter,'"[208] *i.e.*, an intent "to deceive, manipulate, or defraud."[209] Scienter may be pleaded by alleging facts that (a) show defendants' "motive and opportunity to commit fraud" or (b) "constitute strong circumstantial evidence of conscious misbehavior or recklessness."[210] Circumstantial evidence may be adequate where defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check

---

[207]    iAnthus Mem. [20-cv-3135, Dkt. 100], at 27.

[208]    *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007).

[209]    *ECA*, 553 F.3d at 196 (internal citation omitted).

[210]    *Novak*, 216 F.3d at 307.

information they had a duty to monitor."[211] Recklessness may be inferred when a defendant "knew facts or had access to information suggesting that their public statements were" false.[212]

Courts must "take into account plausible opposing inferences" and consider all "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."[213] To state a claim, allegations suggesting scienter must be "at least as compelling as any opposing inference."[214] We consider the complaint in its entirety rather than assessing each allegation individually.[218]

The complaints allege strong circumstantial evidence of scienter. Plaintiffs have pled facts "detail[ing] specific contemporaneous [] information known to the defendants that was inconsistent with the representation[s] in question."[219] The Complaint is replete with quotations by defendants Ford, Kalcevich, and Adler – on behalf of themselves and iAnthus and GGP – touting GGP's $50 million investment in iAnthus and the purported $10 million equity investment included therein. As detailed above, these statements arguably were fraudulent because the undisclosed $10 million exit fee rendered this investment substantially smaller than defendants claimed. These

---

[211]

*ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311 (internal quotation marks omitted)).

[212]

*Emps.' Ret. Sys. Of Goc't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

[213]

*Id.* (citing *Tellabs*, 551 U.S. at 323-24).

[214]

*Tellabs*, 551 U.S. at 322-23.

[218]

*Id.* at 326.

[219]

*Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *11 (S.D.N.Y. March 30, 2012) (internal citations omitted).

50

statements allegedly were made recklessly, if not consciously. The pleadings, taken as a whole, are susceptible to a strong inference that Ford and Ader, as the principals of iAnthus and GGP, knew of or had access to information regarding the existence of the exit fee. And Kalcevich, as the CFO and "contact person" for the May 14, 2018 press release with the CSE regarding the purported $50 million investment, also knew of or was reckless in his disregard for it.[219] This inference is supported also by statements by confidential witnesses who described Ford and Kalcevich as working together to "chase after creative financing" during this period.[220] Nonculpable explanations for defendants' false and misleading statements and omissions regarding the exit fee – for example, that they were unaware of the exit fee provision – are simply not plausible, especially given that it presumably was bargained for.

Plaintiffs have not alleged that defendants made any statements relating to the escrow obligation arising from the amended debenture agreement. But the complaints nonetheless plead strong circumstantial evidence that defendants intended to deceive or defraud plaintiffs, or acted recklessly, including for the reasons just mentioned.[221] At least one other noteworthy factor weighs in favor of the Court's conclusion: following the release of the special committee's report, Ford was fired and two members of the iAnthus Board – Mark Dowley and Stavola – resigned.[222]

---

[219]

    SCAC ¶ 150.

[220]

    *Id.* ¶¶ 128-29.

[221]

    The Court considers allegations of scienter according to a holistic reading of the pleadings, not on a statement-by-statement basis. *Tellabs*, 551 U.S. at 326.

[222]

    SCAC ¶¶ 98, 148, 334-35.

Resignations are "not sufficient in and of themselves" to establish scienter, but they may "add to the overall pleading of circumstantial evidence of fraud."[223]

*Statements "In Connection With" the Purchase or Sale of Securities*

Section 10(b) also requires that misrepresentations or omissions must be made "in connection with" a security, or, in other words, that they must "pertain[] to the securities themselves . . . ."[224]  GGP and Adler argue that they did not make any statements "in connection with" the purchase or sale of iAnthus securities.  But the "in connection with" requirement is construed broadly; it is enough that the "act complained of somehow induced the purchaser to purchase the security at issue."[225]

One statement by Adler in the original press release announcing GGP's $50 million investment in iAnthus is instructive.  The press release quoted Adler stating that "iAnthus'[s] recent acquisitions in New York and Florida, combined with its operations in Massachusetts, provide a compelling growth and investment opportunity.  With this infusion of capital, we look forward to working with the management team to source additional strategic opportunities and accelerate the

---

[223]   *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (quoting *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007)).

[224]   *Ernst & Co. v. Marine Midland Bank, N.A.*, 920 F. Supp. 58, 61 (S.D.N.Y. 1996) (citing *Chemical Bank v. Arthus Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984)).

[225]   *Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999) (internal citations omitted); *see also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 623 (S.D.N.Y. 2003) (quoting *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 966 (2d Cir.1993)) ("Generally, the requisite connection exists 'when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value.'")

Company's growth profile."[226]   Such a statement would tend to induce a reasonable investor to purchase iAnthus securities; Adler's endorsement of the company and expression of his expectation that, through a continued partnership with GGP, iAnthus would continue to grow directly "pertain[ed] to the value, nature, or investment characteristics of the securities at issue."[227]

GGP and Adler's statements therefore were made in connection with the relevant securities.

*Reliance*

To sustain a claim under Section 10(b), a plaintiff must also plead reliance. Defendants GGP and Adler (but not iAnthus and Ford) contend that Silva has not pled reliance.[228] "[R]eliance may be presumed where (1) defendants are alleged to have made material omissions or (2) the fraud-on-the-market doctrine applies."[229]

GGP and Adler indeed may be correct that the *Affiliated Ute* presumption of reliance does not apply where the alleged omission – namely, their failure to disclose the $10 million exit

---

[226]    SCAC ¶ 155.

[227]    *Production Resource Grp., LLC v. Stonebridge Ptns. Equity Fund*, 6 F. Supp. 2d 236, 240 (S.D.N.Y. 1998).

[228]    GGP Mem. [20-cv-3135, Dkt. 94], at 32-33.

The Court does not address GGP and Adler's similar arguments in support of their motion to dismiss the Hi-Med SAC because Hi-Med's claims against these defendants are dismissed on other grounds.

[229]    *In re Parmalat Sec. Litig.*, No. 04-md-1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) (citing *In re Parmalat Sec. Litig.*, 375 F. Supp 2d 278, 303 (S.D.N.Y. 2005)).

fee – served only to "exacerbate[] the misleading nature of the affirmative statements"[230] made regarding the purported investment as a whole.

> Silva's claims nonetheless are entitled to a presumption of reliance under the fraud on the market theory.   In *Basic Inc. v. Levinson*,[231] the Supreme Court held that plaintiffs in securities fraud cases are entitled to such a presumption in certain circumstances.   It applies when the statements at issue "are likely to mislead an entire market in an efficiently-traded stock . . . if the requirements of publicity, materiality, market efficiency, and market timing are met."[232]   Reliance is presumed also in cases of omission when the defendant was under a duty to disclose.   GGP and Adler contend that OTCQX (and OTCQB, on which iAnthus stock was traded earlier in the class period) are not efficient markets.   But the SCAC pleads "multiple factors that establish an efficient market, which supports the presumption that [plaintiff] relied on the integrity of the market price for iAnthus's stock."[233]   These include that the stock was "liquid and traded with moderate to heavy volume," that it traded both on the OTC market and the CSE, that the company was covered by various financial analysts, and that its stock reacted to news reports about the company.[234]   Taken together, these factors are sufficiently persuasive to avoid dismissal on this basis.

---

[230]

> *Id.* (quoting *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir.2005)).

[231]

> 485 U.S. 224, 245 (1988).

[232]

> *Wallace v. Intralinks*, 302 F.R.D. 310, 317 (S.D.N.Y. 2014).

[233]

> iAnthus Mem. [20-cv-3135, Dkt. 102], at 67.

[234]

> *Id.* (citing SCAC ¶¶ 293, 346-47).

54

*Economic Loss and Loss Causation*

        The final requirements under Section 10(b) are economic loss and causation.  A

plaintiff "must only 'provide a defendant was some indication of the loss and the causal connection

that the plaintiff has in mind.'"[235]

        Only GGP and Adler contend that plaintiffs have not met their burdens in pleading

economic loss and loss causation.  They argue that plaintiffs' "conclusory" allegations regarding the

inflation of iAnthus's share price due to defendants' fraud are insufficient.[236]  Lead plaintiff Silva

responds by pointing to allegations of an 18 percent drop in iAnthus's stock price after "iAnthus

announced that GGP provided a demand for repayment of its debt."[237]  Silva attributes this loss to

GGP (and iAnthus) misrepresenting the nature of GGP's investments in iAnthus, including their

alleged micharacterization of GGP's first investment in iAnthus as "an 'equity' investment."[238]  He

asserts that this decline in iAnthus's stock price "br[ought] the [c]ompany closer to bankruptcy."[239]

Far more than simply pleading inflated prices, these allegations suffice to put defendants on notice

of the loss to the class and the causal connection lead plaintiff has in mind.

---

235

    *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *10 (S.D.N.Y. Sept. 24, 2018)
    (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

236

    GGP Mem. [20-cv-3135, Dkt. 94], at 33-34; GGP Mem. [20-cv-3898, Dkt. 83], at 24-25.

    As indicated above, because none of Hi-Med's claims against GGP and Adler survive the
    motion to dismiss, the Court addresses only GGP and Adler's arguments as they relate to
    the class action.

237

    Silva Opp. [20-cv-3135, Dkt. 102], at 68 (citing SCAC ¶ 314).

238

    *Id.*

239

    *Id.*

*Scheme Liability*

Hi-Med claims that defendants are liable for perpetrating a scheme under Rule 10b-5, which prohibits "employ[ing] any device, scheme, or artifice to defraud" and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit."[240] These provisions require only deceptive conduct, not the making of a misstatement or omission.[241] Nevertheless, a plaintiff relying on such a theory must specify "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."[228] In addition, a plaintiff must allege that such deceptive or manipulative acts were in furtherance of the alleged scheme to defraud, scienter, and reliance.[229]

Hi-Med has not met this standard. Its complaint fails to "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it."[230] Plaintiff concedes that, to state a claim for scheme liability, it would need to plead "the performance of an inherently deceptive act that is distinct from an alleged

---

[240]

   17 C.F.R. § 240.10b-5.

[241]

   *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

[228]

   *Id.* (quoting *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005)).

[229]

   *Id.* (quoting *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020) (internal citation omitted)).

[230]

   *Id.*

misstatement."[231]  But no allegations separate from those of alleged misstatements and omissions are forthcoming.  For these reasons, Hi-Med's scheme claim must be dismissed.

*Control Person Liability*

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act."[232]  To plead control person liability, a plaintiff must plead facts which allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[233]  To the extent that plaintiffs have alleged sufficiently the primary violations against iAnthus and GGP, control person liability has also been alleged sufficiently.  The SCAC and Hi-Med SAC allege that Ford and Kalcevich led iAnthus and directed and authorized its financing activities.  They allege also that Adler did the same for GGP.  All three defendants, at various times, authorized and signed off on the transactions that form the basis of plaintiffs' claims in these actions. As alleged, all three were culpable participants therein.

Hi-Med asserts also claims under Section 20(a) against defendants Stavola, Galvin, and Maslow.  Hi-Med pleads facts sufficient to show that these three defendants in some sense

---

[231]
    Hi-Med Opp. [20-cv-3898, Dkt. 91], at 34 n.4 (quoting *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012)).

[232]
    *Emps.' Ret. Sys. Of Gov't of V.I.*, 794 F.3d at 305 (quoting 15 U.S.C. 78t(a)).

[233]
    *ATSI Commc'ns*, 493 F.3d at 108.

57

controlled iAnthus, but it does not plead any facts to suggest how any of them were culpable in the primary violations.  Accordingly, these claims are dismissed.

*Common Law Claims*

Hi-Med asserts common law claims under New York law for (a) breach of contract against iAnthus, (b) tortious interference with contract and prospective economic advantage against GGP and Adler, and (c) common law fraud against all defendants.[234]  It urges the Court to exercise supplemental jurisdiction over these claims.  Hi-Med's common law fraud claim may proceed as to the alleged misstatements and omissions which the Court has concluded are pled sufficiently under Section 10(b) of the Exchange Act.

Hi-Med claims that iAnthus breached the debenture and purchase agreements between the two parties by failing to repay principal and interest due to Hi-Med.[236]  iAnthus contends that these claims would be mooted by the implementation of the Recapitalization Transaction.[237]  But, because the Recapitalization Transaction is still pending review in a Canadian court – or, at least, it was at the time these motions were filed – such an argument is premature.  Hi-Med's breach of contract claims may proceed for now.

---

234    Hi-Med SAC ¶¶ 114-75.

236    *Id.* ¶ 130, 147.

237    iAnthus Mem. [20-cv-3898, Dkt. 89], at 34.

Hi-Med asserts also claims for tortious interference against GGP and Adler. In essence, Hi-Med alleges that GGP and Adler wrongfully caused iAnthus to enter into the Recapitalization Transaction on terms to their benefit and to the detriment of Hi-Med.[238]

GGP and Adler contend that Hi-Med's tortious interference with contract claim is deficient as a matter of law because "the [Hi-Med] SAC is silent about how [GGP and Adler] accomplished any alleged inducement" and "the only allegation that [GGP and Adler] even knew about the Hi-Med debenture agreement is wholly conclusory and unsupported by any facts."[239] The Court agrees. GGP and Adler further contend that Hi-Med's tortious interference with prospective economic advantage claim against them should also be dismissed because "the [Hi-Med] SAC contains nothing beyond conclusory allegations that parrot the elements of the claim."[240] Again, the Court agrees. Accordingly, both of Hi-Med's tortious interference claims must be dismissed.

### Conclusion

For the reasons stated above, the motions to dismiss [20-cv-3135 (LAK), Dkts. 93, 95, 97, 99; 20-cv-3898 (LAK), Dkts. 82, 84, 86, 88] are granted in part and denied in part.[241]

---

[238]    Hi-Med SAC ¶¶ 164-66.

[239]    GGP Mem. [20-cv-3898, Dkt. 83], at 27.

[240]    *Id.* at 29.

[241]    Statements Adequately Pled as Actionable (in whole or part): SCAC ¶¶ 150-53, 165-93; 202-13, 233-36, 241-46, 247-53, 261-68, 272-80 (exit fee); 237-40, 247-53 (escrow); Hi-Med Sec. Am. Compl. ¶¶ 79-80 (escrow).

Inactionable Statements: SCAC ¶¶ 157-64, 194-201, 214-32, 254-60; 269-71; Hi-Med SAC ¶¶ 77-78.

59

SO ORDERED.

Dated: September 28, 2022

Lewis A. Kaplan
United States District Judge