**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE iANTHUS CAPITAL HOLDINGS, INC. SECURITIES LITIGATION | No. 20-cv-03135-LAK<br>No. 20-cv-03513-LAK |
| THIS DOCUMENT RELATES TO:<br>Nos. 20-cv-03135 (Securities Class Action),<br>20-cv-03513 (Cedeno) | |

**DECLARATION OF MICHAEL GRUNFELD IN SUPPORT OF: (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND COMPENSATORY AWARD TO LEAD PLAINTIFF**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 2

    II.    PROSECUTION OF THE ACTION ................................................................ 5

        A.    Commencement Of The Action And Appointment Of Lead Plaintiff And Lead Counsel ................................................................................. 5

        B.    The Comprehensive Pre-Filing Investigation And The Preparation Of The Amended Complaint ................................................................ 5

        C.    Defendants' Motion to Dismiss the Amended Complaint .......................... 6

        D.    Lead Plaintiff's Motion for Leave to File the SAC ................................... 7

        E.    The SAC and Motions to Dismiss the SAC.............................................. 7

        F.    Advancement of the Litigation .................................................................. 8

        G.    Mediation Efforts, Settlement Negotiations, and Order Approving Notice 8

    III.    THE RISKS OF CONTINUED LITIGATION ........................................... 9

        A.    Risks In Proving Liability........................................................................... 10

        B.    Risks To Proving Loss Causation And Damages ................................... 10

        C.    Risks Faced In Obtaining And Maintaining Class Action Status ............. 12

        D.    Other Risks.................................................................................................. 14

        E.    The Settlement Is Reasonable In Light Of Potential Recovery In The Action......................................................................................... 14

    IV.    CERTIFICATION OF THE CLASS FOR SETTLEMENT PURPOSES............ 16

    V.    PLAINTIFF'S COMPLIANCE WITH THE COURT'S ORDER APPROVING ISSUANCE OF THE NOTICE ........................................................................ 17

    VI.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT .............. 20

    VII.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES ........................................ 23

        A.    The Fee Application.................................................................................... 23

            1.    The Favorable Outcome Achieved Is the Result of the Significant Time and Labor That Lead Counsel Devoted to the Class Action ..................................................................... 24

i

|  | 2. | The Magnitude and Complexity of the Action ............................. 27 |
|---|---|---|
|  | 3. | The Significant Risks Borne By Lead Counsel ........................... 28 |
|  | 4. | The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel.................................................... 29 |
|  | 5. | The Requested Fee In Relation to the Settlement......................... 29 |
|  | 6. | Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases ............................................................. 30 |
|  | 7. | The Reaction of the Class Supports Class Counsel's Fee Request 30 |
|  | 8. | Plaintiff Supports Lead Counsel's Fee Request............................ 31 |
| B. | | Reimbursement of The Requested Litigation Expenses Is Fair And Reasonable ........................................................................... 31 |
| C. | | Award for Lead Plaintiff.......................................................... 33 |
| VIII. | | CONCLUSION................................................................... 35 |

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---------|-------|
| 1 | Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024) |
| 2 | Declaration of Rochelle J. Teichmiller dated March 5 2024 ("Teichmiller Decl.") |
| 3 | Lodestar Report of Pomerantz LLP |
| 4 | Table of Peer Law Firm Billing Rates |
| 5 | Biography of Pomerantz LLP |
| 6 | Biography of Bronstein, Gewirtz & Grossman, LLC |
| 7 | Declaration of Jose Antonio Silva dated March 5, 2024 ("Silva Declaration") |

I, Michael Grunfeld, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a partner at Pomerantz LLP ("Pomerantz"), Court-appointed Lead Counsel ("Lead Counsel") for Court-appointed Lead Plaintiff Jose Antonio Silva ("Silva," "Lead Plaintiff" or "Plaintiff") in this action (the "Action").[1] *See* ECF No. 41.  I have personal knowledge of the matters set forth herein based on my participation in the prosecution and settlement of the claims asserted on behalf of the Settlement Class in this Action.

2.      I respectfully submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $2,900,000 settlement (the "Settlement"), which the Court approved notice of in its Order dated December 20, 2023 (the "Order Approving Notice") (ECF No. 133); as well as final approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") and certification of the Class for settlement purposes only (collectively, the "Final Approval Motion").

3.      I also respectfully submit this Declaration in support of Lead Counsel's motion, on behalf of all Plaintiff's Counsel,[2] for an award of attorneys' fees of $965,700, plus interest earned at the same rate as the Settlement Fund; reimbursement of Lead Counsel's out-of-pocket expenses in the amount of $116,615.44; and $15,000 to Lead Plaintiff, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses, including lost wages, incurred in connection with his representation of the Settlement Class (the "Fee and Expense Application").

4.      As part of the Order Approving Notice, the Court directed notice of the Settlement

---

[1] Unless defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated June 16, 2023 (the "Stipulation").  ECF No. 131-1.

[2] "Plaintiff's Counsel" means Lead Counsel and Bronstein, Gewirtz & Grossman, LLC ("BGG").

1

to be disseminated to the Settlement Class. *See* ECF No. 133. Pursuant to the Order Approving Notice, A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.

5. In total, more than 40,100 copies of the Postcard Notice have been disseminated to potential Settlement Class Members, and, to date, no requests for exclusion have been received and no objections have been filed with the Court or received by Lead Counsel.

## I.    INTRODUCTION

6. This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act. Lead Plaintiff asserted claims against defendant iAnthus Capital Holdings, Inc. ("iAnthus" or the "Company"), defendant Gotham Green Partners ("GGP"), and defendants Hadley C. Ford, Julius John Kalcevich and Jason Adler, (collectively, the "Individual Defendants," and, together with iAnthus and GGP, the "Defendants").

7. On November 3, 2021, Plaintiff filed his Second Amended Consolidated Class Action Complaint (the "Second Amended Complaint" or "SAC") asserting claims against all Defendants under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. The SAC alleged that Defendants made materially false and misleading statements and/or omissions concerning iAnthus's financing arrangements, from May 2018 through the planned restructuring that it announced in July 2020, as described further below. Lead Plaintiff further alleged that the price of iAnthus's common stock was artificially inflated as a result of Defendants' false and misleading statements, and declined when the truth emerged. ECF No. 91.

8. The proposed Settlement provides for the resolution of all claims in the Action in

exchange for a cash payment of $2.9 million (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Lead Plaintiff and Lead Counsel believe that the proposed Settlement represents an excellent result for the Settlement Class considering the significant risks of continued litigation.

9. The Settlement was reached over three years of contested litigation. Plaintiff's Counsel's efforts involved, among other things described further below: (i) conducting a comprehensive investigation into Defendants' allegedly wrongful acts; (ii) drafting and filing an 88-page Amended Complaint based on their extensive investigation (ECF No. 48); (iii) opposing Defendants' motions to dismiss the Amended Complaint (ECF Nos. 73-74); (iv) conducting an intensive investigation, pursuant to the Court's order dismissing the Amended Complaint, to show that Lead Plaintiff engaged in domestic transactions under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010); (v) successfully moving for leave to amend (ECF Nos. 82-84, 90); (vi) drafting and filing a 95-page Second Amended Complaint (ECF No. 91); (vii) successfully opposing, in part, Defendants' motions to dismiss the Second Amended Complaint (ECF Nos. 93-103, 108-109, 112); (viii) serving and pursuing third-party discovery requests; (ix) preparing to move for class certification and the discovery process; (x) engaging in the mediation process that led to the Settlement; and (xi) negotiating and drafting the Settlement papers.

10. In preparation for the mediation, Lead Counsel drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement. Following the exchange of detailed mediation statements addressing both liability and damages, Lead Counsel prepared for and engaged in a full day in-person mediation session before Jed D. Melnick, Esq. of JAMS; and engaged in negotiations regarding the terms of the proposed Settlement, which subsequently resulted in an agreement in principle to settle the Action for $2.9 million.

11.     Based on the foregoing efforts, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a very favorable outcome for the Settlement Class and is in the best interests of its members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

12.     In addition, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiff's damages consultant.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

13.     Finally, Lead Counsel, on behalf of all Plaintiff's Counsel, seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee and Expense Application.  As discussed in detail in the accompanying Fee and Expense Application, the requested fee represents a negative lodestar multiplier which provides a strong indication as to the reasonableness of the fee. The 33.3% fee request also falls within the range of percentage awards granted by courts in this Circuit in comparable complex litigation.  Additionally, the requested fee is warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested out-of-pocket litigation costs of $116,615.44 and the requested award of $15,000 to Lead Plaintiff pursuant to the PSLRA are also fair and reasonable.  Accordingly, for the reasons set forth in the Fee and Expense Application and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for

attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.   PROSECUTION OF THE ACTION

### A.   Commencement Of The Action And Appointment Of Lead Plaintiff And Lead Counsel

14.   On April 20, 2020, Donald W. Finch commenced this Action against Defendants styled *Donald W. Finch v. iAnthus Capital Holdings, Inc., et al.*, Case No. 1:20-cv-03135-LAK (S.D.N.Y.). On July 9, 2020, the Court consolidated that action and another putative class action styled *Peter L. Cedeno v. iAnthus Capital Holdings Inc., et al.*, that was filed on May 5, 2020, under the caption *In re iAnthus Capital Holdings, Inc. Securities Litigation*, Case No.: 1:20-cv-03135-LAK. ECF No. 41.[3] The Court appointed Jose Antonio Silva as Lead Plaintiff in the Action and Pomerantz LLP ("Pomerantz") as Lead Counsel for the putative class. *Id.*

### B.   The Comprehensive Pre-Filing Investigation And The Preparation Of The Amended Complaint

15.   Following Lead Counsel's appointment, counsel conducted a comprehensive investigation into Defendants' allegedly wrongful acts, which included, among other things: (1) reviewing and analyzing (a) iAnthus's regulatory filings, (b) public reports and announcements, research reports prepared by analysts, and news articles concerning Defendants, and (c) other publicly available material related to Defendants; and (2) conducting an extensive investigation (with the aid of a private investigator) that involved, *inter alia*, numerous interviews of former iAnthus employees. Lead Counsel also consulted with damages and loss causation experts.

16.   On September 4, 2020, Lead Plaintiff filed the Amended Complaint. ECF No. 48.

---

[3] Hi-Med LLC filed a separate action against Defendants and others (the Hi-Med Action, Case No. 20-cv-03898), which was coordinated with this securities class action for purposes of motion to dismiss briefing and discovery, to the extent the actions address overlapping issues, but the two actions remained separate and were not consolidated for all purposes. ECF No. 114.

The Amended Complaint asserted claims against Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants, Ford, Kalcevich, and Adler, under Section 20(a) of the Exchange Act. The Amended Complaint alleged, among other things, that during the Settlement Class Period (from May 14, 2018 to July 10, 2020), Defendants made false and misleading statements concerning iAnthus's financing arrangements. The specific categories of misrepresentations alleged include, *inter alia*, statements related to (i) Defendants' alleged conflicts of interests; (ii) the terms of iAnthus's transactions with GGP in light of an allegedly secret "Exit Fee"; (iii) iAnthus's ability to obtain further financing; and (iv) iAnthus's compliance with a provision in its September 30, 2019 agreement with GGP that required iAnthus to post $5.27 million in an escrow account so that those funds would be available to repay GGP. The Amended Complaint also alleged that iAnthus's stock price was artificially inflated as a result of these allegedly false and misleading statements and that it declined when the truth was revealed.

### C.    Defendants' Motion to Dismiss the Amended Complaint

17.    Defendants filed motions to dismiss the Amended Complaint on November 20, 2020. ECF Nos. 61-69. Lead Plaintiff filed its opposition to Defendants' motions to dismiss on January 8, 2021. ECF Nos. 73-74. Defendants filed their reply briefs in further support of their motions to dismiss on February 22, 2021. ECF Nos. 77-80. The briefing relating to these motions to dismiss spanned approximately 177 pages. In an Order dated August 30, 2021, the Court dismissed the Amended Complaint solely on the ground that Lead Plaintiff did not adequately plead "'transactions in securities listed on domestic exchanges' or a 'domestic transaction in other securities,'" as required by *Morrison*. ECF No. 81 at 13. The Court, however, granted Lead Plaintiff permission to move for leave to file a proposed second amended complaint. *Id.* at 19.

6

**D.      Lead Plaintiff's Motion for Leave to File the SAC**

18.      On October 1, 2021, Lead Plaintiff filed a Motion for Leave to File the Second Consolidated Amended Class Action Complaint on the basis that the amendments adequately alleged domestic transactions under *Morrison* by providing abundant detail on the mechanics of Lead Plaintiff's transactions and the operation of the over-the-counter ("OTC") market in the United States on which iAnthus's stock traded. ECF Nos. 82-84. After reviewing the motion to amend, Defendants took no position on the motion, which was granted on November 3, 2021. ECF No. 90.

**E.      The SAC and Motions to Dismiss the SAC**

19.      Pursuant to the Court's November 3, 2021 Order, Lead Plaintiff filed the Second Consolidated Amended Class Action Complaint that day, including substantial additional information supporting the domestic nature of Lead Plaintiff's transactions under *Morrison*. ECF No. 91. On December 20, 2021, Defendants filed motions to dismiss the SAC. ECF Nos. 93-101. Lead Plaintiff filed its briefing in opposition to Defendants' motions on February 3, 2022. ECF Nos. 102-103. Defendants filed their reply briefs in further support of their motions on March 21, 2022. ECF Nos. 108-109. The briefing relating to these motions to dismiss spanned approximately 178 pages and covered a wide array of legal issues, including the domestic nature of Plaintiff's transactions under *Morrison*, *forum non conveniens* arguments, and arguments related to all elements of Plaintiff's claims under Section 10(b) of the Exchange Act, including falsity, materiality, loss causation, reliance, and scienter, among other arguments that Defendants made in their multiple motions to dismiss.

20.      In an Order dated September 28, 2022, the Court granted in part and denied in part Defendants' motions to dismiss the SAC. ECF No. 112 ("Motion to Dismiss Decision"). In denying in part Defendants' motions, the Court held that Lead Plaintiff adequately alleged (1)

7

"domestic transactions" under *Morrison*, (2) that Defendants made materially false and misleading statements concerning iAnthus's relationship with GGP, (3) those statements were made "in connection with" Lead Plaintiff's transactions in iAnthus stock, (4) a strong inference of scienter against all Defendants, (5) loss causation, (6) reliance, and (7) control person liability under Section 20(a). *Id.* The Court also rejected Defendants' arguments that Lead Plaintiff's claims are "predominantly foreign" and that they are barred by the doctrine of *forum non conveniens*. *Id.* The Court, however, dismissed Lead Plaintiff's claims arising out of statements related to Defendants' alleged conflicts of interest and self-dealing. *Id.*

### F.    Advancement of the Litigation

21.    In the nearly four months between when the Court issued its denial of Defendants' motions to dismiss the Second Amended Complaint and when the parties reached an agreement in principle to settle this Action, Lead Counsel began preparing for the next steps in the litigation, including pursuing (and obtaining) third-party discovery, preparing to move for class certification, and drafting document requests to Defendants. The third-party discovery that Lead Counsel obtained has benefited the Settlement Class because it supports approval of the Settlement. *See* NYSCEF No. 130 at 24-27.

### G.    Mediation Efforts, Settlement Negotiations, and Order Approving Notice

22.    On January 17, 2023, the parties participated in a full-day private mediation session with Jed D. Melnick, Esq. In advance of the mediation session, Lead Counsel consulted with Plaintiff's expert on loss causation and damages and dedicated substantial efforts to preparing a persuasive mediation statement setting forth the relevant factual and legal predicates for their claims. The Parties then exchanged mediation statements.

23.    The Parties were not able to reach agreement at the mediation, but continued discussions. Following the mediation, the Parties reached an agreement in principle to settle the

8

Action for a payment of $2.9 million for the benefit of the Settlement Class, subject to the execution of a settlement stipulation and related papers. The Parties thereafter memorialized the substantive terms of the settlement in a confidential Memorandum of Understanding to settle the Action on January 30, 2023

24.     On January 31, 2023, the parties informed the Court of the agreement in principle, and the Court agreed to suspend all deadlines in the action and granted the Parties' subsequent request to extend the time to file a motion for preliminary approval of the Settlement to March 21, 2023. ECF Nos. 121 and 124.Thereafter, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation dated June 16, 2023. ECF No. 131-1.

25.     Lead Plaintiff filed a Motion for Preliminary Approval of Settlement on March 21, 2023. ECF Nos. 125-127. On May 25, 2023, the Court denied this motion, noting that it does grant such motions as to class action settlements, but issued this ruling without prejudice to a new motion that is in accordance with the Court's stated practice. ECF No. 128.

26.     In accordance with the May 25, 2023 Order, Lead Plaintiff filed an Unopposed Motion for Approval of Notice of Class Action Settlement on June 16, 2023. ECF Nos. 129-131.

27.     On December 20, 2023, the Court issued its Order Approving Notice.  ECF No. 133.

## III.    THE RISKS OF CONTINUED LITIGATION

28.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $2.9 million.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through continued litigation to a jury trial, followed by the inevitable appeals.  There was no guarantee that Plaintiff and the Settlement Class would achieve any recovery, let alone one greater than $2.9 million.

A.      **Risks In Proving Liability**

29.      When the Settlement was reached, Plaintiff had successfully opposed, in part, Defendants' motion to dismiss the Second Amended Complaint.  The fact that Plaintiff partly overcame Defendants' motion to dismiss, however, is not a guarantee of ultimate success.  Indeed, while the Court sustained certain of Plaintiff's claims, it granted Defendants' motion as to the claims related to Defendants' alleged conflicts of interest. ECF No. 112 ("Motion to Dismiss Decision") at 42.  Defendants would inevitably raise this ruling in an effort to limit the scope of the case going forward.

30.      Plaintiff also faced ongoing risks associated with his forthcoming motion for class certification, as well as Defendants' forthcoming summary judgment motions, motions *in limine*, trial, and likely appeals, which would extend the litigation for years and might lead to a smaller recovery than the Settlement or no recovery at all.  While Plaintiff believes he effectively demonstrated that Defendants made materially false and misleading statements in violation of the federal securities laws, Defendants would likely contest at summary judgment and trial whether their statements are actionable because they are too general and/or not objectively verifiable, Defendants publicly warned of risks, and/or the truth was on the market.

31.      Additionally, Defendants contended that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged.  While the SAC adequately alleged scienter at the motion to dismiss stage, Lead Counsel was well aware of the high hurdle they would have to clear in order to prove as the litigation progressed that the Defendants acted with the intent to "deceive, manipulate, or defraud" investors under the federal securities laws.

B.      **Risks To Proving Loss Causation And Damages**

32.      Even assuming that Plaintiff overcame the risk of establishing Defendants' liability,

as discussed above, Plaintiff would have confronted considerable challenges in establishing loss causation and class-wide damages.

33.    Plaintiff alleges that the truth about iAnthus's financing arrangements were revealed to the market through a series of corrective disclosures. Certain of the alleged corrective disclosures, however, are subject to defenses that they were arguably not statistically significant.

34.    Defendants would also likely argue that the corrective disclosure dates were not causally connected to the subject of the alleged false and misleading statements. For example, Defendants would likely argue that because the Court granted their motions to dismiss concerning allegations related to conflicts of interest and self-dealing (ECF No. 112 at 42), certain of the alleged corrective disclosures did not relate to the remaining statements concerning iAnthus's financing from GGP that the Court held were adequately alleged to be false and misleading. The removal of corrective disclosures related to these allegations had the potential to remove stock drops of 16% and 62% from the damages calculation. *See* Second Amended Complaint ¶¶ 305-08. While Plaintiff would argue that these corrective disclosures are related to the allegations that remain in the case, there was the substantial risk that they would be excluded, in whole or in part.

35.    Pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is the plaintiff's burden to prove loss causation and damages. This would require Plaintiff to proffer expert testimony as to: (a) what the "true value" of iAnthus's stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of iAnthus's common stock was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by each alleged corrective disclosure.  Defendants almost certainly would have presented their own damages expert(s), who would have no doubt asserted that there was no statistically significant, Company-specific price drop on any corrective

11

disclosure date, and thus that declines in iAnthus's share price on the dates of the alleged corrective disclosures were not caused by the alleged corrective disclosures. At bottom, the burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process.

36.    Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Plaintiff recognizes that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and find there were no damages, or that they were only a fraction of the amount claimed by Plaintiff.  Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was no assurance that Plaintiff's key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial.  These issues could have seriously affected Plaintiff's ability to successfully prosecute the Action.

37.    In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated— any potential recovery by the Settlement Class.

### C.    Risks Faced In Obtaining And Maintaining Class Action Status

38.    Additionally, Plaintiff had not yet filed a motion for class certification when the parties agreed to settle. In deciding a motion for class certification, the class would face the risk of arguments by Defendants grounded on any even potential factual dissimilarity of claims asserted by Plaintiff and putative class members.  If successful, the defense would mandate individual lawsuits, many with minimal amounts of damages accrued.  Even if a class were certified over Defendants' objection, it would face multiple challenges with respect to proving the class-wide nature of Defendants' securities law violations at trial.

39.    To be entitled to class certification, Plaintiff must show that common issues predominate over individual ones.  If not for Defendants' consent to certify the Settlement Class, Plaintiff would have to meet his burden by showing that iAnthus Securities traded on an efficient market, entitling class members to the presumption of reliance on Defendants' materially false statements. Under *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258 (2014), Defendants would have been permitted to rebut the presumption by proving that there was no price impact. While it is not unusual for courts to certify securities class actions, it is not automatic.  The law governing certification of securities class actions has been in constant flux, as evidenced by *Halliburton* and the Second Circuit's recent decision in Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys., 594 U.S. 113 (2021).

40.    The Settlement Class would also face the risk, in the litigation context, that Defendants would argue that the criteria for satisfying *Morrison* that the Court described in its Motion to Dismiss Decision would pose manageability issues that would preclude a finding of predominance under Rule 23(b)(3). ECF No. 112 at 19-21.  Plaintiff is confident this would not pose a hurdle to class certification for the independent reasons that (1) the Motion to Dismiss Decision and related authority provide clear class-wide criteria for establishing domesticity and (2) "any variation across plaintiffs is, on balance, insufficient to defeat predominance" in the context of the claims as whole. *In re Petrobras Sec.*, 862 F.3d 250, 274 n.27 (2d Cir. 2017). Defendants, however, would likely argue otherwise. The Settlement avoids this risk because the types of manageability issues that these arguments raise "is not a consideration when settlement-only certification is requested." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 593 (1997)

41.    Even if Plaintiff successfully obtained class certification, Defendants could have

13

sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. In sum, class certification was, by no means, a foregone conclusion. Further, even if the Court were to certify the class, there is always a risk that the certified class could be decertified at a later stage in the proceedings.

**D.     Other Risks**

42.     Plaintiff also would have had to prevail at several later stages of the litigation, each presenting significant risks in complex class actions such as this Action.

43.     Plaintiff would have to successfully navigate and prevail against Defendants' eventual motion(s) for summary judgment, and at trial. Each of these several stages of litigation present significant risks in complex class actions such as this one. Lead Counsel knows from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

44.     Even if Plaintiff succeeded in proving all the elements of his case at trial and obtained a jury verdict, Defendants almost certainly would have appealed. An appeal not only would have renewed the risks faced by Plaintiff—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay. Given these significant litigation risks, Plaintiff and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

**E.     The Settlement Is Reasonable In Light Of Potential Recovery In The Action**

45.     In addition to the risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Plaintiff had fully prevailed on each of his claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiff's

14

damages, the most reasonable estimate of potential damages would be approximately $17.5 million. This figure is based on the statistically significant corrective disclosure dates that Lead Plaintiff's expert on damages and loss causation concluded are applicable based on their standard methodology for calculating damages in securities class actions. It includes corrective disclosure dates from the Second Amended Complaint that are consistent with Lead Plaintiff's theory of damages and their expert's methodology, after accounting for the claims that the Court dismissed in the Motion to Dismiss Decision. These corrective disclosure dates, and the losses attributable to them, are included in the proposed Plan of Allocation. *See* ECF No. 131-1, Ex. A-1, ¶¶44-51.

46.     Under this scenario, the $2.9 million Settlement represents a recovery of approximately 16.6% of the likely recoverable damages, well above the median recovery of approximately 1.8% of estimated damages. *See* Exhibit 1 (Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024 at 26 (Fig. 22)).

47.     However, if Defendants prevailed on any or all of their arguments concerning liability, Plaintiff would have recovered far less, if anything.

48.     Significantly, iAnthus no longer exists as it did when this action was filed, because it went through the restructuring described in the Second Amended Complaint. ECF No. 100 at 8-9. Even in its reconstituted form, which Defendants might argue is not liable for the claims in this action, iAnthus's shares were trading at just $0.02 cents per share as of the close of trading on March 5, 2023. This increases the likelihood that Defendants would be unable to withstand a greater judgment further supporting the reasonableness of the Settlement.

## IV.     CERTIFICATION OF THE CLASS FOR SETTLEMENT PURPOSES

49.     The Court's December 20, 2023, Order Approving Notice finds that it will likely be able to certify the Settlement Class for settlement purposes under Fed. R. Civ. P. 23(e)(1)(B)(ii). ECF No. 133 ¶5.  In particular, the Court found:

> [E]ach element required for certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure has been met or will likely be met: (a) the members of the Settlement Class are so numerous that their joinder in the Action would be impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (c) the claims of Lead Plaintiff in the Action are typical of the claims of the Settlement Class; (d) Lead Plaintiff and Lead Counsel have and will fairly and adequately represent and protect the interests of the Settlement Class; and (e) a class action on behalf of the Settlement Class is superior to other available methods for the fair and efficient adjudication of the Action.

50.     The Court also found that "that it will likely be able to certify Lead Plaintiff as Class Representative for the Settlement Class and appoint Lead Counsel as Class Counsel for the Settlement Class, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure." *Id.* ¶6.

51.     The Settlement Class comprises "all persons and entities who purchased or otherwise acquired iAnthus securities between May 14, 2018 and July 10, 2020, both dates inclusive, pursuant to domestic transactions, and were allegedly damaged thereby," subject to certain exceptions for persons or entities related to Defendants and those that exclude themselves from the Settlement.  Stipulation ¶1(oo).

52.     There have been no changes to alter the propriety of class certification for settlement purposes since this ruling.  The Court should therefore certify the Settlement Class, with Lead Plaintiff as Class Representative, and appoint Lead Counsel as Class Counsel for the Settlement Class, for the reasons stated in Plaintiff's Memorandum of Law in Support of

16

Unopposed Motion for Approval of Notice of Class Action Settlement, as explained further in Plaintiff's accompanying Final Approval Memorandum at pp. 25-29.

## V. PLAINTIFF'S COMPLIANCE WITH THE COURT'S ORDER APPROVING ISSUANCE OF THE NOTICE

53. Pursuant to the Order Approving Notice, Lead Counsel and the Court-approved Claims Administrator, A.B. Data, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail and publication.

54. The Order Approving Notice directed that the Postcard Notice be mailed to potential Settlement Class Members and set a deadline of March 20, 2024 (21 calendar days before the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, as well as to request exclusion from the Settlement Class, and a final fairness hearing date of April 10, 2024 (the "Settlement Hearing").

55. Pursuant to the Order Approving Notice, Lead Counsel instructed A.B. Data, the Court-approved Claims Administrator, to disseminate copies of the Postcard Notice and publish the Summary Notice.  Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed A.B. Data to post downloadable copies of the Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Long-Form Notice") and Claim Form online at www.iAnthusSecuritiesLitigation.com (the "Settlement Website"). The Postcard Notice directed Settlement Class Members to the Settlement Website in order to obtain additional information on the Settlement, including how to file a claim, request exclusion or object to the Settlement, and access to downloadable copies of the Long-Form Notice and Claim Form.

56. The Long-Form Notice disclosed, among other things, the following information

to Settlement Class Members: (a) a summary of the Settlement, including the $2.9 million Settlement Amount; (b) the proposed Plan of Allocation; (c) that Lead Counsel would apply for an award of attorneys' fees on behalf of all Plaintiff's Counsel in an amount not to exceed 33.3% of the Settlement Fund (*i.e.*, $965,700, plus interest), as well as Litigation Expenses, which may include an application for reimbursement to Plaintiff for his costs and expenses related to their representation of the Settlement Class; (d) that any Settlement Class Member could object to the requested attorneys' fees and Litigation Expenses; (e) an explanation of the reasons for the Settlement; (f) that requests for exclusion from the Settlement must be submitted to the Claims Administrator no later than March 20, 2024; (g) that objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application must be filed with the Court no later than March 20, 2024; and (h) that the deadline for submitting a Claim Form is April 17, 2024.

57.     To disseminate the Postcard Notice, on January 12, 2024, A.B. Data mailed a copy of the Postcard Notice to 440 potential Settlement Class Members identified in a data file provided by Defendants' counsel.  *See* Declaration of Rochelle J. Teichmiller Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Teichmiller Decl."), attached hereto as Exhibit 2 at ¶2.

58.     In addition, A.B. Data maintains a proprietary database with names and addresses of the largest and most common banks, brokerage firms, institutions, and other third-party nominees.  On January 12, 2024, A.B. Data caused Postcard Notices to be mailed or emailed to the 4,960 nominees and institutional groups contained in the A.B. Data record holder mailing database.  Teichmiller Decl., ¶3. Further, on or around January 12, 2024, A.B. Data also delivered electronic copies of the Long-Form Notice and the Proof of Claim and Release Form to 487 banks, brokers, and nominees for which A.B. Data has a registered email address. Teichmiller Decl., ¶4.

A.B. Data informed the nominees to which it sent the Postcard Notice and Long-Form Notice of the procedures provided for in the Court's Order Approving Notice, by which the nominees must either (1) forward the Postcard Notice to all beneficial owners for whose benefit the nominees purchased or otherwise acquired iAnthus securities during the Settlement Class Period or (2) send a list of the names and addresses of all such beneficial owners to A.B. Data for A.B. Data to promptly mail the Postcard Notice to such beneficial owners. Teichmiller Decl., ¶5.

59.     As of March 5, 2024, 40,169 Postcard Notices have been mailed to potential Settlement Class Members and their nominees. *Id.* at ¶8. In addition, A.B. Data has re-mailed 47 Postcard Notices to persons whose original mailing was returned by the U.S. Postal Service and for whom updated addresses were obtained through either the Postal Service or address research conducted through TransUnion. *See id.*

60.     On January 22, 2024, in accordance with the Order Approving Notice, A.B. Data caused the Summary Notice to be published once in *Investor's Business Daily* and to be transmitted over *PR Newswire*. *See id.* at ¶9; Exs. D and E (confirmations of publications).

61.     Lead Counsel also caused A.B. Data to establish the dedicated Settlement Website, which became operational on or about January 12, 2024, to provide potential Settlement Class Members with information concerning the Settlement, including exclusion, objection, and claim-filing deadlines for the case; the online claim filing link; the date and time of the Settlement Hearing; and downloadable versions of the Postcard Notice, Long-Form Notice and Claim Form, as well as copies of the Stipulation and Order Approving Notice. Teichmiller Decl. ¶11.

62.     A.B. Data maintains a toll-free telephone number for potential Settlement Class Members to call and obtain information about the Settlement and/or request a Long-Form Notice and Claim Form.  A.B. Data promptly responds to each telephone inquiry and will continue to

19

address potential Settlement Class Members' inquiries.  *Id.* at ¶10.

63.     As set forth above, the Postcard Notice and Long-Form Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application is March 20, 2024, and that the deadline to request exclusion from the Settlement Class is March 20, 2024.  To date, no requests for exclusion have been received.  *Id.* at ¶¶12.

64.     In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application have been entered on the Court's docket or have otherwise been received by Lead Counsel or A.B. Data.  Lead Counsel will file reply papers by April 3, 2024, which will address any objections that may be received.  Lead Counsel's reply papers will include a supplemental affidavit from A.B. Data addressing whether any requests for exclusion have been received.

## VI.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

65.     Pursuant to the Order Approving Notice, and as set forth in the Long-Form Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than April 17, 2024.  As set forth in the Long-Form Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court. The Settlement Class includes all persons and entities who purchased or otherwise acquired iAnthus securities between May 14, 2018 and July 10, 2020, both dates inclusive, pursuant to domestic transactions, and were allegedly damaged thereby.

66.     Plaintiff's  damages  expert  developed  the  proposed  Plan  of  Allocation  in

20

consultation with Lead Counsel.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the SAC.

67.    The Plan of Allocation is set forth at pages 13 to 16 of the Long-Form Notice.  *See* Teichmiller Decl. Ex. B (Long-Form Notice).  As described in the Long-Form Notice, the calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial.  Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  The computations under the Plan of Allocation are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

68.    In developing the Plan of Allocation, Plaintiff's damages expert calculated the amount of estimated alleged artificial inflation in the per share closing prices of iAnthus common stock that was allegedly proximately caused by Defendants' purportedly false or misleading statements and omissions.  In calculating the estimated artificial inflation caused by Defendants' alleged misrepresentations and omissions, Plaintiff's damages expert considered the price change in iAnthus common stock that occurred on February 27, 2020, April 6, 2020, June 12, 2020, June 23, 2020, and July 13, 2020, respectively, and adjusted the price change observed on these days for changes that were attributable to market or industry forces, or allegations that the Court ruled in the Motion to Dismiss decision are not actionable.

69.    Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase of iAnthus common stock during the Settlement Class Period (*i.e.*, from May 14, 2018, through and including July 10, 2020) that is listed in the Claim Form and for which adequate

21

documentation is provided.  The calculation of Recognized Loss Amounts will depend upon several factors, including how many shares of iAnthus common stock the Claimant purchased, when the iAnthus common stock was bought, acquired, or sold (or if it was still held at the end of the Settlement Class Period), and the purchase price and sales price (if sold).  In general, the Recognized Loss Amount calculated will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale (with certain adjustments based on the 90-day average price following the end of the Settlement Class Period if the stock was still held as of the end of the Settlement Class Period), or the difference between the actual purchase price and sales price of the stock, whichever is less.

70.    Claimants who purchased iAnthus common stock during the Settlement Class Period and sold those shares before the alleged corrective disclosures impacted the Company's share price (on February 27, 2020, April 6, 2020, June 12, 2020, June 23, 2020, and July 13, 2020, respectively) will have no Recognized Loss Amount for those transactions.  The Plan of Allocation also incorporates the "Lookback Period" damage claim ceiling provisions of the PSLRA. Recognized Loss Amounts for shares of iAnthus common stock sold during the 90-day period after the end of the Settlement Class Period or still held at the end of trading on October 8, 2020, the end of the 90-day period, are also limited by the difference between the purchase price and the average closing price of iAnthus common stock during that period, consistent with provisions of the PSLRA, 15 U.S.C. § 78u-4(e).

71.    The sum of the Recognized Loss Amounts for all of a Claimant's purchases of iAnthus common stock during the Settlement Class Period is the Claimant's "Recognized Claim". The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

72.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on domestic transactions in iAnthus common stock that were attributable to the conduct alleged in the SAC and upheld in the Motion to Dismiss Decision.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

73.    To date, no objections to the proposed Plan of Allocation have been received by Lead Counsel or the Claims Administrator or posted on the Court's docket.  *See* Teichmiller Decl. at ¶13.

## VII.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

74.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of $965,700, plus interest earned at the same rate as the Settlement Fund.  Lead Counsel also requests reimbursement of Litigation Expenses from the Settlement Fund in the amount of $116,615.44 in out-of-pocket expenses that Plaintiff's Counsel incurred in connection with the prosecution of the Action. Finally, Lead Counsel requests an award of $15,000 to Lead Plaintiff as an award in connection with representing the Settlement Class.  The total Litigation Expenses amount of $116,615.44 is below the maximum expense amount of $250,000, set forth in the Settlement Website, Long Notice, and Postcard Notice.  The legal authorities supporting the requested fee award are set forth in the accompanying Fee and Expense Application, filed concurrently herewith.  The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.    The Fee Application

75.    Lead Counsel is applying for a fee award to compensate them for the services they

rendered on behalf of the Settlement Class. As set forth in the accompanying Fee and Expense Application, Courts may award attorneys' fees in common fund cases under either the lodestar method or percentage of the fund method. Lead Counsel's fee request in the instant matter is fully supported by both the lodestar method and percentage of the fund method.

76.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is fair and reasonable and should be approved. As discussed in the Fee and Expense Application, a fee award which represents a negative lodestar, such as this one, provides a strong indication as to the reasonableness of the requested fee. Further, fee awards of 33.3% are commonly awarded in securities class actions with comparable settlements in this Circuit.

### 1.    The Favorable Outcome Achieved Is the Result of the Significant Time and Labor That Lead Counsel Devoted to the Class Action

77.    Lead Counsel spent considerable time prosecuting this Action on behalf of the Settlement Class. As previously summarized above, Lead Counsel, among other things:

- drafted the initial complaint in the Action and moved for the appointment of Lead Plaintiff and Lead Counsel;

- conducted an extensive investigation of the claims asserted, which included, among other things: (a) reviewing and analyzing (i) iAnthus's filings with the Canadian Securities Exchange ("CSE"), (ii) research reports prepared by securities and financial analysts, and news and industry articles, concerning iAnthus, (iii) iAnthus's investor call transcripts, and (iv) other publicly available material related to iAnthus and Gotham Green Partners; (b) retaining and working with private investigators, who interviewed numerous former Company employees; and (c) working with a damages and loss causation expert to analyze iAnthus's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the comprehensive 88-page Amended Complaint (ECF No. 48), which asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and against the Individual Defendants under Section 20(a) of the Exchange Act;

24

- researched and drafted the opposition to Defendants' motions to dismiss the Amended Complaint (ECF Nos. 73-74);

- conducted an intensive investigation, pursuant to the Court's order dismissing the Amended Complaint, to show that Lead Plaintiff engaged in domestic transactions under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010);

- successfully moved for leave to amend (ECF Nos. 82-84, 90);

- drafted and filed a 95-page Second Amended Complaint addressing the issues that the Court raised concerning *Morrison* (ECF No. 91);

- successfully opposed, in part, Defendants' motions to dismiss the Second Amended Complaint (ECF Nos. 93-103, 108-109, 112);

- pursued and obtained third-party discovery requests (*see* ECF No. 119);

- began preparing to move for class certification;

- engaged in a mediation process overseen by a highly experienced third-party mediator, Jed D. Melnick, Esq., which involved an exchange of written submissions concerning the facts of the case, liability and damages, a full-day formal mediation session, and extensive consultation with Plaintiff's expert on damages, loss causation, and class certification;

- negotiated a detailed confidential settlement term sheet with Defendants' counsel, which was executed on January 30, 2023;

- drafted and then negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel;

- worked with a damages expert to craft a plan of allocation that treats Plaintiff and all other members of the proposed Settlement Class fairly;

- drafted the Motion for Approval of Notice of Class Action Settlement and supporting papers (ECF Nos. 129-131);

- oversaw the implementation of the notice process; and

- drafted the accompanying Motion for Final Approval and supporting papers.

78.    Attached hereto as Exhibit 3 is a schedule summarizing Lead Counsel's hours and lodestar.[4]

79.    The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District in the context of the lodestar method.  Additionally, the rates billed by Lead Counsel attorneys (ranging

---

[4] Time expended in preparing the Fee and Expense Application has not been included.

from $510-$715 per hour for non-partners and $975-$1,325 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Exhibit 4 attached hereto (table of peer law firm billing rates).

80.    As set forth above and in detail in Exhibit 3, Lead Counsel expended a total of 1,320.74 hours in the investigation and prosecution of the Action. The resulting total lodestar is $1,072,024.25. The requested fee of $965,700 (plus interest earned at the same rate as the Settlement Fund) represents a negative multiplier of 0.90 of Lead Counsel's lodestar.

81.    Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Members' claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process. ***No additional compensation will be sought for this work, other than expenses incurred with respect to claims administration and any other necessary activities to conclude this matter.***

82.    As detailed above, throughout this litigation, Lead Counsel devoted substantial time to the prosecution of the Action. Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case. I personally devoted substantial time to this litigation and was personally involved in, among other things: (a) the investigation of the facts and applicable law; (b) drafting, reviewing and editing the pleadings, court filings, the meditation statement, and other correspondence prepared on behalf of Plaintiff; (c) communicating with Plaintiff; (d) engaging with damages, loss causation, and class certification experts; (e) conducting discussions with counsel for Defendants on a variety of matters; (f) pursuing and obtaining various

third-party discovery requests; and (g) participating in settlement negotiations and drafting the Settlement papers.

83.     Experienced attorneys at Lead Counsel were also involved in these tasks. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

84.     Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 2.     The Magnitude and Complexity of the Action

85.     As detailed in the Fee and Expense Application, securities class action cases are known for their notorious complexity. This case was no different. As detailed above, this was a hard-fought, expensive, multi-year litigation, with millions of dollars of damages at stake, and it required considerable skill and resources to litigate. Indeed, Plaintiff faced two rounds of motion to dismiss briefing, each involving multiple motions to dismiss, that spanned approximately 149 pages total and covered complicated issues spanning the domestic nature of Plaintiff's transactions under *Morrison*, *forum non conveniens* arguments, and arguments related to all elements of Plaintiff's claims under Section 10(b) of the Exchange Act, including falsity, materiality, loss causation, reliance, and scienter, among other arguments that Defendants made in their multiple motions to dismiss.

86.     Additionally, the mediation and settlement process in this Action was hard-fought. The Parties zealously advocated their positions throughout the mediation process, including a full-day mediation session and follow-up correspondence before the Parties agreed to settle this Action.

27

### 3.    The Significant Risks Borne By Lead Counsel

87.    This prosecution was undertaken by Lead Counsel on an entirely contingent-fee basis.  From the outset, there was no guarantee that Lead Counsel would ever be compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a litigation like this one was covered.  With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during the course of the Action and incurred $116,615.44 in out-of-pocket litigation-related expenses.

88.    Additionally, Plaintiff alleged his claims without information gained through subpoena power, as Defendants would likely have argued that any attempt to do so would have been precluded by the PSLRA's automatic stay of discovery.

89.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this litigation presented multiple risks and uncertainties that could have prevented any recovery whatsoever.

90.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured.  Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

28

#### 4. The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel

91.    As demonstrated by the firm resumes of Pomerantz and BGG, attached hereto as Exhibits 5 and 6, Plaintiff's Counsel are highly experienced and skilled law firms that focus their practices on securities class action litigation.  Indeed, Lead Counsel has substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country.  Lead Counsel enjoys a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters.  Lead Counsel's experience added valuable leverage in the settlement negotiations.

92.    Additionally, the quality of the work performed by Lead Counsel in obtaining the Settlement should be evaluated in light of the quality of the opposition.  Here, the Defendants were represented by Levine Lee LLP, Reed Smith LLP and Perkins Coie LLP, prestigious and well-respected law firms with substantial securities class action litigation practices that vigorously represented the interests of their clients throughout the Action.  In the face of this experienced and formidable opposition, Lead Counsel was able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that we believe are highly favorable to the Settlement Class.

#### 5. The Requested Fee In Relation to the Settlement

93.    The amount of the fee requested (33.3%) in relation to the Settlement Amount ($965,700) is fair and reasonable.  Courts routinely award fees of one-third in securities class action settlements.  *See* Fee and Expense Application at § II.B.

**6.     Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases**

94.     Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel in consideration of the risks undertaken in prosecuting a particular securities class action.  Relatedly, it is a long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

**7.     The Reaction of the Class Supports Class Counsel's Fee Request**

95.     As noted above, as of March 5, 2024, 40,169 copies of the Postcard Notice have been disseminated advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund.  Teichmiller Decl. ¶8, Ex. A (Postcard Notice); Ex. B (Long-Form Notice).  In addition, the Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  Teichmiller Decl. at ¶9; Exs. D and E (confirmation of Summary Notice publications).  To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice and Long-Form Notice have been received or entered on this Court's docket.  Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers, set to be filed by April 3, 2024.

**8.    Plaintiff Supports Lead Counsel's Fee Request**

96.    As set forth in his declaration submitted, Plaintiff has concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Declaration of Jose Antonio Silva ("Silva Decl."), attached hereto as Exhibit 7 at ¶8.  Plaintiff has been involved in the litigation and settlement of the Action, and his endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

97.    In sum, Lead Counsel accepted the Action on a fully contingent basis, committed significant resources, and prosecuted the Action without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the litigation risks, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of $965,700 of the Settlement Fund, resulting in a negative multiplier of 0.90, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

**B.    Reimbursement of The Requested Litigation Expenses Is Fair And Reasonable**

98.    Lead Counsel seeks a total $116,615.44 in out-of-pocket expenses, as reflected by its books and records, reasonably and necessarily incurred in connection with commencing, litigating, and settling the claims asserted in the Action. The following is a breakdown by category of all expenses incurred by Lead Counsel:

| CATEGORY OF EXPENSE | AMOUNT |
|---|---|
| CLERICAL OVERTIME | $873.14 |
| CLERK/COURT FILING FEES | $400.00 |
| COMPUTER RESEARCH | $2,716.84 |
| EXPERT FEES | $88,574.44 |
| INVESTIGATOR FEES | $9,611.35 |
| MEALS AND CONFERENCE | $594.80 |

31

| | |
|---|---:|
| MEDIATOR FEES | $9,348.94 |
| MESSENGER | $19.79 |
| PHOTOCOPYING | $446.15 |
| POSTAGE AND OVERNIGHT MAIL | $199.54 |
| PRESS RELEASES & NEWSWIRES | $2,228.00 |
| PROCESS SERVER | $665.00 |
| TRAVEL | $937.45 |
| **GRAND TOTAL** | **$116,615.44** |

99.     The Postcard Notice and Long-Form Notice informed the Settlement Class that Lead Counsel intended to apply for reimbursement of expenses of up to $250,000 (Teichmiller Decl. Ex. A, Ex. B at ¶¶5, 66).

100.     To date, no objection has been raised as to expenses.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

101.     From the commencement of this Action, Lead Counsel understood that they might not recover their out-of-pocket expenses.  Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute the Action.  Accordingly, Lead Counsel was motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

102.     By far the largest component of expenses, $88,574.44, or approximately 76% of the total expenses, was expended on the retention of damages, loss causation, and market efficiency experts.  These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the complaints, preparation for Plaintiff's anticipated motion for class certification, mediation and negotiation of the Settlement, and the proposed Plan of Allocation.

103.    Another large component of expenses, $9,611.35, or approximately 8.2% of the total expenses, was expended on the retention of private investigators in connection with Lead Counsel's investigation.  Plaintiff retained the investigatory services of a U.S.-based investigator, On Point Investigations.  The investigation included numerous fact interviews with former iAnthus employees.  The use of investigators is necessary in securities class actions given the PSLRA's high pleading standard and automatic stay of discovery pending a court's resolution of a motion to dismiss.

104.    Additionally, Lead Counsel paid $9,348.94, in mediation fees, which is approximately 8% of the total expenses incurred.

105.    The other litigation expenses for which Lead Counsel seeks reimbursement are types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things: (a) the use of online research databases to research many of the factual allegations alleged in the SAC and to research and support Plaintiff's legal arguments; (b) press releases and newswires; (c) travel; (d) clerical overtime; and (e) process servers, among other smaller expenses.

### C.    Award for Lead Plaintiff

106.    Finally, as stated above, Plaintiff respectfully requests a PSLRA award in the amount of $15,000 pursuant to 15 U.S.C. § 78u-4(a)(4) for the reasonable costs directly incurred, including the time and effort expended by Plaintiff in connection with representing the Settlement Class.  *See* Silva Decl., ¶¶6-7.  Based on the work performed by Plaintiff for the benefit of the Settlement Class, I believe the award is justified and appropriate.

107.    As set forth in his declaration, Lead Plaintiff Silva participated in discussions concerning the prosecution of the Action, the strengths of and risks of the asserted claims, and potential settlement. In particular, throughout the course of the Action, Silva (a) regularly

33

communicated with Plaintiff's Counsel regarding strategic and other aspects of the litigation; (b) compiled his trading data and completed his certification in connection with his successful motion to be appointed Lead Plaintiff; (c) requested and received regular updates on material events, and reviewed drafts of court filings that Plaintiff's Counsel prepared, including the First Amended Complaint; Defendants' motions to dismiss the First Amended Complaint, including his opposition to Defendants' motion and Defendants' reply briefs; the Court's order dismissing the First Amended Complaint; the Second Amended Complaint; and Defendants' motions to dismiss the Second Amended Complaint, including his opposition to Defendants' motion and Defendants' reply briefs; (d) assisted Plaintiff's Counsel in obtaining information related to his transactions in iAnthus stock, to add support in the Second Amended Complaint for the conclusion that these transactions occurred in the United States; (e) consulted with Plaintiff's Counsel regarding the settlement negotiations and mediation; (f) evaluated and approved the proposed Settlement; and (g) reviewed the Settlement documents and motions in support of the Settlement.

108.    Lead Plaintiff Silva thus took an active role in the litigation by, among other things: (i) regularly communicating with his attorneys regarding the posture and progress of the case; (ii) producing documents to his attorneys; (iii) reviewing all significant pleadings and memoranda; and (iv) consulting with his attorneys regarding the settlement negotiations and approving the proposed Settlement. These are "precisely the types of activities that support awarding reimbursement of expenses to class representatives." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009).

109.    Moreover, Lead Plaintiff played a crucial role in the success of this Action, beyond the ordinary case, by obtaining information concerning his transactions in iAnthus stock that enabled the Settlement Class to overcome the issues that the Court raised under *Morrison* in its

initial decision dismissing the Amended Complaint. Indeed, when the Court rejected Defendants' motions to dismiss the Second Amended Complaint, it noted that "Silva now has furnished additional information . . . concerning how TD Ameritrade processed the transactions." ECF No. 112 at 20-21. This information formed the basis for the Court's ruling that "[t]he facts pleaded, viewed in the light most favorable to the plaintiffs, are sufficient to show a domestic purchase under *Morrison*'s second prong." *Id.*

110.    To date, no objections to the Litigation Expenses, including the award to Lead Plaintiff, have been filed on the Court's docket.  In Lead Counsel's opinion, the Litigation Expenses incurred by Lead Counsel and Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VIII.   CONCLUSION

111.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, Lead Counsel respectfully submits that the Settlement should be approved as fair, reasonable, and adequate, the proposed Plan of Allocation should be approved as fair and reasonable, and the Class should be certified for settlement purposes only, including the appointment of Lead Plaintiff as Class Representative and Lead Counsel as Class Counsel.  Lead Counsel further submits that the requested fee in the amount of $965,700 of the Settlement Fund, the request for reimbursement of $116,615.44 in Litigation Expenses, and Plaintiff's request for $15,000 in PSLRA compensation should be approved be approved as fair and reasonable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 6th day of March 2024, at New York, New York.

*/s/ Michael Grunfeld*

MICHAEL GRUNFELD
